**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- X

CLIFFORD CONE and MICHAEL SABIN,  :

                Plaintiffs,  :

v.  :

CLIFFORD CHANCE LLP,  :

                Defendant.  :

------------------------------------------------------- :

                    X

Case No.:

## DECLARATORY JUDGMENT COMPLAINT

Plaintiffs Clifford Cone and Michael Sabin ("Plaintiffs"), by and through its undersigned counsel, Duane Morris LLP, bring this Declaratory Judgment Action against Defendant Clifford Chance LLP ("Clifford Chance" or the "Firm") and allege as follows:

## NATURE OF THE ACTION

1. This is an action for declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, to determine the rights and obligations between Plaintiffs and the Firm, as pertaining to the December 1, 2006 Clifford Chance Partnership Agreement, as amended as of October 24, 2024 (the "Primary Partnership Agreement") and the February 8, 2001 Clifford Chance US LLP Partnership Agreement, amended as of February 6, 2012 (the "US Partnership Agreement") (collectively, the "Agreements").

2. Specifically, Plaintiffs seek a Declaration that the rights and obligations of the Parties with respect to the applicable dispute resolution mechanisms in the Agreements, including Mediation and Arbitration, be governed by the law of the State of New York.

3.      This Action relates to the Firm's efforts to claw back Plaintiffs' already paid and already-earned compensation, pursuant to certain provisions of the Agreements, as punitive and anti-competitive measures in apparent response to Plaintiffs' withdrawal from the Firm to join Sidley Austin LLP ("Sidley Austin"), a competing global law firm in New York, New York.

4.      Prior to their withdrawal, Plaintiffs were the co-heads of the Firm's US-based Funds and Investment Managements Practice Group, based in the Firm's New York Office.

5.      Plaintiffs have worked together for many years building a practice and client base in New York and throughout the country.

## PARTIES

6.      Plaintiff Clifford Cone ("Mr. Cone") is an individual and a resident of the State of New York, with an office address of 787 Seventh Avenue, New York, NY 10019, and a home address of 72 Whippoorwill Lake Road, Chappaqua, New York 10514.  Mr. Cone served as an Equity Partner in the Firm from May 1, 2016 through January 16, 2024.  Mr. Cone's practice involves the representation of investment funds, investment advisers, and registered investment companies and private funds.

7.      Plaintiff Michael Sabin ("Mr. Sabin") is an individual and a resident of the State of New York, with an office address of 787 Seventh Avenue, New York, NY 10019, and a home address of 203 Highview Street, Mamaroneck, New York 10543.  Mr. Sabin served as an Equity Partner in the Firm from May 1, 2020 through January 14, 2026.  Mr. Sabin's practice also involves the representation of investment funds, investment advisers, and private equity funds.

8.      Upon information and belief, Defendant Clifford Chance LLP is a foreign limited liability partnership incorporated in England and Wales, with a principal place of business at 10 Upper Bank Street, London, England E14 5JJ.

2

**JURISDICTION AND VENUE**

9.     This Court is a proper venue for this Declaratory Judgment Action pursuant to 28 U.S.C. § 1391(b), because a substantial portion of the events giving rise to this Action took place within the Southern District of New York, and because the Firm is subject to this Court's Personal Jurisdiction.

10.     This Court has subject matter jurisdiction over this Declaratory Judgment Action pursuant to 28 U.S.C. § 1332.

**GENERAL ALLEGATIONS**

A.     **The Firm's Partnership Agreements**

11.     The Firm is a global law firm headquartered in London, United Kingdom.

12.     The Firm employs over 3,000 lawyers worldwide throughout 34 offices in 22 countries.

13.     On or about December 1, 2006, the Firm ratified the Primary Partnership Agreement.  Upon information and belief, the Primary Partnership Agreement has been amended and the operative version of the Primary Partnership Agreement is dated October 24, 2024.  A true and correct copy of the operative Primary Partnership Agreement at the time of Plaintiffs' withdrawal is annexed hereto as **Exhibit A**.

14.     Paragraph 7 of Schedule 6 of the Primary Partnership Agreement references that Clifford Chance US LLP ("Clifford Chance US") is an "Associated Firm" of the Firm.  Ex. A, Sch. 6, ¶ 7.

15.     On or about February 8, 2001, Clifford Chance US ratified the US Partnership Agreement.  Upon information and belief, the US Partnership Agreement has been amended and the operative version of the US Partnership Agreement is dated February 6, 2012.  A true and correct copy of the operative US Partnership Agreement is annexed hereto as **Exhibit B**.

3

16.     The US Partnership Agreement explicitly indicates that its purpose is to "continue the law practice formerly engaged in by certain [Equity Partners] and others as the firm of Clifford Chance Roger & Wells LLP." Ex. B, ¶ 1.1.  The Firm's US-based predecessor, Rogers & Wells LLP, was a New York-based international law firm founded in 1873, which was eventually chaired by former U.S. Attorney General and Secretary of State, William P. Rogers.

17.     The US Partnership Agreement makes clear that it is to be interpreted in conjunction with the Primary Partnership Agreement.  Ex. B, ¶ 2.2.

18.     Plaintiffs are signatories to both the Primary Partnership Agreement and the US Partnership Agreement.

**B.**     **Relevant Provisions of the Primary Partnership Agreement**

19.     The Primary Partnership Agreement contains several provisions dictating the procedure for the retirement or withdrawal of Partners and Equity Partners from the Firm.

20.     In doing so, the Primary Partnership Agreement makes certain distinctions between United States-based Partners and Partners who are based in offices outside of the United States.

21.     For instance, Paragraph 2.1 of Schedule 14 of the Primary Partnership Agreement outlines the procedure for retirement before the mandatory retirement date of Equity Partners "other than a US-based Partner," whereas Paragraph 2.2 of Schedule 14 outlines the procedure for such retirement for US-based Partners.  Ex. A, Sch. 14, ¶¶ 2.1, 2.2.

22.     Specifically, Paragraph 2.2 of Schedule 14 of the Primary Partnership Agreement provides that a US-based Partner "may retire from the Partnership at any time upon the expiry of such period of notice given in writing to the Senior Partner or the Managing Partner as the Senior

4

Partner or the Managing Partner agrees." *Id.*, ¶ 2.2.[1]  In such case, the Senior Partner or

Managing Partner "will not require notice longer than such period (being not greater than 120

days) as is reasonably required for the Partnership to comply with its duties to any clients for

whom the US-based Partner is then working."  *Id.*

23.      Schedule 5 of the Primary Partnership Agreement applies only to Equity Partners

allocated 300 Units or more in the Firm.

24.      Schedule 5.1.3 of the Primary Partnership Agreement provides that where an

Equity Partner (i) holds 300 or more Units in the Firm and (ii) has "has given notice of an

intention to retire from the Partnership in order to work in some capacity which in the opinion of

the [Executive Leadership Group] competes with" the Firm, then the Executive Leadership

Group (the "ELG")[2] may reduce that Equity Partner's interest in the Firm to 280 Units.  *Id.*, Sch.

5.1.3.

25.      Meanwhile, Schedule 5.1.4 imposes additional punitive measures on Equity

Partners withdrawing from the Firm and seeking to compete with the Firm, in the ELG's sole

discretion, "within two years after that Equity Partner's retirement from the Partnership."  *Id.*,

Sch. 5.1.4.[3]

26.      In such case, the Primary Partnership Agreement provides that: (i) if the Equity

Partner retires from the Partnership in a financial year in which that Equity Partner was allocated

---

[1] "Partnership" is defined as "Clifford Chance LLP, a limited liability partnership incorporated in England and Wales … whose registered office is at 10 Upper Bank Street, London E14 5JJ." *See* Ex. A, pg. 1.

[2] Pursuant to Paragraph 1.2 of Schedule 9 of the Primary Partnership Agreement, the ELG is delegated with the "responsibility and authority for all matters" affecting both the Firm and the Associated Firms.  Ex. A, Sch. 9, ¶ 1.2.

[3] The Primary Partnership Agreement does not define "compete" or "competition."

5

300 or more Units, the EP will "cease to be entitled to Equity Remuneration"[4] and distributions of Equity Remuneration "amounting to x," where x = the amount by which the aggregate value of the Equity Partner's Equity Remuneration in the three years before the date of retirement exceeded the aggregate value of 280 Units in each year; (ii) the Managing Partner may, up to the amount of "x," authorize a reduction in the number of Units allocated to each Equity Partner in the financial year of retirement; and (iii) if such reductions of the Equity Remuneration and distributions amount to less than the amount by which the aggregate value of the Equity Remuneration in the three years before retirement exceeded the aggregate value of 280 Units in each year, the ELG may require the Equity Partner to repay the difference net of any tax which it "reasonably determines" to be or to have been payable by the Equity Partners.  Ex. A, Sch. 5.1.4.

27.    The Primary Partnership Agreement further provides that the Firm may "set off any amount from time to time" which the ELG believes is owed by a Partner to the Firm.  Ex. A, Sch. 6, ¶ 15.1.

28.    The Primary Partnership Agreement is "governed by English law."  Ex. A, ¶ 24.1.

**C.    <u>Relevant Provisions of the US Partnership Agreement</u>**

29.    The US Partnership Agreement applies to the Firm's United States-based Equity Partners and Non-Equity Partners.  *See* Ex. B.

30.    To that effect, the US Partnership Agreement provides that each Equity Partner and Non-Equity Partner subject to the US Partnership Agreement "shall also at all times be a partner in [the Firm]."  Ex. B, Clause 7.2.

---

[4] "Equity Remuneration" is defined as the profit and loss for the financial year after deducting: (i) Non-Equity Partner Remuneration; a provision for allowances; (iii) capital-related profit; (iv) such other amounts that are, in the opinion of the ELG, properly deductible in determining Equity Remuneration; and (v) the Bonus Pool.  *See* Ex. A, Sch. 4, ¶ 3.1.2.

DM3\22794854.1

31.     The US Partnership Agreement incorporates the withdrawal and retirement procedures of the Primary Partnership Agreement, stating that a US-based Partner "may voluntarily withdraw (retire) from [Clifford Chance US] pursuant to the applicable provisions of the [Primary Partnership Agreement]." *Id*., Clause 21.

32.     The US Partnership Agreement explicitly states that it is governed by the law of the State of New York. *Id*., Clause 32.

### D.     Relevant Dispute Resolution Provisions

33.     The US Partnership Agreement contains an Arbitration clause, which provides that any "claim in contract, tort or otherwise arising out of the [US Partnership Agreement] or the partnership relationship … shall be resolved in accordance with the applicable dispute resolution procedures specified in the [Primary Partnership Agreement]." Ex. B, Clause 31.1.

34.     The Primary Partnership Agreement contains a more detailed procedure for alternative dispute resolution, including for Arbitration.

35.     A "Dispute" shall arise where one party serves on another party a "written notice setting out the nature of the Dispute." Ex. A, ¶ 24.2.

36.     If the Dispute is not resolved by negotiations within 30 days of the service of the notice of Dispute, the parties shall "refer the Dispute to mediation in accordance with the LCIA Mediation Procedure" before proceeding to Arbitration. *Id*., ¶ 24.4.

37.     If the Dispute is not settled by mediation within 30 days of the appointment of the mediator (or such further period as agreed upon by the parties), then the Dispute shall be referred to and finally resolved "in accordance with the UNCITRAL Arbitration Rules by a sole arbitrator appointed pursuant to those Rules." *Id*., ¶ 24.5.

7

38.     The Primary Partnership Agreement explicitly contemplates that an Arbitration may be instituted between "an Associated firm and a party to [the Primary Partnership Agreement]." *Id.*, ¶ 24.7.

39.     Regardless, throughout the alternative dispute resolution process, the Firm shall be "represented by [its] Senior Partner, the Managing Partner or the Executive Partner." *Id.*, ¶ 24.3.

**E.      Plaintiffs Withdraw/Retire from the Firm**

40.     On or about January 6, 2026, each of the Plaintiffs retired/withdrew from the Firm, pursuant to Paragraph 2.2 of Schedule 14 and Clause 21 of the US Partnership Agreement.

41.     Plaintiffs retired from the Firm contemporaneously and as a group, with the intention of continuing their practice together at Sidley Austin.

42.     Plaintiffs made clear to the Firm that they intended to join the New York Office of Sidley Austin, a competitor of the Firm.  Plaintiffs have since joined Sidley Austin where they practice in that firm's blockchain, capital markets, investment funds, and private equity groups, representing some of the world's largest, most lucrative, and most powerful financial institutions.

43.     Mr. Sabin's retirement from the Firm became effective as of January 14, 2026, whereas Mr. Cone's retirement from the Firm became effective as of January 16, 2026.

44.     On or about March 9, 2026, Charles Adams, the Firm's Global Managing Partner, sent nearly identical correspondence to each Plaintiff on behalf of the Firm.  True and correct copies of the Firm's letters to Plaintiffs are annexed hereto as **Exhibit C**.

45.     In an apparent response to Plaintiffs' departure to join Sidley Austin, a competing law firm, the Firm indicated to Plaintiffs that it was applying Paragraphs 5.1.2, 5.1.3, and 5.1.4 of Schedule 5, as well as Paragraph 15 of Schedule 6, of the Primary Partnership Agreement to each Plaintiff's withdrawal from the Firm.  *Id.*

8

46. Accordingly, and among other things, the Firm advised that it was seeking to claw back from each Plaintiff significant sums constituting a reduction in Units to 280 for the three prior fiscal years.

47. Specifically, pursuant to these provisions of the Primary Partnership Agreement, the Firm seeks to claw back $4,356,966 from Mr. Cone and $1,398,653 from Mr. Sabin. *See id.*

48. The Firm's correspondence to each Plaintiff also included tables reflecting how it calculated these amounts.

49. On or about March 18, 2026, undersigned counsel sent a letter on behalf of Plaintiffs to Mr. Adams indicating that Duane Morris LLP had been retained to represent Plaintiffs concerning their Disputes with the Firm involving their retirements and the Firm's efforts to claw back already earned and -paid compensation. Plaintiffs' counsel further requested a discussion to reach a resolution of these Disputes. A true and correct copy of Plaintiffs' counsel's March 18, 2026 letter is annexed hereto as **Exhibit D**.

50. Throughout the negotiations regarding the Disputes, the Firm made clear that it intended to insist upon the claw backs and forfeitures of Schedules 5 and 6, as stated in the March 9 letters to each Plaintiff.

51. The Parties complied with Section 24.3 of the Primary Partnership Agreement by attempting to resolve the Disputes through negotiations, and otherwise came to an agreement that such negotiations had reached an impasse, thereby triggering the right to proceed to Mediation. Ex. A, ¶¶ 24.3, 24.4.

**F.      The Disputes are Ripe for Declaratory Judgment**

52. This Action presents a case of actual controversy for which this Court should exercise its discretion to issue a Declaratory Judgment.

9

53.     The application of New York law to any Mediation or Arbitration between Plaintiffs and the Firm, as opposed to English law, will likely be outcome dispositive with respect to the enforceability of the claw back and forfeiture provisions of Schedules 5 and 6 of the Primary Partnership Agreement.

54.     New York law prohibits the enforcement of law firm partnership agreement terms which impose financial disincentives, penalties, or claw backs of already-earned or -paid compensation against partners withdrawing from a law firm to join a competing firm.

55.     Indeed, just last year, the New York City Bar Association Professional Ethics Committee issued Formal Opinion 2025-3, which determined that the implementation by law firms of partnership terms – including, but not limited, to payments in the form of forgivable loans, bonuses, deferred compensation, withdrawal payments, deductions from capital or otherwise that are automatically forfeitable or forfeitable at the discretion of the firm – which have the actual effect of discouraging or deterring competition by lawyers who leave the law firm, violate New York Rule of Professional Conduct 5.6(a).  A true and correct copy of Formal Opinion 2025-3 is annexed hereto as **Exhibit E**.

56.     The Committee explicitly noted that partnership agreements ordinarily violate this Rule if they "impose more severe financial penalties on departing lawyers who intend to compete … than are imposed on departed lawyers who do not compete."  *See id*.

57.     Notably, the prohibition against such anti-competitive terms reflects the majority rule throughout United States jurisdictions.

58.     Accordingly, the various factors Courts consider in determining whether to issue declaratory relief – as outlined in *Dow Jones & Co., Inc. v. Harrods Ltd*., 346 F.3d 357 (2d Cir.

DM3\22794854.1

2003) and *The New York Times v. Gonzales*, 459 F.3d 160 (2d Cir. 2006) – weigh strongly in favor of entering Declaratory Judgment.

59. Specifically, and among other reasons, such a judgment would serve a useful purpose in clarifying or settling the legal issues involved, finalize the controversy, offer relief from uncertainty, and would be the best and most effective remedy to resolve this Dispute.

60. Even if this Court were to determine that the Primary Partnership Agreement's choice of law provision (English law) overrides the conflicting choice of law in the US Partnership Agreement (New York law) with respect to Mediation and/or Arbitration, it should nevertheless issue a Declaratory Judgment that New York law shall apply to any Mediation or Arbitration between the parties.

61. After all, the application of the English law would be "contrary to a fundamental policy" of New York (prohibiting the application of anti-competitive clauses and preventing clients from exercising their choice of counsel) in such a manner that it would constitute an "overriding concern to public policy." *Estee Lauder Cos. Inc. v. Batra*, 430 F. Supp. 2d 158, 170 (2d Cir. 2006).

62. Further, the Primary Partnership Agreement explicitly contemplates that, in certain instances, it may be enforced "in the appropriate court in any jurisdiction," thereby strongly suggesting that the choice of local law should control. *See* Ex. A, ¶ 24.6.

63. Given the evolution of large, global law firms, allowing English law to control would allow any firm with a UK-based office to interpose English law on its US-based counterparts, effectively undermining the public policy underlying New York's prohibition of these exact anti-competitive clauses.

DM3\22794854.1

64.     Additionally, New York has a much stronger interest in the resolution of this Dispute than does England.

65.     Plaintiffs are both residents of the State of New York and attorneys-at-law in the State of New York who served as Equity Partners in the Firm's New York office.

66.     Further, upon information and belief, several members of the Firm's ELG are either based in New York and/or travel regularly to New York in connection with their duties and obligations to the Firm and their service on the Firm's ELG.

## COUNT I
## DECLARATORY JUDGMENT

67.     Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 through 66 as if fully set forth herein.

68.     An actual controversy exists concerning the applicable law governing the forthcoming Mediation and Arbitration between Plaintiffs and the Firm.

69.     Pursuant to Paragraph 24.1 of the Primary Partnership Agreement, the Primary Partnership Agreement is "governed by English law."  Ex. A, ¶ 24.1.

70.     Conversely, Clause 32 of the US Partnership Agreement provides that the US Partnership Agreement "shall be governed by the law of the State of New York without regard to its conflict of laws rules."  Ex. B, ¶ 32.

71.     The US Partnership Agreement explicitly incorporates by reference the Primary Partnership Agreement's procedure for the institution of Arbitration proceedings, providing that any claim in contract, tort, or otherwise relating to the "partnership relationship" between any Partner and the Firm "shall be resolved in accordance with the applicable dispute resolution procedures specified in the [Primary Partnership Agreement]."  *Id.*

12

72.     Accordingly, the referral of each Plaintiff's Dispute to Arbitration, pursuant to Section 24.5 of the Primary Partnership Agreement, has arisen pursuant to the terms of the US Partnership Agreement.

73.     Plaintiffs are therefore entitled to a Declaratory Judgment that the laws of the State of New York shall apply to any Mediation and/or Arbitration proceeding between Plaintiffs and the Firm.

74.     A Declaration from this Court is necessary and appropriate to resolve the Parties' dispute and clarify their respective rights and obligations, as it pertains to Mediation and/or Arbitration, under both the Primary Partnership Agreement and the US Partnership Agreement.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in its favor on Count I and:

a.     Declare that the laws of the State of New York shall apply to any Mediation and/or Arbitration proceeding between the Parties pursuant to either the Primary Partnership Agreement and/or the US Partnership Agreement;

b.     Award Plaintiffs their reasonable attorneys' fees, costs, and expenses in bringing this Declaratory Judgment Action; and

c.     Grant such other and further relief as the Court deems just and proper.

13

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Clifford Cone and Michael Sabin respectfully request that this Court enter judgment in its favor and against Defendant Clifford Chance LLP as follows:

1.      On Count I, entering a Declaratory Judgment as requested;

2.      Awarding Plaintiffs their reasonable attorneys' fees, costs, and expenses in bringing this Declaratory Judgment Action; and

3.      Awarding such other and further relief as the Court deems just and proper.

Dated:  June 29, 2026                    Respectfully submitted,

                                               **DUANE MORRIS LLP**

By: _____
            Leslie D. Corwin, Esq.
            Matthew M. Caminiti, Esq.
            22 Vanderbilt
            335 Madison Avenue
            New York, NY 10017
            E: LDCorwin@duanemorris.com
            E: MMCaminiti@duanemorris.com
            T: (212) 692-1000
            F: (212) 692-1020

            *Attorneys for Plaintiffs*
            *Clifford Cone and Michael Sabin*

DM3\22794854.1