**C L I F F O R D**

**C H A N C E**

CLIFFORD CHANCE LLP

---

CLIFFORD CHANCE LLP
PARTNERSHIP AGREEMENT

---

DATED 1 DECEMBER 2006

restated to include amendments as at 24 October 2024

# CONTENTS

Clause                                                                          Page

1.    Partners ....................................................................................................................1

2.    Admission as Partner ...............................................................................................1

3.    Commencement and Duration ................................................................................1

4.    Nature of Business ...................................................................................................2

5.    Business Names .......................................................................................................2

6.    Computation of Profits............................................................................................2

7.    Sharing of Equity Remuneration ............................................................................2

8.    Distribution of Remuneration .................................................................................2

9.    Capital .....................................................................................................................2

10.    Partnership Votes and Meetings .............................................................................3

11.    Governance and Management..................................................................................3

12.    Policies.....................................................................................................................3

13.    Borrowings...............................................................................................................3

14.    Registers...................................................................................................................3

15.    Partner Behaviour and Obligations.........................................................................3

16.    Retirement and Annuities .......................................................................................4

17.    Termination, Suspension etc....................................................................................4

18.    Partnership Property and Liability of Equity Parties ..............................................4

19.    Winding-Up of The Partnership and Associated Firms...........................................5

20.    Effect of this Agreement..........................................................................................5

21.    Contracts and Documents .......................................................................................6

22.    Notices .....................................................................................................................6

23.    Interpretation...........................................................................................................6

24.    Governing Law and Jurisdiction..............................................................................6

Schedule 1 Status etc.  of Partners.....................................................................................9

Schedule 2 Admission as Partner......................................................................................14

Schedule 3 Business of The Partnership............................................................................19

Schedule 4 Accounts..........................................................................................................20

Schedule 5 Sharing of Equity Remuneration....................................................................24

Schedule 6 Distribution of Remuneration.........................................................................33

Schedule 7 Capital .............................................................................................................44

Schedule 8 Partnership Decisions and Meetings ..............................................................48

Schedule 9 Governance and Management.........................................................................53

Schedule 10 Borrowings.....................................................................................................67

Schedule 11 Registers ................................................................................................70

Schedule 12 Partner Behaviour and Obligations ....................................................71

Schedule 13 Partnership Property and Liability of Equity Partners ........................75

Schedule 14 Retirement of Equity Partners and Annuity Arrangements for Equity Partners . 76

Schedule 15 Equity Partners' Termination, Immediate Termination, Suspension and Retirement Upon Physical or Mental Incapacity .......................................96

Schedule 16 Indemnities and Liabilities ...............................................................107

Schedule 17 Winding-Up of The Partnership and Associated Firms .....................114

Schedule 18 Contracts and Documents ..................................................................117

Schedule 19 Approved Persons ..............................................................................118

Schedule 20 Interpretation .....................................................................................124

**THIS AGREEMENT** is made on 1 December 2006 and is restated so as to include amendments made up to and effective as at 24 October 2024

**BETWEEN:**

(1)    **CLIFFORD CHANCE LLP**, a limited liability partnership incorporated in England and Wales (registered no. OC323571) whose registered office is at 10 Upper Bank Street, London E14 5JJ (the "**Partnership**");

(2)    the **EQUITY PARTNERS** (as hereinafter defined) from time to time; and

(3)    the **NON-EQUITY PARTNERS** (as hereinafter defined) from time to time.

**INTRODUCTION:**

(A)    The parties to this Agreement on the Effective Date are the Partnership and those Equity Partners whose names are recorded in the relevant Register on the Effective Date, being all the Equity Partners (as defined in the Previous Partnership Agreement) of the Previous Partnership on the Effective Date;

(B)    On the business day after the Effective Date, the other parties to the Previous Partnership Agreement who then deliver this Agreement, duly executed, will become Partners;

(C)    The Partnership was incorporated to acquire the business and assets and to assume the liabilities of the Previous Partnership on the Effective Date and to carry on that business in succession to the Previous Partnership and as a continuation of that business;

(D)    This is a limited liability partnership agreement (as defined in regulation 79 of the LLP (ACA) Regulations) intended to determine the mutual rights and obligations of the Partnership, the Members and the other Partners.

*(Amended 29 January 2010)*

**THE PARTIES AGREE** as follows.

1.    **PARTNERS**

Schedule 1 (*Status etc. of Partners*) sets out provisions relating to the status of Partners and includes certain rights and obligations. Schedule 19 (*Approved Persons*) applies in relation to Approved Persons, as defined in that Schedule.

2.    **ADMISSION AS PARTNER**

Schedule 2 (*Admission as Partner*) governs the admission of a person as an Equity Partner or Non-Equity Partner.

3.    **COMMENCEMENT AND DURATION**

3.1    This Agreement takes effect from the Effective Date.

3.2    The Partnership shall subsist until wound up pursuant to the LLPA.

3.3 An Equity Partner shall cease to have that status in accordance with Schedule 14 (*Retirement etc*) or Schedule 15 (*Equity Partners' Termination etc*).

3.4 A Non-Equity Partner shall cease to have that status:

3.4.1 on ceasing to be a partner in, or contracted to provide legal services to, or an employee of, the Partnership or an Associated Firm unless that relationship is replaced by another arrangement described in this paragraph 3.4.1; or

3.4.2 pursuant to the Policies under paragraph 3.4.3 of Schedule 1 (*Status etc. of Partners*).

3.5 Upon any cessation as mentioned in clause 3.3 or 3.4, the Partner concerned shall, if also a Member, cease to be a Member unless that Partner is to acquire the status of Non-Equity Partner or Equity Partner, as the case may be, in accordance with Schedule 2 (*Admission as Partner*).

4. **NATURE OF BUSINESS**

The Partnership and the Associated Firms shall carry on the practice of lawyers, legal advisers, notaries or tax advisers or any associated or other activities or all or any of them as determined in accordance with Schedule 3 (*Business of the Partnership*).

5. **BUSINESS NAMES**

The names under which the Partnership and the Associated Firms carry on business shall be determined in accordance with Schedule 3 (*Business of the Partnership*).

6. **COMPUTATION OF PROFITS**

The profits and losses of the Partnership and Associated Firms shall be computed in accordance with Schedule 4 (*Accounts*).

7. **SHARING OF EQUITY REMUNERATION**

The Equity Partners shall share Equity Remuneration in accordance with Schedule 5 (*Sharing of Equity Remuneration*).

8. **DISTRIBUTION OF REMUNERATION**

Equity Remuneration shall be distributed to Equity Partners in accordance with Schedule 6 (*Distribution of Remuneration*). Paragraph 2 of that Schedule describes the way in which Non-Equity Partners are to be remunerated.

9. **CAPITAL**

Each Equity Partner shall contribute capital to the Partnership or Associated Firms in accordance with Schedule 7 (*Capital*).

10.     **PARTNERSHIP VOTES AND MEETINGS**

Schedule 8 (*Partnership Decisions and Meetings*) contains provisions concerning decisions by Partners, meetings of Partners and related matters.

11.     **GOVERNANCE AND MANAGEMENT**

The governance and management of the Partnership and Associated Firms shall be in accordance with Schedule 9 (*Governance and Management*).

12.     **POLICIES**

12.1    The Policies of the ELG and the Partnership Council comprise those certified by the Senior Partner as being the Policies of the ELG and the Partnership Council in effect from time to time.

*(Amended with effect from 1 May 2017)*

12.2    Each of the ELG and the Partnership Council may adopt, amend and cancel Policies in accordance with paragraph 6 of Schedule 9 (*Governance and Management*). In addition Policies may be adopted, amended or cancelled pursuant to a Special Resolution of Partners or a Special Resolution of Equity Partners.

12.3    Subject to clause 12.2, each Policy from time to time shall form part of this Agreement and shall have effect as if it were incorporated in this Agreement.

13.     **BORROWINGS**

The Partnership and Associated Firms shall incur Borrowings only in accordance with Schedule 10 (*Borrowings*).

14.     **REGISTERS**

The Partnership shall maintain registers in accordance with Schedule 11 (*Registers*).

15.     **PARTNER BEHAVIOUR AND OBLIGATIONS**

Schedule 12 (*Partner Behaviour and Obligations*) contains provisions relating to:

15.1    good faith;

15.2    confidentiality;

15.3    attendance to business;

15.4    contribution;

15.5    values, conduct and standards;

15.6    disciplinary investigations;

15.7    disciplinary action;

15.8    compulsory insurance;

15.9    assignment of share or interest in the Partnership; and

15.10   notifications.

*(Amended with effect from 23 April 2020)*

16.     **RETIREMENT AND ANNUITIES**

Schedule 14 (*Retirement etc*) contains provisions:

16.1    relevant when an Equity Partner approaches the age of 60;

16.2    specifying each Equity Partner's Mandatory Retirement Date;

16.3    concerning voluntary retirement of Equity Partners; and

16.4    concerning annuities, fixed amounts and other payments that may be paid to an Equity Partner who ceases to have that status.

17.     **TERMINATION, SUSPENSION ETC**

Schedule 15 (*Equity Partners' Termination etc*) contains provisions concerning the circumstances in which any Equity Partner:

17.1    will cease to hold that status, following notice from the Managing Partner;

17.2    may be suspended from that status; and

17.3    may be treated as having retired as a result of physical or mental incapacity.

*(Amended with effect from 1 March 2010)*

18.     **PARTNERSHIP PROPERTY AND LIABILITY OF EQUITY PARTIES**

18.1    Schedule 13 (*Partnership Property and Liability of Equity Partners*) contains provisions relating to:

18.1.1  property held or used by the Partnership or Associated Firms;

18.1.2  the effect upon a person's share or interest in the Partnership or an Associated Firm of that person ceasing to hold the status of a Partner; and

18.1.3  a Partner's personal liability for losses of the Partnership or an Associated Firm.

18.2    Schedule 10 (*Borrowings*) contains provisions relating to arrangements with lenders which may result in some personal obligation for Equity Partners.

18.3    Schedule 16 (*Indemnities and Liabilities*) contains provisions relating to an asset protection scheme and to certain residual liabilities of Old Partnerships which may result in some personal obligation for Equity Partners. It also contains provisions

relating to professional indemnity insurance and circumstances in which the Partnership may give an indemnity to a Partner.

19.    **WINDING-UP OF THE PARTNERSHIP AND ASSOCIATED FIRMS**

Schedule 17 (*Winding-up of the Partnership and Associated Firms*) contains provisions relating to the winding-up or dissolution of the Partnership or any Associated Firm.

20.    **EFFECT OF THIS AGREEMENT**

20.1    This Agreement binds each Partner and retired Partner, except that a retired Partner is not bound by an amendment to this Agreement made after that Partner's retirement date.

20.2    Although the Partners include persons who are not Members, this Agreement is a limited liability partnership agreement as defined in regulation 79 of the LLP (ACA) Regulations. None of the default provisions set out in regulations 7 and 8 of the Limited Liability Partnerships Regulations 2001, SI 1090 of 2001 (or any other regulations made under section 15(c) of the LLPA) applies to the Partnership.

*(Amended 29 January 2010)*

20.3    No relationship subsists between the Partners which may be regarded as a partnership within the meaning of the Partnership Act 1890, except in their capacity as partners of an Associated Firm constituted as such a partnership by a separate written agreement.

20.4    Each Member excludes, for a period of 100 years from the Effective Date, the right conferred on a Member by section 994(1) of the Companies Act 2006 (*petition on grounds of unfair prejudice*).

*(Amended 29 January 2010)*

20.5    Each Partner hereby irrevocably appoints each of the Managing Partner and the Executive Partner (or any Equity Partner nominated by either of them) as that Partner's attorney to execute any deed or document or do any other act or thing which is necessary or desirable to give effect to any obligation undertaken by the Partner in or pursuant to this Agreement and undertakes to ratify anything done by such attorney pursuant to the authority conferred by this clause. In relation to any matter which is not of a routine administrative nature, this power of attorney may only be exercised with the express authority of the Senior Partner and the Managing Partner. Any question as to whether a matter is of a routine administrative nature shall be decided by the Senior Partner, whose decision shall be final and binding.

20.6    A person who is not a party to this Agreement has no rights to rely on or enforce any term of this Agreement.

20.7    The invalidity, illegality or unenforceability of any provision of this Agreement does not affect the continuation in force of the remainder of this Agreement.

20.8    This Agreement may be executed in any number of counterparts each of which when executed and delivered is an original, but all the counterparts together constitute the same document.

21. **CONTRACTS AND DOCUMENTS**

The provisions of Schedule 18 (*Contracts and Documents*) apply in relation to contracts to be made and documents to be executed by or on behalf of the Partnership and Associated Firms.

22. **NOTICES**

22.1 Save as otherwise expressly provided in any Schedule or Policy, any notice to be given to or by a Partner or retired Partner pursuant to the provisions of this Agreement shall be duly given if:

22.1.1 in the case of a notice to a Partner or retired Partner, it is sent by pre-paid recorded delivery to the relevant Partner or retired Partner's last-known home address, is delivered personally, or by email (to an email address known to be used by the recipient), or is given by any other means permitted by the law of the jurisdiction in which the relevant person resides; and

22.1.2 in the case of a notice to the Partnership, it is sent by pre-paid recorded delivery to the registered office of the Partnership addressed to, or it is delivered personally to, the Senior Partner or the Managing Partner.

22.2 If the notice is delivered by email it must also be delivered by one of the other methods specified in this clause. A notice sent by email will be deemed to be given when the email is sent, provided that a copy of the notice is sent by another method referred to in this clause within one business day of sending the email.

22.3 Each Partner shall notify a person nominated by the Executive Partner of that Partner's home address from time to time.

*(Amended with effect from 1 March 2010 and 15 March 2024)*

23. **INTERPRETATION**

Schedule 20 (*Interpretation*) applies to the interpretation of this Agreement.

24. **GOVERNING LAW AND JURISDICTION**

24.1 This Agreement is governed by English law.

24.2 A Dispute shall be treated as arising under this Agreement (and any other agreement to which these provisions apply) when one party serves on another party a written notice setting out the nature of the Dispute.

24.3 If during the continuance of the Partnership or at any time thereafter any Dispute shall arise then the parties thereto will attempt to resolve such Dispute through negotiations. In the negotiations, the Partnership will be represented by the Senior Partner, the Managing Partner or the Executive Partner.

24.4 If the Dispute is not resolved by negotiations within 30 days of the service of the notice of Dispute then, before commencing arbitration proceedings, the parties thereto shall

refer the Dispute to mediation in accordance with the LCIA Mediation Procedure, which procedure is deemed to be incorporated by reference into this clause 24.4.

24.5    If the Dispute is not settled by mediation within 30 days of the appointment of the mediator, or such further period as the parties thereto shall agree in writing, the Dispute shall be referred to and finally resolved in accordance with the UNCITRAL Arbitration Rules by a sole arbitrator appointed pursuant to those Rules.  To the extent permitted by law, the parties to this Agreement hereby agree to exclude any right of appeal against the arbitrator's award to any court which would otherwise have jurisdiction in the matter.  The appointing authority shall be the London Court of International Arbitration. The place of arbitration shall be Geneva, Switzerland. The language to be used in the arbitral proceedings shall be English.

24.6    For the avoidance of doubt, the Partnership, acting through the Senior Partner, the Managing Partner or the Executive Partner, shall have the authority to seek an injunction in the appropriate court in any jurisdiction or through the arbitrator appointed under clause 24.5 against any person from acting in any manner which is considered to be harming or likely to harm the interests of the Partnership or any Associated Firm, if such action is inconsistent with the obligations either express or implied which such person has or had to the Partnership or any Associated Firm or under an agreement between an Associated Firm and a party to this Agreement.

24.7    If any arbitration proceedings are commenced under this Agreement or under an agreement between an Associated firm and a party to this Agreement and any party thereto considers that the arbitration proceedings raise issues which are substantially the same as or connected with issues raised in arbitration proceedings which have already been commenced under this Agreement or another agreement to which an Associated Firm or a party to this Agreement is party (an "**Existing Proceeding**"), or arises out of substantially the same facts as are the subject of an Existing Proceeding (in either case, a "**Related Proceeding**"), the arbitrator appointed or to be appointed in respect of any such Existing Proceeding shall also be appointed as arbitrator in respect of any Related Proceeding, save where the arbitrator considers that such appointment would be inappropriate. Any Dispute as to whether the issues arising in a Related Proceeding are substantially the same as or connected with issues raised in an Existing Proceeding shall be determined by the arbitrator already appointed in the Existing Proceeding.

24.8    Where, pursuant to clause 24.7, the same arbitrator has been appointed in relation to two or more sets of arbitration proceedings, the arbitrator may order that the whole or part of the matters at issue shall be heard together upon such terms or conditions as the arbitrator thinks fit.  The arbitrator shall have the power to make such directions and any interim, partial or final awards as the arbitrator considers just and desirable.

24.9    Upon the request of a party to this Agreement or an Associated Firm that wishes to be joined in any arbitration proceedings that have been commenced, the arbitrator may join any such party to the arbitration proceedings, and may make a single, final award determining all disputes between them. Each of the parties to this Agreement hereby consents to the joiner of any other party to this Agreement or an Associated Firm to any arbitration proceedings that have been commenced hereunder, where the arbitrator so requires following a request made in accordance with this clause 24.9.

24.10   Upon the request of a party to an Existing Proceeding to have joined to it any additional party who is a party to this Agreement, the arbitrator may join any such additional party, and may make a single, final award determining all disputes between them. Each of the parties to this Agreement hereby consents to be joined to any arbitration proceedings that have been commenced hereunder, where the arbitrator so requires following a request made in accordance with this clause 24.10.

24.11   The parties to this Agreement hereby waive any objections they may have as to the validity and/or enforcement of any interim, partial or final awards made by an arbitrator appointed under this Agreement, where proceedings have been consolidated or parties have been joined in accordance with this clause 24, where such objections are based solely on the fact that such consolidation or joinder has occurred.

24.12   For the purposes of clause 24 each Partner agrees that the process by which any proceedings are begun by the Partnership in any court of competent jurisdiction may be served by being sent in accordance with clause 22.1.

# SCHEDULE 1
# STATUS ETC. OF PARTNERS

*The following table summarises certain of the main features of the status of Partners. It is included for illustrative purposes only and does not affect the interpretation of this Schedule or any other term of this Agreement.*

| Status | | Equity Interests | Member* |
|---|---|:---:|:---:|
| 1. | **Equity Partner** | | |
| 1.1 | Firm Equity Partner | ✓ | ✓ |
| 1.2 | Employed Equity Partner | ✓ | ✓ |
| 1.3 | Associated Firm Equity Partner | ✓ | X |
| 2. | **Non-Equity Partner** | | |
| 2.1 | Firm Non-Equity Partner | X | ✓ |
| 2.2 | Associated Firm Non-Equity Partner | X | X |

\*    *subject to exceptions pursuant to paragraph 2.1*

1. **Status**

1.1    Each Partner shall have the status described in one of the following categories:

1.1.1    *Equity Partner*

(a)    A Firm Equity Partner is a Partner with Equity Interests who is not an Employed Equity Partner or Associated Firm Equity Partner;

(b)    An Employed Equity Partner is a Partner with Equity Interests satisfied exclusively or predominantly through the relevant person's employment by the Partnership or an Associated Firm or who is designated by the ELG as an Employed Equity Partner;

(c)    An Associated Firm Equity Partner is a Partner with Equity Interests satisfied exclusively through the relevant person's share of profits as a partner in, or through employment by, an Associated Firm and who is (i) prohibited by law or regulation from becoming a Member or (ii) designated by the ELG as an Associated Firm Equity Partner;

(d)    Any other category of Equity Partner as referred to in paragraph 1.2;

1.1.2    *Non-Equity Partner*

    (a)    A Firm Non-Equity Partner is a Partner without Equity Interests who is not an Associated Firm Non-Equity Partner;

    (b)    An Associated Firm Non-Equity Partner is a Partner without Equity Interests and a partner in, or contracted to provide legal services to, or an employee of, an Associated Firm who is (i) prohibited by law or regulation from becoming a Member or (ii) designated by the ELG as an Associated Firm Non-Equity Partner;

    (c)    Any other category of Non-Equity Partner as referred to in paragraph 1.2.

1.2    The ELG has the authority to create additional categories of Equity Partner or Non-Equity Partner if, in its opinion, it is expedient to do so having regard to law, regulation or like considerations. The authority may not be exercised unless (i) it is to be exercised in a manner which, taking into account the overall interests of the Partnership, is fair to all Partners concerned and (ii) the Partnership Council confirms that to be the case.

Upon exercise of the authority, this Agreement shall stand amended (without need of a Special Resolution of Equity Partners) in such manner as the ELG, with the approval of the Partnership Council, reasonably determines to be necessary to give effect to the creation of the additional category.

## 2.    Members

2.1    Firm Equity Partners, Employed Equity Partners and Firm Non-Equity Partners shall, by virtue of holding that status, be Members except that, if in any particular case it is expedient to do so having regard to law, regulation or like considerations, the Managing Partner or the Executive Partner may determine that any such person shall not be a Member.

*(Amended with effect from 23 April 2020)*

2.2    Associated Firm Equity Partners and Associated Firm Non-Equity Partners shall not be Members.

2.3    If the ELG creates any further category of status pursuant to paragraph 1.2 above, it may also determine whether or not any Partner assuming that status shall be a Member.

2.4    Any Partner who is not a Member shall become a Member upon the relevant prohibition ceasing to apply or, as the case may be, the ELG reversing it previous designation or determination.

## 3.    Sources of Partners' rights and obligations

### 3.1    *Firm Equity Partners*

3.1.1    The rights and obligations of a Firm Equity Partner in relation to the Partnership and the other Partners are set out in this Agreement and such agreements as may be entered into pursuant to this Agreement.

3.1.2    Any agreement between a Firm Equity Partner and an Associated Firm shall be consistent with, and give effect to the rights and obligations of the Firm Equity Partner pursuant to, this Agreement.

3.2    *Employed Equity Partners*

3.2.1    The rights and obligations of an Employed Equity Partner in relation to the Partnership and the other Partners are set out in this Agreement and such agreements as may be entered into pursuant to this Agreement.

3.2.2    Any agreement between the Employed Equity Partner and the Partnership or any Associated Firm shall be consistent with, and give effect to the rights and obligations of the Employed Equity Partner pursuant to, this Agreement.

3.3    *Associated Firm Equity Partners*

3.3.1    The rights and obligations of an Associated Firm Equity Partner in relation to the Partnership and the other Partners are set out in:

(a)    this Agreement and such agreements as may be entered into pursuant to this Agreement; and

(b)    the agreement governing the relevant Associated Firm and/or an agreement between the Associated Firm and Associated Firm Equity Partner.

3.3.2    The rights and obligations of an Associated Firm Equity Partner under any agreement referred to in paragraph 3.3.1(b) shall correspond with the rights and obligations that would apply if the Associated Firm Equity Partner was a Firm Equity Partner and shall also give effect to the rights and obligations of the Associated Firm Equity Partner pursuant to this Agreement.

3.4    *Non-Equity Partners*

3.4.1    The rights and obligations of a Non-Equity Partner in relation to the Partnership and the other Partners are set out in this Agreement and such agreements as may be entered into pursuant to this Agreement.

3.4.2    If a Non-Equity Partner is:

(a)    a partner in an Associated Firm, then that Non-Equity Partner also has rights and obligations under the agreement governing the relevant Associated Firm and/or an agreement between the Associated Firm and the Non-Equity Partner; and/or

(b)    contracted to provide services to, or an employee of, the Partnership or an Associated Firm, then that Non-Equity Partner also has rights and obligations under the agreement between the Partnership or the relevant Associated Firm and the relevant Non-Equity Partner.

The agreements referred to in this paragraph 3.4.2 (other than this Agreement) shall give a Non-Equity Partner rights and obligations of the Non-Equity Partner

pursuant to this Agreement including, without limitation, the Policies referred to in paragraph 3.4.3 below. *

3.4.3    The Partnership Council shall establish by Policy the framework for the rights and obligations of Non-Equity Partners.

**4.    Performance of obligations relating to the Partnership or Associated Firms**

4.1    In relation to any agreement (other than this Agreement) that a Partner has with or relating to the Partnership or an Associated Firm, each Partner agrees:

4.1.1    to exercise any rights in a manner consistent with such Partner's rights under this Agreement and so as to comply with, enforce and give effect to the terms of this Agreement; and

4.1.2    to perform obligations under such an agreement so as to comply with, enforce and give effect to the terms of this Agreement,

in each case treating any references (as at the Effective Date) to the Previous Partnership in the constitutional documents of an Associated Firm as if, from the Effective Date, they were references to the Partnership.

4.2    Paragraph 4.1 does not apply in the case of an Associated Firm if not all its profits or losses are included in Equity Remuneration (**"a part-owned Associated Firm"**) to the extent that an express provision in a written agreement between the Partnership and the part-owned Associated Firm or its partners, shareholders or other proprietors has contrary effect.

4.3    A provision of this Agreement which purports to apply to a part-owned Associated Firm shall be subject to an express provision having a contrary effect in a written agreement between the Partnership and the part-owned Associated Firm or its partners, shareholders or other proprietors.

4.4    By entering into this Agreement, each Associated Firm Equity Partner and Associated Firm Non-Equity Partner:

4.4.1    acknowledges the terms upon which an Associated Firm Equity Partner and Associated Firm Non-Equity Partner might become a Firm Equity Partner, Employed Equity Partner or Firm Partner;

4.4.2    acknowledges the framework in which the Associated Firms operate; and

4.4.3    agrees that rights and obligations of an Associated Firm Equity Partner and Associated Firm Non-Equity Partner in relation to the Partnership and the applicable Associated Firm are determined and governed by this Agreement.

4.5    Nothing in this Agreement shall be construed as affecting the personal and proper conduct of office by, and the independence and impartiality of, a notary in Clifford Chance Partnerschaft mit beschränkter Berufshaftung von Rechtsanwälten, Steuerberatern und Solicitors LLP.

*(Amended with effect from 1 September 2014 and 15 March 2024)*

Schedule 1: Status etc. of Partners

5.     **Transitional Arrangements**

5.1    In paragraph 5.2, **"applicable date"** means:

5.1.1    in the case of an Equity Partner, as defined in the Previous Partnership Agreement, the business day before the Effective Date; or

5.1.2    in the case of an Approved Person, Associated Firm Partner or Partner, as defined in the Previous Partnership Agreement, the business day following the Effective Date.

5.2    A person who was a party to the Previous Partnership Agreement and who, on the applicable date, delivers this Agreement duly executed (together with such other documents as are reasonably required by the Senior Partner, the Managing Partner or an Executive Partner of the Previous Partnership) shall, with effect from the Effective Date, have the following status under this Agreement:

5.2.1    Firm Equity Partner, if defined in the Previous Partnership Agreement as an Equity Partner;

5.2.2    Employed Equity Partner, if defined in the Previous Partnership Agreement as an Approved Person;

5.2.3    Associated Firm Equity Partner, if defined in the Previous Partnership Agreement as an Associated Firm Partner;

5.2.4    Firm Non-Equity Partner, if defined in the Previous Partnership Agreement as a Partner and that person is not to be an Associated Firm Non-Equity Partner;

5.2.5    Associated Firm Non-Equity Partner, if defined in the Previous Partnership Agreement as a Partner and that person is (i) prohibited by law or regulation from becoming a Member or (ii) designated by the Management Committee as an Associated Firm Non-Equity Partner.

5.3    The Partnership undertakes to each Partner who was a party to the Previous Partnership Agreement to perform all of the obligations of the Previous Partnership owed to that Partner under or pursuant to the Previous Partnership Agreement.

**SCHEDULE 2**
**ADMISSION AS PARTNER**

1. **Admission**

1.1     Any person may be admitted as a Non-Equity Partner with the approval of a Special Resolution of Partners.

1.2     Any Non-Equity Partner may be admitted as an Equity Partner if:

1.2.1     the Partner Selection Group so recommends and the ELG so agrees; or

1.2.2     the Partnership Council and the ELG so agree.

1.3     Any person (if not a Non-Equity Partner whose admission is governed by paragraph 1.2) may be admitted as an Equity Partner with the approval of a Special Resolution of Partners.

1.4     The ELG shall determine the particular status to be accorded to a person admitted under this paragraph 1 as an Equity Partner (namely a category in paragraph 1.1.1 of Schedule 1 (*Status etc. of Partners*)) or a Non-Equity Partner (namely a category in paragraph 1.1.2 of Schedule 1 (*Status etc. of Partners*)).

1.5     The Partnership Council may establish by Policy criteria or guidelines to be satisfied in the case of:

1.5.1     a person from the Partnership or an Associated Firm who is to be considered for admission as a Non-Equity Partner;

1.5.2     a Non-Equity Partner who is to be considered for admission as an Equity Partner.

2. **Conditions**

2.1     No person may be admitted as a Partner pursuant to paragraph 1.1 or 1.3 unless:

2.1.1     all applicable law and regulation is complied with; and

2.1.2     such person has signed such documents and agreements as are a pre-requisite to that person's admission in accordance with a Policy of the ELG.

2.2     No Non-Equity Partner may be admitted as an Equity Partner pursuant to paragraph 1.2 unless that Non-Equity Partner has signed such documents and agreements as are required from Equity Partners in accordance with a Policy of the ELG.

3. **Change of Status**

3.1     ***Employed Equity Partner to Firm Equity Partner***

An Employed Equity Partner is entitled to be admitted as a Firm Equity Partner if the Employed Equity Partner so requests and resigns from employment by the Partnership and/or an Associated Firm. In that event the Senior Partner may admit that Employed

Equity Partner as a Firm Equity Partner without further reference to the parties and the person concerned shall cease to be an Employed Equity Partner.

3.2     ***Firm Equity Partner or Associated Firm Equity Partner to Employed Equity Partner***

A Firm Equity Partner or an Associated Firm Equity Partner may, with the agreement of the Senior Partner, resign from such status in order to become employed by the Partnership and/or an Associated Firm. In that event if permitted by law and regulation, the Senior Partner may admit that Firm Equity Partner or Associated Firm Equity Partner as an Employed Equity Partner without further reference to the parties and the person concerned shall cease to be a Firm Equity Partner or an Associated Firm Equity Partner.

3.3     ***Firm Equity Partner or Employed Equity Partner to Associated Firm Equity Partner***

A Firm Equity Partner or Employed Equity Partner who (i) becomes prohibited by law or regulation from being a Member or (ii) is designated by the ELG as an Associated Firm Equity Partner shall retire as a Firm Equity Partner or Employed Equity Partner and be admitted as an Associated Firm Equity Partner. In that event, the Senior Partner may admit that Firm Equity Partner or Employed Equity Partner as an Associated Firm Equity Partner without further reference to the parties and the person concerned shall cease to be a Firm Equity Partner or Employed Equity Partner.

3.4     ***Associated Firm Equity Partner to Firm Equity Partner***

An Associated Firm Equity Partner shall be admitted as a Firm Equity Partner upon the legal or regulatory prohibition preventing that Associated Firm Equity Partner being a Member ceasing to apply or upon ceasing to be designated by the ELG as an Associated Firm Equity Partner. In that event, the Senior Partner may admit that Associated Firm Equity Partner as a Firm Equity Partner without further reference to the parties and the person concerned shall cease to be an Associated Firm Equity Partner.

The rights of Associated Firm Equity Partners under this paragraph 3.4 constitute an Entrenched Right for the benefit of Associated Firm Equity Partners as a single class of Beneficiaries.

3.5     ***Firm Non-Equity Partner to Associated Firm Non-Equity Partner***

A Firm Non-Equity Partner who (i) becomes prohibited by law or regulation from being a Member or (ii) is designated by the ELG as an Associated Firm Non-Equity Partner shall retire as a Firm Non-Equity Partner and be admitted as an Associated Firm Non-Equity Partner. In that event, the Senior Partner may admit that Firm Non-Equity Partner as an Associated Firm Non-Equity Partner without further reference to the parties and the person concerned shall cease to be a Firm Non-Equity Partner.

3.6     ***Associated Firm Non-Equity Partner to Firm Non-Equity Partner***

An Associated Firm Non-Equity Partner shall be admitted as a Firm Non-Equity Partner upon the legal or regulatory prohibition preventing that Associated Firm Non-Equity Partner being a Member ceasing to apply or upon ceasing to be designated as an Associated Firm Non-Equity Partner by the ELG. In that event, the Senior Partner may admit that Firm Non-Equity Partner as a Firm Non-Equity Partner without further

reference to the parties and the person concerned shall cease to be an Associated Firm Non-Equity Partner.

3.7    ***Firm Equity Partner or Employed Equity Partner to Firm Non-Equity Partner***

A Firm Equity Partner or an Employed Equity Partner may, with the approval of the Managing Partner (who shall discuss the proposal with the Senior Partner), retire as a Firm Equity Partner or an Employed Equity Partner and be admitted as a Firm Non-Equity Partner. The Firm Equity Partner or Employed Equity Partner concerned may, by request to the Senior Partner, require that all Equity Partners are notified of that person's admission as a Firm Non-Equity Partner.

*(Amended with effect from 23 April 2020)*

3.8    ***Associated Firm Equity Partner to Associated Firm Non-Equity Partner***

An Associated Firm Equity Partner may, with the approval of the Managing Partner (who shall discuss the proposal with the Senior Partner), retire as an Associated Firm Equity Partner and be admitted as an Associated Firm Non-Equity Partner. The Associated Firm Equity Partner concerned may, by request to the Senior Partner, require that all Equity Partners are notified of that person's admission as an Associated Firm Non-Equity Partner.

*(Amended with effect from 23 April 2020)*

3.9    ***General***

When a person changes status in accordance with this paragraph 3, that person's name shall be entered in the appropriate Register in accordance with the provisions of this Agreement.

4.    **Other Admission Formalities**

4.1    The effective date of a person's admission as a Partner shall be the date specified in the Special Resolution of Partners approving that person's admission or, if admitted pursuant to paragraph 1.2, in the decision of the ELG and the Partnership Council agreeing that person's admission; or, if no date is so specified, the date determined by the Senior Partner.

If a person's admission as a Partner is delayed by the requirement to comply with any law or regulation or is delayed pending some other action on the part of a regulatory or similar body, the effective date of that person's admission shall nevertheless be as stated above.

The effective date of a Partner's admission may therefore pre-date the date on which a Partner becomes a Member. In that event, to the extent permitted by law, the Partner's rights and obligations under this Agreement shall correspond to those the Partner would have had if that Partner had been a Member from the effective date of admission.

4.2    The ELG has the power to determine that a new Partner shall hold partnership interests, shares or other proprietorship rights or hold employment rights in one or more Associated Firms, to determine the Policy which will govern the exercise of such power

and to delegate such power to the Managing Partner. If a Partner is to hold such rights in an Associated Firm, the Partners who already hold the partnerships interests, shares or other proprietorship rights in the relevant Associated Firm shall cause the new Partner to be admitted to it or employed by it with effect from the date of that Partner's admission to the Partnership.

4.3     If before the admission of a new Equity Partner, other Equity Partners have entered into any commitment in relation to the Partnership which is personally binding on all Equity Partners, the new Equity Partner shall upon being admitted enter into such supplemental agreement or deed as is necessary to obligate that new Equity Partner to the same extent as the other Equity Partners are so committed. This paragraph 4.3 is without prejudice to the provisions of paragraph 3 of Schedule 10 (*relating to Borrowings*) and paragraph 4 of Schedule 16 (*Asset Protection Scheme*).

*(Former paragraph 4.2 deleted 23 April 2020)*

5.      **Assessment of candidates for admission**

5.1     The Partnership Council shall establish by Policy a group of persons representative of the Partnership to be called the Partner Selection Group ("**PSG**") and to have responsibility for assessing all candidates for admission as a Partner. The Partnership Council may allow the PSG to delegate its responsibilities and enlist the help of others to the extent permitted by Policy.

5.2     The PSG will report to the Partnership Council on its assessment of the personal qualities of all candidates. The PSG will report to the ELG insofar as it has any comments on a candidate's business case.

5.3     The PSG shall have a chair proposed by the Partnership Council, approved by an Ordinary Resolution of Partners and appointed for a term of four years. No chair of the PSG may hold office for more than two terms.

5.4     The Partnership Council shall establish a procedure for appointment of all members of the PSG other than the chair and such members shall be appointed for staggered terms of office of approximately four years.

5.5     The PSG shall establish its own procedures in consultation with the Senior Partner.

5.6     The Partnership Council shall submit for approval by a Special Resolution of Partners the admission of a person pursuant to paragraph 1.1 or 1.3 if the candidate:

5.6.1   is recommended by the PSG (and the ELG does not disagree with the recommendation on business or strategic grounds); or

5.6.2   is recommended by the ELG.

5.7     As regards any candidate for admission pursuant to paragraph 1, the Partnership Council shall satisfy itself:

5.7.1   whether or not the PSG has carried out appropriate due diligence as to the personal qualities of the candidate; and

5.7.2    that the ELG agrees that the candidate has the requisite business case,

and shall advise Partners accordingly.

*(Paragraph 6 deleted 29 January 2010)*

## SCHEDULE 3
## BUSINESS OF THE PARTNERSHIP

1.     **Nature of business**

1.1    The business of the Partnership and the Associated Firms as a whole shall be predominantly that of practising law or related activities. Subject to that requirement, the ELG has the authority to decide what business the Partnership and each Associated Firm shall carry on.

1.2    The business of the Partnership and the Associated Firms may include the ownership of companies, the taking of partnership shares in a business or other similar investment.

2.     **Business names**

2.1    The name of the Partnership shall be registered as Clifford Chance LLP.

2.2    The Partnership and Associated Firms shall carry on business under the name Clifford Chance LLP or Clifford Chance except to the extent that law or regulation forbids the use of such names. The ELG shall decide the legal and business name of an Associated Firm that does not use only the name Clifford Chance LLP or Clifford Chance.

3.     **Registered Office**

The registered office of the Partnership shall be at such place in England as the ELG may determine from time to time.

**SCHEDULE 4**
**ACCOUNTS**

1.    **Financial Year**

The Financial Year of the Partnership shall end at the close of business on 30 April in each year or on such other date as the ELG may determine in advance.  No Financial Year shall be for a period exceeding eighteen months.

*(Former paragraph 1.2 deleted with effect from 1 September 2014)*

2.    **Partnership Accounts**

2.1    Accounts of the Partnership ("**Partnership Accounts**") shall be prepared for each Financial Year.

2.2    The Partnership Accounts shall be prepared:

2.2.1    in accordance with the LLPA and any applicable statement of recommended practice;

2.2.2    in accordance with International Accounting Standards ("**IAS**"); and

2.2.3    in the Accounts Currency.

2.3    The ELG shall be responsible, on behalf of the Members, for the preparation of the Partnership Accounts.

2.4    The Partnership Accounts shall be:

2.4.1    approved by the ELG and by the Audit Committee;

2.4.2    audited by the Auditors; and

2.4.3    approved by resolution of the Members passed in accordance with paragraph 4 of Schedule 8 *(Resolutions of Members)*.

After compliance with the requirements of paragraphs 2.4.1 to 2.4.3, the Partnership Accounts shall be:

2.4.4    published, together with the Auditor's report, on PartnerConnect (each Member hereby agreeing to that method of delivery); and

2.4.5    delivered by the Designated Members, together with the Auditor's report, to the Registrar in accordance with the LLPA.

*(Former paragraph 2.5 deleted with effect from 1 September 2014 and paragraph 2.4.1 amended with effect from 23 April 2020).*

Schedule 4: Accounts

3.    **Partnership Financial Report**

3.1    A financial report of the Partnership ("**Partnership Financial Report**") shall be prepared for each Financial Year so as to show the following (reflecting adjustments made pursuant to paragraph 3.2):

3.1.1    Partnership Profit, being the profit or loss for the Financial Year, before remuneration or profit share payable to Partners;

3.1.2    Equity Remuneration, being Partnership Profit after deducting:

(a)    Non-Equity Partners' remuneration (including profit share);

(b)    a provision for Allowances (to the extent not reflected in Partnership Profit);

(c)    capital-related profit;

(d)    such other amounts as are, in the opinion of the ELG, properly deductible in determining Equity Remuneration; and

(e)    the Bonus Pool, after deducting the amounts under paragraphs (a) to (d) above.

*(Amended 29 January 2010 and amended with effect from 1 September 2014)*

3.1.3    Equity Partners' Funds as at the end of the Financial Year, being capital, undistributed profits (net of payments on account made pursuant to paragraph 4.2 of Schedule 6 (*Rules for distribution of Equity Remuneration*)), the Tax reserve and the foreign exchange reserve.

3.2    The Partnership Financial Report shall be derived from the Partnership Accounts for the corresponding Financial Year, adjusted so as to apply such accounting policies as, in the opinion of the ELG:

3.2.1    are appropriate for determination of the matters referred to in paragraph 3.1 (whether or not such policies are in accordance with the requirements of the LLPA, IAS or any applicable statement of recommended practice); and

3.2.2    will not materially and adversely affect any Equity Partner as compared with any other Equity Partner.

Unless otherwise decided by the ELG in accordance with the preceding provisions of this paragraph 3.2, such accounting policies shall include the following:

3.2.3    the property and other rental costs will be charged to the profit and loss account as they are incurred;

3.2.4    the net costs of sublet and vacant properties will be charged to the profit and loss account as they are incurred;

3.2.5  pension costs will be accounted for on the basis of charging the expected costs of providing pensions over the period during which the Partnership and Associated Firms benefit from the employee's services; and

3.2.6  annuities which depend on the value of a Unit will be recognised in the Financial Year which determines their value and all other annuities payable will be recognised on a cash payable basis.

*(Amended 29 January 2010 and paragraph 3.2.3 amended with effect from 23 April 2020)*

3.3  The ELG shall be responsible for the preparation of the Partnership Financial Report and the calculation of the share of Equity Remuneration to be allocated to each Equity Partner.

3.4  The Partnership Financial Report shall be:

3.4.1  approved by the Audit Committee;

3.4.2  reported on by the Auditors (in terms that it has been properly compiled in accordance with this Agreement); and

3.4.3  signed by the Senior Partner and Managing Partner.

3.5  The Partnership Financial Report shall be published on PartnerConnect.

3.6  Forthwith upon compliance with the requirements of paragraph 3.4:

3.6.1  Non-Equity Partners' profit share (if any) reported in the Partnership Financial Report shall be treated as allocated to the Non-Equity Partners concerned;

3.6.2  capital-related profit and Allowances referred to in the Partnership Financial Report shall be treated as allocated to the Equity Partners concerned; and

3.6.3  the Equity Remuneration reported in the Partnership Financial Report shall be treated as allocated to the Equity Partners concerned

provided that no loss shall be treated as allocated to any Partner.

3.7  The Auditors shall also report on the allocation of Equity Remuneration to each Equity Partner as calculated pursuant to paragraph 3.3 (in terms that the amount of such allocation has been properly calculated in accordance with this Agreement). A person who has ceased to be an Equity Partner has the right to a statement of the Equity Remuneration allocated to such person in the Financial Year in which that person ceased to be an Equity Partner (but no right to the Partnership Financial Report, or any other financial information, relating to that Financial Year).

3.8  The Partnership Financial Report shall be binding on all parties except to the extent of any error notified in writing by an interested party to the Managing Partner within one month after the publication of the Partnership Financial Report on PartnerConnect. The allocation of Equity Remuneration shall be binding on the Equity Partner to whom the allocation has been made except to the extent of any error notified in writing by the

relevant Equity Partner to the Managing Partner within one month after the date on which that Equity Partner has been sent notification of the applicable allocation.

3.9    If an error in the Partnership Financial Report or the allocation of Equity Remuneration to an Equity Partner has resulted in an incorrect allocation of Equity Remuneration to a person who was an Equity Partner during the relevant Financial Year, the error may be corrected on such terms and at such times as the Audit Committee may specify. The correction or its effect will be taken into account in the Partnership Financial Report of a Financial Year subsequent to the Financial Year of the error.

*(Former paragraph 4 deleted with effect from 1 September 2014)*

**4.    Auditors, accounting records etc.**

4.1    The Auditors shall be appointed by the Designated Members upon the recommendation of the Audit Committee.

4.2    The Partnership and the Members shall comply with their duties and responsibilities under the LLPA in relation to the Partnership's accounting records and accounts.

4.3    The Partnership and Associated Firms shall keep accounting records which comply with the LLPA and are sufficient to enable the preparation of the Partnership Accounts in accordance with this Agreement.

4.4    The Partnership's books of account shall be:

4.4.1    kept at such places as the Executive Partner shall determine; and

4.4.2    open to inspection by the Partners.

4.5    The ELG shall be responsible for the preparation of all other accounts prepared by the Partnership and the Associated Firms. An Associated Firm will prepare accounts on a cash basis if a local tax authority so requires or it is expedient to do so for local tax purposes.

**SCHEDULE 5**
**SHARING OF EQUITY REMUNERATION**

This Schedule applies in relation to an Equity Partner's entire share of Equity Remuneration, whether that share is received by that Equity Partner in whole or in part as profits of, or remuneration, benefits or any other payment from, the Partnership or any Associated Firm including any entitlement to receive any part of the Equity Remuneration by way of a Bonus Award in accordance with the terms of this Schedule 5.

This schedule also applies to Bonus Awards to all Partners, to the extent paid from Equity Renumeration.

1.     **Sharing Equity Remuneration according to Units**

1.1     Subject to the provisions of paragraph 4 (*Bonus Awards*), the Equity Remuneration for each Financial Year shall be shared between the Equity Partners in proportion to the number of Units allocated to and held by each of them in the Financial Year.

1.2     The parties shall procure that each Employed Equity Partner's entire share of Equity Remuneration is paid to each Employed Equity Partner as remuneration, benefits or other payments which that person is entitled to receive as an employee of the Partnership or an employee or officer of an Associated Firm.

        No Employed Equity Partner is entitled to Equity Remuneration in a capacity as a Member.

1.3     If in the course of a Financial Year an Equity Partner is first allocated Units, or ceases to hold any Units, or there is a change in the number of Units held by the relevant Equity Partner, that Equity Partner shall be treated as holding the relevant number of Units for the whole of that Financial Year. For this purpose, the relevant number of Units shall be calculated by averaging over the whole of the Financial Year the Units held by the relevant Equity Partner during the different portions of the Financial Year and by reference to (i) the number of days in each portion of the Financial Year during which the relevant Equity Partner held no Units or different numbers of Units in relation to (ii) the number of days in the Financial Year.

1.4     If the number of an Equity Partner's Units would have more than two decimal places it shall be rounded up or down to the nearest two decimal places. An entitlement to 0.005 of a Unit shall be rounded up to 0.01.

2.     **Allocation of Units**

2.1     The number of Units allocated to an Equity Partner every Financial Year depends, among other things, on:

        2.1.1     the number of Units allocated to that Equity Partner on admission as an Equity Partner; and

        2.1.2     the number of Financial Years and part Financial Years that have elapsed since that Equity Partner was first admitted and the outcome of any Biennial and Annual Review to the extent relevant for that Equity Partner.

Schedule 5: Sharing of Equity Remuneration

At the beginning of each Financial Year on and following admission as an Equity Partner, and subject always to paragraph 2.3, the Equity Partner will be allocated a number of Units that corresponds to the next position up on the Ladder.

2.2   The Ladder confers a number of Units, the numbers in each row representing a "**position**" on the Ladder.

|    | Units |
|----|-------|
| 1  | 60    |
| 2  | 80    |
| 3  | 100   |
| 4  | 120   |
| 5  | 140   |
| 6  | 160   |
| 7  | 180   |
| 8  | 200   |
| 9  | 220   |
| 10 | 240   |
| 11 | 260   |
| 12 | 280   |
| 13 | 300   |
| 14 | 320   |
| 15 | 340   |
| 16 | 370   |
| 17 | 400   |
| 18 | 450   |
| 19 | 500   |
| 20 | 550   |
| 21 | 600   |
| 22 | 650   |
| 23 | 700   |
| 24 | 750   |
| 25 | 800   |
| 26 | 850   |
| 27 | 900   |
| 28 | 950   |
| 29 | 1000  |

| 30 | 1050 |
|----|------|
| 31 | 1100 |
| 32 | 1150 |
| 33 | 1200 |
| 34 | 1250 |
| 35 | 1300 |
| 36 | 1350 |
| 37 | 1400 |
| 38 | 1450 |
| 39 | 1500 |

Subject to paragraph 2.3, an Equity Partner's progression from one position on the Ladder to the next position up takes place at the beginning of every Financial Year.

2.3    Paragraphs 2.1 and 2.2 are subject to any agreement or action pursuant to this Agreement which has contrary effect, including pursuant to:

2.3.1    paragraph 3 *(Biennial Reviews)*;

2.3.2    paragraph 4 (*Annual Reviews and Bonus Awards*);

2.3.3    paragraph 6 (*Agreed Unit reductions*);

2.3.4    paragraph 3 of Schedule 14 (*Gateway Arrangements for Equity Partners reaching the age of 60*);

2.3.5    a Policy under paragraph 3 of Schedule 12 (*Attendance to Business*);

2.3.6    a Policy under paragraph 6.9 of Schedule 12 (*Disciplinary Action*); or

2.3.7    a Special Resolution of Equity Partners in accordance with paragraphs 1.1.1 and 2.1.4 of Schedule 8.

If a dispute arises as to which provisions of this Agreement (or, if relevant, partnership agreements previously in effect) determine an Equity Partner's Unit allocation, the Senior Partner (or, if the dispute is with the Senior Partner, the Partnership Council) will determine which provisions apply. The determination of the Senior Partner (or, if the dispute is with the Senior Partner, the Partnership Council) will be final and binding.

2.4    The number of Units allocated to an Equity Partner admitted with effect from or after the completion of the Transitional Review is:

2.4.1    for a Non-Equity Partner admitted as an Equity Partner pursuant to paragraph 1.2 of Schedule 2 (*Admission as Partner*), usually 60, 80, 100, 120 or 140 Units on the Ladder, as decided by the ELG; or

2.4.2    for a person admitted as an Equity Partner with the approval of a Special Resolution of Partners, the number of Units allocated to that Equity Partner by that Special Resolution of Partners.

2.5    **Transition to the Ladder**

Equity Partners admitted on or before 1 May 2021 were transitioned to their positions on the Ladder pursuant to the Transitional Review, effective as at 1 May 2021.

2.6    **Changes to the Ladder**

The Wider Leadership Group (provided the approval of the Partnership Council is obtained) may establish one or more additional positions on the Ladder between 1500 and 1700 Units to the extent the Wider Leadership Group considers such steps are necessary to support the strategic objectives of the Firm.

3.    **Biennial Reviews**

3.1    Subject to paragraph 4, each Equity Partner's position on the Ladder will be reviewed at the end of Financial Year 2024/25 and at the end of each alternate Financial Year thereafter. Each such review shall be a "**Biennial Review**".

*(Amended 24 October 2024)*

The review will be carried out by the Wider Leadership Group, having regard to the expectations of Partner performance and contribution and Product and Market Dynamics, each as established under the Policy of the ELG, and any other guidance issued by the ELG from time to time (and approved by the Partnership Council) for such purpose, as well as available feedback and the annual self-reviews prepared by each Partner.

3.1.1    Subject to paragraphs 3.1.2, 3.1.3, 3.1.4, 5 and 8, the outcome of a Biennial Review will be, as decided by the Wider Leadership Group, one of the following:

(a)    the Equity Partner progresses on the Ladder to the next position in each of the subsequent two Financial Years;

(b)    the Equity Partner progresses on the Ladder to a higher position than the applicable next position in accordance with paragraph 2.2 for the immediately following Financial Year and progresses to the next position for the subsequent Financial Year;

(c)    the Equity Partner progresses on the Ladder to the next position for the immediately following Financial Year and remains at that position for the subsequent Financial Year;

(d)    the Equity Partner progresses on the Ladder to a higher position than the applicable next position for the immediately following Financial Year and remains at that higher position for the subsequent Financial Year;

Schedule 5: Sharing of Equity Remuneration

(e) the Equity Partner remains at the current position on the Ladder in the subsequent two Financial Years;

(f) the Equity Partner remains at the current position on the Ladder and progresses to the next position in the subsequent Financial Year;

(g) the Equity Partner is moved to a lower position on the Ladder and progresses on the Ladder to the next position starting from that lower position in the subsequent Financial Year;

(h) the Equity Partner is moved to a lower position on the Ladder in immediately following Financial Year and remains at that position in the subsequent Financial Year;

(i) the Equity Partner is moved to a lower position on the Ladder in the immediately following Financial Year and to another lower position on the Ladder in the subsequent Financial Year.

3.1.2 An Equity Partner may not progress to any level above 280 Units other than as agreed at a Biennial Review or the Annual Review.

3.1.3 The Wider Leadership Group's review of Equity Partners will be subject to review and moderation by the Partner Review Group whose membership, scope, role and procedures shall be determined in accordance with a Policy of the ELG.

3.1.4 The Wider Leadership Group will also review the performance of each Non-Equity Partner at each Biennial Review. The review will be carried out having regard to the expectations of Partner performance and contribution and Product and Market Dynamics, each as established under the Policy of the ELG, and any other guidance issued by the ELG from time to time (and approved by the Partnership Council) for such purpose, as well as available feedback and the annual self-reviews prepared by each Partner.

3.1.5 The Partnership Council shall have the final decision in relation to any compensation proposals of each member of the Wider Leadership Group (taking into account the recommendations of the Managing Partner (other than in respect of the Managing Partner)) and Partner Review Group members (taking into account the recommendations of the Wider Leadership Group) in relation to Biennial Reviews and no member of the Partner Review Group who is also a member of the Partnership Council shall be involved in decision making in relation to that member's own compensation. The same criteria as applies to other Equity Partners will be applied in assessing performance of Wider Leadership Group or Partner Review Group members.

4. **Annual Reviews and Bonus Awards**

4.1 The Wider Leadership Group will carry out a review of Partners at the end of each Financial Year (the "**Annual Review**") and may nominate any Equity Partner for progression to a higher level up the Ladder, or any Non-Equity Partner to become an Equity Partner at a higher level on the Ladder than usual, following, in the view of the Wider Leadership Group, sustained and sustainable exceptional performance above that

ordinarily expected. The Annual Review will form part of the Biennial Review in any year that a Biennial Review is taking place.

*(Amended 24 October 2024)*

In reaching decisions, the Wider Leadership Group shall having regard to the expectations of Partner performance and contribution and Product and Market Dynamics, each as established under the Policy of the ELG, and any other guidance issued by the ELG from time to time (and approved by Partnership Council) for such purpose, as well as available feedback and self-reviews.

4.2   Following the Annual Review the Wider Leadership Group may nominate any Partner for payment of a bonus (a **"Bonus Award"**) if, in its view, a Partner meets the bonus criteria established by a Policy of the ELG for such purpose.

4.3   A maximum aggregate amount of 5% of Equity Remuneration shall be available for the Bonus Awards to Partners each Financial Year (the **"Bonus Pool"**). Subject to this maximum amount, the ELG may determine by Policy the minimum and any maximum amounts of bonuses payable and times when bonuses may be paid.

4.4   Nominations for progression to a higher level on the Ladder, or entry into the Ladder by a Non-Equity Partner on a higher level than usual, and for Bonus Awards will be subject to review and moderation by the Partner Review Group.

4.5   If a Partner resigns (or is asked to leave the Partnership in accordance with the terms of this Agreement) prior to 31 October in any Financial Year when such Partner has received or is due to be paid a Bonus Award, then, if the ELG so decides, that Partner will forfeit the entitlement to receive any unpaid instalment of the Bonus Award and shall be required to repay any Bonus Award previously paid in such Financial Year.

4.6   The Partnership Council shall have the final decision in relation to any acceleration proposals or Bonus Awards in respect of any member of the Wider Leadership Group (taking into account the recommendations of the Managing Partner (other than in respect of the Managing Partner)) and Partner Review Group members (taking into account the recommendations of the Wider Leadership Group) and no member of the Partner Review Group who is also a member of the Partnership Council shall be involved in decision making in relation to that member's own compensation. The same criteria as applies to other Equity Partners will be applied in assessing performance of Wider Leadership Group or Partner Review Group members.

5.    **Equity Partners allocated 300 Units or more**

This paragraph applies to each Equity Partner and retired Equity Partner allocated 300 Units or more or, before 1 May 2021, more than 130 Units. Its application may be waived by the ELG in whole or in part and before or after the admission of an Equity Partner from outside the Partnership and Associated Firms.

5.1.1   In addition to the other provisions of this Agreement, the ELG may require any Equity Partner holding 340 Units or more to agree that some or all of such entitlement in excess of 340 Units or any other agreed compensation is conditional upon specific terms, including in relation to such Equity Partner's

contribution, applicable notice periods and other matters that the ELG considers appropriate and in the interests of the Partnership as a whole. *

5.1.2    In addition to any change decided at any Biennial Review, in circumstances which the Managing Partner and Senior Partner agree to be exceptional the Managing Partner and Senior Partner may at any time decide that an Equity Partner's Unit allocation will be reduced to 280 Units with effect from the beginning of the next Financial Year.

5.1.3    Where an Equity Partner holding 300 Units or more has given notice of an intention to retire from the Partnership in order to work in some capacity which in the opinion of the ELG competes with (or with the business or any part of the business of) the Partnership or any Associated Firm, the ELG may decide that such Equity Partner's Unit allocation will be reduced to 280 Units from the date of the notice.

5.1.4    This paragraph 5.1.4 applies if an Equity Partner gives notice of an intention to retire from the Partnership while holding 300 Units or more and, within two years after that Equity Partner's retirement from the Partnership, works in some capacity which in the opinion of the ELG competes with (or with the business or any part of the business of) the Partnership or any Associated Firm.

If the Equity Partner retired from the Partnership in a Financial Year in which (disregarding the effect of this paragraph 5) that Equity Partner was allocated 300 Units or more, the Equity Partner will cease to be entitled to Equity Remuneration and distributions of Equity Remuneration amounting to x, where x = the amount by which the aggregate value of the Equity Partner's Equity Remuneration in the three years before the date of that Equity Partner's retirement exceeded the aggregate value of 280 Units in each year (or, if the three-year period began before 1 May 2021, the amount by which the aggregate value of the Equity Partner's remuneration exceeded 130 Units in the relevant part of the period) net of any tax which the ELG reasonably determines to be or to have been payable by the Equity Partner in relation to the excess amount notwithstanding that Equity Partner ceasing to be entitled to Equity Remuneration or distributions.

The Managing Partner or Executive Partner may therefore, up to the amount of x, authorise reductions in the number of Units allocated to the Equity Partner in the Financial Year of retirement (with effect from the beginning of that Financial Year) and the cessation of all or any distributions of Equity Remuneration to that Equity Partner.

If such reductions of the Equity Partner's Equity Remuneration and distributions amount to less than the amount by which the aggregate value of the Equity Partner's Equity Remuneration in the three years before retirement exceeded the aggregate value of 280 Units in each year (or, if the three-year period began before 1 May 2021, the amount by which the aggregate value of the Equity Partner's remuneration exceeded 130 Units in the relevant part of the period) in that three-year period, the ELG may require the Equity Partner to repay the difference net of any tax which it reasonably determines to be or to have been

payable by the Equity Partner in relation to the excess amount notwithstanding the Equity Partner's obligation to repay.

For the purposes of this paragraph 5 the value of a Unit for a Financial Year for which there is not yet a Partnership Financial Report will be calculated by reference to the latest estimate of Unit value for the relevant Financial Year which is available to the ELG at the date of the Equity Partner's retirement. In determining the aggregate value of the Equity Partner's Equity Remuneration in the three years before retirement and also the aggregate value of the relevant Units in that three-year period, the averaging and pro rating provisions of paragraph 1.3 shall (with the necessary modifications) apply where that three-year period does not exactly coincide with successive Financial Years.

6. **Agreed Unit reductions**

6.1 An Equity Partner may agree with the Managing Partner a reduction in the number of Units allocated to that Equity Partner from the number that Equity Partner is entitled to by virtue of paragraphs 2, 3 or 4. The Managing Partner will consult with the Senior Partner prior to exercising such authority.

6.2 If the Managing Partner has made such an agreement with an Equity Partner, the Managing Partner may also agree with the Equity Partner that the number of Units allocated is thereafter increased, but not to a number which exceeds 280 Units.

6.3 The Partnership Council will establish a Policy which governs the exercise of the Managing Partner's authority under this paragraph. The Policy will require the Managing Partner to consult the Senior Partner within every two years about an agreement with an Equity Partner made under this paragraph 6, unless such agreement with the relevant Equity Partner expressly provides for that Equity Partner's retirement from the Partnership at a specified date.

7. **Reporting**

7.1 As soon as is reasonably practicable after finalisation of the decisions:

7.1.1 each Equity Partner will be notified of the outcome of any Biennial Review in writing by the Managing Partner; and

7.1.2 each Partner who will be accelerated to a higher position on the Equity Ladder and/or awarded a bonus will be notified of the outcome of any Annual Review by the Managing Partner.

7.2 After each Annual Review and Biennial Review has been completed (including the determination of any appeal), the Wider Leadership Group will post on PartnerConnect a paper providing:

7.2.1 An overview of the outcome of the review, including the rationale for decision making, notable trends and comments on the outcomes from a diversity perspective (together with relevant comparisons to previous years);

7.2.2 A summary of acceleration decisions;

Schedule 5: Sharing of Equity Remuneration

7.2.3    A register of Bonus Awards;

7.2.4    An overview of agreements pursuant to paragraph 6 of Schedule 5 (*Agreed Unit reductions*), distinguishing those agreed in connection with orderly succession or retirement planning;

7.2.5    The number of Equity Partners and Non-Equity Partners, including a breakdown by gender by region and practice area; and

7.2.6    The number of Equity Partners and Non-Equity Partners who have retired in each of the last two Financial Years.

7.3    The Partner Review Group will, as an annex to the Wider Leadership Group's report, confirm how it performed its role and include any observations on the review process that it considers relevant to share with Partners.

## 8.    Appeals

8.1    An Equity Partner will have a right of appeal if the outcome of a Biennial Review is that such Equity Partner's share of Equity Renumeration is reduced to a level below 220 Units (having been previously allocated more than 220 Units).

8.2    Any appeal must be notified in writing to the Senior Partner within ten business days of being notified of the outcome of any Biennial Review. The Equity Partner's request must be accompanied by a submission of no more than five pages stating the matters that such Equity Partner wants to be taken into consideration of the appeal.

8.3    The appeal shall be considered by a panel of three Equity Partners selected by the Partnership Council. A decision on whether the relevant outcome was fair shall be made by a majority of the appeal panel members and shall be final.

8.4    The Partnership Council may by Policy establish additional procedures in relation to the administration and conduct of appeals.

*(Schedule 5 amended on 29 January 2010, with effect from 1 March 2010, with effect from 1 September 2014, with effect from 1 May 2015, with effect from 1 May 2017, with effect from 23 April 2020, with effect from 1 May 2021 and 15 March 2024)*

**SCHEDULE 6**
**DISTRIBUTION OF REMUNERATION**

This Schedule applies to the distribution and payment of profit and other remuneration by the Partnership and the Associated Firms to Equity Partners or Non-Equity Partners (including, in each case, amounts allocated in accordance with paragraph 3.6 of Schedule 4 (*Accounts*)). Schedule 7 (*Capital*) also applies to Equity Partners' capital-related profit.

1.    **Responsibility**

1.1    The ELG shall determine all matters relating to the distribution and payment of remuneration to Partners and shall determine the Policies which govern the exercise of this responsibility.

1.2    The Partners shall procure (to the extent they are able to do so) that Associated Firms distribute profits in accordance with any determination of the ELG.

2.    **Non-Equity Partners' remuneration**

2.1    A Non-Equity Partner's remuneration is determined by reference to the applicable contract concluded pursuant to the Policies under paragraph 3.4.3 of Schedule 1 (*Status etc. of Partners*).

2.2    The ELG has the authority to determine the extent to which all or part of a Non-Equity Partner's remuneration is satisfied by way of employment remuneration or allocating and distributing a profit share to the Non-Equity Partner or by other means. The ELG may only allocate a profit share to a Non-Equity Partner if it is satisfied that the arrangements relating to such allocation are in the overall interests of the Partnership and do not materially prejudice the Partners concerned.

2.3    The allocation of a profit share to a Non-Equity Partner does not indicate that the Non-Equity Partner has different standing from a Non-Equity Partner who is remunerated in another manner.

2.4    The ELG has authority to determine all matters relating to any arrangements under this paragraph 2 and shall determine the Policies which govern the exercise of this authority.

3.    **Equity Partners' Entitlement**

3.1    Equity Partners are entitled to receive their shares of Equity Remuneration in accordance with this Schedule and the relevant Policies.

3.2    Each Equity Partner who has made a capital contribution is entitled to receive a capital-related profit in accordance with this Schedule, Schedule 7 (*Capital*) and the relevant Policies.

4.    **Rules for distribution of Equity Remuneration**

4.1    The ELG shall by Policy determine the gross sums to be paid to each Equity Partner during each Financial Year on account of each Equity Partner's share of (a) capital-related profit and (b) estimated Equity Remuneration for that Financial Year.

4.2     The ELG shall determine by Policy the instalments in which the payments on account are to be made, the timing of the payments and the deductions which are to be made from the gross sum.

4.3     The Policy may provide that the payment of the gross sum be subject to deductions for:

4.3.1   Tax likely to be payable by the Equity Partner on an income equal to the gross sum;

4.3.2   such sums as the Partnership and the Associated Firms have paid or will pay on behalf of the Equity Partner; and

4.3.3   such sums as may be due to the Partnership and Associated Firms from the Equity Partner.

4.4     Each Equity Partner is entitled to receive, on account, the gross sum less the deductions determined pursuant to the Policy.

4.5     The ELG shall determine by Policy the basis on which, for any Financial Year, the balance of each Equity Partner's share of Equity Remuneration is paid (that is, the balance after payments on account as provided in paragraph 4.1). This will include the instalments in which the balance is paid, the timing of the payments and the deductions which are to be made from the payments for:

4.5.1   Tax on remuneration likely to be payable by the Equity Partner in accordance with any Policies relating to the Tax reserve;

4.5.2   such sums as the Partnership and the Associated Firms have paid or will pay on behalf of the Equity Partner; and

4.5.3   such sums as may be due to the Partnership and the Associated Firms from the Equity Partner.

4.6     Each Equity Partner is entitled to receive the balance less the deductions determined pursuant to the Policy unless this Agreement provides otherwise.

*(Former paragraph 4.6 deleted with effect from 1 May 2015)*

5.      **Overpayment**

If an Equity Partner or former Equity Partner receives more than the applicable due amount of remuneration for a Financial Year (as reduced by the deductions referred to in paragraphs 4.1 and 4.2), the relevant Equity Partner or former Equity Partner shall repay the excess on such terms and at such time as the Managing Partner or the Executive Partner may specify.

6.      **Distribution of Equity Remuneration otherwise than in Accounts Currency**

6.1     The Equity Remuneration of an Equity Partner whose Long-term Base is in an office whose management accounting currency (the **"Office Currency"**) is not the Accounts Currency shall be paid in the Office Currency unless the Managing Partner or the Executive Partner agrees otherwise in accordance with any Policy of the ELG.

6.2    The ELG has the authority to determine by Policy the exchange rate for the calculation and payment of Equity Remuneration to an Equity Partner who is not paid in the Accounts Currency.

*(Amended 20 March 2012)*

7.    **Tax reserve**

7.1    The Partnership shall reserve out of each Equity Partner's share of Partnership Profit for each Financial Year such amount as is determined pursuant to a Policy of the ELG to be necessary to meet the likely Tax liabilities of the Equity Partner in relation to such share of Partnership Profit. To the extent necessary to achieve parity of Tax liability between Equity Partners in the same country, an Equity Partner may be treated as liable for a proportionate share of another Equity Partner's Tax if, as a result of receiving a share of Partnership Profit from different sources to other Equity Partners in the same country, that Equity Partner is thereby unfairly advantaged. An Equity Partner may be treated as liable for a proportionate share of the Tax for which an Associated Firm or a foreign branch of the Partnership is liable, to the extent that Equity Partner receives a share of Partnership Profit from a source which includes that Associated Firm or branch. The reserve may include an appropriate provision for deferred Tax in accordance with applicable accounting standards. Any payments of an Equity Partner's share of Partnership Profit shall be made net of the amount of the Tax reserve.

*(Amended with effect from 1 May 2009)*

7.2    The Partnership is responsible for calculating the Tax payable by each Equity Partner in respect of each Financial Year in relation to each such Equity Partner's share of Partnership Profit. The Partnership shall have the responsibility for paying on the applicable Tax payment dates any Tax which has been, or will fall to be, taken into account in calculating the amount of the Tax reserved on account of the Equity Partner in question. Each Equity Partner shall comply with all requirements of the Partnership to enable the Partnership to make or supply (either for its own account or on account of the Equity Partner) all appropriate Tax returns, information to Tax authorities, Tax computations, Tax payments, claims for reliefs, credits or repayments, and generally to enable the Partnership to manage the computation and proper discharge of all Tax liabilities of the Equity Partner in relation to that Equity Partner's share of Partnership Profit and to comply with the requirements of any relevant Tax authority in respect of applicable Tax liabilities. Any interest, penalty or other cost incurred as a result of the failure of an Equity Partner to comply with the requirements of the Partnership shall be for the account of that Equity Partner.

7.3    The Partnership shall maintain a Tax reserve account in relation to each Equity Partner. The account shall include all entries necessary to reflect the Tax reserved by the Partnership under these provisions, the relevant Tax liabilities of the Equity Partner, the discharge of such Tax liabilities and any other matters relating thereto. The ELG shall by Policy determine the basis on which the Tax reserve account will be maintained. In connection with the Tax reserve account, the Partnership may advance to Equity Partners the benefits of certain Tax reliefs arising in connection with certain pension arrangements upon terms determined pursuant to a Policy. The Partnership shall not pay interest in respect of a positive balance on a Tax reserve account. Interest shall not

be payable by an Equity Partner in respect of a negative balance on that Equity Partner's Tax reserve account.

7.4     Each Equity Partner authorises (i) the Managing Partner (or such other Equity Partner as the Managing Partner nominates), the chief financial officer and the Director of Tax and Treasury and (ii) any professional organisation appointed by the Executive Partner to assist in completing Equity Partners' Tax returns, to sign any Tax return, Tax computation, Tax election or other similar document on behalf of the Equity Partner provided that:

  7.4.1     the laws of the relevant Tax jurisdiction permit the document in question to be so signed; and

  7.4.2     the relevant document relates exclusively (i) to the profits, losses, income, gains or Tax liability of the Partnership or of any Associated Firm or to that Equity Partner's share thereof or liability to Tax in respect thereof and (ii) any other profits, losses, income, gains or Tax liability that the Equity Partner has disclosed to the Partnership so that it may prepare the relevant document on behalf of the Equity Partner.

Any person authorised under this paragraph and, in the case of a professional association including the individuals acting under its name, may, in their discretion, notify any member of the ELG and/or the Regional Managing Partner if that person considers that an Equity Partner is acting in a manner which is materially inconsistent with that Equity Partner's obligations under this Agreement or any Policy concerning the completion and/or filing of any tax return. Each Equity Partner acknowledges that any obligations of professional secrecy are waived in respect of such notification.

*(Amended with effect from 23 April 2020)*

7.5     Each Equity Partner authorises the Partnership to pay into any bank account held in the name of the Partnership any cheque or other financial instrument issued by any relevant Tax authority in respect of taxes paid or overpaid by the Equity Partner or by the Partnership or an Associated Firm (a "**Partnership Tax refund**"), whether such cheque or other financial instrument is payable to the Equity Partner or to the Partnership or to an Associated Firm, and agrees to endorse any such cheque or financial instrument in favour of the Partnership, provided that:

  7.5.1     the laws of the relevant Tax jurisdiction permit the authority to be exercised;

  7.5.2     the Partnership Tax refund relates exclusively to the profits, losses, income, gains or Tax liability of the Partnership or an Associated Firm or to the Equity Partner's share thereof or liability to Tax in respect thereof;

  7.5.3     the Equity Partner's Tax reserve account has been calculated on the assumption that the anticipated Partnership Tax refund will be paid or repaid to the Partnership or an Associated Firm and not to the Equity Partner; and

  7.5.4     when the Partnership pays a cheque or other financial instrument in respect of an Equity Partner's Partnership Tax refund into a bank account held in the name

of the Partnership it will account to that Equity Partner for the Partnership Tax refund by crediting that Equity Partner's Tax reserve account.

Subject to the same provisos, any Equity Partner who is paid any Partnership Tax refund by electronic means, will pay such refund to the Partnership.

7.6    The ELG has authority for all matters required to give full and practical effect to these Tax reserve provisions and to make Policies dealing with the payment of Equity Partners' tax liabilities. The Managing Partner has the power to specify any particular cases where, by reason of the circumstances of the Equity Partner concerned, or by reason of the nature of the Tax liabilities concerned, no reserve (or a partial reserve only) in relation to a liability to Tax should be made for an Equity Partner.

7.7    Paragraphs 7.1 to 7.6 apply to a Non-Equity Partner to the extent decided by the ELG by Policy.

7.8    The Partnership has authority to administer, in a manner consistent with the terms of this paragraph 7, the tax reserve account maintained by the Previous Partnership in relation to each Equity Partner. Each such account may be consolidated with the Tax reserve account to be maintained in relation to the relevant Equity Partner pursuant to this paragraph 7.

7.9    This paragraph concerns the UK Tax on overlap profit which, under UK legislation, is attributable to a Partner's first tax years as a member or partner of a partnership, when either the Partner is UK tax resident or the partnership has UK source profits.

The Partnership will fund the Partner's tax on overlap profit until the Financial Year in which the Partner ceases to be a Member or, if later, a member of any Associated Firm for the purposes of the LLPA.

The Partner will take the risk (whether proving beneficial or detrimental) which arises from the possibility that the rates at which the overlap profit is taxed will be different from the rates prevailing in the Financial Year in which the Partner ceases to be a member of the Partnership or an Associated Firm for the purposes of the LLPA (when UK legislation allows the Partner's overlap profit to be deducted from the Partner's UK source income). The ELG has the authority to establish a Policy under which, in exceptional circumstances, the Partnership will take all or part of such risk.

*(Added 12 July 2012 and amended with effect from 23 April 2020)*

8.    **Income from Associated Firms, allocation of sources of income, varying structural arrangements and related matters**

8.1    The ELG has the power to determine the matters set out below and may determine Policies governing the exercise of such power. The Managing Partner has the power to determine the matters set out below to the extent they are of a routine and administrative nature. Any question as to whether a matter is, for the purposes of this paragraph 8, of a routine and administrative nature shall be decided by the Senior Partner whose decision shall be final and binding. The matters in question are:

8.1.1    the basis on and extent to which a Partner's remuneration is satisfied out of an allocation of gross income and/or as between the different sources of income

and profit of the Partnership and/or any share of income, profits or other remuneration from being a partner, principal, officer or employee in, or contracted to provide services to, any Associated Firm;

8.1.2    the structural arrangements through which the Partnership and/or Associated Firms operate (both generally and in relation to any specific jurisdiction) and the participation therein by Partners or groups of Partners or particular Partners (including, without limitation, participation as a partner, principal, officer or employee in, or under any contract to provide services to, the Partnership or any Associated Firm);

8.1.3    the basis on and extent to which a Partner may be indemnified by the Partnership or any Associated Firm for a Tax liability which has arisen by reason of the Transfer;

8.1.4    the basis on and extent to which a Partner accounts to the Partnership for any benefit or remuneration received from any directorship, trusteeship or other office or position or from acting as arbitrator or mediator, or from teaching, speaking or writing about legal and business matters or which is otherwise connected with a Partner's practice, experience or reputation as a lawyer from the Partnership; and

8.1.5    the basis on which an Equity Partner's entitlement to remuneration is abated by amounts received by that Equity Partner under the insurance in relation to sickness or incapacity that Equity Partner is required to buy in accordance with paragraph 8 of Schedule 12 (*Partner Behaviour and Obligations*).

8.2    In determining any of the matters referred to in paragraphs 8.1.1 and 8.1.2, the ELG will endeavour to reflect (so far as practicable) the structural and other arrangements existing immediately before the Effective Date. However, in order to meet any changing circumstances, the ELG or the Managing Partner (as the case may be) will have a general discretion to vary arrangements between Partners as it (or the Managing Partner) sees fit. The discretion must be exercised in a manner which, taking into account the overall interests of the Partnership, is fair to all Partners concerned. The discretion may be exercised so as to vary the structure of the Partnership and Associated Firms or the participation therein by any Partners, vary profit allocation or sources of income and profit as between Partners (although not the overall entitlement to a share of Equity Remuneration), require indemnities between Partners or between the Partnership or an Associated Firm and Partners or require that Partners take action to mitigate or, at the Partnership's cost, dispute arrangements which have an adverse effect on them, allowing the Partnership conduct of any proceedings. The discretion may not be exercised unless the variation in arrangements is of a routine and administrative nature or the Partnership Council confirms that the variation in arrangements is (i) in accordance with this Agreement and (ii) taking into account the overall interests of the Partnership, fair to all Partners concerned. In exercising the discretion the ELG or the Managing Partner (as the case may be) will take account of the following guidelines, which the ELG or the Managing Partner may interpret and apply as it (or the Managing Partner) thinks is reasonable.

8.2.1    Except in relation to any foreign Tax liabilities where (by reason of the incidence of the Tax or its treatment in the Partnership Accounts or otherwise)

the cost thereof is a charge which it is fair should be borne directly or indirectly by all or substantially all Equity Partners, an Equity Partner should not normally pay more Tax on the applicable Equity Remuneration than would have been the case if the full share of Equity Remuneration had been earned as income arising in that Equity Partner's country of residence or citizenship (ignoring for these purposes any particular relief or Tax shelter available to an Equity Partner from non-partnership interests).

8.2.2   An Equity Partner should not normally be regarded as prejudiced if an Equity Partner pays Tax (or suffers some indirect cost) on that Equity Partner's share of Equity Remuneration up to the extent of any Tax liability which that Equity Partner would have paid had the full share of Equity Remuneration been earned as income arising in that Equity Partner's country of residence or citizenship.

8.2.3   As a general approach (but without creating any obligation on the Partnership or the ELG or the Managing Partner and without conferring any right on any Equity Partner), the Partnership should facilitate in its worldwide structure such arrangements as are effective in achieving Tax efficiency for each Equity Partner, provided that such Tax efficiency for one Equity Partner or group of Equity Partner is not achieved:

(a)   in a way which could conflict with the commercial or professional requirements of the Partnership as a whole;

(b)   at a material Tax or other cost (directly or indirectly) borne by other Equity Partners; or

(c)   at a material administrative cost borne by the Partnership as a whole.

8.2.4   It may be the case in particular circumstances that certain Tax efficiencies for one group of Equity Partners may be achieved only at a Tax or other cost to another group of Equity Partners, but that the Tax efficiencies potentially available to the first group of Equity Partners significantly exceed those Tax or other costs potentially suffered by the second group of Equity Partners. In such a case, if it is possible to so arrange matters in a manner which is fair to all Equity Partners concerned, the ELG or the Managing Partner (as the case may be) may permit arrangements whereby that group of Equity Partners who wish to take advantage of such Tax efficiencies may do so, but on terms under which the Equity Partners in that group bear in appropriate proportions the costs or losses (including the costs represented by any additional Tax liabilities) suffered by the second group of Equity Partners as described above.

8.2.5   If certain Tax liabilities, being foreign Tax liabilities of particular Equity Partners, bear unfairly as a cost on some Equity Partners (and not equitably on all Equity Partners) by reason of the structure adopted by the Partnership and Associated Firms and the ELG or the Managing Partner cannot reasonably rearrange matters to eliminate the cost in question, the ELG or the Managing Partner (as the case may be) shall determine in a just and reasonable manner how such cost should be shared appropriately between all Equity Partners.

8.3     Paragraphs 8.2.1, 8.2.2 and 8.2.5 apply to a Non-Equity Partner who is allocated a profit share as if references to that Non-Equity Partner's share of Equity Remuneration were references to that profit share.

8.4     The Firm shall be permitted to make or direct any Partner to make, or refrain from making, any lawfully permitted election in relation to any deferral of the payment of any Tax by a Partner in order to avoid a detrimental effect on the Firm's cashflows provided that the Firm shall hold any impacted Partner harmless from any additional costs or payments that Partner may be liable for as a result of such election.

*(Added with effect from 15 March 2024)*

8.5     Any determination made pursuant to this paragraph 8 shall constitute a binding obligation on the Partners concerned.

9.      **Allowances for Equity Partners**

9.1     The ELG has the power to implement a system of monetary allowances and/or benefits for any Equity Partner who is working:

9.1.1   by way of temporary secondment to an office of the Partnership or an Associated Firm;

9.1.2   in an office in a country which is not the Equity Partner's Long-term Base;

9.1.3   over a prolonged period in a country where there is no office of the Partnership or an Associated Firm; or

9.1.4   in any other circumstances where in the opinion of the ELG it is appropriate to pay such an allowance or provide such benefits, having regard to the displacement, disruption and cost to the Equity Partner of working away from the Equity Partner's Long-term Base or home country or such other circumstances as the ELG, with the approval of the Partnership Council, determines to be exceptional.

and to determine any Policy which will govern the exercise of such power.

*(Amended with effect from 23 April 2020)*

9.2     The ELG shall determine:

9.2.1   the nature and scope of such a system of allowances and benefits; and

9.2.2   the terms and conditions relating to the operation of such a system and to any awards of specific allowances or benefits.

10.     **New Equity Partners: special drawings and accelerated payments of Equity Remuneration**

A person admitted as an Equity Partner may suffer a cashflow disadvantage (after deductions for the Tax reserve and all other deductions made by the Partnership on that person's behalf) under the then current arrangements for profit distributions when they

are compared with the net amount, and timing of payments, to which that Equity Partner was entitled in respect of remuneration from that Equity Partner's previous organisation or when that Equity Partner was a Non-Equity Partner.

In such a case the Managing Partner or the Executive Partner shall have the power, for a period not exceeding three years after the person concerned was admitted as an Equity Partner, to make additional or accelerated distributions of or on account of Equity Remuneration to the Equity Partner so as to minimise any such cashflow disadvantage to the Equity Partner, taking that Equity Partner's position overall. They may not exercise such power so as to pay the Equity Partner more than in total is due on that Equity Partner's share of Equity Remuneration for the Financial Year in question, after deductions for the Tax reserve.

In exercising such power, the Managing Partner and the Executive Partner will take into account the following factors:

10.1    any payments (after all deductions) which the Equity Partner, if admitted as a lateral hire, continues to receive from that Equity Partner's previous organisation;

10.2    the amount and timing of payments in respect of Tax for which the Equity Partner would have been liable had the Partnership had no system of reserving for Tax and the consequence for that Equity Partner of moving to the Partnership's system of reserving for Tax; and

10.3    the desirability of the Equity Partner receiving distributions of or on account of Equity Remuneration in accordance with the Policy made under this Schedule as soon as is reasonable.

*(Amended with effect from 1 September 2014 and former paragraph 11 deleted 23 April 2020)*

11.    **Withholding of Equity Remuneration and distributions from an Equity Partner allocated 300 Units or more**

Paragraph 5 of Schedule 5 (Sharing of Equity Remuneration) contains provisions which, in certain circumstances, disentitle Equity Partners who have been allocated 300 Units or more (or more than 130 Units prior to 1 May 2021) to certain Equity Remuneration and distributions.

*(Amended with effect from 1 May 2015, with effect from 1 May 2017, with effect from 23 April 2020 and with effect from 15 March 2024)*

12.    **Payments of Partnership Profit to a former Equity Partner**

12.1    The ELG shall determine by Policy the basis on which there is paid to an Equity Partner the balance of any Partnership Profit due to that Equity Partner for the Financial Year in which that Equity Partner ceases to be an Equity Partner or for a previous Financial Year.

12.2    The ELG's Policy may provide that the Partnership will settle the balance of an Equity Partner's Partnership Profit or Partner Annuity before it would otherwise be payable

and release all or part of the Equity Partner's Tax reserve. The Managing Partner has the authority to make such an agreement within the terms of the applicable Policy.

12.3    The Managing Partner may agree that if a settlement in respect of Partnership Profit or a Partner Annuity made under these provisions proves to represent less or more than the share of Partnership Profit or the Partner Annuity which would have been payable for any Financial Years ending before or after the date on which the Equity Partner in question ceases to be an Equity Partner, no further payment in respect of Partnership Profit or the Partner Annuity shall be made to or by the Equity Partner in respect of the shortfall or the excess. In that case the shortfall or the excess shall accrue to the Partnership and Associated Firms for the Financial Year in which the Equity Partner in question ceases to be an Equity Partner or such other Financial Year as the Audit Committee may determine.

13.    **Withholding of Partnership Profits from a former Equity Partner who recently took sabbatical**

If an Equity Partner retires from the Partnership otherwise than at the Partnership's request within 18 months after returning from a sabbatical, the Partnership Council, with the recommendation of the ELG, may decide that the Equity Remuneration of the retired Equity Partner shall be reduced by the amount of Equity Remuneration accruing to the retired Equity Partner for the period of the sabbatical. The reduction in Equity Remuneration shall be effected by an appropriate reduction in the number of Units allocated to the retired Equity Partner in the Financial Year of that Equity Partner's retirement and, if necessary to achieve such reduction in full, in the preceding Financial Year. To give full effect to the reduction in Equity Remuneration, the Partnership and Associated Firms may deduct an appropriate amount from any other amount owed by the Partnership or any Associated Firm to the retired Equity Partner.

Such a decision by the Partnership Council shall be binding, notwithstanding any other provision of this Agreement.

*(Amended 9 August 2007)*

14.    **Withholding of Partnership Profits from an Equity Partner pursuant to a decision of the Disciplinary Committee**

Paragraph 7.3 of Schedule 12 permits the Partnership Council to establish a Policy which determines the operation and powers of the Disciplinary Committee and the consequences of its decisions. Such Policy may permit the Disciplinary Committee to impose a fine or deferment of payment which causes the withholding of Equity Remuneration and distributions from an Equity Partner.

*(Added 23 April 2020)*

15.    **Deductions and set-off**

15.1    The Partnership and any Associated Firm may set off any amount from time to time owing by any of them to a Partner against any amount from time to time owing by that Partner to the Partnership or Associated Firm.

- 43 -

Schedule 6: Distribution of Remuneration

15.2    The failure to make a deduction authorised by this Agreement shall not impair or constitute a waiver of the right to make the deduction.

**SCHEDULE 7**
**CAPITAL**

1.    **Capital Contributions – general**

1.1    Each Equity Partner shall contribute capital to the Partnership or an Associated Firm.

1.2    Such contributions shall be governed by the terms of this Schedule and such other terms as, being consistent with this Schedule, are determined by the ELG from time to time.

2.    **Firm Equity Partners**

2.1    *Capital Contributions*

2.1.1    Each Firm Equity Partner shall contribute capital to the Partnership. The amount, currency and timing of such contributions shall be determined by the ELG by Policy, provided that the required contribution of each Firm Equity Partner in respect of each Unit held by that Firm Equity Partner shall be no more than the Relevant Amount. The **"Relevant Amount"** is £4,060 or such other figure determined from time to time by a Special Resolution of Equity Partners.

*(Amended with effect from 1 May 2017, with effect from 1 May 2021 and with effect from 24 October 2024)*

2.1.2    The ELG may determine by Policy that certain Unit holdings (or fluctuations therein) shall be disregarded for the purposes of this Schedule.

2.1.3    Capital contributions will not be repayable except as stated in paragraphs 2.1.4, 2.1.5 and 2.1.6 and will carry no right to receive income or any other distribution save for the capital-related profit referred to in paragraph 2.4.

2.1.4    Within six months after a person ceases to be a Firm Equity Partner, the Partnership shall repay the capital contributed by that person pursuant to this Schedule. If a Firm Equity Partner's Unit allocation is reduced, the Partnership shall repay the capital attributable to the number of Units by which that Firm Equity Partner's allocation has been reduced within six months after the beginning of the Financial Year in which the reduction takes effect. No repayment of capital shall be made if a winding-up of the Partnership has commenced. A Firm Equity Partner's contribution shall continue to be treated as capital until it is actually repaid.

2.1.5    If all or part of a loan to a Firm Equity Partner from a third party funder which was arranged by the Partnership and used in full to finance all or part of that Firm Equity Partner's 's capital contribution (a **"Partner Capital Loan"**) becomes repayable whilst that person is a Firm Equity Partner (and such repayment cannot be deferred or refinanced with other funding arranged for by the Partnership), the ELG may approve the Partnership making a loan to the Firm Equity Partner (a **"Bridging Loan"**) in such amount as required to make such repayment by no later than the relevant repayment date. Any Bridging Loan shall bear interest at the rate equal to the prevailing average rate chargeable by third party funders of capital contributions. The ELG may require

a Firm Equity Partner to repay a Bridging Loan at any time (without incurring any breakage costs) with funding from a third-party bank arranged by the Firm.

*(Added with effect from 15 March 2024)*

2.1.6    Upon a winding-up of the Partnership, capital contributions shall rank for repayment as provided in Schedule 17 (*Winding-Up of the Partnership and Associated Firms*).

2.1.7    If and to the extent decided by the ELG pursuant to paragraph 3, a Firm Equity Partner's contribution shall be made to an Associated Firm (rather than to the Partnership).  In that event, references to the Partnership shall include that Associated Firm.  As regards right of repayment, contributions made to an Associated Firm shall rank *pari passu* with contributions made to the Partnership.

2.2    *Firm Equity Partner funding of capital contributions*

2.2.1    The Partnership shall endeavour to make arrangements with banks to enable each Firm Equity Partner to borrow an amount equal to the capital required to be contributed.

2.2.2    If so required by a bank as a term of any such borrowing arrangement mentioned in paragraph 2.2.1, a Firm Equity Partner may assign, alienate, charge or offer as security that Firm Equity Partner's interest in the relevant capital contribution (and the Managing Partner shall be deemed to have consented to such action for the purposes of paragraph 3.1.2 of Schedule 15 (*Equity Partners' Termination etc.*)).

2.2.3    Any other assignment, alienation, charge or security by a Firm Equity Partner of that Firm Equity Partner's interest in the relevant capital contribution (and any variation in an assignment, alienation, charge or security referred to in paragraph 2.2.2) shall require the prior written consent of the Managing Partner.

2.3    *Failure to contribute capital*

2.3.1    If a Firm Equity Partner fails to make a capital contribution by the due date:

(a)    that Firm Equity Partner's share of Equity Remuneration shall be reduced by an amount, determined by Policy of the ELG, calculated as default interest on so much of the contribution as is for the time being unpaid; and

(b)    an amount equal to so much of the contribution as is for the time being unpaid shall be withheld from any amounts owing to that Firm Equity Partner by the Partnership or any Associated Firm (whether on account of Equity Remuneration or otherwise) and applied in or towards payment of the contribution.

2.3.2    The ELG may relax the application of paragraph 2.3.1 to the extent justified by the circumstances surrounding the failure to make the contribution.

### 2.4    *Capital-related profit*

2.4.1    The Partnership shall from time to time pay, out of Partnership Profit, a capital-related profit to each Firm Equity Partner who has made a capital contribution.

2.4.2    The amount payable to a Firm Equity Partner as capital-related profit in respect of any period shall be equal to:

(a)    the interest, calculated at the Relevant Rate, which would be payable in respect of that period on a borrowing of an amount corresponding to that Firm Equity Partner 's capital contribution; or

(b)    if there are no such arrangements as referred to in paragraph 2.4.3(a), an amount determined by the ELG; or

(c)    such lesser amount as the ELG may decide, taking into account the overall interests of the Partnership.

2.4.3    For the purposes of paragraph 2.4.2, the **"Relevant Rate"** is:

(a)    in relation to a Firm Equity Partner who has borrowed money from a bank under the arrangements mentioned in paragraph 2.2.1, the interest rate applicable to that borrowing in respect of the relevant period;

(b)    in relation to any other Firm Equity Partner, (i) the lowest interest rate applicable to a borrowing in respect of the relevant period from any of the banks participating in those arrangements or (ii) such other interest rate as the ELG considers fair and reasonable (as between Firm Equity Partners) in the circumstances.

2.4.4    The currency, timing and other terms of any payments of capital-related profit shall be determined by the ELG by Policy.

2.4.5    Payments of capital-related profit shall be subject to the Partnership's Tax Reserve arrangements and such deductions in respect of Tax as it is required by law to deduct.

### 3.    Associated Firm Equity Partners and Employed Equity Partners

3.1    The provisions of this Schedule and any related Policy shall apply *mutatis mutandis* (with such adaptations as the Managing Partner or the Executive Partner decides the circumstances require) to Associated Firm Equity Partners and Employed Equity Partners as if they were Firm Equity Partners: but, unless the ELG determines otherwise, each Associated Firm Equity Partner shall make capital contributions to the Associated Firm with which that Associated Firm Equity Partner is most closely associated (rather than to the Partnership) and each Employed Equity Partner shall make capital contributions to the Partnership.

3.2    Contributions made by any Associated Firm Equity Partner or Employed Equity Partner (whether to an Associated Firm or the Partnership) shall be treated as (or, as nearly as may be permitted by law, as if they were) contributions of capital and, as regards right of repayment, shall rank *pari passu* with capital contributions made by Firm Equity

Partners.  If so required by the ELG, the individual concerned shall subordinate (on terms stipulated by the ELG) claims that individual has against the Partnership and any Associated Firm in respect of that individual's contributions to the claims of the Partnership's (and Associated Firms') banks and such other creditors of the Partnership (and any Associated Firm) as the ELG may determine.

3.3     The ELG may delegate its authority under this paragraph to either or both of the Managing Partner and the Executive Partner.

4.      **Capital contributions prior to the Effective Date**

Except to the extent otherwise decided by the ELG, capital contributions made by an Equity Partner to the Previous Partnership and not repaid before the Effective Date shall be treated, as from the Effective Date, as having been made to the Partnership and, to the extent of the contribution, as satisfying the contributor's obligations under this Schedule.  The rights and obligations of Equity Partners and the Partnership as regards those contributions shall be governed by this Schedule.

**SCHEDULE 8**
**PARTNERSHIP DECISIONS AND MEETINGS**

1.    **Decisions**

1.1    Except where otherwise stated:

1.1.1    a decision by the Equity Partners shall be made by a Special Resolution of Equity Partners; and

1.1.2    a decision by the Partners shall be made by a Special Resolution of Partners.

1.2    A decision which concerns any equity matter (as defined in paragraph 2.1) requires a Special Resolution of Equity Partners.

1.3    Except as mentioned in paragraph 1.4, the following matters require prior approval by a Special Resolution of Partners:

1.3.1    the Partnership or any Associated Firm's acquisition of or investment in any other Entity;

1.3.2    the merger of the Partnership or any Associated Firm with any other Entity;

1.3.3    any arrangement between the Partnership or any Associated Firm and any other Entity (the **"first-mentioned Entity"**) involving:

(a)    the use of the words "Clifford Chance" in the name (or business name) of the first-mentioned Entity or any other Entity; or

(b)    the sharing of profits (otherwise than in relation to a single specific matter) with the first-mentioned Entity;

1.3.4    any arrangement for the reconstruction of the Partnership (involving the transfer of all or any of its business, assets or liabilities to one or more successor Entities in which Partners are to have interests);

1.3.5    the making by the Partnership of a voluntary arrangement or a scheme of compromise or arrangement with its creditors;

1.3.6    any application for an administration order in relation to the Partnership;

1.3.7    the voluntary winding-up of the Partnership or any application for the Partnership to be wound up by the Court; and

1.3.8    an amendment to this Agreement which is not effected by a Special Resolution of Equity Partners.

*(Added with effect from 23 April 2020)*

1.4    Paragraph 1.3.1 does not apply if the other Entity is not a law firm and the acquisition or investment is consistent with the strategy set by the ELG (and communicated to Partners) and the amount initially committed to be invested by the Partnership and

Associated Firms and their acquisition cost, including any deferred or non-cash consideration), is no more than £10m.

Paragraphs 1.3.1 and 1.3.2 do not apply if the other Entity in question is an Associated Firm or the Partnership.

Paragraph 1.3.3 does not apply if the first-mentioned Entity is an Associated Firm or the Partnership.

*(Amended with effect from 23 April 2020)*

1.5     A decision by the Equity Partners or Partners made in accordance with this Agreement (including a Special Resolution of Partners approving an agreement with or relating to a successor Entity as mentioned in paragraph 1.3.4) shall be binding upon the Partnership and upon each Partner, whether or not a Partner voted in favour of it (or had no vote on it) and whether or not its terms do or may require a Partner to incur some personal obligation or liability. Each Partner shall execute all deeds and documents and do all other acts and things necessary or desirable to give effect to the terms of any such decision.

1.6     The relevant Entrenched Consent is required before an Entrenched Right is cancelled or amended in a manner that is contrary to the interests of a Beneficiary.

2.      **Votes**

2.1     Each Partner is entitled to vote on any resolution concerning a matter which requires a decision by Partners, provided that a Non-Equity Partner is not entitled to vote on a resolution which concerns any of the following matters (each an **"equity matter"**):

2.1.1   the termination of this Agreement (including the replacement of it with a new partnership agreement);

2.1.2   capital, including the Relevant Amount as defined in paragraph 2.1.1 of Schedule 7 (*Capital*);

2.1.3   Borrowings requiring a Special Resolution of Equity Partners under paragraphs 3.1.2 to 3.1.4 of Schedule 10 (*Borrowings*);

2.1.4   the sharing or distribution of Equity Remuneration;

2.1.5   the expulsion of an Equity Partner;

2.1.6   an amendment to a provision of this Agreement which concerns an equity matter.

However if the resolution also concerns another substantive matter which, in the opinion of the Senior Partner, is not an equity matter, the Senior Partner has the discretion to determine that the equity matter requires a Special Resolution of Partners notwithstanding any contrary provision of this Agreement (and, in relation to the equity matter, the resolution, if passed, shall have effect as if it had been a Special Resolution of Equity Partners).

*(Amended with effect from 23 April 2020)*

2.2    Each Partner is entitled to one vote on a matter on which that Partner is entitled to vote in that capacity.

2.3    Partners shall reach their decisions by secret ballot. A secret ballot may be carried out by such method (including electronic means) as the Senior Partner may specify. The counting of Partners' votes shall be carried out under the supervision of a person who is not a Partner but who (either individually or as a member of a body) is approved for the purpose by the Senior Partner.

The Senior Partner may ascertain how (i) Equity Partners collectively and (ii) Non-Equity Partners collectively have voted.

2.4    A Partner may appoint another Partner or another person specified by the Senior Partner to vote as a proxy. The appointment may (but need not) direct the way in which the proxy shall cast that Partner's vote. The appointment shall be in writing (including e-mail or facsimile) and delivered to the Senior Partner or another person specified by or with the authority of the Senior Partner before the vote closes.

*(Amended 9 August 2007)*

2.5    Where this Agreement provides that a Partner is not entitled to vote on a particular matter, that Partner's existence shall be ignored when calculating whether or not the requisite majority has been obtained.

2.6    The Partnership Council has the authority to determine that by reason of any law, regulation or like consideration concerning a particular Partner (or any other Partner), that particular Partner is not entitled to vote. An Equity Partner who is not entitled to vote for this reason is entitled to "express a view" on resolutions of Equity Partners and resolutions of Partners. A Non-Equity Partner who is not entitled to vote for this reason is entitled to "express a view" on resolutions of Partners.

2.7    If the expressions of view would have altered the result of the vote had they been counted as votes, a further vote of Equity Partners or Partners, as the case may be, shall be taken as to whether the result of the vote should stand or whether it should be altered to take account of the expressions of view. The further vote shall be determined by the same majority as was required on the original vote. If the requisite majority is in favour of the result being altered, the altered result shall be the actual result of the vote.

The Senior Partner may ascertain how (i) Equity Partners collectively and (ii) Non-Equity Partners collectively have expressed their views.

2.8    Paragraph 2.4 applies *mutatis mutandis* so that a Partner who is entitled to express a view may appoint another Partner or another person specified by the Senior Partner to express a view as a proxy.

*(Amended 9 August 2007)*

2.9     This paragraph 2.9 applies if:

2.9.1   the Managing Partner has good reason to believe that a Partner is contemplating retiring from the Partnership in the near future; and

2.9.2   the Managing Partner believes that confidential information in the hands of the Partner could pose a risk, or could be seen by other Partners to pose a risk, to the best interests of the Partnership or its clients.

In such circumstances the Managing Partner may, with the agreement of the Senior Partner, decide that the Partner is not entitled to confidential information nor to attend meetings or discussions at which confidential information might be disclosed nor entitled to vote or express a view on a particular matter. The Partner will be told about such a decision unless the Senior Partner or a member of the ELG has been informed by such Partner that such Partner is considering or intending retirement from the Partnership. Such a decision by the Managing Partner shall be binding on all parties to this Agreement.

*(Amended 9 August 2007)*

3.      **Meetings**

3.1     The Senior Partner or the Managing Partner may convene a meeting of Partners or a meeting of Equity Partners.

A meeting of Partners shall be held when at least a tenth of the Partners has made written requests to the Senior Partner, or in the Senior Partner's absence, the Managing Partner, to convene a meeting.

A meeting of Equity Partners shall be held when at least a tenth of the Equity Partners has made written requests to the Senior Partner, or in the Senior Partner's absence, the Managing Partner, to convene a meeting. Non-Equity Partners shall only be entitled to attend meetings of Equity Partners if the Senior Partner so decides.

3.2     Unless the Partnership Council decides otherwise, there shall be one meeting of the Partners each calendar year having the purpose of an "annual meeting". The Partnership Council shall determine by Policy the matters to be included on the agenda for the annual meeting.

3.3     The Senior Partner may invite any person to attend, without a vote, any meeting of Partners and any meeting of Equity Partners.

3.4     The Auditors are entitled:

3.4.1   to receive all notices of, and other communications relating to, any meeting which a Member is entitled to receive (in a Member's capacity as Member) and where any part of the business of the meeting concerns them as auditors;

3.4.2   to attend any meeting of the Partnership where any part of the business of the meeting concerns them as auditors; and

3.4.3    to be heard at any meeting which they attend on any part of the business of the meeting which concerns them as auditors.

4.    **Resolutions of Members**

4.1    Save as provided in paragraph 4.2, any matter which, pursuant to the LLPA (or regulations made thereunder), is required to be approved, agreed or authorised by the Members (in that capacity) shall be treated as so approved, agreed or authorised if it is approved by resolution of the Members passed by such majority as is required by the relevant statute or regulations or, if no majority is specified therein, by more than half of the votes cast by Members.

4.2    This paragraph 4.2 applies where any matter referred to in paragraph 1.3 involves a scheme of compromise or arrangement between the Partnership and Members or any class of them (the **"relevant Members"**) under section 899 of the Companies Act 2006. For the purposes of determining whether the scheme has been agreed by the relevant Members in accordance with the section, the requisite majority in value shall be determined by reference to the number of Units held by the relevant Members.

5.    **Procedures and Practical Matters**

Subject as provided in this Schedule, the Partnership Council has the power to decide on the procedures for:

5.1.1    the convening and conduct of (i) meetings of Partners and (ii) meetings of Equity Partners; and

5.1.2    voting by Partners

and to determine such procedures by Policy.

**SCHEDULE 9**
**GOVERNANCE AND MANAGEMENT**

1.    **Governance and Management**

1.1    The Partnership will have a Partnership Council and an Executive Leadership Group. This Schedule sets out:

1.1.1    the responsibilities of the Partnership Council and ELG and their members;

1.1.2    the composition of the Partnership Council and ELG;

1.1.3    how the members of the Partnership Council and ELG are appointed and may be removed from office;

1.1.4    provisions governing the business of the Partnership Council and ELG;

1.1.5    procedures for adoption, amendment or cancellation of Policies; and

1.1.6    emergency powers provisions.

1.2    The ELG is delegated with responsibility and authority for all matters affecting the Partnership and Associated Firms, including their management except insofar as a matter is:

1.2.1    reserved for a decision:

(a)    by Equity Partners pursuant to paragraph 1.2 of Schedule 8 (*Partnership Decisions and Meetings*),

(b)    by Partners pursuant to paragraph 1.3 of Schedule 8 (*Partnership Decisions and Meetings*),

or as otherwise expressly provided by this Agreement;

1.2.2    reserved for decision by Members or Designated Members by or pursuant to the LLPA;

1.2.3    within the responsibilities delegated to the Partnership Council under this Agreement; or

1.2.4    within the responsibilities delegated to the Senior Partner, the Managing Partner, the Executive Partner or any other person under this Agreement.

1.3    If any dispute arises as to whether a matter is within the responsibilities delegated to any person or any body, the Managing Partner and Senior Partner will attempt to resolve the dispute and their determination of the matter will be final and binding. If they fail to resolve the dispute, the question of who has responsibility for the matter will be put to the Equity Partners and determined by an Ordinary Resolution of Equity Partners.

1.4    Any action by any person or any body which is within the powers conferred on the relevant person or body by this Agreement or by law and which gives rise to rights or

liabilities in respect of any other person (whether or not a party to this Agreement) will not be invalidated by any subsequent decision by Equity Partners or Partners.

1.5    Each of the ELG and the Partnership Council has the authority to delegate its powers and responsibilities to committees in accordance with this Schedule. The Managing Partner has the authority to delegate the Managing Partner's powers and responsibilities to any person as the Managing Partner sees fit. A delegation of powers and responsibilities under this Agreement will not relieve the delegator of any responsibilities under this Agreement.

2.    **ELG and Executive Appointments**

2.1    *Responsibilities*

2.1.1    The responsibilities of the ELG will include those set out in a Policy of the Partnership Council. Notwithstanding paragraph 6, the Partnership Council may only amend or cancel the Policy made under this paragraph 2.1.1 with the agreement of the Executive Leadership Group.

2.1.2    Each member of the ELG is expected to carry out that member's responsibilities in the interests of the Partnership and Associated Firms as a whole in the implementation of the strategy set by the ELG and to act as a leader and a role model. Members of the ELG will at all times behave in accordance with the values, conduct and standards expected of all Partners. When the ELG makes a decision, each member of the ELG is required to support and implement the decision unless the Managing Partner agrees otherwise.

2.2    *Committees*

The ELG may appoint ad hoc or permanent committees to help it perform some of its functions and may dissolve all or any of them as and when it considers it appropriate to do so. The committees will comprise members of the ELG and others from the Partnership and Associated Firms with relevant skills or experience. The committees will be accountable to the ELG. The ELG will specify the extent to which each committee is to be delegated with responsibilities of the ELG and/or the extent to which its role is advisory and will agree with each committee the scope of its task. The ELG will supervise all its committees and a list of those in force from time to time will be published on PartnerConnect. Such list will contain:

(a)    the name and purpose of the committee;

(b)    the responsibilities (if any) which are delegated to the committee; and

(c)    the names of the members of the committee.

2.3    *Composition*

2.3.1    The ELG will consist of:

(a)    the Managing Partner, who will be an Equity Partner elected by the Partners;

(b)  the leaders of the Global Business Units;

(c)  the Regional Managing Partners whom the Managing Partner, with the agreement of the Partnership Council, appoints to the ELG (and whom the Manging Partner may, with the agreement of the Partnership Council, remove from the ELG);

(d)  up to four executive members appointed by the Managing Partner (and whom the Managing Partner may remove from the ELG); and

(e)  such additional members as the Managing Partner appoints in accordance with paragraph 2.3.2 (and whom the Managing Partner may, after consulting the Partnership Council, remove from the ELG).

2.3.2  When deciding whom to appoint to the ELG, the Managing Partner will seek to advance the strategy of the Partnership and Associated Firms and to foster an inclusive approach to their leadership.  For either of those reasons the Managing Partner may, after consulting the Partnership Council, appoint to the ELG up to two Partners who do not necessarily have a role described in paragraph 2.3.1 (b), (c) or (d) and a person with relevant skills and experience who is not from the Partnership and Associated Firms.

The ELG will not, without the consent of the Partnership Council, have more than 13 members.

2.3.3  When the ELG decides on a matter by a vote:

(a)  each ELG member who is a Partner will have one vote; and

(b)  ELG members who are not Partners will each have one vote if the Managing Partner so decides

subject to the Policies under paragraph 2.4.

No ELG member who has more than one role on the ELG will have more than one vote.

The Managing Partner may invite whoever the Managing Partner sees fit to attend meetings of the ELG.

2.3.4  The Global Business Units and the regions which have a Regional Managing Partner are defined by a Policy of the ELG.  The ELG may, after consultation with the Partnership Council, create additional GBUs, regions and global practice areas or reorganise or replace them as it sees fit.

2.3.5  If there is any disagreement about the GBU, global practice area or region of which each Partner is a member, the Managing Partner may decide the question and the Managing Partner's decision will be binding.

## 2.4    *Decisions*

The ELG has the power to determine its own decision-making processes and to establish Policies on its decision-making processes.

## 2.5    *Managing Partner*

2.5.1    The Managing Partner will hold office for a period of four years. No Equity Partner may be Managing Partner for more than two terms of office.

2.5.2    The Partnership Council will determine by Policy the procedures for the election of the Managing Partner.

2.5.3    The Partnership Council will be responsible for the administration of elections for the Managing Partner. It may appoint such person or independent body as it thinks fit to assist it in the process or any part of it. A declaration by the Senior Partner as to who has been elected will be conclusive and binding except in the case of manifest error.

2.5.4    A resolution to remove the Managing Partner from office will be put to the Partners if so decided by the Partnership Council. The Partnership Council will put such a resolution to Partners if it considers that the Managing Partner has failed to act as a leader and a role model or has lost the confidence of a significant proportion of Partners. The resolution will be effective if passed as an Ordinary Resolution of Partners.

2.5.5    The Managing Partner may resign from office at any time upon the expiry of not less than six months' notice in writing to the Senior Partner or such shorter period as the Senior Partner may agree. The Managing Partner will cease to be in office on the Managing Partner's Mandatory Retirement Date or on otherwise ceasing to be an Equity Partner.

2.5.6    The Managing Partner will lead the Partnership and Associated Firms.

The Managing Partner will agree twelve-month objectives with the Partnership Council and, at the end of each twelve-month period, review the achievement of the objectives with the Partnership Council and agree renewed twelve-month objectives with the Partnership Council.

2.5.7    The Managing Partner may delegate from time to time such of the Managing Partner's powers and responsibilities as the Managing Partner considers appropriate to the Executive Partner or any other person as the Managing Partner sees fit. If the Managing Partner is absent temporarily or ceases to hold office before a successor is elected, the Senior Partner will allocate the Managing Partner's powers and responsibilities to the Executive Partner and any other person as the Senior Partner sees fit and so that, together or singly, they act as Managing Partner during the Managing Partner 's absence or (as the case may be) until a successor to the Managing Partner is elected and during that period they will, together or singly, have all the powers and responsibilities of the Managing Partner as provided in the Agreement.

2.6    ***Managing Partner's Appointments***

2.6.1    The Managing Partner will appoint each GBU Leader, each Global Practice Area Leader and each Regional Managing Partner. Each will be an Equity Partner. Each will be expected to maintain a material role with clients.

Unless the Partnership Council agrees otherwise, the Managing Partner will appoint a GBU Leader as the Global Practice Area Leader of one of the global practice areas embraced by the relevant GBU Leader's GBU.

When appointing a GBU Leader, a Global Practice Area Leader or a Regional Managing Partner, the Managing Partner will give due consideration to the outcome of a soundings process agreed pursuant to a Policy of the Partnership Council and the Managing Partner will consult the Partnership Council. Each such appointment will require the agreement of the Partnership Council, which will also give due consideration to the outcome of the soundings process.

2.6.2    The term of office of a GBU Leader, a Global Practice Area Leader and a Regional Managing Partner will be four years or such shorter period as the Managing Partner decides. No GBU Leader, Global Practice Area Leader or Regional Managing Partner may hold that position for longer than two terms of up to four years.

If a GBU Leader, a Global Practice Area Leader or a Regional Managing Partner was a member of the Management Committee or ELG before being appointed to that position:

(a)    the relevant person's initial term on the Management Committee or ELG will be treated as having begun on the effective date of that person's election to the Management Committee or ELG as the Practice Area Leader, Regional Managing Partner or Europe Representative; and

(b)    if that was the relevant person's second term on the Management Committee or ELG in that position the two-term limit will run from the effective date of that person's initial election to the Management Committee or ELG as the Practice Area Leader, Regional Managing Partner or Europe Representative.

2.6.3    The Managing Partner will appoint the Executive Partner, the chief financial officer and such other executives as the Managing Partner decides. The Managing Partner will decide their terms of office (which may, subject to paragraph 2.6.7, be indefinite) and their responsibilities.

The Executive Partner will be an Equity Partner. The Executive Partner's appointment will require the agreement of the Partnership Council.

2.6.4    Each member of the ELG, Regional Managing Partner and Global Practice Area Leader will report to the Managing Partner. The Managing Partner will decide the reporting lines of all other persons appointed by the Managing Partner.

Schedule 9: Governance and Management

2.6.5   The Managing Partner will decide the powers and responsibilities of each member of the ELG and others who report to the Managing Partner and set their objectives.

2.6.6   If a member of the ELG is unable to carry out the relevant role due to prolonged absence (including as a consequence of illness, sabbatical leave or exceptional client demand) or ceases to hold office before a successor is appointed, the Managing Partner may, after consulting the Senior Partner, confer on another Equity Partner the powers and responsibilities of the member of the ELG concerned during such absence or (as the case may be) until a successor is appointed.

2.6.7   The Managing Partner may remove from office any person appointed by the Managing Partner. Before removing a GBU Leader, Global Practice Area Leader, Regional Managing Partner or Executive Partner from office the Managing Partner will consult the Partnership Council and obtain its agreement.

2.6.8   A person appointed to office by the Managing Partner will cease to hold that office on that person's Mandatory Retirement Date or ceasing to be a Partner or, if not a Partner, on the termination of that person's contract with the Partnership or any Associated Firm.

*(Added with effect from 23 April 2020)*

## 2.7   *Local Leadership*

2.7.1   The Managing Partner will, with the relevant GBU Leader and Global Practice Area Leader, organise the leadership of the GBU and the global practice area, deciding where it is appropriate to have local practice area leaders and what the local practice area leader's powers and responsibilities should be.

The Managing Partner will consult the relevant GBU Leader, Global Practice Area Leader and Regional Managing Partner about who each local practice area leader should be and will appoint the local practice area leader for a term of four years or such shorter period as the Managing Partner decides.

Before removing a local practice area leader from office the Managing Partner will consult the Senior Partner and the relevant GBU Leader, Regional Managing Partner and Global Practice Area Leader.

2.7.2   The Managing Partner will, with the relevant Regional Managing Partner, organise the leadership of each country within the region, deciding where it is appropriate for an office or group of offices to have an office managing partner and what the office managing partner's powers and responsibilities should be.

The Managing Partner will consult the relevant Regional Managing Partner about who each office managing partner should be and will appoint the office managing partner for a term of four years or such shorter period as the Managing Partner decides.

Before removing an office managing partner from office the Managing Partner will consult the Senior Partner and the relevant Regional Managing Partner.

3.    **Partnership Council**

3.1   *Responsibilities*

    3.1.1   The Partnership Council will be responsible for:

       (a)   The implementation of this Agreement and recommending changes to or the termination of this Agreement;

       (b)   Safeguarding the reputation of the Partnership, though this responsibility will not extend to routine reviews of the actions of those with management responsibilities;

       (c)   Gathering views from Partners on topical matters, representing the interests of Partners and raising concerns on their behalf: members of the Partnership Council will be available to any Partner who wishes to raise concerns about that Partner's personal position and, where appropriate, will raise the concerns with the Senior Partner or an appropriate Partner;

       (d)   Agreeing twelve-month objectives with the Senior Partner and Managing Partner, reviewing the achievement of the objectives and renewing them at the end of each twelve-month period; ensuring that PartnerConnect shows the current objectives of the Senior Partner and Managing Partner; and serving as the body to which the Senior Partner and Managing Partner are accountable for their performance;

       (e)   Monitoring the performance of the ELG and its members to ensure they are acting fairly and in accordance with paragraph 2.1 and the rest of the Agreement, having the power to require the Managing Partner to explain how the ELG or any of its members reached a particular decision if it reasonably believes that the decision may have been reached otherwise than fairly and in accordance with the Agreement; if the Managing Partner's explanation shows that the Partnership Council's belief was well-founded, the Partnership Council has the power to censure the responsible members of the ELG and require the ELG to reconsider the decision;

       (f)   At least once a year, evaluating the ELG's performance during the previous year;

       (g)   When requested by the Senior Partner or Managing Partner, serving as a sounding board in any discussions with the Managing Partner concerning the performance of members of the ELG;

       (h)   Agreeing the appointment and removal of each GBU Leader, Global Practice Area Leader, Regional Managing Partner and Executive Partner pursuant to paragraphs 2.6.1, 2.6.3 and 2.6.7;

       *(Added with effect from 23 April 2020)*

Schedule 9: Governance and Management

(i)     Appointing the Audit Committee and at least one of its elected members to the Audit Committee;

(j)     Appointing the Partner Selection Group; and the matters regarding candidates for partnership, referred to in paragraphs 5.6 and 5.7 of Schedule 2 (*Admission as Partner*);

(k)     Conducting and deciding, itself or through committees, appeals pursuant to Schedule 15 (*Equity Partners' Termination etc*); and

(l)     Determining any matter assigned to the Partnership Council under this Agreement.

3.1.2   Members of the Partnership Council are expected to express their own views and to report the views of the Partners but to carry out their responsibilities in the interests of the Partnership and Associated Firms as a whole. Members of the Partnership Council will at all times behave in accordance with the values, conduct and standards expected of all Partners. When the Partnership Council makes a decision, each member of the Partnership Council is required to support and implement the decision unless the Senior Partner agrees otherwise. The Partnership Council will consider matters which are highly confidential and, in the interests of the Partnership, each member will maintain confidentiality in accordance with guidelines set by the Senior Partner.

## 3.2   *Committees*

3.2.1   The Partnership Council may appoint ad hoc or permanent committees to help it perform some of its functions and may dissolve all or any of them as and when it considers it appropriate to do so. The Partnership Council may establish Policies on its committees. The committees will comprise members of the Partnership Council and others from the Partnership and Associated Firms with relevant skills or experience. The Audit Committee may include one or two people with relevant skills or experience who are not from the Partnership and Associated Firms. The committees will be accountable to the Partnership Council. The Partnership Council will specify the extent to which each committee is delegated with responsibilities of the Partnership Council and/or the extent to which its role is advisory and will agree with each committee the scope of its task. The Partnership Council will supervise all its committees and a list of those in force from time to time will be published on PartnerConnect. Such list will contain:

(a)     the name and purpose of the committee;

(b)     the responsibilities (if any) which are to be delegated to the committee; and

(c)     the names of the members of the committee.

*(Amended with effect from 1 May 2017)*

3.2.2   The Partnership Council will appoint an audit and risk committee (the "**Audit Committee**") which will have up to seven members including at least one

elected member of the Partnership Council. The Audit Committee may require any member of the ELG to attend its meetings.

The Audit Committee will:

(a)    after consulting the ELG, recommend to the Designated Members whom they should appoint as the Auditors;

(b)    review the Partnership Accounts and Partnership Financial Report, having such powers as it reasonably requires to do so, and have responsibility for approving the Partnership Accounts and Partnership Financial Report;

(c)    monitor and assess the Partnership's management of risk generally (including in relation to financial controls, business continuity, IT, legal practice and HR) and its budgeting and Borrowings; and

(d)    have such other responsibilities as are conferred on it by this Agreement.

3.2.3    The Partnership Council will appoint a Disciplinary Committee ("the **Disciplinary Committee**"), which will have five members who are Partners chosen by both the Managing Partner and the Senior Partner. None of the Senior Partner, Managing Partner, Executive Partner, a GBU Leader, Global Practice Area Leader, Regional Managing Partner or office managing partner may be a member of the Disciplinary Committee.

The Disciplinary Committee will carry out the responsibilities set out in paragraph 7 of Schedule 12 (*Partner Behaviour and Obligations*).

*(Added with effect from 23 April 2020)*

3.3    *Composition*

3.3.1    The Partnership Council will consist of:

(a)    the Senior Partner, who will be an Equity Partner elected by the Partners;

(b)    six Partners elected by Partners, but no more than two of the six Partners may be based in the same country; and

(c)    such additional members as the Partnership Council appoints pursuant to paragraph 3.3.2.

The Managing Partner will determine where each Partner is based.

3.3.2    The Partnership Council may appoint to the Partnership Council:

(a)    up to two additional Partners in order to advance the strategy of the Partnership and Associated Firms and to foster an inclusive approach to their leadership; and

(b)    after consultation with the Managing Partner, one or more persons with relevant skills and experience who is not from the Partnership and Associated Firms.

3.3.3    No member of the Partnership Council may simultaneously be the Managing Partner or a GBU Leader, Global Practice Area Leader or Regional Managing Partner or the office managing partner of an office or offices of more than 25 Partners.    Other office managing partners may only be members of the Partnership Council with its approval.

## 3.4    *Decisions*

The Partnership Council has the power to determine its own decision-making processes and to establish Policies on its decision-making processes.

## 3.5    *Elections*

3.5.1    The Partnership Council will determine by Policy the procedures for the election of the elected members of the Partnership Council.

3.5.2    The Senior Partner will be responsible for the administration of elections to the Partnership Council, other than for elections of the Senior Partner. The Senior Partner may appoint such person or independent body as the Senior Partner thinks fit to assist in the process or any part of it.  A declaration by the Senior Partner as to who has been elected will be conclusive and binding except in the case of manifest error.

3.5.3    The Partnership Council will be responsible for the administration of elections for the Senior Partner.  It may appoint such person or independent body as it thinks fit to assist it in the process or any part of it.  A declaration by the Partnership Council as to who has been elected will be conclusive and binding except in the case of manifest error.

## 3.6    *Terms of Office*

3.6.1    Each member of the Partnership Council (except the Senior Partner and members appointed by the Partnership Council) will hold office for a term of three years, measured from the effective date of appointment, unless such member is elected for a shorter period.  No elected Partner may be a member of the Partnership Council for more than two consecutive terms of office (disregarding, in the case of the Senior Partner, a previous term served as an ordinary member of the Partnership Council).

3.6.2    A member of the Partnership Council appointed by the Partnership Council will hold office for a term of three years or such shorter period as the Partnership Council decides.

3.6.3    The names and terms of office of members of the Partnership Council will be recorded in the appropriate Register.

3.7    *Cessation of Office*

3.7.1    A member of the Partnership Council may resign at any time by notice in writing to the Senior Partner or, if the relevant member is the Senior Partner, at any time upon three months' notice in writing to the Managing Partner or such shorter period as the Partnership Council may agree.

3.7.2    A member of the Partnership Council will cease to be a member of the Partnership Council forthwith:

(a)    on the expiration of the member's term as a member unless, being eligible for re-election, such member is re-elected;

(b)    upon the effective date of resignation as a member;

(c)    upon being in breach of paragraph 3.3.3;

(d)    if the Senior Partner considers the member has been in material breach of paragraph 3.1.2, upon notice from the Senior Partner to that effect;

(e)    on the member's Mandatory Retirement Date or ceasing to be a Partner; or

(f)    if appointed by the Partnership Council, when decided by the Partnership Council.

3.7.3    If the Partnership Council is satisfied that an elected member of the Partnership Council is likely to be unable to attend meetings of the Partnership Council due to prolonged absence (including as a consequence of illness, sabbatical leave or exceptional client demands) the Partnership Council may, in consultation with the Senior Partner (unless the Senior Partner is the member in question), propose a replacement through the applicable election procedures for such part of the balance of the relevant member's term as they think fit. During that term the Partner who replaces such member will have all the powers and responsibilities of such member.

4.    **Senior Partner**

4.1    The Senior Partner will hold office for a period of four years.

4.2    A resolution to remove the Senior Partner from office will be put to the Partners if so decided by both the ELG and the Partnership Council (and the Senior Partner will be deemed not to be a member of the Partnership Council when the Partnership Council reaches its decision). The resolution will be effective if passed as an Ordinary Resolution of Partners.

4.3    The Senior Partner will have such role in the Partnership and Associated Firm's external relationships as agreed with the Managing Partner.

The general responsibilities of the Senior Partner within the Partnership and Associated Firms will be determined by the Partnership Council.

4.4    The Senior Partner will agree twelve-month objectives with the Managing Partner and the Partnership Council. At the end of each twelve-month period, the Senior Partner will review the achievement of the objectives with the Managing Partner and the Partnership Council and agree renewed twelve-month objectives with them.

4.5    The Senior Partner may delegate powers and responsibilities from time to time to an Equity Partner to the extent the Senior Partner considers appropriate. If the Senior Partner is absent temporarily, the Managing Partner will act as Senior Partner and will have all the powers and responsibilities of the Senior Partner as provided in this Agreement. If the Senior Partner ceases to hold office before a successor is elected, an Equity Partner selected by the Partnership Council, in consultation with the Managing Partner, will have all the powers and responsibilities of the Senior Partner as provided in this Agreement until a successor is elected by Partners.

4.6    Subject to Schedule 18 (*Contracts and Documents*), the Senior Partner has the authority to represent the Partnership and Associated Firms on all matters which are responsibilities of or within the authority of the Partnership Council.

5.    **Designated Members**

5.1    A Member who is the Managing Partner and a Member who is the Executive Partner shall ex officio be a Designated Member.

5.2    The Managing Partner has the authority to appoint any other willing Partner as an additional Designated Member and to remove an additional Designated Member from that office.

5.3    The ELG may by Policy determine procedures to be adopted in the making or recording of any decision by the Designated Members.

6.    **Adoption, amendment and cancellation of Policies**

6.1    Each of the ELG and the Partnership Council may adopt any new Policy on matters for which it has been delegated with responsibility, provided that the Policy:

6.1.1    is within the authority granted to it under this Agreement; and

6.1.2    is adopted in accordance with paragraphs 6.3 to 6.5.

6.2    Each of the ELG and the Partnership Council may amend or cancel any of its previous Policies provided that the amendment or cancellation is in accordance with paragraphs 6.3 to 6.5.

6.3    If the ELG or the Partnership Council intends to adopt, amend or cancel a Policy, it shall give not less than seven days' notice to all Partners of its intention (unless the Partnership Council considers that it is in the interests of the Partnership to give less or no notice).

6.4    The ELG shall not give notice of its intention to adopt, amend or cancel a Policy unless the Partnership Council considers and notifies all Partners that the adoption, amendment or cancellation is (i) within the authority granted to the ELG under this

Agreement and (ii) taking into account the overall interests of the Partnership, fair to all Partners concerned.

6.5    If within the notice period more than 10 per cent of the Equity Partners object in writing to the Senior Partner about the intention of the ELG or the Partnership Council, the adoption, amendment or cancellation of the Policy shall not take effect (i) before the ELG or the Partnership Council (as the case may be) has met to consider such objections or (ii) if the ELG or the Partnership Council (as the case may be) decides not to adopt, amend or cancel the Policy.

7.    **Emergency Powers**

7.1    If:

7.1.1    any of the following events occurs: a national or international emergency (including hostilities), or an allegation of serious impropriety on the part of the Partnership, an Associated Firm or a Partner or the identification of an exceptional risk to the firm; and

*(Added with effect from 23 April 2020)*

7.1.2    in the opinion of each of the ELG and the Partnership Council:

(a)    the event (or its consequences) has, or might realistically have, a severe adverse and continuing effect on the business, reputation or interests of the Partnership or any Associated Firm and urgent action is required with a view to avoiding or mitigating that effect;

(b)    the event relates to or affects the business of the Partnership and Associated Firms in one or more offices (each an **"affected office"**) more than in others; and

(c)    the action proposed to be taken is an appropriate and proportionate response to the circumstances then prevailing,

the Managing Partner may, if so authorised by the ELG and the Partnership Council, take such action as may be necessary or desirable to wind up, close, or reduce the operations of an affected office and to arrange for the completion of outstanding client work of an affected office.

7.2    Such action may include:

7.2.1    suspension of all or any of the Partners based in an affected office; or

7.2.2    determining that all or any of the Partners based in an affected office shall be subject to immediate termination,

7.3    Any action of the Managing Partner which is authorised in accordance with this paragraph 7 may be taken without need to observe any of the procedures or requirements of Schedule 15 (*Equity Partners' Termination etc.*) or the Policies made under paragraph 3.4.3 of Schedule 1 (*Status etc. of Partners*).

7.4    The Partnership Council shall consider whether any Partner who is the subject of immediate termination pursuant to paragraph 7.2.2 shall receive a payment from the Partnership or an Associated Firm in connection with the termination. The Partnership Council has the power to determine, in its discretion, that such a payment be made (and, if so made, it shall be treated as a share of profits or as additional remuneration, as appropriate to the circumstances of the Partner concerned). The amount of any such payment must be approved by the ELG.

7.5    In this paragraph 7 the expressions "suspension" and "immediate termination" have the meanings ascribed by Schedule 15 (*Equity Partners' Termination etc.*) or the Policies made under paragraph 3.4.3 of Schedule 1 (*Status etc.  of Partners*), as the case may require.

7.6    The powers conferred by this paragraph 7 have effect notwithstanding any other provision of this Agreement.

8.    **Transitional Provisions**

Any agreement, decision or action validly made or taken by the Management Committee (including, without limitation, pursuant to Schedules 5, 14 or 15) shall not be invalidated by the ELG's replacement of the Management Committee on 1 September 2014 and shall, as from 1 September 2014, continue to apply as if it were an agreement, decision or action made or taken by the ELG.

*(Schedule 9 amended with effect from 1 September 2014 when the ELG replaced the Management Committee, causing consequential amendments to the rest of the Agreement and the Policies)*

**SCHEDULE 10**
**BORROWINGS**

The ELG has responsibility for the funding and working capital requirements of the Partnership and Associated Firms and the authority to determine in its discretion any Policy which will govern the exercise of such responsibility.

1.    **Rules**

1.1    The ELG will be required to observe the following rules.  In this Schedule, "**Equity Partners' Funds**" means the value in the Accounts Currency of Equity Partners' Funds as shown in the Partnership's most recent quarterly accounts or any other statement of partners' funds drawn up consistently with the latest Partnership Financial Report on any day.

1.2    The ratio of Net Borrowings to Equity Partners' Funds will not at any time exceed 1.4:1.

1.3    The ratio of Net Borrowings (excluding Borrowings for major capital expenditure approved pursuant to paragraph 1.5) to Equity Partners' Funds will not exceed 1:1, except that the ELG will be able to permit Net Borrowings beyond that level in order to meet short-term cash liquidity requirements of the business or the affairs of the Partnership and Associated Firms (including the payment of Tax liabilities on behalf of Partners).

1.4    In deciding upon new Borrowings, the ELG will have due regard for any borrowing restrictions or financial covenants to which the Partnership or any Associated Firm is subject in its contracts with existing lenders or others and for the importance of ensuring the compliance by the Partnership and Associated Firms with such restrictions and covenants at all times (subject to any waivers that may be given).

1.5    On applying the ratio in paragraph 1.3, Borrowings of more than £25 million (expressed in sterling and taking account of any currency hedging arrangements) in aggregate to finance capital expenditure on property (including real estate), plant, equipment and intangible fixed assets in connection with a single specific project will be excluded if they have been approved by the ELG.  The ELG will only approve such Borrowings if it has approved budgets for the relevant project.  Any such Borrowings so approved will be reduced on a basis which corresponds to the depreciation of the relevant property (including real estate), plant, equipment and intangible fixed assets in the Partnership Accounts or more quickly if the Managing Partner decides that this is in the interest of the Partnership, having regard to its funding and working capital requirements from time to time.

1.6    The ELG will seek to negotiate with lenders that Borrowings are on terms whereby there are no arrangements of the kind referred to in paragraph 3.1.2, 3.1.3 or 3.1.4.

2.    **ELG's authority**

2.1    The ELG has the power to agree on behalf of the Partnership and Associated Firms any Borrowings and all terms, conditions and covenants in relation thereto (including any amendments to such terms, conditions and covenants).  The ELG also has the power to vary the terms of any Borrowings and to redeem or terminate any Borrowings.

Schedule 10: Borrowings

2.2     The ELG has the power to agree the terms of any guarantee to be given by an Associated Firm in connection with any Borrowings (provided that such terms exclude recourse to the personal assets of any Partner).

2.3     The ELG may authorise the Managing Partner to exercise on its behalf some or all of the powers of the ELG contained in this paragraph 2.

3.      **Borrowings requiring a vote**

3.1     The powers of the ELG set out in paragraph 2 may be exercised by the ELG without the requirement of any further authority or approval by Partners, except that if the incurrence of any new or increased Borrowings results in any one or more of the following consequences (or any amendment is made to the terms of existing Borrowings so as to result in any one or more of the following consequences), such power may only be exercised by the ELG if that exercise is first authorised, in a case falling within paragraph 3.1.1, by a Special Resolution of Partners or, in a case falling within paragraphs 3.1.2 to 3.1.4, by a Special Resolution of Equity Partners.  The consequences are that:

    3.1.1     the aggregate amount of Net Borrowings (expressed in the Accounts Currency and taking account of any currency hedging arrangements), exceeds at any time an amount equal to Adjusted Equity Remuneration for the Preceding Financial Year, except that the ELG will be able to permit Net Borrowings beyond that level in order to meet short-term cash liquidity requirements of the business or the affairs of the Partnership and Associated Firms (including the payment of Tax liabilities on behalf of Partners);

    3.1.2     an Equity Partner is or may be required by reason of the Borrowings to charge or give security over any personal assets;

    3.1.3     the lender has recourse to the personal assets of any Equity Partner; or

    3.1.4     an Equity Partner is or may be required to agree with the lender any arrangement for subordination or loss-sharing relating to any claims of that Equity Partner in a winding-up of the Partnership or any Associated Firm (other than any arrangement intended to have the effect referred to in paragraph 4.2).

3.2     For the purposes of paragraph 3.1 "**Adjusted Equity Remuneration for the Preceding Financial Year**" means Equity Remuneration as specified in the latest Partnership Financial Report available at the relevant time but adjusted by writing back:

    3.2.1     any depreciation or amortisation charge; and

    3.2.2     any deduction made under paragraphs 3.1.2(b) to (d) of Schedule 4 (*Accounts*),

appearing or reflected in that Partnership Financial Report.  If the relevant Partnership Financial Report relates to a period greater or less than one year, then for the purposes of paragraph 3.1 the amount taken as Adjusted Equity Remuneration for the Preceding Financial Year shall be adjusted on a basis which is fair and reasonable so that at the relevant time the aggregate amount of all Borrowings may be related to a quantum of Equity Remuneration expressed as for a period of one year.

4.    **Equity Partners' authorisation**

Each Equity Partner shall, at the request of the Managing Partner, execute such documents as the Managing Partner shall require to give full effect to the terms of any Borrowings or to give effect to:

4.1    any arrangement referred to in paragraph 3.1.2, 3.1.3 or 3.1.4 which is authorised by a Special Resolution of Equity Partners; or

4.2    the subordination of Equity Partners' rights as referred to in paragraph 2 of Schedule 17 (*Winding-Up of the Partnership and Associated Firms*).

5.    **Managing Partner's authority**

The Managing Partner will have the responsibility for all management and administration of all Borrowings (including, without limitation, any drawings and repayments made under facilities; any exercise of interest rate, currency or other options or discretionary rights available under the terms of any Borrowings; and any action required to ensure compliance with the terms of any Borrowings) and will exercise that responsibility within any guidelines which the ELG may specify for the purpose. The Managing Partner may authorise the Executive Partner or the chief financial officer to exercise some or all of the responsibilities under this paragraph 5 on behalf of the Managing Partner.

**SCHEDULE 11**
**REGISTERS**

1.    Registers shall record:

1.1    the name of and status held by each Partner;

1.2    the name of each Partner Annuitant and Old Partnership Annuitant;

1.3    all amendments to this Agreement and the Policies and the effective date of the amendments; and

1.4    such other information as this Agreement requires or the Partnership Council may determine by Policy.

*(Amended with effect from 1 September 2014)*

2.    The Partnership Council may determine by Policy such procedures as it considers appropriate to make the Registers conclusive evidence of the matters to which they relate.

3.    Every entry made in a Register in accordance with the Policies shall be binding upon all Partners and conclusive evidence to any third party of the matter to which it relates.

4.    A copy of each Register shall be published on PartnerConnect or kept at such places as the Executive Partner shall decide. Every Equity Partner is entitled to inspect Registers at any reasonable time and to be supplied with copies of Registers on request to the Senior Partner.

*(Amended 9 August 2007 and 23 April 2020)*

5.    The Partnership Council has authority to determine by Policy such matters as in its view are required to give effect to this Schedule.

## SCHEDULE 12
## PARTNER BEHAVIOUR AND OBLIGATIONS

1.   **Good faith**

Each Partner shall at all times act in utmost good faith towards the Partnership, each Associated Firm and each other Partner.

2.   **Confidentiality**

Each Partner and retired Partner shall keep the affairs of the Partnership and Associated Firms confidential.  The ELG has authority to make Policies concerning Partners' duties in this respect.

3.   **Attendance to Business**

3.1   The whole time and attention of each Partner shall be devoted to the business of the Partnership and Associated Firms during normal business hours and at such other times as are necessary for the proper performance of each Partner's duties unless a Partner's absence is permitted pursuant to paragraph 3.2 or in accordance with Policies made under paragraph 3.4.

*(Amended 29 January 2010)*

3.2   An Equity Partner is permitted absence from the Partnership and Associated Firms when:

3.2.1   on holiday in accordance with the Policies made under this paragraph 3;

3.2.2   on sabbatical in accordance with the Policies made under this paragraph 3;

3.2.3   on parental leave in accordance with the Policies made under this paragraph 3;

*(Amended with effect from 23 April 2020)*

3.2.4   on compassionate leave;

*(Amended with effect from 15 March 2024)*

3.2.5   ill;

3.2.6   working part-time or flexibly; or

3.2.7   absent for any other legitimate cause approved by the Managing Partner

if, in each case, the Equity Partner complies with the relevant Policy.

3.3   The Partnership Council has the power to determine Policies in relation to entitlement to and procedures relating to holidays, sabbaticals, parental leave, illness and any other issue relating to absence from the Partnership and Associated Firms, including part-time or flexible working arrangements.

*(Amended with effect from 23 April 2020)*

Schedule 12: Partner Behaviour and Obligations

3.4    The Partnership Council has the power to determine Policies in relation to permitted absence from the Partnership or any Associated Firm of a Non-Equity Partner.

4.    **Appraisals**

Each Partner shall participate in the appraisal programme adopted by the ELG, details of which shall be published on PartnerConnect, in accordance with the published timetable.

*(Amended with effect from 1 March 2010 and amended with effect from 1 May 2015)*

5.    **Values, Conduct and Standards**

Each Partner shall observe the terms of any code or other rules adopted by Policy of the ELG with the approval of the Partnership Council concerning the values, conduct and standards to be observed by Partners in relation to the business of the Partnership and Associated Firms.

6.    **Disciplinary Investigations**

6.1    Subject to any decision to the contrary by the Managing Partner, the Executive Partner will investigate, and/or engage others (including third parties) to assist with the investigation as reasonably required, any circumstances which might amount to misconduct on the part of a Partner. The Executive Partner may delegate all or part of any such an investigation to another Partner.

6.2    Where the possible misconduct concerns any form of harassment, bullying or discrimination, the Executive Partner will consult with others representing diverse perspectives before deciding what form the investigation should take.

6.3    Where an investigation finds that misconduct that may warrant the imposition of a sanction only capable of being imposed by or on the recommendation of the Disciplinary Committee, the Managing Partner or the Executive Partner will decide whether the conduct should be referred to the Disciplinary Committee. The Managing Partner or Executive Partner will consult with others representing diverse perspectives before making that decision.

6.4    The ELG will by Policy determine who will be consulted before decisions are made pursuant to paragraphs 6.2 and 6.3.

6.5    Where any two of the Managing Partner, the Senior Partner and the Executive Partner consider that there might have been misconduct by the third, they will investigate the circumstances. They may delegate all or part of such an investigation to another Partner. Where they jointly consider that investigation to show serious misconduct may have occurred, they will refer the conduct to the Disciplinary Committee.

*(Added with effect from 23 April 2020 and amended with effect from 15 March 2024)*

7.    **Disciplinary Action**

7.1    The Disciplinary Committee established pursuant to paragraph 3.2.3 of Schedule 9 will:

    (a)    consider any matter on the part of a Partner referred to it by the Managing Partner or the Executive Partner;

    (b)    determine whether any misconduct has occurred;

    (c)    impose or recommend a sanction on the relevant Partner or retired Partner where misconduct is established.

7.2    The Disciplinary Committee will only hear matters referred to it by the Managing Partner or the Executive Partner, or in circumstances where there is a self-referral to the Disciplinary Committee by a Partner in relation to misconduct. The Disciplinary Committee will not hear complaints by one Partner about another Partner or entertain representations from a Partner about any sanction it has imposed on another Partner.

7.3    The Partnership Council has the authority to determine by Policy such matters as in its view are reasonable in relation to the operation and powers of the Disciplinary Committee and the consequences of its decisions. Subject to any such Policy, the Disciplinary Committee or a panel of its members selected for any particular hearing may determine such procedure and other arrangements as the Disciplinary Committee or the panel considers appropriate in the circumstances of the hearing.

7.4    Where the Disciplinary Committee recommends that an Equity Partner be subject to Termination, the Managing Partner will issue a Termination Notice in accordance with paragraph 1.1 of Schedule 15 unless the ELG and the Senior Partner agree that the Managing Partner should not do so.

7.5    A Partner who has been the subject of proceedings before the Disciplinary Committee may appeal the decision or the sanction, including a decision of the Managing Partner to give effect to a recommendation of the Disciplinary Committee, to the Partnership Council. The appeal will be by way of review rather than re-hearing. The Partnership Council (or a committee established by it to hear the appeal) will only amend the original decision, sanction or recommendation in the case of manifest unfairness.

7.6    If a Partner wishes to appeal the decision of the Disciplinary Committee or the sanction imposed or recommended by it, or action taken by the Managing Partner on the recommendation of the Disciplinary Committee, that Partner must do so in writing to the Senior Partner within 10 days after being notified of it. If the appeal is against a decision by the Managing Partner that the Partner shall leave the Partnership, the Partner will remain a Partner until the appeal has been decided. If the appeal is rejected, the Partner will cease to be a Partner on the date specified by the Partnership Council.

The Partnership Council will decide the appeal on the basis of the written material submitted to it. The Partnership Council will decide the appeal within four weeks of it being submitted or such longer period as the Partnership Council may agree with the Managing Partner. The decision of the Partnership Council will be given in writing and will be final and binding.

*(Added with effect from 23 April 2020 and amended with effect from 15 March 2024)*

8.  **Compulsory Insurance**

8.1  Each Equity Partner shall (save in exceptional circumstances recognised as such by the ELG) effect or contribute to:

8.1.1  a life insurance policy until the Equity Partner reaches age 65; and

8.1.2  a permanent health insurance policy providing cover to age 65.

8.2  Each such policy shall be effected upon such terms or contributed to in such amount as the ELG shall determine by a Policy.

9.  **Assignment of share or interest in the Partnership**

A Partner shall not assign, alienate, charge or offer as security any share (including profit-share) or interest in the Partnership or any Associated Firm or assign the benefit of this Agreement or any agreement relating to an Associated Firm (or purport to do any of those things) without the written consent (or deemed written consent pursuant to paragraph 2.2.2 of Schedule 7 (*Capital*)) of the Managing Partner.

10.  **Notifications**

Each Partner shall promptly give to a person nominated by the Executive Partner any personal information concerning the Partner which is required to be delivered to the Registrar pursuant to the LLPA or is otherwise required for any regulatory purpose.

## SCHEDULE 13
## PARTNERSHIP PROPERTY AND LIABILITY OF EQUITY PARTNERS

1. All the assets and property held by, or used primarily for the purposes of, the Partnership (including, without limitation, goodwill together with the right to use the names under which the Partnership and Associated Firms carry on business) shall be owned by the Partnership absolutely (subject to the rights of any third party who is not a Partner). In particular, the Partnership owns the name and trademark "Clifford Chance". An Associated Firm may only use the name and trademark "Clifford Chance" with the agreement of the Partnership.

2. All the assets and property held by, or used primarily for the purposes of, any Associated Firm shall be owned by that Associated Firm absolutely (save to the extent that such assets or property are owned by the Partnership or another Associated Firm and subject to the rights of any third party who is not a Partner).

3. If a Partner or retired Partner holds an asset used for the purposes of the Partnership or any Associated Firm, that Partner or Retired Partner shall execute such declaration of trust or other document as is reasonably required to give effect to paragraph 1 or 2.

4. If a Partner generates any copyright works, makes any inventions or otherwise generates anything protected by intellectual property rights in the course of that Partner's duties or work for the Partnership and Associated Firms (including advising clients or teaching, speaking or writing about legal or business matters), the copyright, patents and other intellectual property rights belong to the Partnership or relevant Associated Firm. Each Partner will execute such assignment and other documents as are reasonably required to give effect to this paragraph 4.

5. A Partner has no right, upon ceasing to hold that status, to consideration or compensation for or in respect of any share or interest (or future interest) in the Partnership or any Associated Firm. Any such share or interest terminates when the Partner ceases to hold that status.

6. No Partner shall have any personal liability for any losses or liabilities of the Partnership or any Associated Firm except as provided by or pursuant to this Agreement or as otherwise provided by law.

7. No Partner has agreed with other Partners or the Partnership to contribute to the assets of the Partnership if it is wound up.

**SCHEDULE 14**
**RETIREMENT OF EQUITY PARTNERS AND ANNUITY ARRANGEMENTS FOR EQUITY PARTNERS**

This Schedule applies to every Equity Partner in respect of any position held as partner, principal, officer or employee in, or under any contract to provide services to, the Partnership or any Associated Firm.

**Part A – Retirement**

1. **Retirement of Equity Partners at Mandatory Retirement Date**

1.1 Every Equity Partner who has not previously ceased to be an Equity Partner will retire as an Equity Partner from the Partnership on the applicable Mandatory Retirement Date. The applicable Mandatory Retirement Date of each Equity Partner will be recorded in the Register of Partners.

*(Amended with effect from 23 April 2020)*

1.2 The Mandatory Retirement Date for each Equity Partner is the last day of the month in which the Equity Partner reaches the age of 65.

*(Amended 29 January 2010)*

2. **Retirement before Mandatory Retirement Date**

2.1 An Equity Partner (other than a US-based Partner) may retire from the Partnership at any time upon the expiry of not less than six months' notice given in writing to the Senior Partner or Managing Partner. The Senior Partner or Managing Partner has the authority to accept a shorter period of notice.

2.2 A US-based Partner may retire from the Partnership at any time upon the expiry of such period of notice given in writing to the Senior Partner or the Managing Partner as the Senior Partner or the Managing Partner agrees. The Senior Partner and the Managing Partner will not require notice longer than such period (being not greater than 120 days) as is reasonably required for the Partnership to comply with its duties to any clients for whom the US-based Partner is then working.

2.3 This paragraph 2.3 applies if an Equity Partner has given notice of intention to retire from the Partnership and at any time after such notice has been given the ELG believes that either:

2.3.1 the Equity Partner intends to work for another firm or entity (whether as a partner, employee or in some other capacity) which in the opinion of the ELG competes with (or with the business or any part of the business of) the Partnership or any Associated Firm; or

2.3.2 it may be prejudicial to the interests of the Partnership or of any Associated Firm that the Equity Partner continues as an Equity Partner until the expiry of the period of notice given by that Equity Partner.

Where this paragraph 2.3 applies the ELG may require that the Equity Partner shall cease to be an Equity Partner on such date before the expiry of the notice period as the ELG may specify to that Equity Partner. If the Equity Partner is a German-based Partner the date so specified by the ELG must be no earlier than the date which is three months after the day on which the Equity Partner gives notice of intention to retire from the Partnership, unless the ELG decides to refer the matter to an arbitrator under clause 24 to determine whether it is reasonable in all the circumstances to specify an earlier date and the arbitrator rules that an earlier date is reasonable. If such a date is so specified and unless an agreement made pursuant to paragraph 2.4 provides otherwise, the Equity Partner will not be entitled to any share of Partnership Profit in respect of any period after that date.

2.4     An Equity Partner who agrees to retire essentially at the Partnership's request may remain entitled to that Equity Partner's share of Equity Remuneration for any specified period of notice given pursuant to a Policy made under this paragraph 2.4 whether or not that Equity Partner continues to work for the Partnership and Associated Firms during the notice period.

The Partnership Council has the authority to establish a Policy concerning any notice to be given and payments to be made to an Equity Partner who agrees to retire essentially at the Partnership's request.

2.5     If the winding-up of the Partnership has commenced before the date on which an Equity Partner is to cease to be an Equity Partner, any notice which has been given (or any requirement that an Equity Partner will retire as an Equity Partner on a date specified by the ELG) will be cancelled.

2.6     For the purposes of this paragraph 2:

2.6.1     a "US-based Partner" means any Equity Partner who is working substantially in, and whose Long-term Base is in, the United States, at the time the Equity Partner gives any notice of intention to retire from the Partnership; and

2.6.2     a "German-based Partner" means any Equity Partner who is working substantially in, and whose Long-term Base is in, the Federal Republic of Germany, at the time the Equity Partner gives any notice of intention to retire from the Partnership.

Schedule 14: Retirement of Equity Partners and Annuity Arrangements for Equity Partners

## Part B – Gateway

3.    **Gateway Arrangements for Equity Partners reaching the age of 60**

3.1    The Partnership Council has the authority to determine by Policy the procedural and other arrangements which apply to an Equity Partner who wishes to continue as an Equity Partner beyond the end of the Financial Year in which that Equity Partner reaches the age of 60.

3.2    In each Biennial Review, to the extent appropriate arrangements are not already in place prior to the review, the Wider Leadership Group shall consider the position on the Ladder of any Equity Partner who will reach the age of 60 in the two-year period following the Biennial Review or any Equity Partner who is already aged 60 or over at the time of a Biennial Review to have regard to inter-generational fairness, succession planning, the anticipated contribution of that Equity Partner and the need to promote additional partners to the relevant group, as the case may be. In addition, the Wider Leadership Group should consider whether it is appropriate to seek to reach a bilateral agreement on the terms on which any such Equity Partner continues as an Equity Partner in accordance with the Policy of the Partnership Council or whether an alternative arrangement should be agreed including becoming a Non-Equity Partner, a consultant to the Firm or another appropriate arrangement to facilitate succession planning and/or a transition to the next stage of the Equity Partner's professional career.

3.3    Any agreement pursuant to which the Equity Partner continues as an Equity Partner or becomes a Non-Equity Partner must:

3.3.1    either include the date (which, if the relevant Partner is continuing as an Equity Partner, must be on or before the Equity Partner's Mandatory Retirement Date) on which the Equity Partner will retire from the Partnership or provide for a review of the terms agreed with the Equity Partner by a specified date;

3.3.2    include the financial terms on which the Partner will remain as a Partner (including, where it is agreed the Equity Partner will continue to share in Equity Remuneration, the Unit allocation to which the Equity Partner will be entitled until the relevant agreed retirement date or until any earlier date by which it is agreed that the terms will be reviewed); and

3.3.3    include the role the relevant Partner will perform in, and such Partner's contribution to, the Partnership until the relevant agreed retirement date or until any earlier date by which it is agreed that the terms will be reviewed.

3.4    In reaching such an agreement the ELG must take into account the extent of the support for its terms amongst the Equity Partners in the group or practice area or office (as appropriate) in which the Equity Partner works.

3.5    The ELG will have the right to review the terms of any such agreement to take account of any relevant change in circumstances (including in respect of the abilities or contribution of the Partner, the area of practice or field in which the Partner works, the development of or changes in the Partnership's business, and client requirements) and to substitute a revised agreement with the Partner if such Partner so agrees.

- 79 -

Schedule 14: Retirement of Equity Partners and Annuity Arrangements for Equity Partners

3.6    If an Equity Partner fails to reach agreement with the ELG under this paragraph 3, the Equity Partner will continue as an Equity Partner on the terms of this Agreement.

3.7    An Equity Partner may be elected as Senior Partner or as Managing Partner for a term which expires after the end of the Financial Year in which the relevant person reaches the age of 60. In that event the Equity Partner may continue to hold that office for the full term and the provisions of this paragraph 3 will apply when the relevant person ceases to hold that office.

*(Amended with effect from 15 March 2024 and 24 October 2024.)*

Schedule 14: Retirement of Equity Partners and Annuity Arrangements for Equity Partners

## Part C – Annuities and other payments on retirement

4.    **Annuity for Eligible Equity Partners**

4.1    The Partnership will pay an annuity to an Eligible Equity Partner on the conditions and terms of this paragraph 4 and of paragraphs 7 and 8.

4.2    An **Eligible Equity Partner** means an Equity Partner who was a party to the Previous Partnership Agreement on 1 October 2005 (or had agreed in writing before that date to become such a party).

   *(Paragraph 4.2.4 deleted 29 January 2010; former paragraphs 4.2.1, 4.2.2 and 4.2.3 deleted with effect from 1 September 2014)*

4.3    An Eligible Equity Partner who retires as an Equity Partner on or after reaching that Eligible Equity Partner's Threshold is entitled to an annuity.

4.4    Subject to paragraph 4.5 an Eligible Equity Partner's Threshold is reached after having had Eligible Status for 15 years.

4.5    An Eligible Equity Partner who achieved Eligible Status at the age of 39 or more (**"weighted Eligible Equity Partner"**) reaches the Threshold after having Eligible Status for 15 weighted years.

   4.5.1    Weighted Eligible Equity Partners divide into categories:

   (a)    those who achieved Eligible Status after the Previous Effective Date and before 1 January 2008: paragraph 4.12 might apply to them;

   (b)    those who achieved Eligible Status on or after 1 January 2008: the proviso in paragraph 4.11 might apply to them; and

   (c)    all other weighted Eligible Equity Partners.

   4.5.2    A weighted Eligible Equity Partner has had Eligible Status for 15 weighted years when the product of the following calculation, rounded to the nearest quarter of a year, is 15 or more:

   Years and part years (part    x    weighted Eligible Equity
   years being expressed as a         Partner's weighting
   fraction) of weighted Equity
   Partner's Eligible Status

   A weighted Eligible Equity Partner has a weighting which is the result of the following calculation:

   $$\frac{15}{53 - x}$$

   where x = the age at which the Eligible Equity Partner achieved Eligible Status (i.e. 39 or more) to the nearest quarter of a year.

An Eligible Equity Partner who achieved Eligible Status after reaching 52 and before reaching 53 is deemed to have achieved Eligible Status at 52.

4.6    The annuity of an Eligible Equity Partner in respect of a Financial Year is an annual payment that depends on the number of Retirement Annuity Units to which the Eligible Equity Partner is entitled in respect of the Financial Year (and proportionately for any part of a Financial Year). The number of Retirement Annuity Units to which an Eligible Equity Partner is entitled in respect of a Financial Year is one-fifth of the Total Retirement Annuity Units to which that Eligible Equity Partner is entitled as determined by this paragraph 4 (and proportionately when the entitlement begins or ends part way through a Financial Year). However, the Partnership Council may establish a Policy under which an Eligible Equity Partner may elect to receive the relevant annuity for the period of eight years beginning with the Eligible Equity Partner's retirement date.

*(Amended 29 January 2010)*

The number of an Eligible Equity Partner's Total Retirement Annuity Units depends on how long the Eligible Equity Partner remains an Equity Partner after reaching the applicable Threshold.

4.7    If a Retirement Annuity Unit would have more than two decimal places it will be rounded up or down to the nearest decimal place (and 0.005 will be rounded up).

A Retirement Annuity Unit has a value equivalent to the value of a Unit for the Financial Year in respect of which the entitlement to the Retirement Annuity Unit arises or, if less, £4,615.

*(Amended 29 January 2010 and amended with effect from 1 September 2014 and 1 May 2021)*

The annuity of an Eligible Equity Partner is payable for the period of five years (or eight years, if the Eligible Equity Partner has so elected in accordance with a Policy of the Partnership Council) beginning with the date of retirement as an Equity Partner or, if shorter, for the period from the date of retirement as an Equity Partner until death. However, the Partnership Council has the authority to establish a Policy under which the Partnership may pay all or part of the annuity to the estate or spouse or other dependents of a deceased Eligible Equity Partner for the remainder of the relevant five or eight year period.

*(Amended 29 January 2010)*

An Eligible Equity Partner's entitlement to an annuity does not confer a share of Partnership Profit except to the extent that the Managing Partner decides that a settlement in respect of an annuity made under paragraph 12 of Schedule 6 (*Distribution of Remuneration*) will be treated as a payment of Partnership Profit.

Schedule 14: Retirement of Equity Partners and Annuity Arrangements for Equity Partners

4.8    An Eligible Equity Partner who accrued the maximum annuity of 115 Annuity Units pursuant to the partnership agreement in effect on 30 April 2017 shall be treated as having accrued 300 Retirement Annuity Units.

An Eligible Equity Partner who accrued the maximum annuity of 150 New Annuity Units pursuant to the partnership agreement in effect on 30 April 2021 shall be treated as having accrued 300 Retirement Annuity Units.

4.9    An Eligible Equity Partner who reached the applicable Threshold before 1 May 2017 but had not accrued the maximum annuity of 115 Annuity Units pursuant to the partnership agreement in effect on 30 April 2017 shall have an entitlement as at 30 April 2017 calculated pursuant to the partnership agreement in effect on that date. That entitlement will be converted into New Annuity Units by multiplying it by 1.3. Further accrual of that Eligible Equity Partner's annuity from 1 May 2017 to 30 April 2021, and from 1 May 2021, shall be calculated in accordance with paragraphs 4.10 to 4.16.

An Eligible Equity Partner who reached the applicable Threshold before 1 May 2021 (but after 1 May 2017) but had not accrued the maximum annuity of 150 New Annuity Units pursuant to the partnership agreement in effect on 30 April 2021 shall have an entitlement as at 30 April 2021 calculated pursuant to the partnership agreement in effect on that date. That entitlement will be converted into Retirement Annuity Units by multiplying it by 2x. Further accrual of that Eligible Equity Partner's annuity from 1 May 2021, shall be calculated in accordance with paragraphs 4.10 to 4.16

4.10    An Eligible Equity Partner to whom paragraph 4.9 applies is entitled to 4 additional New Annuity Units for every completed six months that the Eligible Equity Partner remained an Equity Partner subsequent to 30 April 2017 up to 30 April 2021, subject to the proviso in paragraph 4.12, the application of paragraphs 4.13 and 4.14, and to a maximum of 150 Total New Annuity Units. That entitlement will be converted into Retirement Annuity Units by multiplying it by 2x.

An Eligible Equity Partner to whom paragraph 4.9 applies (and who has not accrued a maximum of 150 Total New Annuity Units) is entitled to 8 additional Retirement Annuity Units for every completed six months that the Eligible Equity Partner remains an Equity Partner subsequent to 30 April 2021, subject to the proviso in paragraph 4.12, the application of paragraphs 4.13 and 4.14, and to a maximum of 300 Total Retirement Annuity Units.

4.11    An Eligible Equity Partner who did not reach the applicable Threshold before 1 May 2021 shall be entitled to an annuity upon reaching the Threshold calculated in accordance with paragraphs 4.12 to 4.16, provided that if any of the circumstances described in paragraph 4.14 applied to an Eligible Equity Partner before reaching the applicable Threshold, then the entitlement to 220 Retirement Annuity Units on reaching the applicable Threshold will be reduced commensurately, and having regard to the partnership agreements in effect on 30 April 2017 and 30 April 2021, where they applied to the Eligible Equity Partner prior to 1 May 2017 and 1 May 2021 respectively.

4.12    An Eligible Equity Partner to whom paragraph 4.11 applies and who retires as an Equity Partner on or within six months after reaching the applicable Threshold is entitled to 220 Total Retirement Annuity Units, subject to the proviso in paragraph 4.11.

For every completed six months that the Eligible Equity Partner remains an Equity Partner after reaching the applicable Threshold, the Eligible Equity Partner is entitled to additional 8 Retirement Annuity Units subject to a maximum entitlement of 300 Total Retirement Annuity Units (unless subject to a lower cap pursuant to paragraph 4.13). The table below shows the progression for an Eligible Equity Partner entitled to 220 units on reaching the applicable Threshold.

| Period | Total Retirement Annuity Units |
|---|---|
| Threshold | 220 |
| plus ½ year | 228 |
| Plus 1 year | 236 |
| plus 1 ½ years | 244 |
| Plus 2 years | 252 |
| plus 2 ½ years | 260 |
| plus 3 years | 268 |
| plus 3 ½ years | 276 |
| plus 4 years | 284 |
| plus 4 ½ years | 292 |
| plus 5 years or more | 300 |

*Proviso*

However a weighted Eligible Equity Partner who achieves Eligible Status on or after 1 January 2008 is subject to a maximum entitlement of:

4.12.1    260 Total Retirement Annuity Units if the applicable weighting is more than 1.5; or

4.12.2    220 Total Retirement Annuity Units if the applicable weighting is more than 2.

This paragraph 4.12 is subject to paragraphs 4.13 and 4.14.

4.13    Subject to paragraph 4.14, the Total Retirement Annuity Units of a weighted Eligible Equity Partner:

4.13.1    who achieved Eligible Status after the Previous Effective Date and before 1 January 2008; and

4.13.2    whose Partner Number is listed in a Policy made by the Partnership Council under this paragraph 4.13

may be individually limited by that Policy.

4.14    An Eligible Equity Partner's Total Retirement Annuity Units on and following reaching the applicable Threshold might be reduced by the provisions of this paragraph 4.14.

4.14.1    If an Eligible Equity Partner has been on Ladder 1 at any time under this Agreement as in effect at 30 April 2017 and/or 30 April 2021, the number of Retirement Annuity Units to which the Eligible Equity Partner would otherwise be entitled will be reduced by applying the principle that:

(a)    for any period before 1 May 2017 during which the Eligible Equity Partner was on Ladder 1, that Eligible Equity Partner will be entitled to only 70% of the Annuity Units that would otherwise have accrued to that Eligible Equity Partner as at 1 May 2017; and

(b)    for any period from 1 May 2017 to 30 April 2021 during which the Eligible Equity Partner was on Ladder 1, the Eligible Equity Partner will be entitled to only 75% of the New Annuity Units that would otherwise have accrued to that Eligible Equity Partner.

The Partnership Council has the authority to establish Policies to give effect to this paragraph 4.14.1.

4.14.2    This paragraph 4.14.2 does not apply to an Eligible Equity Partner who would have been entitled to 300 Total Retirement Annuity Units (or, in the case of an Eligible Equity Partner who is subject to the terms of the proviso in paragraph 4.12, paragraph 4.13 or paragraph 4.14.1, would have been entitled to 300 Total Retirement Annuity Units but for the application of such terms) had that Eligible Equity Partner retired immediately before an event described in sub-paragraph (a) or (b) below.

If an Eligible Equity Partner has at any time had fewer Units allocated than the number of Units the relevant Eligible Equity Partner would have held because of:

(a)    a decision by the Wider Leadership Group under paragraph 2 of Schedule 5 (*Allocation of Units*) (or the corresponding provision of any partnership agreement previously in effect) which relates to an allocation of Units below 280, including a decision to allocate an Equity Partner fewer Units in or from the Financial Year beginning 1 May 2021 than the Equity Partner would have had if he had transitioned to one of the equivalent positions shown in the table in paragraph 7.2 of Schedule 5 following the Transitional Review;

(b)    making an agreement under paragraph 6 of Schedule 5 (*Agreed Unit reductions*) (or the corresponding provisions of any partnership agreement previously in effect); or

(c)    since 1 January 2008, working part-time or flexibly pursuant to a Policy under paragraph 3 of Schedule 12 (or the corresponding provisions of any partnership agreement previously in effect)

Schedule 14: Retirement of Equity Partners and Annuity Arrangements for Equity Partners

the number of Total Retirement Annuity Units to which the Eligible Equity Partner would otherwise be entitled will be reduced by reference to the proportion which that Eligible Equity Partner's adjusted Unit allocation bears to the number of Units that the Eligible Equity Partner would have held but for the Unit adjustment.

No such reduction in the number of Total Retirement Annuity Units will be made in respect of:

(i)     a Unit adjustment relating to a period before 1 January 2008;

(ii)    a reduction of Units to 118 or more (and any reduction of Units from above 118 to a number below 118 shall be treated as a reduction from 118) under the terms of this Agreement in effect as at 30 April 2021;

(iii)   a reduction of Units to 280 or more (and any reduction of Units from above 280 to a number below 280 shall be treated as a reduction from 280); or

(iv)    the fact that after the Financial Years in which the Eligible Equity Partner's Units were thereby adjusted, the Eligible Equity Partner might hold fewer Units than would otherwise have been held.

The Partnership Council has the authority to establish Policies to give effect to this paragraph 4.14.2.

*(Amended with effect from 1 March 2010 and amended with effect from 1 May 2015)*

4.14.3   If a weighted Eligible Equity Partner has not reached 280 Units because the weighted Eligible Equity Partner has had Eligible Status for insufficient time, the applicable Total Retirement Annuity Units will be:

$$\frac{x}{280}$$

of the number that Eligible Equity Partner would otherwise have been entitled to

where:

$x$  =   the number of Units the relevant Eligible Equity Partner holds at retirement, or would have held but for an event described in paragraph 4.14.2(a), (b) or (c).

4.14.4   If two or all of paragraphs 4.14.1, 4.14.2 and 4.14.3 apply to an Eligible Equity Partner, that Eligible Equity Partner's Total Retirement Annuity Units will be reduced under each applicable paragraph.

Schedule 14: Retirement of Equity Partners and Annuity Arrangements for Equity Partners

4.14.5  An agreement between an Eligible Equity Partner and the ELG under paragraph 3 (*Gateway Arrangements for Equity Partners reaching the age of 60*) will not cause a reduction in the Eligible Equity Partner's Total Retirement Annuity Units.

4.14.6  In the calculation of an Annuity any allocation of more than 280 Units shall disregarded.

4.15  The Partnership Council has the authority to establish a Policy that applies to an Eligible Equity Partner who is admitted as a Non-Equity Partner, allowing the Eligible Equity Partner to defer an annuity to which that Eligible Equity Partner is entitled under this paragraph 4, on the terms and conditions of this paragraph 4.15.

4.15.1  The Policy may allow the Eligible Equity Partner to defer a right to the annuity until the Eligible Equity Partner retires as a Non-Equity Partner.

4.15.2  The Policy may provide that the number of Total Annuity Units to which the Eligible Equity Partner is entitled on retiring as an Equity Partner may, if the Eligible Equity Partner so defers a right to an annuity, be increased by up to 4 Retirement Annuity Units for every six months the Eligible Equity Partner remains a Non-Equity Partner. The Partner would still be subject to any maximum entitlement of Total Retirement Annuity Units that applied when the Partner retired as an Equity Partner.

4.16  If a person is re-admitted as an Equity Partner having previously been an Eligible Equity Partner the ELG may, with the approval of the Partnership Council, agree that that person may be treated as an Eligible Equity Partner on that person's second retirement as an Equity Partner. The ELG will only make such an agreement if the re-admitted Equity Partner had retired as an Equity Partner, with the support of the Senior Partner or Managing Partner, in order to take up a role in another organisation which, in the opinion of the Senior Partner or Managing Partner, would benefit the Partnership.

If the ELG makes such an agreement:

4.16.1  on that person's second retirement, the annuity of the re-admitted Equity Partner will be calculated by reference to the aggregated period during which that person was an Equity Partner;

4.16.2  the number of Total Retirement Annuity Units to which that Equity Partner is entitled on the second retirement will be reduced by:

(a)  the number of any Retirement Annuity Units or New ERC Units for which the re-admitted Equity Partner has received an annual payment; or

(b)  2 multiplied by the number of New Annuity Units or ERC Units for which the re-admitted Equity Partner has received an annual payment; and

4.16.3  the re-admitted Equity Partner will cease to be entitled to any annuity attributable to that Equity Partner's prior retirement.

Schedule 14: Retirement of Equity Partners and Annuity Arrangements for Equity Partners

*(Paragraph 4 amended with effect from 1 May 2017, 1 May 2021 and 15 March 2024)*

5.      **Discretionary Annuity for Eligible Equity Partner with 12 to 15 years' service**

5.1     The Partnership Council has the authority to agree that the Partnership will pay an annuity to an Eligible Equity Partner who retires before reaching the applicable Threshold but after having had Eligible Status for 12 years or, in the case of a weighted Eligible Equity Partner, weighted years (calculated by reference to the applicable weighting as defined in paragraph 4.5.2). The terms and conditions of this paragraph and of paragraphs 6 and 7 apply to such an annuity.

5.2     The annuity of such an Eligible Equity Partner in respect of a Financial Year is an annual payment that depends on the number of New Annuity Units which the Equity Partner may be granted in respect of the Financial Year (and proportionately for any part of a Financial Year). The number of Retirement Annuity Units which an Equity Partner may be granted in respect of a Financial Year is one-fifth of the Total Retirement Annuity Units that the Partnership Council agrees will be granted to that Equity Partner in accordance with this paragraph 5 (and proportionately when the annuity begins or ends part way through a Financial Year). However, the Partnership Council may establish a Policy under which an Eligible Equity Partner may elect to receive an annuity for the period of eight years beginning with the date of the relevant Eligible Equity Partner's retirement.

*(Amended 29 January 2010)*

Subject to the proviso below, the Total Retirement Annuity Units which may be granted to an Eligible Equity Partner pursuant to paragraph 5.1 will not exceed a number that corresponds to the actual or, if applicable, weighted years of the Eligible Equity Partner's Eligible Status, as specified below:

| Actual/weighted years of Eligible Status | Maximum Total Retirement Annuity Units |
|---|---|
| 12 < 13 | 129.4 |
| 13 < 14 | 155.2 |
| 14 < 15 | 181.2 |

*Proviso*

The Total Retirement Annuity Units which may be granted to an Eligible Equity Partner pursuant to paragraph 5.1 may be a maximum of 220 for an Eligible Equity Partner who joined as a lateral hire before 1 May 2017 with an allocation of 70 or more Units (under the partnership agreement then in effect) in the Financial Year of admission.

*(Amended with effect from 1 May 2017 and 1 May 2021)*

5.3     Paragraph 4.7 applies to discretionary annuities granted in accordance with this paragraph 5.

Schedule 14: Retirement of Equity Partners and Annuity Arrangements for Equity Partners

5.4    The Partnership Council has the authority to establish Policies on discretionary annuities to which this paragraph 5 applies.

*(Former paragraph 6 deleted with effect from 15 March 2024; former paragraph 6 deleted with effect from 1 September 2014; former paragraph 7 deleted 29 January 2010)*

Schedule 14: Retirement of Equity Partners and Annuity Arrangements for Equity Partners

**Part D – General matters**

6. **General**

6.1 No Equity Partner (and no spouse or dependents of any Equity Partner) will have any entitlement (whether against the Partnership, any Associated Firm or any Old Partnership) to be paid any annuity or other amount upon or by reason of a person ceasing for any reason to be an Equity Partner except as expressly provided in this Agreement.

6.2 A retired Equity Partner will cease to be entitled to receive at any time or to continue to receive at any time any annuity or other annual payment or fixed amount under this Schedule if the ELG reasonably determines that the retired Equity Partner is engaging in any activity or disparaging the Partnership or any Associated Firm in any manner which in the reasonable opinion of the ELG is or will become prejudicial to the interests or activities or business of the Partnership or of any Associated Firm ("**prejudicial activity**"). If a retired Equity Partner ceases to be entitled to receive or to continue to receive any such annuity or other annual payment or fixed amount in these circumstances, the retired Equity Partner will have no further right to it, whether or not the retired Equity Partner desists from engaging in the prejudicial activity.

An Equity Partner or retired Equity Partner may give the Senior Partner or Managing Partner full details of any activity proposed to be undertaken following or at any time during retirement. Within one month thereafter the ELG will notify the relevant Equity Partner or retired Equity Partner whether or not such activity is a prejudicial activity. If the Equity Partner or retired Equity Partner is notified that the proposed activity is not a prejudicial activity, then for so long as the Equity Partner or retired Equity Partner acts only in accordance with the scope of the activity as described in the details given to the Senior Partner or Managing Partner, then the Equity Partner or retired Equity Partner will be entitled to receive or to continue to receive any annuity or other annual payment or fixed amount under this Schedule.

6.3 The Managing Partner has the authority to specify in any particular case and at any particular time whether an annuity or other annual payment or fixed amount to which a retired Equity Partner, or a spouse or any dependent children or the estate of a retired Equity Partner, is entitled under this Schedule is paid in whole or in part by (and as a liability of) the Partnership or is paid in whole or in part by (and as a liability of) an Associated Firm. If an Associated Firm defaults in making the payment, the Partnership will be liable to the person concerned in place of the defaulting Associated Firm.

The ELG has the authority to make a Policy which may apply when the payment of an annuity or other annual payment under paragraph 4, 5 or 6 would give rise, for a retired Equity Partner, to a lower cash receipt (after all Tax payable in respect of the payment) than if the payment were made (i) by the Associated Firm where the retired Equity Partner worked for a significant part of that retired Equity Partner's career or (ii) if the Equity Partner was working in a non-UK branch of the Partnership, by an entity resident in the country where the retired Equity Partner worked for a significant part of the retired Equity Partner's career (the difference being the "**shortfall**"). Under the Policy, the Managing Partner may determine that the principles of paragraph 8.2.4 of Schedule 6 (*Distribution of Remuneration; allocation of source of profit*) apply to the shortfall.

Schedule 14: Retirement of Equity Partners and Annuity Arrangements for Equity Partners

*(Amended 12 July 2012)*

6.4    If an Equity Partner retires and is entitled to an annuity or other annual payment or fixed amount under this Schedule, the date of retirement will be entered in the Register of Partner Annuitants upon the Equity Partner's retirement together with the amount of the annuity or other annual payment or fixed amount to which the Equity Partner is entitled upon retirement.  At the beginning of each Financial Year in which the Equity Partner is entitled to such an annuity or other annual payment or fixed amount, the amount of that annuity or other annual payment or fixed amount for that Financial Year will be entered against the Equity Partner's name in the Register of Partner Annuitants.

If a retired Equity Partner who is in receipt of an annuity or other annual payment under this Schedule dies and upon death the Equity Partner's estate, surviving spouse (or any dependent children) becomes entitled to or is granted an annuity or other annual payment under this Schedule, the corresponding entries will be made in the Register of Partner Annuitants against the name of that deceased retired Equity Partner in respect of the annuity or other annual payment payable to the Equity Partner's estate, surviving spouse (or any dependent children).

6.5    Unless the Managing Partner or the Executive Partner agrees otherwise in accordance with any Policy of the ELG, an annuity or other annual payment payable under paragraph 4, 5 or 6 will be calculated and paid in the Accounts Currency or, if the Equity Partner's Long-term Base immediately before ceasing to be an Equity Partner was in an office where the Office Currency was not the Accounts Currency, the Office Currency.

The ELG has the authority to determine by Policy the exchange rate for the calculation and payment of an annuity or other annual payment payable under paragraph 4, 5 or 6 otherwise than in the Accounts Currency.

*(Amended 20 March 2012)*

6.6    An annuity or other annual payment payable under paragraph 4, 5 or 6 will be paid not later than the first day of the ninth month after the end of the Financial Year to which the entitlement relates.

6.7    If at any time there is a revision of the system of sharing profits by reference to an allocation of Units or a material change in the system of allocating Units, or if 280 Units ceases to be the applicable number of Units for the purposes of paragraphs 4.14.2(a) or 4.14.2(c)(iii), the Partnership Council will:

6.7.1    make such changes to the terms whereby an annuity or other annual payment payable under paragraph 4, 5 or 6 is calculated as are fair and reasonable in order to ensure that the amount of such annuity or other annual payment continues to reflect a similar relationship to the profit share of the most senior group of Equity Partners as was previously the case by reference to a holding of 280 Units; and

6.7.2    make such changes to the terms of any annuity or other annual payment which is then being paid under paragraph 4, 5 or 6 as are fair and reasonable in order to ensure that the amount of such annuity or other annual payment continues to

reflect a similar relationship to the profit share of the most senior group of Equity Partners as existed when it was first payable taking into account the expectation that the value of a Retirement Annuity Unit would be limited to £4,615.

The Partnership Council will by Policy determine how such changes will be made and given effect to, having regard to the nature, extent and purpose of the revision of the system of sharing profits, the material change in the system of allocating Units or the other events which have caused such changes to be made, and the need to reflect fairly the original intention and scope of the annuity or other annual payment arrangements.

*(Amended with effect from 1 May 2015 and with effect from 1 May 2017)*

6.8     An annuity or other annual payment payable under this Schedule will accrue on a daily basis.

6.9     On payment of an annuity or other annual payment or fixed amount under this Schedule, the Partnership and any Associated Firm:

6.9.1    will deduct such amounts in respect of Tax as it is required by law to deduct; and

6.9.2    may deduct such sums as it has paid or will pay on behalf of the retired Equity Partner and such sums as may be due to it from the retired Equity Partner.

6.10    No annuity or other annual payment or fixed amount or other payment will be paid to a Defaulting Partner or to the estate, surviving spouse or dependent children of a Defaulting Partner.

6.11    If an Equity Partner or retired Equity Partner who is or will be entitled to any payment of an annuity or other annual payment or fixed amount under this Schedule becomes bankrupt or insolvent, the annuity or other annual payment or fixed amount will (if it is then due) immediately cease to be payable or will (if it has not yet become payable) not become payable by the Partnership or any Associated Firm. Instead, an equivalent amount will be paid by the Partnership (or, as the case may be, an Associated Firm) on corresponding terms to any spouse or dependent children of the Equity Partner or retired Equity Partner as the ELG may determine. If there is no spouse and there are no dependent children, the ELG will have the discretion to agree that the amount in question will be paid to a person nominated by the Equity Partner or retired Equity Partner or to a charity.

6.12    The Partnership Council may determine by Policy such matters as in its view are required to calculate, apportion or regulate in any way any annuity or other annual payment or fixed amount payable under this Schedule and to give full and practical effect to its provisions.

6.13    The Partnership will not be obliged to recognise any assignment to any third party of any annuity or other annual payment or fixed amount payable under this Schedule, and payment of any sum due under this Schedule to the retired Equity Partner will fully discharge the Partnership's obligations in respect thereof.

Schedule 14: Retirement of Equity Partners and Annuity Arrangements for Equity Partners

6.14    If the Partnership is to be wound-up by reason of amalgamation, reconstruction or other form of reorganisation resulting in some other firm or body (corporate or otherwise) acquiring the whole or the greater part of the business of the Partnership, then the Partnership will procure such other firm or body to enter into a novation agreement with each Partnership Annuitant and the Partnership, whereby such other firm or body will assume the Partnership's liability for each Partner Annuity (including any liability to make good in a subsequent Financial Year any prior reduction (by abatement) in a Partner Annuity) and thereupon the Partnership will be discharged from any future liability in respect of the Partner Annuity in question.  The annual remuneration of the highest paid individual in such other firm or body (and such remuneration will be deemed to include the value of all benefits provided for or payments made on behalf of such individual by such firm or body or by any other firm or body which it controls) (but disregarding any system of remunerating an exceptional contribution, such as the Wider Leadership Group's discretion to allocate more than 280 Units) will be deemed to represent 280 Units and the value of each Partner Annuity will be calculated by reference thereto.

Each Partnership Annuitant will enter into the novation agreement upon being requested by the Partnership and upon the Partnership Annuitant being satisfied (such expression of satisfaction not to be unreasonably withheld) that the new firm or body assuming responsibility for payment of the Partner Annuity will be able to pay the same.

*(Amended with effect from 1 May 2015 and with effect from 1 May 2017)*

6.15    If the Partnership is wound-up in circumstances other than those set out in paragraph 7.14:

6.15.1    Partnership Annuitants whose entitlements to an annuity or other annual payment under this Schedule are calculated by reference to the value of a Unit will not rank as creditors in respect of their annuities or other annual payments; in respect of any such amount Partnership Annuitants will rank for payment *pari passu* with Equity Partners in respect of the amount of any profit or remuneration for which, but for paragraph 2 of Schedule 17 (*Winding-up of the Partnership and Associated Firm*), Equity Partners would rank as creditors; and

6.15.2    the calculation of the amount payable to the Partnership Annuitants in respect of their annuities or other annual payments or fixed amounts will take into account the annuities or other annual payments or fixed amounts they could have reasonably expected to have received in the future but for the Partnership being wound up.

7.    **Reduction of Partner Annuities if they exceed a specified percentage of Adjusted Partnership Profit**

7.1    This paragraph 8 applies to determine the extent and the manner by which a Partner Annuity is reduced if in any Financial Year the aggregate amount of Partner Annuities and Old Partnership Annuities exceeds a specified percentage of Adjusted Partnership Profit, and also to determine how such a reduction is subsequently to be made good.

Schedule 14: Retirement of Equity Partners and Annuity Arrangements for Equity Partners

In the following provisions:

7.1.1    **"Adjusted Partnership Profit"** means Partnership Profit after deducting Partners' remuneration or profit share as referred to in paragraph 3.1.2(a) of Schedule 4;

7.1.2    the **"Total Annuities Amount"** means, in relation to any Financial Year, the aggregate amount of all Partner Annuities and Old Partnership Annuities payable in respect of that Financial Year; and

7.1.3    the **"5 per cent Cap"** means, in relation to any Financial Year, an amount which is equal to 5 per cent of the aggregate of (i) Adjusted Partnership Profit for that Financial Year and (ii) the Total Annuities Amount in relation to that Financial Year.

*(Amended 20 March 2009 and amended with effect from 1 September 2014)*

7.2    If the Total Annuities Amount exceeds the 5 per cent cap in relation to any Financial Year, the Partnership will calculate the amount by which each Partner Annuity and Old Partnership Annuity which would (but for these provisions) be payable for that Financial Year must be reduced in order to result in the Total Annuities Amount (recalculated to take account of such reductions) equalling the 5 per cent Cap in relation to that Financial Year.  For the purposes of such calculation the amount of each Partner Annuity and Old Partnership Annuity will be reduced by the same proportion.

In relation to that Financial Year, the Partnership Annuitant shall only be entitled to a Partner Annuity as so reduced.

7.3    If, following a Financial Year in which a Partner Annuity has been reduced by the application of paragraph 8.2, the Total Annuities Amount for a subsequent Financial Year is less than the 5 per cent Cap in relation to that subsequent Financial Year, all Partner Annuities payable in respect of that subsequent Financial Year will be paid in full and the reduction made to any Partner Annuity in respect of the earlier Financial Year will be made good in that subsequent Financial Year on the following basis.

7.3.1    The Partnership will calculate the amount required to make good the reduction to each Partner Annuity and Old Partnership Annuity (in each case, by the same proportion) to the extent that results in the aggregate of:

(a)    the amounts required to make good all Partner Annuities and Old Partnership Annuities; and

(b)    the Total Annuities Amount in relation to that subsequent Financial Year itself

equalling the 5 per cent Cap in relation to that subsequent Financial Year (or until the whole amount of all reductions is treated as made good, if that is achieved without the calculation resulting in the 5 per cent Cap being exceeded).

7.3.2    The amount so calculated will be paid to the relevant Partnership Annuitant as though it were a Partner Annuity to which the annuitant was entitled in relation to that subsequent Financial Year (such payment being in addition to the

Schedule 14: Retirement of Equity Partners and Annuity Arrangements for Equity Partners

payment of any Partner Annuity to which that Partnership Annuitant is entitled in relation to that subsequent Financial Year itself).

7.3.3    If in relation to any such subsequent Financial Year any Partner Annuity is only partially made good, the balance of any reduction (that is, the amount which is not made good in that subsequent Financial Year) will be carried forward with the intention that it will be made good at the earliest opportunity upon similar terms in a following Financial Year but only after any Partner Annuities and Old Partnership Annuities payable in respect of that following Financial Year have been paid in full: but in carrying forward and making good any reduction from a prior Financial Year, reductions made in an earlier Financial Year will be made good in priority to reductions made in a later Financial Year.

7.3.4    If a Partnership Annuitant has suffered a reduction in a Partner Annuity and has died before that reduction is made good, the payments whereby that reduction is made good will be made to the annuitant's personal representatives or heir or heirs (as appropriate).

7.4    The Partnership Council will by Policy determine such other matters as in its view are required to calculate, apportion, reduce, make good any reduction in, or regulate in any way any Partner Annuity so as to give full and practical effect to the provisions of this paragraph 8.

## Part E- Entrenched Rights

*(Former paragraphs 11 and 13 deleted 29 January 2010; former paragraph 10 deleted with effect from 1 September 2014)*

8.    **Entrenched Rights**

Paragraph 4 may not be amended in a manner contrary to the interests of those Equity Partners who were parties to the Previous Partnership Agreement on 1 October 2005 or had agreed in writing before that date to become such a party (together, **"relevant parties"**) or be deleted unless the amendment or deletion is first agreed by more than 50 per cent of those relevant parties who are Equity Partners at the time of such proposed amendment or deletion.

*(Amended with effect from 1 September 2014)*

*(Schedule 14 amended on 10 June 2008 with effect from 1 January 2008 pursuant to a Special Resolution of Equity Partners of 11 January 2008)*

**SCHEDULE 15**
**EQUITY PARTNERS' TERMINATION, IMMEDIATE TERMINATION,**
**SUSPENSION AND RETIREMENT UPON PHYSICAL OR MENTAL INCAPACITY**

This Schedule applies to every Equity Partner in respect of any position held as partner, principal, officer or employee in, or under any contract to provide services to, the Partnership and any Associated Firm.

1. **Termination**

1.1    The Managing Partner may cause an Equity Partner to cease to be an Equity Partner by giving a **"Termination Notice"** either (i) pursuant to any Policy which the Partnership Council has authority to make under this Schedule 15 (**"Performance Termination"**) or (ii) upon a recommendation of the Disciplinary Committee (**"Disciplinary Termination"**). The Equity Partner will cease to be an Equity Partner on the date specified in the Termination Notice, which will be at least 10 days after it is given subject, only in the case of Performance Termination, to paragraph 1.2.

The Termination Notice will set out the reasons for the Termination.

*(Amended with effect from 23 April 2020)*

1.2    An Equity Partner may appeal a Performance Termination to the Partnership Council. An appeal must be made in writing and submitted to the Senior Partner within 10 days after the Termination Notice is given. The Partnership Council will decide whether the proposed Performance Termination is justified and allow or reject the appeal accordingly.

Until the appeal has been decided, the Equity Partner will remain an Equity Partner. If the appeal is rejected the Equity Partner will cease to be an Equity Partner on the date specified in the Termination Notice or, if that date has passed, on a date to be decided by the Partnership Council. The Equity Partner will not cease to be an Equity Partner if the appeal is successful.

The Partnership Council will decide the appeal on the basis of the written material submitted to it. The Partnership Council will decide the appeal within four weeks of it being submitted, or such longer period as the Partnership Council may agree with the Managing Partner. The decision of the Partnership Council will be given in writing. On all matters relating to the proposed Performance Termination, including whether and when the Equity Partner should cease to be an Equity Partner, the decision of the Partnership Council will be final and binding.

The Partnership Council has the authority to determine by Policy such matters as in its view are reasonable in relation to a Performance Termination. Subject to any such Policy, the Partnership Council may determine such procedural and other arrangements as it considers appropriate in the circumstances of each appeal against a Performance Termination.

*(Amended with effect from 23 April 2020)*

1.3    An Equity Partner may appeal a Disciplinary Termination pursuant to paragraphs 7.5 and 7.6 of Schedule 12.

Schedule 15: Equity Partners' Termination, Immediate Termination, Suspension and Retirement Upon Physical or Mental Incapacity

*(Added with effect from 23 April 2020)*

1.4    The Partnership Council may, under paragraph 3.2 of Schedule 9 (*Governance and Management*), appoint a committee of three or more to conduct and decide an appeal against a Performance Termination or a Disciplinary Termination.

*(Added with effect from 23 April 2020)*

1.5    A Suspension Notice may be given to an Equity Partner before, when or after a Termination Notice is given.

1.6    The giving of a Termination Notice gives the Equity Partner to whom it applies no right in law, equity or otherwise to challenge the procedure for dealing with the proposed Termination, nor to claim against the Partnership or any Associated Firm nor against any Partner or other person for any remedy, declaration, benefit, compensation, damages or other payment of any kind, whether or not any appeal against the Termination Notice or the decision of the Disciplinary Committee is successful.

*(Amended with effect from 23 April 2020)*

1.7    This paragraph 1.7 applies to an Equity Partner who is subject to Disciplinary Termination (but not a Performance Termination). Such an Equity Partner may not resign before the later of (a) date on which, according to the Termination Notice, the Equity Partner will cease to be an Equity Partner and (b) an appeal against the decision of the Disciplinary Committee is decided.

The Equity Partner will be a Defaulting Partner unless the Partnership Council decides otherwise.

The Equity Partner will have no right in law, equity or otherwise to claim against the Partnership or any Associated Firm nor against any Partner or other person for any remedy, declaration, benefit, compensation, damages or other payment of any kind as a result of (i) the application of the Termination process under this paragraph 1 or (ii) ceasing to be an Equity Partner or to claim under this Agreement or any other agreement with the Partnership or an Associated Firm or to claim for any Partner Annuity or other payments which would otherwise have been payable to the Equity Partner upon ceasing to be an Equity Partner, except for (a) the balance of any Partnership Profit which may be due to the Equity Partner for the period up to the date the Equity Partner ceases to be an Equity Partner, as specified in paragraph 12 of Schedule 6 (*Distribution of Remuneration*), (b) any share of Equity Remuneration which the Managing Partner decides should be paid to the Equity Partner pursuant to paragraph 1.9, (c) the repayment of any capital contributed by the Equity Partner pursuant to Schedule 7 (*Capital*), (d) any compensation to which the Equity Partner is entitled under paragraph 2 (*Compensation rights of certain Pünder Partners)* and (e) such Partner Annuity as the Equity Partner may be entitled to if, under this paragraph 1.7, the Partnership Council decides that the Equity Partner should not be a Defaulting Partner.

*(Amended with effect from 1 January 2008 and 23 April 2020)*

1.8    In the event that the Disciplinary Committee recommends that the Managing Partner be subject to Termination, then (a) the Executive Partner will be responsible for all

actions which would normally fall to the Managing Partner under this paragraph and any Policy made under it, and (b) the Executive Partner will issue a Termination Notice unless the ELG and the Senior Partner agree that the Executive Partner should not do so.

*(Former paragraph 1.8 deleted 23 April 2020)*

1.9    The Managing Partner has the authority to agree that an Equity Partner who is subject to a Performance Termination will receive an additional share of Equity Remuneration for the Financial Year of the Termination, not exceeding the value of the Units the Equity Partner would have held in the six months following the date the Termination Notice was given, subject to the Equity Partner entering into documentation satisfactory to the Managing Partner or the Executive Partner including an appropriate waiver of any claims;

Any Equity Partner who is subject to a Performance Termination who has 300 Units or more on the Ladder, will be treated as having 280 Units for the purposes of determining any additional share of Equity Remuneration payable under this paragraph; and

The Partnership Council has authority to determine by Policy the basis on which such authority may be exercised.

Any such share of Equity Remuneration will be paid in accordance with paragraph 12 of Schedule 6 *(Distribution of Remuneration)*.

*(Amended with effect from 23 April 2020 and 15 March 2024)*

2.    **Compensation rights of certain Pünder Partners upon their Termination**

2.1    The provisions of this paragraph will apply to all Pünder Partners aged 54 or under at the Previous Effective Date (each a **"Relevant Pünder Partner"**).

2.2    Any Relevant Pünder Partner may be subject to Termination under the provisions of paragraph 1. The provisions of this paragraph determine whether or not any Relevant Pünder Partner who is subject to Termination will have any right to be paid compensation by the Partnership.

2.3    Any Relevant Pünder Partner who is subject to Termination where the circumstances are such that there is Just Cause for Termination will have no right to be paid compensation by the Partnership for Termination. For these purposes **"Just Cause"** means any situation where the acts or omissions of the Relevant Pünder Partner have resulted in a serious breach of the trust between that partner and the remaining Equity Partners and in the breakdown of the relationship between that partner and the remaining Equity Partners so that it cannot reasonably be expected that the Relevant Pünder Partner should continue in partnership with the remaining Equity Partners.

2.4    Any Relevant Pünder Partner who is subject to Termination where the circumstances are such that there is no Just Cause for Termination will be paid by the Partnership the following amounts by way of compensation for Termination:

2.4.1    If the Relevant Pünder Partner was appointed an equity partner in Pünder with effect from a date on or after 1 January 1995, an amount (which will be payable

as an additional share of Equity Remuneration in respect of the Financial Year in which the Relevant Pünder Partner ceases to be an Equity Partner) which is equal to the share of Equity Remuneration which the Relevant Pünder Partner would have been entitled to receive had the Relevant Pünder Partner remained an Equity Partner for a period of 6 months following the date on which the Relevant Pünder Partner ceases to be an Equity Partner by reason of Termination. If the Financial Year ends during that 6 month period the amount will be calculated on the assumption that for the Financial Year beginning in that 6-month period (i) the Relevant Pünder Partner is entitled to the Unit allocation that would have been received had the Relevant Pünder Partner continued as an Equity Partner until the end of the 6-month period and (ii) the share of Equity Remuneration per Unit is the same amount as the share of Equity Remuneration per Unit for the immediately preceding Financial Year;

2.4.2 In any other case, an amount equal to and payable as provided in paragraph 2.4.1 plus a unit compensation amount (a **"Unit Compensation Amount"**). For any Relevant Pünder Partner the Unit Compensation Amount will either be:

(a) A lump sum (which will be payable as an additional share of Equity Remuneration in respect of the Financial Year in which the Relevant Pünder Partner ceases to be an Equity Partner) which is equal to the amount of a share of Equity Remuneration which an Equity Partner would receive in respect of the Financial Year in which the Relevant Pünder Partner ceases to be an Equity Partner on the basis of a number of Units (which may include a fraction of a Unit), calculated by multiplying three Units by the aggregate of the number of years (and pro-rated for any part of a year) since the Relevant Pünder Partner was first admitted to an Eligible Status (but so that (i) it will be assumed for these purposes that the Relevant Pünder Partner continues as an Equity Partner for 6 months after the date of Termination and (ii) such number of years, if less than 8, will be treated as 8 years, and if more than 25, will be treated as 25 years); or

(b) An annuity for a term of five years beginning on the date on which the Relevant Pünder Partner ceases to be an Equity Partner (and payable on that date and on the four subsequent anniversaries of that date) where the amount of the annuity paid on each of the five annual payment dates is the equivalent of one-fifth of the amount of the lump sum calculated as provided in sub-paragraph (a) above;

2.4.3 It will be for the Partnership Council to decide whether in any particular case the Relevant Pünder Partner receives the Unit Compensation Amount as such a lump sum or as such an annuity.

2.5 Notwithstanding the provisions of paragraphs 2.3 and 2.4 the Partnership Council may exercise any discretion which it may have under the provisions of Schedule 14 (*Retirement of Equity Partners and Annuity Arrangements for Equity Partners*) to make a payment to a Relevant Pünder Partner upon and by reason of retirement from the Partnership (including retirement following a Termination Notice). However, if the Relevant Pünder Partner is entitled to any amount by way of compensation under the provisions of paragraph 2.4, the Partnership Council may exercise any such discretion

in favour of the Relevant Pünder Partner only upon that Relevant Pünder Partner releasing the Partnership unconditionally and in full from any liability to pay any such amount by way of compensation.

*(Amended with effect from 1 March 2010)*

2.6     The Managing Partner may specify in any particular case where an amount by way of compensation is payable under the provisions of paragraph 2.4 that such compensation is paid in whole or in part by (and as a liability of) the Partnership or is paid in whole or in part by (and as a liability of) any Associated Firm.

2.7     The Partnership Council will by Policy determine such other matters as in its view are required to determine whether or not there is Just Cause for the Termination of a Relevant Pünder Partner, or to calculate, apportion or regulate in any way any amounts payable under the provisions of this paragraph 2, and generally to give full and practical effect to such provisions.

2.8     The terms of this paragraph 2 constitute an Entrenched Right for the benefit of each Relevant Pünder Partner concerned as Beneficiary.

*(Former paragraph 3 deleted with effect from 1 March 2010)*

3.    **Immediate Termination**

3.1     Notwithstanding any other provision of the Agreement, an Equity Partner will be subject to Immediate Termination and will cease to be an Equity Partner immediately and without any notice of any kind (and without any action by or on behalf of the Partnership, the Partnership Council or any Equity Partners) upon:

> 3.1.1     the Equity Partner commencing any proceedings intended to result in bankruptcy or insolvency of the Equity Partner or upon any action being taken or any decision being made by any court or other legal body in any jurisdiction resulting in or as a result of the Equity Partner's bankruptcy or insolvency;

> 3.1.2     the Equity Partner assigning, alienating, charging or offering as security any share (including profit-share) and interest in the Partnership or any Associated Firm to any third party (or the Equity Partner purporting to take any such action) unless before so doing the Equity Partner has obtained the written consent of the Managing Partner to such action;

> 3.1.3     the Equity Partner having a professional qualification or any licence or permit required to practise as a lawyer cancelled or otherwise withdrawn by any professional or regulatory authority which has jurisdiction over the Equity Partner in respect of day to day practice of law by the Equity Partner;

> 3.1.4     the Equity Partner failing to comply fully with the requirements made on the Equity Partner in respect of any action approved by the Partnership in relation to insolvency proceedings or compounding or dealing with creditors in respect of the Partnership or any Associated Firm (whether pursuant to any legislation in any jurisdiction or pursuant to any court or similar proceedings or orders in any jurisdiction) including (without limitation) failing to sign upon demand all necessary documents relating to such matters; or

3.1.5   the Managing Partner determining pursuant to paragraph 7 of Schedule 9 (*Emergency Powers*) that the Equity Partner shall be subject to Immediate Termination.

3.2   An Equity Partner who ceases to be an Equity Partner in any of the circumstances specified in paragraph 3.1 will be a Defaulting Partner and have no right in law, equity or otherwise to claim against the Partnership or any Associated Firm nor against any Partner or other person for any remedy, declaration, benefit, compensation, damages or other payment of any kind as a result of ceasing to be an Equity Partner or to claim under this Agreement or any other agreement with the Partnership or an Associated Firm or to claim for or any Partner Annuity or other payments which would otherwise have been payable to that Equity Partner upon ceasing to be an Equity Partner, except for (a) the balance of any Partnership Profit which may be due to that Equity Partner for the period up to the date of ceasing to be an Equity Partner as specified in paragraph 12 of Schedule 6 (*Distribution of Remuneration*) and (b) the repayment of any capital contributed by that Equity Partner pursuant to Schedule 7 (*Capital*).

*(Amended with effect from 1 March 2010)*

### 4.   Suspension of an Equity Partner who has acted (or who is alleged to have acted) improperly

4.1   If an Equity Partner appears (or is alleged) to be guilty of an act or omission which is inconsistent in any way with such Equity Partner's obligations or position as an Equity Partner then the Managing Partner will have the power to suspend that Equity Partner from acting as an Equity Partner in accordance with the provisions of this paragraph 4.

4.2   The Managing Partner may suspend an Equity Partner by giving a Suspension Notice and the Equity Partner will be suspended from acting as an Equity Partner from such date and for such period and upon such terms as are set out in that Suspension Notice. The period of suspension and the terms of suspension must (in the opinion of the Managing Partner) be reasonable having regard to the matter or matters (or alleged matter or matters) which have given rise to the suspension and the time likely to be necessary to enable a proper investigation to be made into that matter or those matters pending any referral to the Disciplinary Committee and any appeal against its decision.

*(Amended with effect from 23 April 2020)*

4.3   In deciding whether or not to serve a Suspension Notice upon an Equity Partner and in determining the period and terms of suspension, the Managing Partner will consult with the Senior Partner (but any final decision will be made by the Managing Partner alone). If either the Managing Partner or the Senior Partner is absent when the other considers that it may be appropriate to serve a Suspension Notice upon an Equity Partner, or if it appears that the conduct of either the Managing Partner or the Senior Partner may have been such that it may be appropriate to serve a Suspension Notice either of them, then two members of the Partnership Council appointed for the purpose by the Partnership Council will have the power and responsibilities of the Managing Partner or the Senior Partner (as the case may be).

Schedule 15: Equity Partners' Termination, Immediate Termination, Suspension and Retirement Upon Physical or Mental Incapacity

4.4    An Equity Partner who has been given a Suspension Notice and has been suspended for more than three months may appeal against it to the Partnership Council. The appeal must be made in writing and submitted to the Senior Partner.

4.5    The suspension of the Equity Partner will continue during the conduct of any appeal. The Partnership Council will decide the appeal on the basis of written material. The Partnership Council will decide the appeal within four weeks of it being submitted or such longer period as the Partnership Council may agree with the Managing Partner. The decision of the Partnership Council will be given in writing.

*(Amended with effect from 23 April 2020)*

The Partnership Council's decision on an appeal may be to end the suspension or to continue the suspension for the period and on the terms set out in the Suspension Notice or for such other period or on such other terms as it determines. On all matters relating to the Suspension Notice, the decision of the Partnership Council will be final and binding.

4.6    The Partnership Council has the authority to determine by Policy such matters as in its view are reasonable in relation to a Suspension Notice. Subject to the Policy, the Partnership Council may determine such procedural and other arrangements as it considers appropriate in the circumstances of each appeal.

4.7    The Managing Partner will have the right (in addition to any other rights the Partnership Council may give the Managing Partner by Policy) to require that any Equity Partner who is suspended will not, whilst suspended:

4.7.1    enter any Partnership or Associated Firm premises or use the Partnership's intranet;

4.7.2    (to protect the interests of the Partnership or any Associated Firm) contact or have any communication with any clients or business contacts of the Partnership or any Associated Firm;

4.7.3    contact or have any communication with any employees of the Partnership or any Associated Firm;

4.7.4    be entitled to vote on or become involved in any matter to be determined by the Partnership or to receive any papers or information relating to the Partnership; or

4.7.5    make any statement to any person regarding the suspension except to members of the Equity Partner's immediate family, professional advisers and other Equity Partners.

4.8    Unless the Partnership Council determines otherwise, an Equity Partner's share of Partnership Profit will continue to accrue, and the Equity Partner will continue to receive all distributions of or on account of Partnership Profit whilst a Suspension Notice is in force. If the Partnership Council determines that this should not be the case and the Equity Partner is not subject to Disciplinary Termination for the reasons which have given rise to the suspension, then the Equity Partner's share of Partnership Profit

which has been withheld will be restored when the Suspension Notice ceases to be in force.

*(Amended with effect from 23 April 2020)*

4.9    A Termination Notice may be given to an Equity Partner before or when a Suspension Notice is given or in force.  If an Equity Partner is given a Suspension Notice and, following a decision of the Disciplinary Committee, a Termination Notice and appeals against the Termination Notice, the Partnership Council may, when deciding the appeal, decide to end the suspension or to continue the suspension for the period and on terms set out in the Suspension Notice or for such other period and on such other terms as it determines.  On all matters relating to the Suspension Notice, the decision of the Partnership Council will be final and binding.

*(Amended with effect from 23 April 2020)*

4.10    Neither the giving of a Suspension Notice nor the suspension itself gives the Equity Partner who is suspended any right in law, equity or otherwise to challenge the suspension, nor to claim against the Partnership or any Associated Firm nor against any Partner or other person for any remedy, declaration, benefit, compensation, damages or other payment of any kind, whether or not any appeal against the Suspension Notice is successful.

*(Amended with effect from 1 March 2010)*

4.11    In circumstances where the ELG and the Senior Partner consider that the Managing Partner appears (or is alleged) to be guilty of an act or omission which is inconsistent in any way with the Managing Partner's obligations or position as an Equity Partner, then the Executive Partner will have the power to suspend the Managing Partner in accordance with the provisions of this paragraph 4. The powers and duties of the Managing Partner set out in this paragraph 4 and any Policy under it will then fall to the Executive Partner.

*(Added with effect from 23 April 2020)*

5.    **Suspension of an Equity Partner who has given notice of intention to retire as an Equity Partner**

5.1    The provisions of this paragraph 5 will apply to every Equity Partner who is not either a US-based Partner or a German-based Partner.  For the purposes of this paragraph 5:

5.1.1    a **"US-based Partner"** means any Equity Partner who, at the time of giving any notice of intention to retire from the Partnership, is working substantially in, and whose Long-term Base is in, the United States; and

5.1.2    a **"German-based Partner"** means any Equity Partner who, at the time of giving any notice of intention to retire from the Partnership, is working substantially in, and whose Long-term Base is in, the Federal Republic of Germany.

5.2    If an Equity Partner gives notice to retire from the Partnership under the provisions of Schedule 14 (*Retirement of Equity Partners and Annuity Arrangements for Equity*

*Partners*), the Managing Partner will have the power, exercisable at any time before the notice period expires, to suspend that Equity Partner, in accordance with the provisions of this paragraph 5, from acting as an Equity Partner until the date upon which the retirement of that Equity Partner takes effect.

5.3     The Managing Partner may suspend an Equity Partner by giving a Suspension Notice and the Equity Partner will be suspended from acting as an Equity Partner from such date and for such period and upon such terms as are set out in that Suspension Notice. The period of suspension and the terms of suspension will be determined by the Managing Partner in the Managing Partner's absolute discretion subject only to complying with any Policy of the Partnership Council in relation to such matters.

5.4     In deciding whether or not to serve a Suspension Notice upon an Equity Partner and in determining the period and terms of suspension, the Managing Partner will consult with the Senior Partner (but any final decision will be made by the Managing Partner alone). If the Managing Partner or Senior Partner is absent when the other considers that it may be appropriate to serve a Suspension Notice upon an Equity Partner, or if it is the Managing Partner or Senior Partner who has served notice to retire in circumstances where it might be appropriate to serve a Suspension Notice upon either of them, then two members of the Partnership Council appointed for the purpose by the Partnership Council will have the power and responsibilities of the Managing Partner or the Senior Partner (as the case may be).

5.5     An Equity Partner who has been given a Suspension Notice and has been suspended for more than three months may appeal against it to the Partnership Council. The appeal must be made in writing and submitted to the Senior Partner

5.6     The suspension of the Equity Partner will continue during the conduct of any appeal. The Partnership Council will decide the appeal on the basis of written material. The Partnership Council will decide the appeal within six weeks of it being submitted or such longer period as the Partnership Council may agree with the Managing Partner. The decision of the Partnership Council will be given in writing.

        The Partnership Council's decision on an appeal may be to end the suspension or to continue the suspension for the period and on the terms set out in the Suspension Notice or for such other period or on such other terms as it determines. On all matters relating to the Suspension Notice, the decision of the Partnership Council will be final and binding.

5.7     The Partnership Council has the authority to determine by Policy such matters as in its view are reasonable in relation to a Suspension Notice. The Policy may be the same as the Policy in relation to a Suspension Notice served on an Equity Partner under paragraph 4. Subject to the Policy, the Partnership Council may determine such procedural and other arrangements as it considers appropriate in the circumstances of each appeal.

5.8     The Managing Partner will have the right to require an Equity Partner who is suspended to refrain from action whilst suspended as referred to in paragraph 4.7.

5.9     Unless the Partnership Council determines otherwise, an Equity Partner's share of Partnership Profit will continue to accrue, and the Equity Partner will continue to

receive all distributions of or on account of Partnership Profit whilst a Suspension Notice is in force.

5.10    A Termination Notice may be given to an Equity Partner before or when a Suspension Notice is given or in force.  If an Equity Partner is given a Suspension Notice and a Termination Notice and appeals against the Termination Notice, the Partnership Council may, when deciding the appeal, decide to end the suspension or to continue the suspension for the period and on terms set out in the Suspension Notice or for such other period and on such other terms as it determines.  On all matters relating to the Suspension Notice, the decision of the Partnership Council will be final and binding.

5.11    The ELG may exercise its rights under paragraph 2.3 of Schedule 14 (*Retirement of Equity Partners and Annuity Arrangements for Equity Partners*) (relating to the ELG's power to require an Equity Partner to retire before expiry of notice period) before or when a Suspension Notice is given or in force.

5.12    Neither the giving of a Suspension Notice nor the suspension itself gives the Equity Partner who is suspended any right in law, equity or otherwise to challenge the suspension, nor to claim against the Partnership or any Associated Firm nor against any Partner or other person for any remedy, declaration, benefit, compensation, damages or other payment of any kind, whether or not any appeal against the suspension is successful.

*(Amended with effect from 1 March 2010)*

6.    **Retirement of an Equity Partner who becomes physically or mentally incapacitated**

6.1    If an Equity Partner becomes physically or mentally incapacitated and remains so for a period of twelve consecutive months and in consequence of such incapacity is throughout that period (or substantially throughout that period) unable to carry out the Equity Partner 's responsibilities, the Equity Partner will be treated as having retired from the Partnership on the day on which that twelve month period ends.  The Senior Partner will have power to agree with the Equity Partner concerned to extend the period of twelve months (but not beyond eighteen months) if either (a) in the Senior Partner's view there is a reasonable expectation that the Equity Partner will recover to full health within the extended period or (b) the benefits of the group disability policy applicable to that Equity Partner will not begin to accrue to that Equity Partner until a date falling after the end of the twelve-month period.  The Equity Partner in question will cease to be an Equity Partner on the day the Equity Partner is so treated as having retired.

6.2    An Equity Partner who ceases to be an Equity Partner by reason of the provisions of this paragraph 6 will have no right to claim in law, equity or otherwise against the Partnership or any Associated Firm nor against any Partner or other person for any remedy, declaration, benefit, compensation, damages or other payment of any kind as a result of (i) the process whereby that Equity Partner may be treated as having retired under this paragraph 6 or (ii) ceasing to be an Equity Partner or to claim under this Agreement or any other agreement with the Partnership or an Associated Firm or to claim for any Partner Annuity or other payments which would otherwise have been payable upon that Equity Partner ceasing to be an Equity Partner, except for (a) the balance of any Partnership Profit which may be due to that Equity Partner for the period

up to the date of ceasing to be an Equity Partner as specified in paragraph 12 of Schedule 6 (*Distribution of Remuneration*) and (b) the repayment of any capital contributed by that Equity Partner pursuant to Schedule 7 (*Capital*); and except that if, had that Equity Partner voluntarily retired from the Partnership on the date of ceasing to be an Equity Partner, that Equity Partner would have been entitled to or, at the discretion of the Partnership Council, eligible for any Partner Annuity or other payment under any of the provisions of Schedule 14 (*Retirement of Equity Partners and Annuity Arrangements for Equity Partners*), then that Equity Partner will be so entitled or eligible as if that Equity Partner had so voluntarily retired on that date.

*(Amended with effect from 23 April 2020)*

6.3     The Partnership Council will by Policy determine such other matters as in its view are required to give full and practical effect to the provisions of this paragraph 6.

*(Amended with effect from 1 March 2010)*

*(Former paragraph 8 deleted with effect from 1 March 2010)*

### SCHEDULE 16
### INDEMNITIES AND LIABILITIES

1. **Indemnities**

1.1 The Partnership shall indemnify any Partner who, as contemplated in or arising out of any agreement or arrangement between that Partner and the Partnership (or any Old Partnership) or any Associated Firm including this Agreement (or any Old Partnership Agreement):

    1.1.1 undertakes or has undertaken, at the request of the Managing Partner or the Executive Partner or in a capacity as an office holder in the Partnership or any Associated Firm, any obligation or liability which is not common to all Partners;

    1.1.2 holds or has held any share, property or other asset which for any reason appears or appeared to belong to such Partner in such Partner's own right but which:

        (a) is or was held by such Partner as nominee or trustee for the Partnership (or any Old Partnership) or any Associated Firm, or

        (b) is subject to a call option for the benefit of, or giving power of direction to, the Partnership (or any Old Partnership) or any Associated Firm or its nominee;

    1.1.3 is or was an office holder in any entity in which an interest is or was held on behalf of the Partnership (or any Old Partnership) or any Associated Firm; or

    1.1.4 undertakes administrative duties in relation to the Partnership or any Associated Firm,

on an after tax basis against any taxes, duties, costs, penalties, fines, damages or other expenses or liabilities (**"financial obligations"**) for which that Partner is liable legally as a result of or arising in connection with any such agreement or arrangement (and after taking into account benefits accruing to such Partner from the circumstances giving rise to such financial obligations).

1.2 The indemnity in paragraph 1.1 shall not extend:

    1.2.1 to financial obligations which have arisen or may arise as a result of the Partner's:

        (a) fraud or dishonesty;

        (b) improper act when an office holder for which the Partner would nevertheless be liable personally were the Partner not such office holder;

        (c) liability for the Partner's own negligence;

        (d) failing to make any payment or any statutory or other return when legally due as a consequence of any gross negligence;

(e)     failing to carry out the requirements of the ELG or the Managing Partner, the Executive Partner or another duly authorised individual to dispute or defend any demand, claim or action in respect of financial obligations;

(f)     failing to honour the terms of any agreement or arrangement express or implied between the Partnership (or any Old Partnership) or any Associated Firm and such Partner relating to the subject matter giving rise to financial obligations;

(g)     failing to deal with any share, property or other asset or to act when an office holder in such way as the ELG or the Managing Partner, the Executive Partner or another duly authorised individual may from time to time lawfully direct; or

(h)     carrying out any administrative duties in a grossly negligent manner;

1.2.2    to that part of financial obligations (if any) which properly is the personal responsibility of such Partner, which arises by reason of such Partner having a personal beneficial interest in the subject matter giving rise to the same and which is not common to all Partners.  If the other part of such financial obligations which are the responsibility of the Partnership by reason of the indemnity in paragraph 1.1 shall result in the cost to the Partner of settling a personal responsibility being in excess of what it otherwise would have been, then for the avoidance of doubt such indemnity shall extend to such excess; or

1.2.3    to that part of financial obligations which represents such Partner's share thereof as a Partner.

1.3    The indemnity in paragraph 1.1 is given by the Partnership with the intent that a Partner shall neither suffer financially or otherwise in acting on behalf of the Partnership (or any Old Partnership) or an Associated Firm in a manner required or requested by it, nor benefit financially or otherwise from so doing to any greater extent than the Partner would have done had any other Partner been required or requested so to act in place of the Partner.

1.4    If a Partner is required or requested to act in any manner or for any purpose by the Partnership and, in the opinion of the ELG, the indemnity in paragraph 1.1 will or may not apply, it may on behalf of the Partnership authorise giving the Partner a specific indemnity in respect of that matter in terms consistent with the scope of paragraph 1.1.

1.5    The ELG may on behalf of the Partnership authorise giving a Partner a specific indemnity in respect of a matter if:

1.5.1    in the opinion of the ELG, the matter is of a routine and administrative nature; or

1.5.2    in any other case, the Partnership Council agrees that the indemnity be given.

1.6    The Partnership shall indemnify each Partner in respect of payments made and personal liabilities incurred (acting within the scope of the relevant Partner's actual authority) (a) in the ordinary and proper conduct of the business of the Partnership and Associated

Firms and (b) in or about anything necessarily done for the preservation of the business or property of the Partnership and Associated Firms.

1.7     If any claim is made against a Partner or a retired Partner, any indemnity from the Partnership to which such person is entitled shall, unless the ELG determines otherwise, be conditional upon the relevant Partner acting in such way and doing all such things as the Partnership (or its insurers) shall properly require in relation to the claim.

1.8     Each Partner acknowledges that:

1.8.1     save as mentioned in paragraphs 1.1, 1.6 and 2.2, this Agreement does not contain any indemnity by the Partnership or any Associated Firm for the benefit of the Partner in respect of the Partner's own (or any other Partner's) acts or omissions; and

1.8.2     any indemnity given (otherwise than in the Previous Partnership Agreement) by the Previous Partnership to a Partner in a capacity as an Approved Person or Partner in the Previous Partnership shall be of no effect as regards acts or events occurring on or after the Effective Date.

## 2.     Professional indemnity insurance

2.1     The Partnership shall at all times maintain professional indemnity insurance for itself and each Associated Firm (and Old Partnership) in such sum and with such excess (if any) as the ELG considers appropriate. The Partnership shall ensure that such insurance provides cover for Partners, retired Partners and retired partners in any Old Partnership of at least the same amount and to the same extent as and on comparable terms to that provided for the Partnership and the Associated Firms.

2.2     If an excess becomes payable under any such professional indemnity insurance, it shall be treated as an expense of and paid by the Partnership and the Partnership shall indemnify any Partner or any retired Partner or retired partners in any Old Partnership who incurs any personal liability as a result of such excess, unless the relevant Partner or retired Partner or retired partners in any Old Partnership is excluded for any reason from the cover provided by such insurance.

## 3.     Notification of claims and conduct of proceedings

3.1     A Partner or retired Partner shall:

3.1.1     promptly upon becoming aware of it, notify the Managing Partner or the Executive Partner of any claim or threatened claim, or any circumstances which may give rise to a claim or threatened claim, which involves the Partner or retired Partner and which is against the Partnership, any Associated Firm, any Old Partnership or any Partner or retired Partner (in the capacity as a partner or other representative or, as the case may be, retired partner or other representative of the Partnership, any Associated Firm or any Old Partnership); and

3.1.2     cooperate with the Partnership and any Associated Firm and their insurers in such a way as may reasonably be required by the Managing Partner or the Executive Partner in relation to any claim or threatened claim, as referred to in

paragraph 3.1.1, which involves the Partner or retired Partner, such cooperation to be given without any payment other than the reimbursement of reasonable expenses.

*(Amended 29 January 2010)*

3.2    In relation to any claim made against the Partnership or any Associated Firm or Old Partnership and/or a Partner or retired Partner (in a capacity as a partner or other representative or, as the case may be, retired partner or other representative of the Partnership or any Associated Firm or Old Partnership) and whether or not the claim or any settlement thereof is covered in whole or in part by any insurance:

3.2.1    the Managing Partner or the Executive Partner (or any Partner or Partners appointed by the Executive Partner for the purpose) is hereby authorised by the Partnership and by each Partner (and so that this authorisation by each Partner shall survive notwithstanding that the Partner in question ceases to be a Partner) to have full conduct of all matters on their behalf and in their name relating to the defence, litigation, or settlement of any such claim including (without limitation) the instruction of lawyers on their behalf, the registration and execution of tolling and jurisdiction agreements, acceptance and acknowledgement of service of issue of legal proceedings, the completion and filing of all forms and documents required in the course of legal proceedings, the conduct of any litigation in defence of the claim, and the settlement of any claim (whether or not proceedings have been issued) provided that (unless the Partners and/or retired Partners concerned otherwise expressly consent thereto) no action will be taken pursuant to this authorisation which unfairly benefits the Partnership, any Associated Firm or any Old Partnership to the detriment of any Partner or retired Partner who is subject to the claim; and

3.2.2    if it appears to the Managing Partner to be fair and reasonable in all the circumstances, the Managing Partner may require a Partner or retired Partner to be separately advised or represented in relation to any claim which is also made against the Partnership, any Associated Firm or any Old Partnership. In any such case, the Managing Partner shall have authority and may exercise discretion to determine whether or not (and if so, to what extent) the costs of such Partner or retired Partner should be met by the Partnership.

4.    **Asset Protection Scheme**

4.1    This paragraph sets out certain provisions concerning the asset protection scheme constituted by the Trust and the TrustCo Covenant.

4.2    Whenever the professional indemnity insurance referred to in paragraph 2.1 falls for renewal (and at such other times as it thinks fit), the ELG shall review:

4.2.1    the likely potential risk to the TrustCo of claims being made against it under the TrustCo Covenant; and

4.2.2    the feasibility of insuring that risk.

Following such review, the ELG may, in its discretion, determine to make some or all of the arrangements described in paragraphs 4.3 to 4.5. The discretion must be exercised in a manner which, taking into account the overall interests of the Partnership, is fair to all Equity Partners concerned.

4.3     If it so determines pursuant to paragraph 4.2, the ELG may arrange, or assist in arranging, insurance of the TrustCo's risk for such period and amount, and on such other terms and conditions, as the ELG thinks fit. The premium payable for any such insurance shall be treated as an expense of the Partnership (or, to the extent decided by the ELG, any one or more of the Associated Firms).

4.4     If, in respect of any particular period, the amount of insurance cover available as referred to in paragraph 4.3 is less than £25 million (or such other figure as the ELG may decide from time to time), the ELG may, with the approval of the Partnership Council, determine that paragraph 4.5 shall apply.

4.5     If this paragraph 4.5 applies, each person who is (or who, at any time during the Relevant Period, becomes) an Equity Partner shall be obliged to execute an Equity Partner Covenant (or a deed of adherence thereto): provided that, in such Equity Partner Covenant:

4.5.1     the Relevant Period shall be such period as the ELG may decide, but commencing at a date not earlier than the date of the ELG's determination under paragraph 4.4 and lasting no longer than 18 months; and

4.5.2     the Reference Amount shall be such amount not exceeding £800 as the ELG may decide.

4.6     Subject to paragraphs 4.5.1 and 4.5.2, the form of Equity Partner Covenant may be amended from time to time in such manner as the ELG may determine, provided that:

4.6.1     the amendment would not, in the opinion of the ELG, materially prejudice the interests of the Equity Partners giving an Equity Partner Covenant in the amended form; and

4.6.2     no such amendment shall apply to, or be incorporated in, any Equity Partner Covenant actually executed before the date of the ELG's determination under this paragraph 4.6.

The form of Equity Partner Covenant, as amended, shall be published on PartnerConnect.

4.7     In this paragraph 4:

4.7.1     **"Equity Partner Covenant"** means a covenant in the form of the draft dated 1 November 2006 published on PartnerConnect, with such amendments thereto as may be made in accordance with paragraph 4.6;

4.7.2     **"Reference Amount"** has the meaning given in the Equity Partner Covenant;

4.7.3     **"Relevant Period"** has the meaning given in the Equity Partner Covenant;

4.7.4    **"Trust"** means the Clifford Chance Asset Protection Discretionary Trust constituted by a trust deed dated 16 November 2006, as amended from time to time with the approval of the Protectors named therein;

4.7.5    **"TrustCo"** means APS Ltd or any other covenantor under a TrustCo Covenant;

4.7.6    **"TrustCo Covenant"** means (a) the covenant dated 30 November 2006 entered into between the TrustCo and the trustee for the time being of the Trust or (b) any other covenant replacing or supplementing such covenant, in each case as amended from time to time with the approval of the ELG.

A copy of each TrustCo Covenant and the trust deed constituting the Trust shall be published on PartnerConnect.

5.    **Residual Personal Liabilities**

5.1    In this paragraph 5, **"Residual Liabilities"** means the liabilities referred to in the following schedules to the Previous Partnership Agreement:

5.1.1    paragraph 2 of schedule 10 (relating to certain Former Partnership Annuities concerning the Previous Partnership);

5.1.2    paragraph 4 of schedule 10 (relating to certain Former Partnership Annuities concerning Pünder); and

5.1.3    paragraph 4.3 of schedule 14 (relating to certain contractual liabilities not crystallised at the Previous Effective Date).

5.2    In the Transfer Agreement the Partnership (for itself and the Associated Firms) assumes responsibility for discharging the Residual Liabilities.

5.3    The Equity Partners shall also have personal joint and several liability for the Residual Liabilities (to the extent not discharged by the Partnership or an Associated Firm) and agree to indemnify each other and the Partnership (and the Associated Firms) accordingly.

5.4    The terms of this paragraph 5 will constitute an Entrenched Right:

5.4.1    as regards the matters referred to in paragraph 5.1.1, for the benefit of the pre-2000 Clifford Chance Partners as Beneficiaries;

5.4.2    as regards the matters referred to in paragraph 5.1.2 for the benefit of the Pünder Partners as Beneficiaries; and

5.4.3    as regards the matters referred to in paragraph 5.1.3, for the benefit of the pre-2000 Clifford Chance Partners, the Pünder Partners and the Rogers & Wells Partners as Beneficiaries.

6.    Upon ceasing to be an Equity Partner for any reason (other than on a winding-up of the Partnership) an Equity Partner shall be released immediately following the date of ceasing to be an Equity Partner from all liability in respect of any sums becoming due thereafter for the annuities referred to in paragraphs 5.1.1 and 5.1.2, provided always

that (unless the Partnership Council decides otherwise) an Equity Partner who retires prior to the Equity Partner's 55th birthday shall be released on the first anniversary of retirement if at that time a winding-up of the Partnership has not commenced.

## SCHEDULE 17
## WINDING-UP OF THE PARTNERSHIP AND ASSOCIATED FIRMS ⋆

1.      If the Partnership is wound up (otherwise than in connection with its amalgamation, reconstruction or reorganisation), the principles in paragraphs 2 to 5 shall apply as regards any surpluses remaining at the conclusion of (a) the winding-up of the Partnership and (b) the winding-up or dissolution of any Associated Firm (each of the Partnership and any such Associated Firm being a **"wound-up entity"**), after paying in the winding-up or dissolution of the wound-up entity:

  1.1.1    all expenses of the relevant winding-up or dissolution; and

  1.1.2    all moneys due to creditors of the wound-up entity (other than as mentioned in paragraph 2).

2.      For the purposes of paragraph 1, Equity Partners shall not rank as creditors in respect of any amount payable to them by way of profit, other remuneration or return of capital. In respect of any such amount Equity Partners shall instead rank for payment as referred to in paragraph 3.

3.      The aggregate of any such surpluses (after payment of the amounts referred to in paragraph 1) shall be applied:

3.1     first, in paying to Non-Equity Partners *pari passu* any remuneration (including profit share) owing to them and accrued to the date of commencement of the winding-up of the Partnership;

3.2     secondly, in paying to Equity Partners *pari passu* the amount of any profit or remuneration for which, but for paragraph 2, they would rank as creditors;

3.3     thirdly, in paying to Equity Partners *pari passu* any capital contributed by them to the Partnership or any Associated Firm pursuant to Schedule 7 (*Capital*);

3.4     fourthly, in distributing any remaining aggregate surplus to Equity Partners pro rata to the number of Units held by them respectively at the date of commencement of the winding-up of the Partnership:

  3.4.1    treating an Equity Partner allocated over 280 Units as if that Equity Partner were allocated 280 Units; and

  3.4.2    disregarding any special terms previously agreed in relation to the retirement of any particular Equity Partner or retired Equity Partner.

        *(Amended 29 January 2010 and amended with effect from 1 September 2014, with effect from 1 May 2015, with effect from 1 May 2017 and with effect from 1 May 2021)*

4.      Amounts otherwise payable to Partners in the winding-up or dissolution of any particular wound-up entity shall be adjusted (including by way of adjusting payments between Partners and taking into account paragraph 2 and any arrangement made to give effect thereto), to the extent necessary to achieve *pari passu* participation in the aggregate surplus as contemplated by paragraph 3.

The adjustments shall treat Non-Equity Partners as having *pari passu* entitlement to remuneration arising from the same Financial Year, whether it was treated as a payment on account of profit or whether the Non-Equity Partner had the right to keep it.

The adjustments shall treat Equity Partners as having *pari passu* entitlement to remuneration arising from the same Financial Year, whether it was treated as a payment on account of profit or whether the Equity Partner had the right to keep it.

In making such adjustments, there shall also be deducted from the amount otherwise payable to a Partner the value of that Partner's interest in any Associated Firm which is not (or is not in the course of being) wound-up or dissolved.

5.    To the extent that any Equity Partner has made a contribution pursuant to Schedule 7 (*Capital*) in the form of a loan, it shall be treated as if it were a capital contribution. Consequently it shall rank for payment in accordance with paragraph 3.3, and the Equity Partner shall not rank as a creditor of the Partnership or any Associated Firm in respect thereof.

6.    Any amount accrued to the date of commencement of the winding-up of the Partnership and owing to an Equity Partner in respect of Allowances or interest on a contribution referred to in paragraph 5 or in the form of employment or consultancy income shall be treated as if it were an entitlement to a share of Equity Remuneration. Consequently, to the extent that the Equity Partner does not rank for payment under paragraph 3.2 in respect of any such amount (as so treated), it shall be translated into Units by applying the Unit Value, and the Equity Partner shall rank for participation in any distribution under paragraph 3.4 in respect of the resultant number of Units.

*(Amended 29 January 2010 and amended with effect from 1 September 2014)*

The "**Unit Value**" means the amount of Equity Remuneration attributable to one Unit, calculated by reference to the Equity Remuneration as disclosed by the then most recently prepared Partnership Financial Report.

7.    Amounts payable to Partnership Annuitants and Old Partnership Annuitants in accordance with their rights as referred to in paragraph 7.15 of Schedule 14 (*Retirement of Equity Partners and Annuity Arrangements for Equity Partners*) shall rank *pari passu* with amounts payable to Equity Partners pursuant to paragraph 3 until such time as the first-mentioned amounts are paid in full.

8.    If any Associated Firm is wound up or dissolved and at that time:

8.1.1    the Partnership is not being or has not been wound up; or

8.1.2    the Partnership is being or has been wound up, but solely in connection with its amalgamation, reconstruction or reorganisation,

no Partner who is a partner in the Associated Firm shall be entitled to rank as a creditor of the Associated Firm or to participate in any surplus in the winding-up or dissolution of the Associated Firm, except to the extent a Partner does so as a nominee of (and with the express authority of) the Partnership. This paragraph does not affect any such Partner's rights under this Agreement.

Schedule 17: Winding-Up of the Partnership and Associated Firms

9.      No Partner or retired Partner shall petition or apply for the winding-up of, or the making of an administration order (or analogous order) in relation to, the Partnership or any Associated Firm, or participate in any action relating to any such winding-up or order, without the approval of the ELG (and, in the case of a petition or order relating to the Partnership, the approval of a Special Resolution of Partners in accordance with paragraph 1.3 of Schedule 8 (*Partnership Decisions and Meetings*)).

10.     Each Partner shall take such lawful action as the ELG shall require in relation to the winding-up of, or an administration order (or analogous order) in relation to, the Partnership or any Associated Firm.

## SCHEDULE 18
## CONTRACTS AND DOCUMENTS

1.    A contract made by the Partnership will be made in accordance with any Policy under this Schedule.

2.    The Partnership will execute any document in accordance with any Policy made under this Schedule.

3.    This Schedule applies to each Associated Firm as it applies to the Partnership.

4.    The Partnership Council has the authority to determine Policies under this Schedule.

**SCHEDULE 19**
**APPROVED PERSONS**

1.    **Approved Persons**

An "**Approved Person**" is a person who is not a Partner but who has been designated with the status of Approved Person pursuant to paragraphs 5 or 6. Such designation shall stipulate that the Approved Person is either an "**AP(E)**" (having the right to be admitted as an Equity Partner) or an "**AP(NE)**" (having the right to be admitted as a Non-Equity Partner).

2.    **Register of Approved Persons**

The Partnership shall maintain a Register of Approved Persons. The Register shall record the name of each person who is for the time being an Approved Person and that person's designation as an AP(E) or AP(NE). Every entry made in the Register shall be binding upon all Approved Persons and Partners and shall be conclusive evidence to any third party of the matter to which it relates.

3.    **Sources of Approved Persons' rights and obligations**

3.1    The rights and obligations of an Approved Person in relation to the Partnership and the Partners and other Approved Persons are set out in this Agreement and such agreements as may be entered into pursuant to this Agreement. Any agreement between an Approved Person and the Partnership or an Associated Firm shall be consistent with, and shall have terms which apply, the rights and obligations of the Approved Person as provided for in this Agreement.

3.2    An Approved Person shall not be a Member.

4.    **Performance of rights and obligations relating to the Partnership or Associated Firms**

In any agreement between an Approved Person and the Partnership or an Associated Firm, the Approved Person shall agree:

4.1    to exercise any rights under such agreement so as to comply with, enforce and give effect to the terms of this Agreement; and

4.2    to perform obligations under such agreement so as to comply with, enforce and give effect to the terms of this Agreement,

in each case treating any references (as at the Effective Date) to the Previous Partnership in the constitutional documents of an Associated Firm as if, from the Effective Date, they were references to the Partnership.

5.    **Initial designation as an Approved Person**

5.1    Any person may be designated as an AP(NE) with the approval of a Special Resolution of Partners.

5.2    Any AP(NE) may be designated as an AP(E) or admitted as an Equity Partner if:

5.2.1    the Partner Selection Group so recommends and the ELG so agrees; or

5.2.2    the Partnership Council and the ELG so agree.

5.3    Any person (if not an AP(NE) whose admission is governed by paragraph 5.2) may be designated as an AP(E) with the approval of a Special Resolution of Partners.

5.4    Paragraphs 1, 2, 4 and 5 of Schedule 2 (*Admission as Partner*) shall apply as if references therein to:

5.4.1    "Partner" included references to Approved Persons;

5.4.2    "Equity Partner" included references to AP(E)s; and

5.4.3    "Non-Equity Partner" included references to AP(NE)s.

6.    **Change of status**

6.1    *AP(E) to Firm Equity Partner or Associated Firm Equity Partner*

An AP(E) is entitled to be admitted as a Firm Equity Partner or, if required by law or regulation, Associated Firm Equity Partner if the relevant AP(E) so requests and resigns from employment by the Partnership and/or an Associated Firm. In that event the Senior Partner may admit the relevant AP(E) as a Firm Equity Partner or Associated Firm Equity Partner without further reference to the parties and the person concerned shall cease to be an AP(E).

Paragraphs 2.6.8 and 3.7.2(e) of Schedule 9 (*Governance and Management*) shall not apply to an AP(E) upon such cessation.

This paragraph confers no rights on an AP(E) who has ceased to hold that status pursuant to Schedule 15 (*Equity Partners' Termination etc.*).

6.2    *AP(E) to Employed Equity Partner*

An AP(E) who is entitled to be admitted as a Firm Equity Partner or Associated Firm Equity Partner may instead, and, with the agreement of the Senior Partner, resign from such status in order to become an Employed Equity Partner. In that event, the Senior Partner may admit the relevant AP(E) as an Employed Equity Partner without further reference to the parties and the person concerned shall cease to be an AP(E).

Paragraphs 2.6.8 and 3.7.2(e) of Schedule 9 (*Governance and Management*) shall not apply to an AP(E) upon such cessation.

This paragraph confers no rights on an AP(E) who has ceased to hold that status pursuant to Schedule 15 (*Equity Partners' Termination etc.*).

6.3    *AP(NE) to Firm Non-Equity Partner or Associated Firm Non-Equity Partner*

An AP(NE) is entitled to be admitted as a Firm Non-Equity Partner or, if required by law or regulation, Associated Firm Non-Equity Partner if the relevant AP(NE) so requests and, if requested by the Senior Partner, resigns from employment by the Partnership and/or an Associated Firm. In that event the Senior Partner may admit the relevant AP(NE) as a Firm Equity Partner or Associated Firm Non-Equity Partner without further reference to the parties and the person concerned shall cease to be an AP(NE).

Paragraphs 2.6.8 and 3.7.2(e) of Schedule 9 (*Governance and Management*) shall not apply to an AP(NE) upon such cessation.

*(Added with effect from 23 April 2020)*

6.4    *AP(E) to AP(NE)*

An AP(E) may, with the approval of the Partnership Council, retire as an AP(E) and be designated as an AP(NE). The AP(NE) concerned may, by request to the Senior Partner, require that all Equity Partners and AP(E)s are notified of the new designation as an AP(NE).

6.5    *Firm Equity Partner, Employed Equity Partner or Associated Firm Equity Partner to AP(E)*

A Firm Equity Partner, Employed Equity Partner or an Associated Firm Equity Partner may, with the agreement of the Senior Partner, resign from such status in order to be designated as an AP(E). In that event if permitted by law and regulation, the Senior Partner may designate the person concerned as an AP(E) without further reference to the parties and that person shall cease to be a Firm Equity Partner, Employed Equity Partner or an Associated Firm Equity Partner.

Paragraphs 2.6.8 and 3.7.2(e) of Schedule 9 (*Governance and Management*) shall not apply to a Firm Equity Partner, Employed Equity Partner or Associated Firm Equity Partner upon such cessation.

6.6    *Firm Non-Equity Partner or Associated Firm Non-Equity Partner to AP(NE)*

A Firm Non-Equity Partner or an Associated Firm Non-Equity Partner may, with the agreement of the Senior Partner, resign from such status in order to be designated as an AP(NE). In that event if permitted by law and regulation, the Senior Partner may designate the person concerned as an AP(NE) without further reference to the parties and that person shall cease to be a Firm Non-Equity Partner or an Associated Firm Non-Equity Partner.

Paragraphs 2.6.8 and 3.7.2(e) of Schedule 9 (*Governance and Management*) shall not apply to a Firm Non-Equity Partner or Associated Firm Non-Equity Partner upon such cessation.

*(Added with effect from 23 April 2020)*

7.    **AP(E) remuneration**

Provisions comparable to paragraphs 2 and 3 of Schedule 5 (*Sharing of Equity Remuneration*) and paragraph 11 of Schedule 6 shall be applied to each AP(E) as if references therein to:

7.1    an "Equity Partner" included references to an AP(E); and

7.2    an Equity Partner's share of Equity Remuneration were to an AP(E)'s remuneration.

*(Amended with effect from 23 April 2020)*

8.    **Expression of view**

Approved Persons shall be entitled to "express a view" as referred to in paragraphs 2.6 to 2.8 of Schedule 8 (*Partnership Decisions and Meetings*). Those paragraphs shall apply to Approved Persons as if references therein to:

8.1    "Equity Partners" included references to AP(E)s; and

8.2    "Non-Equity Partners" included references to AP(NE)s.

9.    **Application of other provisions of the Agreement to Approved Persons**

9.1    Those clauses of the Agreement which refer to a Schedule shall be applied, with the necessary modifications, in relation to Approved Persons to the extent that paragraphs 9.2, 9.3 or 9.4 below refer to that Schedule.

9.2    To the extent indicated below, the following clauses of the Agreement and Schedules shall be applied, with the necessary modifications, in relation to Approved Persons as if references therein to "Partners" included references to Approved Persons:

9.2.1    clause 20.5;

9.2.2    Schedule 6 (*Distribution of Remuneration*) – paragraphs 1, 7, 8 and 15;

9.2.3    Schedule 9 (*Governance and Management*) – paragraphs 2.1, 2.3, 2.5.4, 2.6.8, 3.1, 3.2.3, 3.3, 3.6, 3.7, 4.2, 6.3, 6.4, 7;

9.2.4    Schedule 10 (*Borrowings*) – paragraph 2.2;

9.2.5    Schedule 12 (*Partner Behaviour and Obligations*) – the entire Schedule;

9.2.6    Schedule 13 (*Partnership Property and Liability of Equity Partners*) – the entire Schedule;

9.2.7    Schedule 16 (*Indemnities and Liabilities*) – the entire Schedule;

9.2.8    Schedule 17 (*Winding Up of the Partnership and Associated Firms*) – the entire Schedule;

9.2.9    Schedule 20 (*Interpretation*) – paragraphs 1 (in the definitions of "Long-term Base" and "Tax"), 2.4.

9.3     To the extent indicated below, the following Schedules shall be applied, with the necessary modifications, in relation to AP(E)s as if references therein to "Equity Partners" included references to AP(E)s:

9.3.1   Schedule 6 (*Distribution of Remuneration*) – paragraphs 3, 4, 5, 6, 9, 10, 11, 12, 13 and 14;

9.3.2   Schedule 7 (*Capital*) – paragraph 3 (but as if references therein to "Employed Equity Partners" included references to AP(E)s);

9.3.3   Schedule 9 (*Governance and Management*) – paragraphs 2.3.1, 2.6.1, 2.6.3, 3.3.1, 4.5;

9.3.4   Schedule 10 (*Borrowings*) – paragraphs 3.1, 4;

9.3.5   Schedule 11 (*Registers*) – paragraph 4;

9.3.6   Schedule 12 (*Partner Behaviour and Obligations*) – the entire Schedule;

9.3.7   Schedule 14 (*Retirement of Equity Partners and Annuity Arrangements for Equity Partners*) – the entire Schedule;

9.3.8   Schedule 15 (*Equity Partners' Termination etc.*) – the entire Schedule;

9.3.9   Schedule 16 (*Indemnities and Liabilities*) – the entire Schedule;

9.3.10  Schedule 17 (*Winding up of the Partnership and Associated Firms*) – the entire Schedule;

9.3.11  Schedule 20 (*Interpretation*) – paragraphs 1 (in the definitions of "Defaulting Partner", "Eligible Status", "Executive Partner", "GBU Leader", "Global Practice Area Leader", "Immediate Termination", "Managing Partner", "Mandatory Retirement Date", "PartnerConnect", "pre-2000 Clifford Chance Partner", "Regional Managing Partner", "Senior Partner", "Suspension Notice", "Termination"), "Wider Leadership Group", 2.4.

*(Amended with effect from 1 March 2010 and 23 April 2020)*

9.4     To the extent indicated below, the following clauses of and Schedules shall be applied, with the necessary modifications, in relation to AP(NE)s as if references therein to "Non-Equity Partners" included references to AP(NE)s (and references therein to Equity Partners included AP(E)s):

9.4.1   Clause 3.4;

9.4.2   Schedule 1 (*Status etc. of Partners*) – paragraph 3.4.3;

9.4.3   Schedule 12 (*Partner Behaviour and Obligations*) – the entire Schedule;

9.4.4   Schedule 17 (*Winding up of the Partnership and Associated Firms*) – the entire Schedule.

10.    In case of any doubt as the application of the provisions of this Agreement to Approved Persons, AP(E)s or AP(NE)s, the matter shall be determined by the Senior Partner whose decision shall be final and binding on all Approved Persons and Partners.

*(Schedule 19 amended 29 January 2010, amended with effect from 1 September 2014 and amended with effect from 23 April 2020)*

**SCHEDULE 20**
**INTERPRETATION**

1.    In this Agreement (including the Policies) the following expressions shall have the meanings set against them:

**"Accounts Currency"**

sterling or such other currency as the ELG may decide from time to time;

**"Agreement"**

this Agreement;

**"Allowance"**

any monetary allowance or benefit awarded to an Equity Partner under the provisions of paragraph 9 of Schedule 6 (*Distribution of Remuneration*);

**"Annual Review"**

has the meaning given in paragraph 4.1 of Schedule 5 (*Sharing of Equity Remuneration*);

**"Associated Firm"**

any separate partnership, firm or body corporate which carries on the practice or business of lawyers or which provides professional business or other advice or services in any part of the world under the same name as the Partnership or under a name which includes the same name as that of the Partnership, or which is associated financially with the Partnership and/or whose profits or losses or any part thereof are included in Partnership Profit, or (in the case of a corporate entity) whose shares or similar proprietorship rights are held directly or indirectly in the interests of the Partnership or any Associated Firm or may be so held upon the exercise of any rights vested in the Partnership or any Associated Firm (and, unless the context otherwise requires, includes the Previous Partnership);

**"Associated Firm Equity Partner"**

a Partner who is recorded in the appropriate Register as an Associated Firm Equity Partner with an entry confirmed by the signature of the Senior Partner;

**"Associated Firm Non-Equity Partner"**

a Partner who is recorded in the appropriate Register as an Associated Firm Non-Equity Partner;

**"Audit Committee"**

the audit and risk committee appointed by the Partnership Council pursuant to paragraph

|  | 3.2.2 of Schedule 9 (*Governance and Management*); |
|---|---|
| **"Auditors"** | the independent firm of chartered accountants appointed by the Audit Committee pursuant to paragraph 3.2.2 of Schedule 9 (*Governance and Management*); |
| **"Beneficiary"** | a person who is expressly stated in this Agreement to have the benefit of an Entrenched Right, and a "class of Beneficiaries" means any group of Beneficiaries expressly classified as such herein; |
| **"Biennial Review"** | a review pursuant to paragraph 3 of Schedule 5 (*Sharing of Equity Remuneration*); <br><br> (*Amended with effect from 1 May 2021*) |
| **"Bonus Award"** | has the meaning given in paragraph 4.2 of Schedule 15 (*Sharing of Equity Remuneration*); |
| **"Bonus Pool"** | has the meaning given in paragraph 4.2 of Schedule 5 (*Sharing of Equity Remuneration*) <br><br> (*Amended with effect from 1 May 2021*) |
| **"Borrowings"** | money borrowed, debit balances at banks, money raised by the issue of any bond, note or equivalent debt instrument, and the amount of the liability incurred under any transaction having the same commercial effect (such as finance leases, the sale or discounting of receivables, guarantees of the financial liabilities of third parties and documentary or acceptance credit facilities), in each case owing by the Partnership or an Associated Firm: but any new Borrowings made for the purpose of immediate repayment of a like amount of then existing Borrowings shall be disregarded before the time of such repayment; and, for the avoidance of doubt, "Borrowings" does not include amounts contributed pursuant to Schedule 7 (*Capital*) or amounts or liabilities owing as between the Partnership and any |

Schedule 20: Interpretation

|  |  |
|---|---|
|  | Associated Firm or as between Associated Firms); |
| **"business day"** | a day other than a Saturday or Sunday or public holiday in England and Wales or such other place as is determined by the Managing Partner or the Executive Partner from time to time; |
| **"capital-related profit"** | the amount payable pursuant to paragraph 2.4 of Schedule 7 (*Capital*); |
| **"Companies Act 2006"** | the Companies Act 2006 as modified pursuant to the LLPA and LLP (ACA) Regulations; |
|  | *(Amended 29 January 2010)* |
| **"Defaulting Partner"** | an Equity Partner who ceases to be an Equity Partner at any age as a result of: |

(a)     being subject to Immediate Termination;

(b)     retiring voluntarily in order to avoid being or becoming subject to Immediate Termination;

(c)     retiring after being given a Termination Notice upon a recommendation of the Disciplinary Committee, but (i) before the date on which, according to the Termination Notice, that Equity Partner will cease to be an Equity Partner or (ii) before an appeal against the Termination Notice is decided, unless the Partnership Council decides that Equity Partner should not be a Defaulting Partner; or

(d)     being subject to Disciplinary Termination unless the Partnership Council decides that Equity Partner should not be a Defaulting Partner;

*(Amended with effect from 1 March 2010 and 23 April 2020)*

|  |  |
|---|---|
| **"Designated Member"** | a Member holding the office of a designated member for the purposes of the LLPA and |

|  |  |
|---|---|
|  | pursuant to Schedule 9 (*Governance and Management*); |
| **"Disciplinary Committee"** | the Disciplinary Committee appointed by the Partnership Council pursuant to paragraph 3.2.3 of Schedule 9; |
|  | *(Added with effect from 23 April 2020)* |
| **"Disciplinary Termination"** | has the meaning given in paragraph 1.1 of Schedule 15; |
|  | *(Added with effect from 23 April 2020)* |
| **"Dispute"** | any dispute or difference touching or concerning the Partnership or an Associated Firm or the winding-up or dissolution thereof, or the construction, meaning, termination, validity or effect of this Agreement or any Old Partnership Agreement or any other agreement entered into pursuant to this Agreement or any Old Partnership Agreement, or anything contained in or otherwise relating to any of the foregoing; |
| **"Effective Date"** | 2 December 2006 |
| **"ELG" or "Executive Leadership Group"** | the body constituted pursuant to paragraph 2 of Schedule 9 (*Governance and Management*); |
|  | *(Added with effect from 1 September 2014)* |
| **"Eligible Equity Partner"** | has the meaning given in paragraph 4.2 of Schedule 14 (*Retirement etc*); |
|  | *(Added with effect from 1 January 2008)* |
| **"Eligible Status"** | status as: |

(a)    an Equity Partner;

(b)    an Equity Partner, Associated Firm Partner or Approved Person, as defined in the Previous Partnership Agreement; or

|  | (c) | an equity partner in a Former Partnership; |
|---|---|---|

| **"Employed Equity Partner"** | a Partner who is recorded in the appropriate Register as an Employed Equity Partner; |
|---|---|
|  | *(Amended with effect from 23 April 2020)* |

| **"Entity"** | any corporation, body corporate, partnership, association, joint venture, organisation or other entity; |
|---|---|

**"Entrenched Consent"**    the consent:

(a) where an Entrenched Right has a single class of Beneficiaries, of a majority of at least two-thirds of the votes cast by the Beneficiaries in such class of Beneficiaries; or

(b) where an Entrenched Right has more than one class of Beneficiaries, of a majority of at least two-thirds of the votes cast by the Beneficiaries in each of such classes of Beneficiaries separately; or

(c) where an Entrenched Right has a Beneficiary not within a class of Beneficiaries, of the Beneficiary concerned;

| **"Entrenched Right"** | any provision of this Agreement which is expressly stated therein to constitute an Entrenched Right; |
|---|---|

| **"Equity Interests"** | an entitlement to a share of Equity Remuneration under Schedule 5 (*Sharing of Equity Remuneration*); |
|---|---|

| **"Equity Partners' Funds"** | has the meaning given in paragraph 3.1.3 of Schedule 4 (*Accounts*); |
|---|---|

| **"Equity Partner"** | a Partner with Equity Interests, namely a Firm Equity Partner, Employed Equity Partner or Associated Firm Equity Partner; |
|---|---|

| **"Equity Remuneration"** | has the meaning given in paragraph 3.1.2 of Schedule 4 (*Accounts*); |
|---|---|

Schedule 20: Interpretation

| | |
|---|---|
| **"Executive Partner"** | the Equity Partner holding the office of Executive Partner pursuant to Schedule 9 (*Governance and Management*); |
| **"Financial Year"** | each accounting period of the Partnership as provided in Schedule 4 (*Accounts*); |
| **"Firm Equity Partner"** | a Partner who is recorded in the appropriate Register as a Firm Equity Partner; |
| | *(Amended with effect from 23 April 2020)* |
| **"Firm Non-Equity Partner"** | a Partner who is recorded in the appropriate Register as a Firm Non-Equity Partner; |
| | *(Amended with effect from 23 April 2020)* |
| **"Former Partnership"** | all or any of the partnerships which, at some time before the Previous Effective Date, bore the name of Clifford Turner or Coward Chance or Clifford Chance or Pünder, Volhard, Weber & Axster or Pünder, Volhard & Weber or Axster & Partner or Spickernagel, Houben, Metzner & Maschmeier or Rogers & Wells or Fältz & Kremer as the context requires or permits; |
| **"GBU" or "Global Business Unit"** | is defined by a Policy made pursuant to paragraph 2.3.4 of Schedule 9 *(Governance and Management)*; |
| | *(Added with effect from 1 September 2014)* |
| **"GBU Leader"** | an Equity Partner holding the office of a GBU Leader pursuant to Schedule 9 *(Governance and Management)*; |
| | *(Added with effect from 1 September 2014)* |
| **"Global Practice Area Leader"** | an Equity Partner holding the office of a Global Practice Area Leader pursuant to Schedule 9 (*Governance and Management*); |
| | *(Amended with effect from 1 September 2014)* |
| **"Immediate Termination"** | the termination of an Equity Partner's right to be an Equity Partner upon the occurrence of any event specified in paragraph 3 of |

|  | Schedule 15 (*Equity Partners' Termination etc.*); |
|---|---|
| **"Ladder"** | has the meaning given in paragraph 2.2 of Schedule 5 (*Sharing of Equity Remuneration*)<br><br>(*Amended with effect from 1 May 2021*) |
| **"Ladder 1" or "Ladder 2"** | has the meaning given by paragraph 2 of Schedule 5 (*Sharing of Equity Remuneration*) in the version of this Agreement in effect as at 30 April 2021;<br><br>(*Amended with effect from 1 May 2021*) |
| **"LLPA"** | the Limited Liability Partnerships Act 2000; |
| **"LLP (ACA) Regulations"** | the Limited Liability Partnerships (Application of Companies Act 2006) Regulations 2009, SI 1804 of 2009;<br><br>(*Amended 29 January 2010*) |
| **"Long-term Base"** | a Partner's Long-term Base is as determined by the Managing Partner; |
| **"Management Committee"** | the executive body which preceded the establishment of the ELG on 1 September 2014<br><br>(*Amended with effect from 1 September 2014*) |
| **"Managing Partner"** | the Equity Partner holding the office of Managing Partner pursuant to Schedule 9 (*Governance and Management*); |
| **"Mandatory Retirement Date"** | the date on which an Equity Partner is required to retire as a Partner from the Partnership as specified in paragraph 1 of Schedule 14 (*Retirement of Equity Partners and Annuity Arrangements for Equity Partners*); |
| **"Member"** | a Partner who is a member of the Partnership for the purposes of the LLPA; |
| **"Net Borrowings"** | Borrowings, less cash held at banks; |

Schedule 20: Interpretation

| | |
|---|---|
| **"Non-Equity Partner"** | a Firm Non-Equity Partner or Associated Firm Partner; |
| **"Office Currency"** | has the meaning given in paragraph 6.1 of Schedule 6 (*Distribution of Remuneration*);<br><br>(*Added 20 March 2012*) |
| **"Old Partnership"** | the Previous Partnership or any Former Partnership; |
| **"Old Partnership Agreement"** | the Previous Partnership Agreement or any agreement governing any Former Partnership; |
| **"Old Partnership Annuitant"** | a person entitled to receive an Old Partnership Annuity; |
| **"Old Partnership Annuity"** | any annuity or other amount payable under the provisions of schedule 7 or 10 to the Previous Partnership Agreement; |
| **"Ordinary Resolution of Equity Partners"** | a resolution passed by more than half of the votes cast on it by Equity Partners; |
| **"Ordinary Resolution of Partners"** | a resolution passed by more than half of the votes cast on it by Partners; |
| **"Partner"** | an Equity Partner or Non-Equity Partner; |
| **"Partnership Annuitant"** | a person entitled to be in receipt of a Partner Annuity; |
| **"Partner Annuity"** | any annuity, other annual payment or fixed amount payable by the Partnership in relation to any Financial Year under the provisions of Schedule 14 (*Retirement etc*);<br><br>(*Amended with effect from 1 January 2008*) |
| **"Partner Number"** | the number accorded to each Partner by the Register of Partners;<br><br>(*Amended with effect from 1 January 2008*) |
| **"Partner Selection Group" or "PSG"** | the group established pursuant to paragraph 5 of Schedule 2 (*Admission as Partner*); |

Schedule 20: Interpretation

| | |
|---|---|
| **"PartnerConnect"** | the Partnership's intranet site known as PartnerConnect or any other method (whether or not electronic) approved from time to time by the ELG for the purpose of communicating information to Partners or any group of Partners; |
| **"Partnership Accounts"** | the consolidated accounts prepared pursuant to paragraph 2 of Schedule 4 (*Accounts*); |
| **"Partnership Council"** | the body constituted pursuant to paragraph 3 of Schedule 9 (*Governance and Management*); |
| **"Partnership Financial Report"** | the financial report prepared pursuant to paragraph 3 of Schedule 4 (*Accounts*); |
| **"Partnership Profit"** | has the meaning given in paragraph 3.1.1 of Schedule 4 (*Accounts*); |
| **"Performance Termination"** | has the meaning given in paragraph 1.1 of Schedule 15; |
| | *(Added with effect from 23 April 2020)* |
| **"Policy"** | is defined by clause 12.1; |
| **"pre-2000 Clifford Chance Partner"** | an Equity Partner who: |

(a)     was an equity partner in the Former Partnership of Clifford Chance on 3 August 1999 and immediately before the Previous Effective Date; or

(b)     was an Approved Person (as that expression is defined in the Previous Partnership Agreement) in the Former Partnership of Clifford Chance immediately before the Previous Effective Date and became an equity partner in the Previous Partnership on the Previous Effective Date;

| | |
|---|---|
| **"Previous Effective Date"** | 1 January 2000 or, in relation to partners in Pünder, 2 January 2000; |

Schedule 20: Interpretation

| | |
|---|---|
| **"Previous Partnership"** | Clifford Chance Limited Liability Partnership, organised and registered under the laws of the State of New York; |
| **"Previous Partnership Agreement"** | the partnership agreement of the Previous Partnership dated 31 December 1999 as amended from time to time; |
| **"Product and Market Dynamics"** | has the meaning given in the Policy made pursuant to paragraphs 3.1 and 4.1 of Schedule 5 (*Sharing of Equity Renumeration*); |
| **"Pünder"** | (*Added with effect from 15 March 2024*)<br><br>the partnership which on 31 December 1999 bore the name Pünder, Volhard, Weber & Axster; |
| **"Pünder Partner"** | an Equity Partner who was an equity partner in Pünder on 3 August 1999 and an Equity Partner, Associated Firm Partner or Approved Person (as those expressions are defined in the Previous Partnership Agreement) on the Previous Effective Date; |
| **"Regional Managing Partner"** | an Equity Partner holding the office of a Regional Managing Partner pursuant to Schedule 9 (*Governance and Management*); |
| **"Register"** | a register maintained pursuant to Schedule 11 (*Registers*); |
| **"Registrar"** | the Registrar of Companies in England and Wales; |
| **"Rogers & Wells"** | the partnership which on 31 December 1999 bore the name Rogers & Wells LLP; |
| **"Rogers & Wells Partner"** | an Equity Partner who was an equity partner in Rogers & Wells on 3 August 1999 and an Equity Partner, Associated Firm Partner or Approved Person (as those expressions are defined in the Previous Partnership Agreement) on the Previous Effective Date; |
| **"Senior Partner"** | the Equity Partner holding the office of Senior Partner pursuant to Schedule 9 (*Governance and Management*); |

| | |
|---|---|
| **"Special Resolution of Equity Partners"** | a resolution passed by at least two thirds of the votes cast on it by the Equity Partners; |
| **"Special Resolution of Partners"** | a resolution passed by at least two thirds of the votes cast on it by Partners; |
| **"Suspension Notice"** | a notice in writing suspending an Equity Partner from acting as an Equity Partner for a specified period pursuant to paragraph 1, 4 or 5 of Schedule 15 (*Equity Partners' Termination etc.*) or paragraph 7 of Schedule 9 (*Governance and Management*); |
| **"Tax"** | any tax, charge, or fiscal levy imposed by the government of any country, state, region, municipality or area and including (a) any national insurance, social, welfare or similar charges which are levied compulsorily or which a Partner elects to pay and (b) any interest or penalties payable in relation to any such tax, charge, or fiscal levy or any such social, welfare or similar charges or arising by virtue of late payment or a failure to comply with any applicable regulations: and any question as to whether a liability is for the purposes of this Agreement a liability for Tax within this definition shall be determined by the Audit Committee; |
| **"Termination"** | causing an Equity Partner to cease being an Equity Partner pursuant to a Termination Notice and paragraph 1 of Schedule 15 (*Equity Partners' Termination etc.*); <br><br>*(Amended with effect from 1 March 2010)* |
| **"Termination Notice"** | a notice given pursuant to paragraph 1.1 of Schedule 15 (*Equity Partners' Termination etc*); <br><br>*(Added with effect from 1 March 2010)* |
| **"Threshold"** | is defined pursuant to clause 4 of Schedule 14 (*Retirement of Equity Partners and Annuity Arrangements for Equity Partners*); <br><br>*(Added with effect from 1 May 2017)* |
| **"Transfer"** | the transfer to be effected by or pursuant to the Transfer Agreement together with such other actions as are referred to as the |

Schedule 20: Interpretation

|  | "Conversion Proposal" in the Information Memorandum dated 1 November 2006 addressed to partners in the Previous Partnership; |
|---|---|
| **"Transfer Agreement"** | the agreement made (or to be made) between (1) the Previous Partnership and (2) the Partnership whereby the Previous Partnership agrees to transfer all or substantially all its business, assets and liabilities to the Partnership on the Effective Date; |
| **"Transitional Review"** | the review by the Wider Leadership Group of every Equity Partner to decide the Unit allocations of those Equity Partners for Financial Year 2021/2022 and subsequently, subject to the next Annual Review or Biennial Review;<br><br>*(Amended with effect from 15 March 2024)* |
| **"Unit"** | one equal part of the total number of Units in issue and held by all Equity Partners pursuant to Schedule 5 *(Sharing of Equity Remuneration)* and which gives the holder the right to a proportionate share of Equity Remuneration; |
| **"Wider Leadership Group"** | the ELG, the other Global Practice Area Leaders and such Equity Partners as the Managing Partner may, after consulting the Partnership Council, appoint for reviews under paragraphs 3 and 4 of Schedule 5 *(Sharing of Equity Remuneration)*.<br><br>*(Added with effect from 1 May 2015 and amended with effect from 23 April 2020)* |

2.    In this Agreement (including the Policies) a reference to:

2.1    a statute or statutory provision includes a reference to the statute or statutory provision as modified or re-enacted or both from time to time whether before or after the date of this Agreement and any subordinate legislation made or other thing done under the statute or statutory provision whether before or after the date of this Agreement;

2.2    a clause or Schedule, unless the context otherwise requires, is a reference to a clause of, or schedule to, this Agreement and a reference in a Schedule or Policy to a paragraph is, unless the context requires otherwise, a reference to a paragraph of that Schedule or Policy;

Schedule 20: Interpretation

2.3    a person includes a reference to a natural person, corporation, body corporate, association or partnership, and any such person's legal personal representatives, successors and permitted assigns;

2.4    references to a retiring or retired Equity Partner or, as the case may be, a retiring or retired Partner are to a person who has ceased to have that status; and

2.5    the masculine includes the feminine and vice versa and, unless the context otherwise requires, the singular includes the plural and vice versa.

3.    The headings in this Agreement (including the Policies) do not affect their interpretation.

**C L I F F O R D**

**C H A N C E**

CLIFFORD CHANCE LLP

---

POLICIES UNDER THE PARTNERSHIP
AGREEMENT OF CLIFFORD CHANCE LLP
DATED 1 DECEMBER 2006

---

POLICIES AS AT 24 October 2024

**POLICIES IN EFFECT AS AT 15 March 2024**
including amendments made on 9 April 2007, 9 August 2007, 7 March 2008
(with effect from 1 May 2008), 10 June 2008 (with effect from 1 January 2008),
21 October 2008, 3 April 2009, 15 May 2009 (with effect from 1 May 2009),
29 January 2010, (pursuant to a resolution of 19 February 2010) with effect from
1 March 2010, 20 April 2010 (with effect from 1 May 2010), 14 September 2010,
14 November 2011, 20 March 2012, 11 June 2012, 12 July 2012, 15 February 2013 (with
effect from 3 December 2012), (pursuant to a resolution of 23 July 2014) with effect
from 1 September 2014, (pursuant to a resolution of 29 April 2015) with effect from
1 May 2015, 15 June 2016 (with effect from 1 May 2016), 12 May 2017
(with effect from 1 May 2017), 15 June 2017 (with effect from 1 May 2017),
18 July 2017 (with effect from 1 May 2016) and 18 January 2019 (with effect from
8 October 2018), 23 April 2020, 9 July 2020, 1 May 2021, 15 March 2024 and
24 October 2024

**Policies under Schedule 1: Status etc. of Partners**

1.    Sources of rights and obligations

2.    Rights and obligations in the Agreement

3.    Rights and obligations in agreements entered into pursuant to the Agreement

**Policies under Schedule 2: Admission as Partner**

1.    Conditions for Admission

2.    Promotion of Non-Equity Partners to equity status

3.    Criteria for promotion to Non-Equity Partner status

4.    New Partners' participation in Associated Firms

5.    Partner Selection Group (PSG)

**Policies under Schedule 5: Sharing of Equity Remuneration**

1.    Unit allocation of promoted Non-Equity Partners

2.    Reviews of Equity Partners' Ladder positions (ELG Policy)

3.    Reviews of Equity Partners' Ladder positions (Partnership Council Policy)

4.    Agreed Unit Reductions

**Policies under Schedule 6: Distribution of Remuneration**

1.    Non-Equity Partners' Remuneration

2.    Payments on account of Equity Remuneration

3.    Special Distributions

Partnership Agreement Policies v. 32:
24 October 2024

- 1 -

4.    Distribution of Equity Remuneration otherwise than in Accounts Currency

5.    Tax reserve

6.    Overlap Profit

7.    Allocation of gross income to Equity Partners who are also partners in Clifford Chance US LLP

8.    Partners' participation in Associated Firms

9.    Accounting to Partnership for benefits received from directorships or other positions or activities

10.    Allowances for Equity Partners

11.    Payment of Partnership Profits to a former Equity Partner

**Policies under Schedule 7: Capital**

1.    Introduction

2.    Amount of contribution

3.    Currency of contribution

4.    Timing of contributions

5.    Equity Partner funding

6.    Failure to contribute capital

7.    Capital-related profit

8.    Associated Firm Equity Partners and Employed Equity Partners

**Policies under Schedule 8: Partnership Decisions and Meetings**

1.    Voting Periods

2.    Convening of Partners' meetings

3.    Conduct of Meetings

4.    All Partners' meeting

**Policies under Schedule 9:    Governance and Management**

1.    Responsibilities of ELG

2.    GBUS, Global Practice Areas and Regions

3.    Decision-making Processes of ELG

4.      Soundings on Appointments of GBU Leaders and Regional Managing Partners to ELG

5.      Decision-making Processes of Partnership Council

6.      Decision-making Processes of Designated Members

7.      Elections

**Policies under Schedule 11: Registers**

1.      Register of Partners

2.      Register of Office Holders

3.      Register of Annuity Entitlements

4.      Senior Partner's Verification

**Policies under Schedule 12: Partner Behaviour and Obligations**

1.      Confidentiality of Partnership Affairs and Dealing with the Press

2.      Absence from the Partnership

3.      Conduct of Partners prior to leaving

4.      Values, Conduct and Standards

5.      Consultation prior to Disciplinary Actions

6.      Disciplinary Action

7.      Compulsory Insurance

**Policies under Schedule 14: Retirement of Equity Partners and Annuity Arrangements for Equity Partners**

1.      Equity Partners who agree to retire essentially at the Partnership's request

2.      Gateway Arrangements for Equity Partners reaching the age of 60

3.      Election to receive an annuity over eight years

4.      Payment of deceased Equity Partner's annuity

5.      Cap on Total Annuity Units of certain weighted Eligible Equity Partners who achieved Eligible Status after the Previous Effective Date and before 1 January 2008

6.      Effect of Ladder 1 on Total Annuity Units

7.      Effect of off-lockstep Unit allocations on Total Annuity Units

8.      Deferral of annuity or other annual payment

9.    Discretionary Annuity for Eligible Equity Partner with 12 to 15 years' service

10.    Tax Equalisation

11.    Payment of Annuity otherwise than in Accounts Currency

**Policies under Schedule 15: Equity Partners' Termination, Immediate Termination, Suspension and Retirement upon Physical or Mental Incapacity**

1.    Performance Termination

2.    Suspension

3.    Retirement of an Equity Partner who becomes physically or mentally incapacitated

**Policies under Schedule 18: Contracts and Documents**

1.    Contracts

2.    Documents

**Policies under Schedule 1**

**Status etc. of Partners**

**Framework for rights and obligations of Non-Equity Partners: Partnership Council Policy**

This Policy is made under paragraph 3.4.3 of Schedule 1. It sets out the framework for the rights and obligations of Non-Equity Partners.

This Policy shall be applied, with the necessary modifications, in relation to AP(NE)s as if references to "Non-Equity Partners" included AP(NE)s.

1.    **SOURCES OF RIGHTS AND OBLIGATIONS**

The rights and obligations of a Non-Equity Partner in relation to the Partnership and the other Partners are set out in the Agreement and such agreements as may be entered into pursuant to the Agreement.

2.    **RIGHTS AND OBLIGATIONS IN THE AGREEMENT**

The Agreement provides (without limitation) that:

2.1    a Non-Equity Partner is a Member (that is, a member of the Partnership for the purposes of the LLPA) unless prohibited by law or regulation from becoming a Member or otherwise determined by the ELG;

2.2    a Non-Equity Partner does not have Equity Interests;

2.3    a Non-Equity Partner is entitled to vote or express a view on a resolution when the Agreement so provides; and

2.4    a Non-Equity Partner is subject to obligations set out in Schedule 12, including duties of utmost good faith and confidentiality.

3.    **RIGHTS AND OBLIGATIONS IN AGREEMENTS ENTERED INTO PURSUANT TO THE AGREEMENT**

3.1    A Non-Equity Partner will have a separate agreement with the Partnership or an Associated Firm setting out other rights and obligations.

Such an agreement:

3.1.1    may be an Associated Firm's partnership agreement; and

3.1.2    may be subject to local law.

*(Amended with effect from 1 May 2015)*

3.2    The form of the Non-Equity Partner's separate agreement with the Partnership or an Associated Firm will depend on whether the Non-Equity Partner is a partner in the Partnership or an Associated Firm or contracted to provide services to, or an employee of, the Partnership or an Associated Firm (and that question depends on the regulatory

and tax considerations which shape the structure of the Partnership and Associated Firms and how the ELG exercises its power under paragraph 8 of Schedule 6).

A Non-Equity Partner who is a partner in an Associated Firm will have rights and obligations under the agreement governing the Associated Firm.

3.3     Each such agreement is to give a Non-Equity Partner rights and obligations which are consistent with and give effect to the rights and obligations of the Non-Equity Partner pursuant to, the Agreement and this Policy. If any right or obligation of a Non-Equity Partner under an agreement entered into pursuant to the Agreement is inconsistent with this Policy, the Policy will prevail.

3.4     The Managing Partner or the Executive Partner will agree with each Regional Managing Partner or office managing partner a form of agreement for Non-Equity Partners in the relevant region or country which gives effect to the following provisions.

A Regional Managing Partner may delegate responsibility under the following provisions to the relevant office managing partner.

*(Amended with effect from 1 September 2014)*

3.5     **Remuneration**

3.5.1     In the interest of aligning all Non-Equity Partners to the success of the Partnership, a material proportion of each Non-Equity Partner's remuneration should comprise a non-discretionary entitlement to **"shadow units"** as defined in paragraph 3.5.4.

3.5.2     The Regional Managing Partner will decide the criteria for the remuneration of Non-Equity Partners in the offices in the relevant region and agree the criteria with the Managing Partner. The criteria will take account of circumstances in the local market.

3.5.3     Each Non-Equity Partner's remuneration is normally proposed by the leader of the relevant practice area or the office managing partner following the criteria decided by the Regional Managing Partner. The Regional Managing Partner will agree the amount of each Non-Equity Partner's remuneration.

Notwithstanding the criteria, remuneration applicable to an individual Non-Equity Partner may depend on special circumstances. If, because of special circumstances, a Non-Equity Partner is eligible for a bonus, the Regional Managing Partner will consult the Managing Partner and leaders of the relevant practice areas before agreeing the payment of the bonus.

3.5.4     A shadow unit's value represents the value generated by a Unit and will be:

(a)     expressed in the Accounts Currency; and

(b)     if the Non-Equity Partner's Long-term Base is in an office where the Office Currency is not the Accounts Currency, paid in the Office Currency by reference to the average exchange rate for translation of the Office Currency into the Accounts Currency which is used in the

preparation of the Partnership Accounts for the relevant Financial Year subject, in the case of a Non-Equity Partner admitted as such pursuant to paragraph 3.7 or 3.8 of Schedule 2, to any election made under paragraph 4.2 of the Policies under Schedule 6 (*3YA Rate Elections*).

*(Amended 20 March 2012 and amended with effect from 1 May 2015 and with effect from 1 May 2016)*

## 3.6    Termination

### 3.6.1    Termination by Non-Equity Partner

A Non-Equity Partner's relationship with the Partnership and Associated Firms may be terminated by that Non-Equity Partner giving six months' written notice to the Regional Managing Partner. The six months' notice will expire at the end of a month if this is consistent with local requirements. The Regional Managing Partner may accept a shorter period of notice.

If a Non-Equity Partner has served notice:

(a)    the Regional Managing Partner has the right to terminate the Non-Equity Partner's relationship with the Partnership and Associated Firms at any time during the Non-Equity Partner's notice period if the Regional Managing Partner has good grounds to believe that the Non-Equity Partner intends to join another firm in competition with the Partnership or Associated Firm or in other circumstances where the Non-Equity Partner remaining with the Partnership or Associated Firm during the notice period could be prejudicial to the Partnership or Associated Firm; and if the Regional Managing Partner exercises the right of early termination the Non-Equity Partner shall not, unless the Regional Managing Partner decides otherwise, be entitled to any of the remuneration that would have been payable had that Non-Equity Partner remained a Non-Equity Partner for the remainder of the notice period nor to any payment in respect of an accrued bonus, whether discretionary or not; and

(b)    unless the Non-Equity Partner's Long-term Base is in the US or Germany, the Regional Managing Partner may suspend the Non-Equity Partner from such date and on such terms as the Regional Managing Partner reasonably specifies provided that (i) the Non-Equity Partner will remain entitled to non-discretionary remuneration while suspended unless the Partnership Council decides otherwise and (ii) the Non-Equity Partner may appeal to the Senior Partner against the suspension in which case paragraph 3.8 applies.

If the Non-Equity Partner is a German-based Partner a date specified by the Regional Managing Partner pursuant to paragraph (a) must be no earlier than three months after the notice given by the Non-Equity Partner unless the Regional Managing Partner refers the matter to an arbitrator under clause 24 of the Agreement to determine whether it is reasonable in all the circumstances to specify an earlier date and the arbitrator rules that an earlier date is reasonable.

3.6.2    **Termination by Partnership or an Associated Firm**

The Partnership or an Associated Firm may terminate its relationship with a Non-Equity Partner (including under the Agreement) by six months' written notice. The six months' notice will expire at the end of a calendar month. The power to give such notice shall vest with the relevant Regional Managing Partner or, in the Regional Managing Partner's absence, the Executive Partner. The Regional Managing Partner and/or Executive Partner should have consulted the leader of the relevant practice area and office managing partner. The Non-Equity Partner may appeal to the Senior Partner against such termination in which case paragraph 3.8 applies.

If a Non-Equity Partner agrees to retire from the Partnership and Associated Firms essentially at the Partnership's request, the Partnership will normally agree to pay the Non-Equity Partner up to £20,000 plus VAT in aggregate to cover (i) any legal fees incurred in connection with the execution of a waiver and release in a form satisfactory to the Partnership and (ii) any professional fees incurred in helping the Non-Equity Partner find an alternative role. The Non-Equity Partner's claims for payment must be supported by appropriate evidence. (*Paragraph added 3 April 2009 and amended with effect from 1 May 2010*).

3.6.3    **Immediate termination**

A Non-Equity Partner's relationship with the Partnership and Associated Firms will terminate immediately and without notice of any kind or by any person:

(a)    upon the Non-Equity Partner commencing any proceedings intended to result in that Non-Equity Partner's bankruptcy or insolvency or upon any action being taken or any decision being made by any court or other legal body in any jurisdiction resulting in or as a result of the Non-Equity Partner's bankruptcy or insolvency;

(b)    upon the Non-Equity Partner assigning, alienating, charging or offering as security a share (including profit-share) and interest in the Partnership or any Associated Firm to any third party (or the Non-Equity Partner purporting to take any such action) unless before so doing the Non-Equity Partner has obtained the written consent of the Managing Partner to such action;

(c)    upon the Non-Equity Partner having a professional qualification or any licence or permit required to practise as a lawyer cancelled or otherwise withdrawn by any professional or regulatory authority which has jurisdiction over the Non-Equity Partner in respect of the day to day practice of law by the Non-Equity Partner;

(d)    if the Non-Equity Partner fails to comply fully with the requirements made of the Non-Equity Partner in respect of any action approved by the Partnership in relation to any insolvency proceedings or compounding or dealing with creditors in respect of the Partnership or any Associated Firm (whether pursuant to any legislation in any jurisdiction or pursuant

to any court or similar proceedings or orders in any jurisdiction) including (without limitation) failing to sign upon demand all necessary documents relating to such matters;

(e)     if the Non-Equity Partner's behaviour amounts to a serious breach or repudiation of an agreement (including the Agreement) between the Non-Equity Partner and the Partnership or an Associated Firm that concerns the Non-Equity Partner's relationship with the Partnership or the Associated Firm; or

(f)     pursuant to paragraph 7 of Schedule 9.

### 3.6.4    Incapacity

A Non-Equity Partner who becomes physically or mentally incapacitated and remains so for a period of 12 consecutive months and in consequence of such incapacity is throughout that period (or substantially throughout that period) unable to carry out the Non-Equity Partner's responsibilities, will be treated as having terminated the Non-Equity Partner's relationship with the Partnership and Associated Firms on the day on which that 12 month period ends. This paragraph 3.6.4 is without prejudice to any other terms agreed with a Non-Equity Partner regarding the relevant illness or incapacity.

## 3.7    Suspension

### 3.7.1    If a Non-Equity Partner appears (or is alleged) to be guilty of an act or omission which is inconsistent in any way with the Non-Equity Partner's obligations or position as a Non-Equity Partner the Regional Managing Partner will have the power to suspend the Non-Equity Partner from acting as a Non-Equity Partner on such terms as the Regional Managing Partner reasonably specifies provided that (i) the Non-Equity Partner will remain entitled to non-discretionary remuneration while suspended unless the Partnership Council decides otherwise and (ii) the Non-Equity Partner may appeal to the Senior Partner against the suspension in which case paragraph 3.8 applies.

### 3.7.2    A Non-Equity Partner may be suspended pursuant to paragraph 7 of Schedule 9.

## 3.8    Termination and suspension: general

### 3.8.1    The preceding provisions do not affect any termination right available to a Non-Equity Partner or the Partnership or an Associated Firm under the applicable law of the agreement governing the Non-Equity Partner's relationship with the Partnership or Associated Firm.

### 3.8.2    A Non-Equity Partner's appeal to the Senior Partner under a preceding paragraph:

(a)     shall not affect the validity of the Non-Equity Partner's termination or suspension; and

(b)      shall cause the Senior Partner to (i) investigate the circumstances (ii) consult the Regional Managing Partner, GBU Leader, Global Practice Area Leader and office managing partner on whether the Regional Managing Partner's decision was well-founded and justified the termination or suspension and (iii) let the Non-Equity Partner know the conclusion as soon as practicable.

If the Senior Partner believes an alternative solution is in the overall interests of the Partnership and Associated Firms and fair to the Non-Equity Partner concerned, the Senior Partner will try to achieve it.

3.8.3    Subject to paragraph 3.8.4 the termination or suspension of a Non-Equity Partner pursuant to the preceding paragraphs gives the Non-Equity Partner no right in law, equity or otherwise to claim against the Partnership or any Partner or against any Associated Firm any compensation or other payment of any kind.

3.8.4    A Non-Equity Partner whose relationship with the Partnership or an Associated Firm terminates pursuant to paragraph 3.6 is entitled to the balance of any remuneration which may be due to that Non-Equity Partner (which will not include any accrual for a bonus, whether discretionary or not).

3.8.5    Notwithstanding any other provision of the Agreement, Schedule 15 does not apply to Non-Equity Partners.

3.8.6    The termination of an agreement that has been made with a Non-Equity Partner pursuant to this Policy terminates the relevant Non-Equity Partner's rights and obligations under every agreement held with the Partnership (including the Agreement) and any Associated Firm.

### 3.9    Absence

3.9.1    A Non-Equity Partner is permitted absence from the Partnership and Associated Firms in accordance with terms approved by the Regional Managing Partner.

3.9.2    Paragraph 2.6 of the Policies under Schedule 12 *(Absence from the Partnership)* will apply to a Non-Equity Partner who wishes to work part-time or flexibly.

The ELG will take into account local law and practice on flexible working before determining the impact of such an arrangement on a Non-Equity Partner's remuneration.

### 3.10    Benefits

To the extent feasible, Non-Equity Partners will be offered benefits generally available to Equity Partners such as participation in life assurances, permanent health insurance ("**PHI**") or health insurance plans on a voluntary basis and at no cost to the Partnership and Associated Firms. However, the Managing Partner may require that a Non-Equity Partner participates in the life assurance and PHI plans which each Equity Partner is required to maintain pursuant to paragraph 7 of Schedule 12. If the Managing Partner so requires, the Non-Equity Partner's participation will be at the Non-Equity Partner's own cost and, unless the Managing Partner specifies a lower level of cover, at the same level of cover as applies to each Equity Partner.

### 3.11    Status

3.11.1    Partners are subject to, *inter alia*, Schedule 12. Non-Equity Partners are expected to provide service of a quality to be expected of a "Clifford Chance partner", to undertake internal roles and responsibilities appropriate to that status, and are subject to the same appraisal process as an Equity Partner.

*(Amended 29 January 2010 and with effect from 1 March 2010)*

3.11.2    When the Partnership and the Associated Firms deal with clients and employees, they will not distinguish Equity Partners from Non-Equity Partners.

The Partnership and Associated Firms may publish statistical data which distinguish Equity Partners from Non-Equity Partners.

3.11.3    Non-Equity Partners will receive the same information as Equity Partners except to the extent that the information concerns Equity Partners to the exclusion of Non-Equity Partners or matters on which Non-Equity Partners do not have the right to vote (as referred to in paragraph 2.1 of Schedule 8).

**Date Policy adopted:**          **the Effective Date**

**Policies under Schedule 2**
**Admission as Partner**

1.     **CONDITIONS FOR ADMISSION: ELG POLICY**

This Policy is made under paragraph 2 of Schedule 2.

1.1     The documents and agreements that a person must sign in order to become a Partner are:

1.1.1     a deed of adherence in the form set out at the end of these Policies (or another form approved by the Executive Partner) whereby the relevant person agrees to become a party to and be bound by the Agreement (as amended from time to time) in the capacity in which that person is to be admitted;

1.1.2     if that person is to be a Member, the duly completed form required under section 9 of the LLPA when a person is to become a member of a limited liability partnership and such other documents as may be required under the LLPA;

1.1.3     if that person is to be admitted as an Equity Partner in a period in which paragraph 4.5 of Schedule 16 (*Indemnities and Liabilities*) applies, the Equity Partner Covenant required by paragraph 4.5 of Schedule 16 (*Indemnities and Liabilities*) or a deed of adherence thereto in a form approved by the Executive Partner; and

1.1.4     any document to give full effect to the terms of any Borrowings or to give effect to:

(a)     any arrangements referred to in paragraph 3.1.2, 3.1.3 or 3.1.4 of Schedule 10 (*Borrowings*) which has been authorised by a Special Resolution of Equity Partners; or

(b)     the subordination of Equity Partners' rights as referred to in paragraph 2 of Schedule 17.

1.2     The documents and agreements that a person must sign in order to become an Approved Person are:

1.2.1     a deed of arrangements in a form approved by the Executive Partner whereby that person agrees to be designated as an AP(E) or AP(NE), as the case may be;

1.2.2     if that person is to be designated as an AP(E) in a period in which paragraph 4.5 of Schedule 16 (*Indemnities and Liabilities*) applies, the covenant required by paragraph 4.5 of Schedule 16 (*Indemnities and Liabilities*) or a deed of adherence thereto in a form approved by the Executive Partner; and

1.2.3     any document to give full effect to the terms of any Borrowings or to give effect to:

(a)     any arrangements referred to in paragraph 3.1.2, 3.1.3 or 3.1.4 of Schedule 10 (*Borrowings*) which has been authorised by a Special Resolution of Equity Partners; or

Partnership Agreement Policies v. 32:          - 8 -
24 October 2024

(b)    the subordination of Equity Partners' and AP(E)s' rights pursuant to paragraph 2 of Schedule 17.

**Date Policy adopted:         the Effective Date**

2.    **PROMOTION OF NON-EQUITY PARTNERS TO EQUITY STATUS: PARTNERSHIP COUNCIL POLICY**

This Policy is made under paragraph 1.5 of Schedule 2.

This Policy shall be applied, with the necessary modifications, in relation to AP(NE)s as if references to "Non-Equity Partners" included AP(NE)s and references to "Equity Partners" included AP(E)s.

2.1    A Non-Equity Partner cannot expect to be considered for status as an Equity Partner as of right.

2.2    As a general rule, a Non-Equity Partner will not be admitted as an Equity Partner in less than three years of becoming a Non-Equity Partner. The ELG may waive the general rule in a case which involves exceptional circumstances. No candidate should be told of a potential consideration for status as an Equity Partner in less than three years of becoming a Non-Equity Partner unless the chair of the PSG has confirmed in writing that this is so.

**Date Policy adopted:         the Effective Date; paragraph 2.2 amended with effect from 1 May 2016**

3.    **CRITERIA FOR PROMOTION TO NON-EQUITY PARTNER STATUS: PARTNERSHIP COUNCIL POLICY**

This Policy is made under paragraph 1.5 of Schedule 2. It sets out the criteria to be fulfilled by a lawyer from the Partnership or an Associated Firm if that lawyer is invited to become a Non-Equity Partner. In the case of any particular lawyer, the criteria may be modified or waived by the Partnership Council after consultation with the ELG.

This Policy shall be applied, with the necessary modifications, in relation to AP(NE)s as if references to "Non-Equity Partners" included AP(NE)s and references to "Equity Partners" included AP(E)s.

3.1    The candidate will have been with the Partnership or an Associated Firm for at least 18 months on the date of becoming a Non-Equity Partner.

3.2    The candidate will have been proposed for admission as a Non-Equity Partner by the relevant GBU Leader or Global Practice Area Leader and will have the overwhelming support of the Equity Partners from the relevant practice area in the office where the candidate is or is to be based and the overall support of the Equity Partners from the global practice area.

3.3    The candidate will have the same outstanding legal skills as are required of Equity Partners.

3.4   The candidate will normally score well overall in respect of the non-legal skills identified by the PSG.

3.5   There will be a business need for the candidate as a Non-Equity Partner, in the context of the business plan of the relevant practice area, which no existing Partner can realistically fulfil. The business need does not have to be as strong as that required for a candidate for Equity Partner.

3.6   The candidate's case for admission as a Non-Equity Partner will be subject to the process required pursuant to the Agreement.

**Date Policy adopted:          the Effective Date**

4.    **NEW PARTNERS' PARTICIPATION IN ASSOCIATED FIRMS: ELG POLICY**

Pursuant to paragraph 4.2 of Schedule 2, the ELG delegates to the Managing Partner the authority to determine that a new Partner will with effect from admission to the Partnership hold partnership interests, shares or other proprietorship rights or hold employment rights in one or more Associated Firms.

This Policy shall be applied, with the necessary modifications, in relation to Approved Persons as if references to "Partners" included references to Approved Persons.

The power conferred by paragraph 4.2 will not be exercised in such a way as to cause:

4.1   an Associated Firm Equity Partner to cease being an Associated Firm Equity Partner;

4.2   an Associated Firm Non-Equity Partner to cease being an Associated Firm Non-Equity Partner; or

4.3   a Partner to be in breach of law or regulation.

**Date Policy adopted:          the Effective Date**

5.    **PARTNER SELECTION GROUP (PSG): PARTNERSHIP COUNCIL POLICY**

This Policy is made under paragraph 5 of Schedule 2.

This Policy shall be applied, with the necessary modifications, in relation to Approved Persons as if references to "Partners" included references to Approved Persons.

This Policy shall be applied, with the necessary modification in relation to AP(E)s as if references to "Equity Partners" included references to AP(E)s.

This Policy shall be applied, with the necessary modifications, in relation to AP(NE)s as if references to "Non-Equity Partners" included AP(NE)s and references to "Equity Partners" included AP(E)s.

5.1   The principal purpose of the PSG will be to assess the personal qualities of candidates for partnership, having regard to character and legal and non-legal skills.

The PSG will balance candidates' personal skills with the business case for their election and the PSG will be influenced, as far as the business case is concerned, primarily by the views of the ELG, to which it may refer for guidance.

The PSG will normally require a candidate being considered for admission as a Non-Equity Partner to attend a Partnership Candidate Review, a course designed and run by the PSG. The PSG will not normally require a Non-Equity Partner to attend a Partnership Candidate Review to assess whether a Non-Equity Partner should be promoted to become an Equity Partner.

The PSG's procedures for assessing the personal qualities of lateral hires will recognise the likelihood that a lateral hire's admission will need to be addressed in the strictest confidence and often with speed. Accordingly, the PSG may delegate the assessment of the personal qualities of lateral hires to the chair or one or more other members of the PSG and it will not be necessary that the candidate attends a Partnership Candidate Review.

In addition, the PSG may provide feedback on the development needs of Non-Equity Partners to their GBU Leaders, Global Practice Area Leaders and, as it considers appropriate, other Partners so that the Non-Equity Partners' development needs can be addressed through the appraisal programme.

5.2    The PSG:

5.2.1    shall consist of six members (including the chair) or such greater number of members as the Partnership Council decides, chosen by the Partnership Council to balance the interests of different groups of Equity Partners;

5.2.2    shall comprise persons who are Equity Partners (but, with the exception of the chair, a member of the Partnership Council may not be a member of the PSG) or retired Equity Partners; and

5.2.3    may, with the approval of the Senior Partner, enlist the assistance of retired Equity Partners and others to gather and analyse information on candidates, whether by interviews, conducting soundings, attending the Partnership Candidate Review or otherwise.

5.3    The PSG will report to the Partnership Council on its assessment of the personal qualities of all candidates for election as a Partner or for promotion from Non-Equity Partner to Equity Partner. The PSG will report to the ELG insofar as it comments on the business case for a candidate's election or promotion. The ELG will report to the Partnership Council as to whether it agrees or disagrees with any recommendation of the PSG on strategic or business grounds. The PSG's report on each candidate proposed for election (pursuant to paragraph 1.1 or 1.3 of Schedule 2) will be circulated to all Partners at the same time as (or before) they receive details of the voting arrangements for such election.

*(Amended with effect from 1 September 2014 and with effect from 1 May 2017)*

**Date Policy adopted:          the Effective Date; amended 29 January 2010**

**Deed of adherence required by paragraph 1.1.1 of Policies under Schedule 2**

### DEED OF ADHERENCE
### TO THE PARTNERSHIP AGREEMENT OF CLIFFORD CHANCE LLP

**THIS DEED OF ADHERENCE** is made by deed poll on [        ]

**BY [INSERT NAME OF PERSON TO BE ADMITTED]** of [*insert usual resident address*] (the "**Incoming Partner**")

**WHEREAS:**

(A)    The Incoming Partner wishes to be admitted as an [insert relevant capacity: Firm Equity Partner/Employed Equity Partner/Associated Firm Equity Partner/Firm Non-Equity Partner/Associated Firm Non-Equity Partner] for the purposes of the partnership agreement of Clifford Chance LLP (as amended from time to time) (the "**Partnership Agreement**").

(B)    The Incoming Partner may not become an [*insert relevant capacity*] without agreeing to become a party to and bound by the Partnership Agreement.

(C)    The Incoming Partner has been provided with a copy of the Partnership Agreement and wishes to become party to it as an [*insert relevant capacity*] and to adhere to the Partnership Agreement in that capacity.

**THIS DEED WITNESSES** as follows:

1.    With effect from the effective date of admission as a Partner, as provided by the Partnership Agreement (the "**Admission Date**"), the Incoming Partner undertakes and covenants to each party to the Partnership Agreement to observe, perform and be bound by all the terms of the Partnership Agreement as if the Incoming Partner had, from the Admission Date, been party to the Partnership Agreement as an [*insert relevant capacity*].

2.    Any dispute or difference arising out of or in connection with this Deed shall be deemed to be a Dispute under the Partnership Agreement.

3.    Clauses 22, 23 and 24 of the Partnership Agreement apply *mutatis mutandis* to this Deed.

IN WITNESS whereof the Incoming Partner has caused this Deed of Adherence to be duly executed and delivered as a deed poll on the date appearing at the beginning of it.

Executed as a deed by    )
**[INSERT NAME OF INCOMING**    )
**PARTNER]**    )    _____
in the presence of)

_____
_____
_____

**Policies under Schedule 5
Sharing of Equity Remuneration**

1.    **REVIEWS OF EQUITY PARTNERS' LADDER POSITIONS: ELG POLICY**

1.1    This Policy is made under paragraphs 3.1, 3.1.3 and 4.1 of Schedule 5 and applies to each Biennial Review and Annual Review (each an "Equity Partner Review").   The ELG may not amend this Policy without the approval of the Partnership Council.

This Policy shall be applied, with the necessary modifications, in relation to Approved Persons as if references to "Partners" included references to Approved Persons.

This Policy shall be applied, with the necessary modifications, in relation to AP(E)s as if references to "Equity Partners" included AP(E)s.

1.2    In assessing the expectations of Partner performance and contribution, the Wider Leadership Group shall have regard to:

1.2.1    the "Expectations and Assessment of Partners" published on PartnerConnect on 28 December 2023 (as amended or replaced from time to time);

1.2.2    the provisions of Schedule 12 (Partner Behaviour and Obligations); and

1.2.3    Product and Market Dynamics, being those product and market related dynamics in the context of the CC@40 strategy (or such other strategy that shall from time to time constitute the strategy of the Partnership), including:

(a)    the competitive market dynamics for the legal services in the distinct product area in the relevant market or region and the competitive dynamics in respect of talent in the relevant product area in such market or region;

(b)    market and group financial dynamics in respect of the relevant product area (including historical and anticipated pricing, leverage models, profit margins, scale and prospects for profitable revenue growth);

(c)    the importance of the product area in the relevant market to clients and the ability of the product expertise to generate opportunities for other offices and regions of the Partnership or be a differentiating factor for key clients;

(d)    the market position and profile of the practice; and

(e)    the need for effective succession planning and career development opportunities for senior associates and counsel in the relevant product area,

with it being recognised that such factors and their relative importance can change from time to time.

1.3    The Partner Review Group shall comprise the Senior Partner and three elected members of the Partnership Council nominated by the Partnership Council (where possible, not being from the same region or the same GBU as each other). The Senior Partner will act as chair of the Partner Review Group. Decisions of the Partner Review Group shall be made by majority vote and, in the event of a tie, the Senior Partner shall have a casting vote.

1.4    The Partner Review Group will:

1.4.1    meet with members of the Wider Leadership Group to discuss and review its proposed decisions in relation to Biennial Reviews and Annual Reviews;

1.4.2    have access to the data available to the members of the Wider Leadership Group in respect of any Equity Partner Review and seek any additional data and inputs (including sounding of relevant Partners) where the Partner Review Group considers it appropriate in the context of its review of the proposed decisions of the Wider Leadership Group;

1.4.3    consider whether the proposed decisions of the Wider Leadership Group are broadly consistent and reasonable across the partnership, and that they support and maintain the Firm's partnership culture; and

1.4.4    following such review, advise the Wider Leadership Group that either it agrees with the proposed decisions or that, in the Partner Review Group's opinion, any proposed decision in respect of an Equity Partner (or Non-Equity Partner in respect of a Bonus Award) should be reconsidered.

1.5    Where the proposed decision of the Wider Leadership Group in a Biennial Review is to pause an Equity Partner on the Ladder at or below 220 Units or to move an Equity Partner down to a level of 220 Units or below, the Partner Review Group shall notify the relevant Equity Partner of the proposed decision by private email and the relevant Equity Partner will have a right to meet with and make representations to two members of the Partner Review Group within 7 days of such notification. These meetings will be held before the Partner Review Group finalises its advice to the Wider Leadership Group.

1.6    In a typical year, it is expected that the review cycle will begin in January with meetings of the Partner Review Group with GBU Leaders, Regional Managing Partners and any other members of the Wider Leadership Group as the Partner Review Group considers to be appropriate, to review feedback and data to allow it to review the Wider Leadership Group's equity remuneration proposals in Biennial Review years, and the Wider Leadership Group's proposals in respect of accelerations and Bonus Awards every year. It is anticipated that the Partner Review Group will formally meet with the Wider Leadership Group in February or March, reviewing the Wider Leadership Group's proposed decisions in respect of each Equity Partner. It is anticipated that the Partner Review Group will provide the Wider Leadership Group with its advice as soon as possible following such meeting. Following receipt of the advice of the Partner Review Group, the Wider Leadership Group will use its reasonable endeavours to ensure that it finalises decisions by the end of March in each year.

Policies under Schedule 5: Sharing of Equity Remuneration

**Date Policy adopted:**      **Effective 1 May 2021; amended with effect from 15**
**March 2024**             •          

## 2.    BONUS AWARDS: ELG POLICY

2.1    This Policy is made under paragraph 4 of Schedule 5 and applies to Bonus Awards for Partners.

2.2    The Wider Leadership Group may make Bonus Awards in each Financial Year to Partners who, in its view, have demonstrated exceptional contribution to the success of the Firm during the Financial Year significantly beyond the expectations of a Partner at the relevant level of seniority or position on the Ladder. The Wider Leadership Group may also take into account a Partner's performance in previous Financial Years when deciding to make a Bonus Award. It is expected that Bonus Awards will be finalised in April of each year.

2.3    In respect of each Financial Year, to the extent that any element of the available Bonus Pool for that Financial Year is not allocated in Bonus Awards to Partners pursuant to paragraph 2.2, the balance shall be Equity Remuneration for the relevant Financial Year and accordingly will be shared between Equity Partners pursuant to paragraph 1.1 of Schedule 5.

2.4    The minimum amount of any individual bonus will be GBP100,000.

2.5    There shall be no maximum amount of any individual bonus.

2.6    Bonus Awards up to and including GBP250,000 payment will be paid in full (subject to deductions pursuant to Schedule 6) along with the payment of the Special Distribution made in the September following the end of the Financial Year to which the bonus award relates.

2.7    Bonus Awards above GBP250,000 will be made in two equal instalments (each subject to deductions pursuant to Schedule 6), the first with the Special Distribution made in September and the second with the Special Distribution made in December, following the end of the Financial Year to which the bonus award relates.

**Date Policy adopted:**      **Effective 1 May 2021 and amended with effect from 24**
**October 2024**

## 3.    AGREED UNIT REDUCTIONS: PARTNERSHIP COUNCIL POLICY

3.1    This Policy is made under paragraph 6 of Schedule 5.

This Policy shall be applied, with the necessary modifications, in relation to AP(E)s as if references to "Equity Partners" included references to AP(E)s.

In reaching an agreement with an Equity Partner to reduce Units, and in any subsequent review of that agreement, the Managing Partner will take into account any proposed reduction in the time which the Equity Partner intends to devote to the firm's business as well as the actual and anticipated performance and contribution of such Equity Partner.

3.2    The Managing Partner must be satisfied that the proposed agreement is fair and is also broadly consistent with other agreements made under this paragraph 4 and the Agreement generally.

3.3    The Managing Partner will consult the Senior Partner about a proposed agreement, after having allowed the Equity Partner a reasonable time to make any representations on the proposed agreement to the Senior Partner.

3.4    Unless the agreement also provides for the retirement of the Equity Partner on a specified date, having consulted the relevant Equity Partner, GBU Leader, Global Practice Area Leader and the relevant Regional Managing Partner, the Managing Partner will review the agreement with the relevant Equity Partner every two years from the date the reduction takes effect.

The purpose of such review will be to determine whether, at the expiry of the two-year period the Equity Partner should:

3.4.1    continue for a further period with a further reduced Unit allocation; or

3.4.2    be allocated an increased number of Units within the scope permitted by paragraph 6 of Schedule 5,

provided that, in the event no agreement is reached between the Managing Partner and the Equity Partner, then the existing agreement with the Equity Partner shall continue subject to being reviewed after a further two year period.

**Date Policy adopted: the Effective Date; amended with effect from 1 May 2015, with effect from 1 May 2017 and with effect from 1 May 2021**

**Policies under Schedule 6**

**Distribution of Remuneration**

1.    **NON-EQUITY PARTNERS' REMUNERATION: ELG POLICY**

This Policy is made under paragraph 2 of Schedule 6

1.1    Each Non-Equity Partner's remuneration will be paid on dates provided for in the applicable contract concluded by a Non-Equity Partner pursuant to the Policies under paragraph 3.4.3 of Schedule 1.

1.2    Each Non-Equity Partner will be subject to paragraphs 5.7, 5.15 and 5.16.

*(Added with effect from 23 April 2020)*

**Date Policy adopted:        the Effective Date**

2.    **PAYMENTS ON ACCOUNT OF EQUITY REMUNERATION: ELG POLICY**

2.1    This Policy is made under paragraph 4 of Schedule 6.

This Policy shall be applied, with the necessary modifications, in relation to AP(E)s as if references to "Equity Partners" included references to AP(E)s.

2.2    The payments to each Equity Partner during the Financial Year on account of the applicable share of Equity Remuneration earned for that Financial Year will be made in the relevant Office Currency or other currency agreed by the ELG at the monthly amount equivalent to GBP18,000, save where any deduction in respect of Tax is required by law, in which case the monthly annual amount after the deduction will be GBP18,000. Any such deduction will be charged to the Equity Partner's Tax reserve account.

Without prejudice to each Equity Partner's share in Equity Remuneration and as appropriate depending on any election of an Equity Partner, the 1YA Rate or 3YA Rate (as defined in paragraph 4 of the Policies under Schedule 6) for the previous Financial Year shall be used to determine monthly payments on account equivalent to GBP18,000.

Payments on account of Equity Remuneration for any Financial Year will be made in equal monthly instalments during the Financial Year on or about the 21st day of each month.

Exceptions to the amount and timing of monthly payments pursuant to this paragraph may be agreed by the Executive Partner and the Director of Tax and Treasury.

**Date Policy adopted: with effect from 1 May 2009; paragraph 2.2 amended with effect from 1 May 2016; paragraph 2.3 deleted 12 July 2012; paragraph 2.2 amended with effect from 1 May 2017; paragraph 2.2 amended with effect from 1 May 2021 and 15 March 2024;**

3.      **SPECIAL DISTRIBUTIONS: ELG POLICY**

3.1     This Policy is made under paragraph 4 of Schedule 6.

        This Policy shall be applied, with the necessary modifications, in relation to AP(E)s as if references to "Equity Partners" included references to AP(E)s.

        This Policy shall not prevent arrangements made pursuant to paragraph 10 of Schedule 6, or pursuant to paragraph 11 of the Policies under Schedule 6.

3.2     The balance of Equity Remuneration (after payment of drawings on account) will normally be distributed to Equity Partners through a system of Special Distributions.

3.3     The ELG will determine the amount and timing of each Special Distribution, taking into account:

        3.3.1   information relating to the current and prospective financial performance of the Partnership and Associated Firms, including profitability, trading conditions and working capital management;

        3.3.2   the requirements of Schedule 10 (*Borrowings*); and

        3.3.3   its intention to manage the Partnership's finances prudently.

3.4     To the extent the ELG considers the criteria in paragraph 3.3 are met, the balance of Equity Remuneration (after payment of drawings on account) will be paid by way of Special Distributions in four approximately equal instalments on a date (decided by the ELG) in June, September, December and March of the Financial Year following the Financial Year to which the Equity Remuneration relates (each being an **"instalment date"** for the purposes of this paragraph 3.4).

        The ELG may specify cash collection targets for each quarter in a Financial Year based on the projected cash collections and working capital balance. If these targets are achieved and the ELG considers the criteria in paragraph 3.3 are met, the ELG may increase the amount of the relevant quarterly Special Distribution by at least 70% of the amount by which the actual cash collections in the relevant quarter exceeds the minimum collection targets. The targets will be set by the ELG at levels so that if cash collections reach the upper targets, the balance of Equity Remuneration for the relevant Financial Year will have been paid out on or before the payment of the third Special Distribution in December.

        If any instalment scheduled to be made in June, September, December or March is not paid in full because the ELG considers the criteria in paragraph 3.3 are not met, the shortfall will be carried forward and paid on the next instalment date, in priority to any Special Distribution of Equity Remuneration relating to a subsequent Financial Year, to the extent that the ELG considers the criteria are then met. Any balance of the shortfall remaining unpaid will be carried forward to successive instalment dates and treated in the same way.

        To the extent the ELG considers the criteria in paragraph 3.3 are met, Special Distributions may be greater than and may be paid sooner than contemplated above.

If the Partnership Accounts for the Financial Year have not been finalised by the date for determination of any Special Distribution, the Managing Partner will determine as an interim measure the amount of that Special Distribution by reference to the Managing Partner's estimate of the likely amount of Equity Remuneration. Appropriate adjustments will be made to subsequent Special Distributions for the Financial Year to deal with any difference between the estimate and the actual Equity Remuneration.

Each Equity Partner's Special Distributions will be subject to deductions for or on account of Tax and other payments made by the Partnership or an Associated Firm on behalf of each Equity Partner or pursuant to the Agreement.

*(Former paragraph 3.5 deleted with effect from 1 May 2015; former paragraph 3.4 deleted 9 July 2020; Former paragraphs 3.4-3.8 deleted with effect from 1 May 2021).*

3.5     The ELG may, with the prior approval of the Partnership Council, specify that Equity Partners in different offices/practice groups/sub-groups will be entitled to receive the Special Distributions on less favourable terms than other Equity Partners in order to take account of any consistent failure by the Equity Partners in that office/practice group/sub-group to meet financial performance criteria. The ELG may also, with the prior approval of the Partnership Council, specify that an Equity Partner who consistently fails to meet personal financial performance criteria will be entitled to receive the Special Distributions on less favourable terms than remaining Equity Partners.

3.6     Prior to any decision pursuant to paragraph 3.5 as to whether any individual Equity Partner or group of Equity Partners should receive the Special Distributions on less favourable terms than other Equity Partners, the ELG and Partnership Council will consider a report on all material factors proposed by the Managing Partner. In the event of the Managing Partner, the ELG and the Partnership Council disagreeing on such a decision, the view of the Partnership Council will prevail. No such decision will be implemented until the Equity Partner or group of Equity Partners concerned has had a reasonable opportunity to explain to the ELG or Partnership Council why that Equity Partner or group of Equity Partners have consistently failed to meet relevant financial performance criteria.

**Date Policy adopted:          the Effective Date; paragraph 3.4 amended with effect from 1 May 2021;**

4.     **DISTRIBUTION OF EQUITY REMUNERATION OTHERWISE THAN IN ACCOUNTS CURRENCY : ELG POLICY**

This Policy is made under paragraph 6 of Schedule 6.

This Policy shall be applied, with the necessary modifications, in relation to AP(E)s as if references to "Equity Partners" included references to AP(E)s.

In this Policy:

**"1YA Rate"** means the average exchange rate for the translation of a specified currency into the Accounts Currency which is used in the preparation of the Partnership Accounts for the relevant Financial Year;

"**3YA Rate**" means the average of the 1YA Rates for the three-year period ending with the last day of the Financial Year to which the relevant Equity Partner's share of Equity Remuneration relates;

"**Home Currency**" means the currency, at the time of the relevant payment, of the relevant Equity Partner's home country (as agreed by the Managing Partner) or such other currency as the Managing Partner considers it reasonable to agree, having regard to the Equity Partner's personal circumstances.

4.1    Subject to paragraphs 4.2 and 4.3 the share of Equity Remuneration of an Equity Partner who is paid in the Equity Partner's Office Currency will be calculated by reference to the 1YA Rate.

4.2    An Equity Partner who is not paid in the Accounts Currency may elect that Equity Remuneration payable to that Equity Partner be calculated in that Equity Partner's Office Currency by reference to the 3YA Rate. The following conditions apply to such an election.

    4.2.1    The election must be made by notifying the Director of Tax and Treasury within 30 days after the Equity Partner is admitted as an Equity Partner or, in the case of Equity Partners admitted before the adoption of this Policy, by notifying the Director of Tax and Treasury by 4 August 2017 (in which case such election will take effect from the Financial Year which began on 1 May 2016).

    Notwithstanding the above the Managing Partner has the discretion to allow an Equity Partner who changes Long-Term Base with a resulting change to applicable Office Currency to make such an election with effect from the change of Long-Term Base by notifying the Director of Tax and Treasury within 30 days after the change of Long-Term Base.

    4.2.2    The election will have effect for all future Financial Years and will apply:

        (a)    pursuant to paragraph 11 of the Policies under Schedule 14, to any annuity or other annual payment which is payable to such Equity Partner under paragraph 4, 5 or 6 of Schedule 14; and

        (b)    to the calculation and payment of the shadow units of an Equity Partner who is admitted as a Non-Equity Partner pursuant to paragraph 3.7 or 3.8 of Schedule 2

    Provided that the Managing Partner has the discretion to agree with an Equity Partner who changes Long-Term Base with a resulting change to applicable Office Currency that the Equity Partner's election under this paragraph 4.2 will cease to have effect.

4.3    This paragraph 4.3 applies to an Equity Partner who is on secondment or, having been on secondment, has continued to work in an office which is not in the relevant Equity Partner's home country (as agreed by the Managing Partner) and in other situations where the Managing Partner considers it reasonable for this paragraph 4.3 to apply, having regard to the Equity Partner's personal circumstances.

The Managing Partner or the Executive Partner may agree with the Equity Partner that some or all of that Equity Partner's share of Equity Remuneration will be calculated in that Equity Partner's Home Currency by reference to the 1YA Rate or, if the Equity Partner is bound by an election under paragraph 4.2, by reference to the 3YA Rate. Such an agreement will only be made if the Equity Partner's Home Currency is one of the Office Currencies of the Partnership and Associated Firms. If the Equity Partner's Home Currency is the Accounts Currency, the agreed percentage of Equity Remuneration payable to that Equity Partner will be paid in the Accounts Currency.

An agreement under this paragraph 4.3 will normally be subject to the following conditions.

4.3.1    The Equity Partner's request for a share of Equity Remuneration to be calculated by reference to the Equity Partner's Home Currency must specify the relevant percentage of Equity Remuneration and be submitted to the Director of Tax and Treasury no later than two weeks after the end of the Financial Year to which the Equity Remuneration relates.

4.3.2    The agreement will apply to the agreed percentage of the Equity Partner's Equity Remuneration when Special Distributions are made and to Equity Remuneration for all future Financial Years, so long as the Equity Partner's Long-term Base remains an office whose currency is not the Equity Partner's Home Currency and until the agreement is ended or changed pursuant to a further request from the Equity Partner in accordance with paragraph 4.3.1, but no such request may be given effect until the agreement has applied for three Financial Years or unless the Managing Partner or the Executive Partner agrees that ending or changing the agreement is reasonable, having regard to the Equity Partner's personal circumstances.

4.3.3    The agreement will end if the Equity Partner's Home Currency ceases to be one of the Office Currencies of the Partnership and Associated Firms.

4.4    A payment in the Accounts Currency which is made by the Partnership or an Associated Firm on behalf of an Equity Partner out of Equity Remuneration pursuant to paragraph 2.3.1 of Schedule 7 (*failure to contribute capital*) will be calculated in the Equity Partner's Office Currency by reference to spot exchange rates prevailing at the time of the payment.

**Date Policy adopted:        20 March 2012; amended with effect from 1 May 2015 and with effect from 1 May 2016**

5.    **TAX RESERVE: ELG POLICY**

This Policy shall be applied, with the necessary modifications, in relation to AP(E)s as if references to "Equity Partners" included references to AP(E)s.

This Policy shall be applied, with the necessary modifications, in relation to AP(NE)s as if references to "Non-Equity Partners" included AP(NE)s.

5.1    This Policy sets out the arrangements under which a Tax Reserve account will be maintained and operated for each Equity Partner to reserve the Tax payable by each

Equity Partner from the relevant share of Partnership Profit in each Financial Year and to deal with payments of such Tax by that Equity Partner or on that Equity Partner's behalf by the Partnership.

5.2     In this Policy:

5.2.1   **"Partnership"** means the Partnership taken together with all Associated Firms and any reference to Tax attributable to the profits of the Partnership includes any Tax attributable to, or to the profits of, an Associated Firm (except where that Tax is deductible in the computation of Partnership Profit) and the Tax which is payable by an Equity Partner in a capacity as a partner, principal, consultant, officer or employee in or to the Partnership or an Associated Firm;

5.2.2   **"Tax Relief"** means any Tax-free personal allowances, lower rate bands of tax and any other similar relief from Tax given to all taxpayers under the law or regulation of a particular jurisdiction, disregarding any relief which depends on an individual's personal circumstances (such as whether an Equity Partner has a spouse or dependents), activities or investments;

5.2.3   **"Tax Reserve"** means the reserve for Tax made for each Equity Partner as required by paragraph 7 of Schedule 6; and

5.2.4   references to a **"share of Partnership Profit"** or to **"profits of the Partnership"** shall be taken to include any amounts payable to Equity Partners under paragraph 2.4 of Schedule 7 (*Capital-related profit*) but only to include Allowances to the extent decided by the ELG.

5.3     This Policy will be treated as a continuation of the corresponding Tax Reserve arrangements applicable to partners in any Old Partnership for periods prior to the Effective Date.  Each Equity Partner's Tax Reserve account will be consolidated with the tax reserve account that the Previous Partnership maintained for that Equity Partner.

5.4     There will be maintained in the books of the Partnership a Tax Reserve account in relation to each Equity Partner.

5.5     Each Equity Partner's Tax Reserve account will be maintained to reflect Tax payable by an Equity Partner in relation to the applicable share of Partnership Profit and Tax for which that Equity Partner is to be treated as liable in each Financial Year (calculated on the assumption that the Equity Partner ceases to be an Equity Partner at the end of the relevant Financial Year).

For each Financial Year the balance on each Equity Partner's Tax Reserve account will be established annually in the course of the preparation of the Partnership Accounts for that Financial Year.  Accordingly, after the end of each Financial Year there will be transferred from each Equity Partner's drawing account to such Equity Partner's Tax Reserve account an amount equal to (i) any negative balance on such Tax Reserve account and (ii) such amount as is necessary to make the balance on such Tax Reserve account equal to the amount considered likely to be the aggregate amount of Tax for which the Equity Partner is liable or to be treated as liable (and has not been already paid) in respect of all relevant fiscal years and attributable to profits of the Partnership for any period on the assumption that such Equity Partner had retired from the

Policies under Schedule 6: Distribution of Remuneration

Partnership at the end of such Financial Year. In the case of an Equity Partner who has actually retired from the Partnership or died during the Financial Year the amount necessary to balance that Equity Partner's Tax Reserve account will be ascertained by reference to the date that Equity Partner actually ceases to be an Equity Partner.

The amount of Tax for which an Equity Partner will be treated as liable for the purposes of this paragraph 5.5 will be increased or (as the case may be) reduced by:

5.5.1   an amount calculated to ensure the Equity Partner is not unfairly advantaged or disadvantaged as a result of receiving a share of Partnership Profit from different sources to other Equity Partners in the same country: such an adjustment may only be made at the discretion of the Executive Partner or the Managing Partner, having regard to the interests of all Equity Partners affected to ensure that they are all fairly treated and no such adjustment shall be made by reason of the personal circumstances (including the domicile, tax residence or citizenship) of the Equity Partner in question;

5.5.2   an amount reflecting the Tax for which an Associated Firm or branch is liable, to the extent the Equity Partner receives distributions from that source; and

5.5.3   an amount calculated to ensure that each Equity Partner's Tax Reserve at the end of the relevant Financial Year includes an appropriate and prudent provision in respect of rounding items, audit outcomes and other minor adjustments and for deferred Tax which will be computed in accordance with the relevant financial reporting standard relating to accounting for deferred Tax as in effect from time to time.

5.6   All calculations of amounts of Tax for the purposes of paragraph 5.5 will be made on the basis that any Tax Relief to which the relevant Equity Partner is entitled will be taken into account for the purpose of reducing such Equity Partner's Tax liability attributable to the profits of the Partnership in priority to any reduction in such Equity Partner's Tax liability in respect of any other income, profits or gains.

5.7   Tax returns and payment of Tax

5.7.1   In relation to all taxable income and gains (except those attributable to the profits of the Partnership to the extent the Partnership has completed and filed the appropriate return), each Equity Partner will satisfy the Partnership that an appropriate return has been completed and filed within applicable time limits for each Tax year (or other appropriate period) for which the Equity Partner has a Tax liability in respect of the Equity Partner's share of profits of the Partnership.

5.7.2   Each Equity Partner will, if so requested, use Tax advisers specified by the Partnership (who may be qualified advisers employed by the Partnership) to prepare their Tax returns. While the Partnership will bear the cost of such advisers, it may require a reasonable contribution from any Equity Partner whose non-partnership Tax affairs are complex.

*(Added with effect from 23 April 2020*

5.7.3   If the Partnership is required to make on behalf of an Equity Partner any payment of Tax on income or gains from sources other than that Equity Partner's share of Partnership profits or gains, then the Equity Partner in question will ensure that the Partnership is funded for the purpose (or holds a cheque from the Equity Partner in favour of the relevant Tax authority for the appropriate amount) in sufficient time as the Partnership may specify to enable the payment to be made before the date on which interest and/or penalties begin to accrue in favour of the Tax authority. If the Partnership is so funded (or holds such a cheque), it will make the required payment to the relevant Tax authority on behalf of the Equity Partner before that date. If the Partnership is not funded for such payment, it may make the necessary payment and set the relevant sum off against any sums owing to the Equity Partner.

*(Amended with effect from 23 April 2020)*

5.7.4   The Partnership may require an Equity Partner to provide a copy of any Tax return in respect of any period, including a period before that Partner became an Equity Partner, and to confirm that all such returns were completed and filed within applicable time limits.

*(Added with effect from 23 April 2020 and amended with effect from 15 March 2024)*

5.8   The Partnership will make such Tax payments on account or by way of final Tax payments as are appropriate where those are payments of Tax that has been, or will fall to be, taken into account in calculating the amount to be transferred to an Equity Partner's Tax Reserve account pursuant to paragraph 5.5 in any year. All such payments will be charged to the relevant Equity Partner's Tax Reserve account.

5.9   If it becomes apparent at any time that an Equity Partner is liable to pay any further Tax attributable to the profits of the Partnership then the Partnership will cause such Tax to be paid together with any interest thereon (other than any interest which may arise as a result of such Equity Partner (i) having supplied incorrect information regarding any Tax reliefs to which such Equity Partner was, or was considered by the Equity Partner to be, entitled or (ii) having failed to comply with the provisions of paragraph 5.7 or (iii) having incorrectly completed any Tax assessment form or return in so far as it relates to Tax payable which is not attributable to the profits of the Partnership, all of which will be the responsibility of such Equity Partner personally). Such Tax will be charged to such Equity Partner's Tax Reserve account but any interest so paid by the Partnership will be treated as an expense of the Partnership in the Financial Year in which it is paid. If the Partnership funds the payment of any interest which is the personal responsibility of an Equity Partner such Equity Partner will, forthwith upon receipt of a request from the Managing Partner or the Executive Partner therefore, reimburse the Partnership in respect of such interest.

5.10   A payment required to be charged to an Equity Partner's Tax Reserve account pursuant to this Policy will be so charged notwithstanding that it may give rise to a negative balance on such Tax Reserve account. However, where an Equity Partner has ceased to be an Equity Partner, any payment which is required to be charged to that Equity Partner's Tax Reserve account will be so charged to the extent of the balance at that time on that Tax Reserve account, and any remaining amount of such payment will be

met first out of any other moneys of such Equity Partner held by the Partnership and thereafter any balance will be paid directly by the Equity Partner. •

5.11    The Partnership may advance to Equity Partners the benefit of certain reliefs from Tax arising in connection with pension arrangements ("**Pension Tax Reliefs**"). In such a case (where the relevant Tax authorities will permit such arrangements) an Equity Partner will sign such authorisation forms as may be necessary to ensure that any refund of, or credit for, Tax related to such Pension Tax Reliefs to which that Equity Partner may become entitled in respect of Tax attributable to profits of the Partnership and any repayment supplement, interest or similar compensation for overpaid Tax payable in respect thereof ("**overpayment compensation**") are paid to the Partnership.   If an Equity Partner (a) receives directly any such refund of or credit for Tax or overpayment compensation, or in any other circumstances receives a refund of or credit for Tax (or overpayment compensation) where the relevant Tax was paid on behalf of such Equity Partner by the Partnership (and not charged to such Equity Partner's Tax Reserve account), or (b) the Pension Tax Relief is displaced by some other tax relief available to the Equity Partner or for whatever other reason does not give rise to the expected tax saving or benefit for the Partnership, then in any such case that Equity Partner will forthwith pay or compensate the Partnership to the extent of the Partnership's resulting loss, and the Partnership will be entitled to charge an Equity Partner interest at a reasonable rate on any delay by the Equity Partner in making such restitution to the Partnership.

5.12    The Partnership's authority under paragraph 7.5 of Schedule 6 to pay a Partnership Tax refund (as defined in paragraph 7.5 of Schedule 6) into a Partnership bank account or to require an Equity Partner to do so will only be exercised to the extent that the Equity Partner's Tax Reserve account has been calculated on the assumption that the anticipated Partnership Tax refund will be paid or repaid to the Partnership or an Associated Firm and not to the Equity Partner.

When the Partnership pays an Equity Partner's Partnership Tax refund into a Partnership bank account it will account to the Equity Partner for the payment by crediting it to the Equity Partner's Tax Reserve account.

Thus, for example, the authorisation would be exercised in the case of non-US Equity Partners where the IRS requires the Partnership to withhold US Tax at source at the top marginal rate from earnings of such Equity Partners in respect of their US Tax payable on US source profits; the IRS refunds the overpaid Tax after the Equity Partner's US Tax return is filed.

If an Equity Partner receives a Partnership Tax refund which either cannot be, or is not, paid into the relevant Partnership bank account, the Equity Partner will account to the Partnership for the Tax either by endorsing the relevant financial instrument (if possible) or through an appropriate adjustment to the Equity Partner's Tax Reserve account or a reduction in the amount paid to that Equity Partner by way of distribution of that Equity Partner's share of Partnership Profit or by payment to the Partnership. Where there is any material delay in making the payment to the Partnership, it shall be entitled to charge the Equity Partner interest at a reasonable rate on the amount outstanding.

5.13    If at the time at which a transfer to an Equity Partner's Tax Reserve account would otherwise have fallen to be made pursuant to paragraph 5.5 the balance on that Tax Reserve account is a positive balance in excess of the relevant amount referred to in that paragraph, then an amount equal to such excess will be released from the Tax Reserve account and credited to that Equity Partner's drawing account and distributed as if it formed part of that Equity Partner's share of Partnership Profit for the Financial Year in question.

5.14    It is acknowledged that, in view of the large number of different Tax authorities with which the Partnership is concerned, the foregoing arrangements may not be applicable in whole or in part in all relevant jurisdictions or may not deal appropriately with the Tax liability or compliance obligations of Equity Partners or the Partnership in all relevant jurisdictions. Therefore, in any particular case, or in relation to Tax payable in any particular jurisdiction, or in any dealings with any particular Tax authorities, the Partnership may apply and operate in relation to any relevant Equity Partners arrangements which are in their manner and general effect consistent with the arrangements for reserving on account of an Equity Partner's liability to Tax and for the payment of Tax as set out in this Policy, and those arrangements will be binding on the relevant Equity Partners. Any Equity Partner who is of the view that the Partnership is applying and operating such arrangements which are inappropriate in relation to that Equity Partner or are not consistent in their manner and general effect with the arrangements set out in this Policy, or who considers paragraph 5.5 or 5.6 is not being operated fairly, may refer the issue to the Partnership Council for its review and decision (and the Partnership Council's decision on the issue will be final and binding).

5.15    Each Non-Equity Partner will, as required by the Partnership, be subject to paragraph 5.7 as if every reference to "Equity Partner" was to "Non-Equity Partner".

Non-Equity Partners whose remuneration comprises a share of Partnership Profit will be subject to the Tax Reserve provisions of paragraphs 7.1 to 7.6 of Schedule 6 and therefore paragraphs 5.1 to 5.14.

The ELG delegates to the Managing Partner the authority to decide the extent to which the Tax Reserve provisions of paragraphs 7.1 to 7.6 of Schedule 6 and paragraphs 5.1 to 5.14 apply to each other Non-Equity Partner. The Managing Partner will consult the relevant Regional Managing Partner or office managing partner before making a decision. When making such a decision, the Managing Partner may agree arrangements to mitigate any Tax-related disadvantages associated with a Non-Equity Partner changing from the Tax status of an employee to the Tax status of a self-employed person.

*(Amended with effect from 23 April 2020)*

5.16    If any Partner is legally required to pay, and does pay, any Tax (or any interest or penalty in relation to Tax) which is attributable to another Partner's share of the profits of the Partnership (or any Associated Firm) such other Partner will forthwith indemnify the first-mentioned Partner in respect thereof.

**Date Policy adopted:        the Effective Date; amended with effect from 1 May 2009 and with effect from 1 May 2016**

6.    **OVERLAP PROFIT: ELG POLICY**

This Policy is made under paragraph 7.9 of Schedule 6.

This Policy shall apply, with the necessary modifications, in relation to Approved Persons as if references to "Partners" included references to Approved Persons.

This Policy concerns the circumstances in which the Partnership will take all or part of the risk (whether proving beneficial or detrimental) arising from the possibility that rates at which a Partner's overlap profit is taxed will be different from the rates prevailing in the Financial Year in which the Partner ceases to be a member of the Partnership or an Associated Firm.

If a Partner ceases to be a member of the Partnership or an Associated Firm as a result of being seconded to another office and, at the end of the secondment, that Partner returns to the relevant home office and becomes such a member again, the Partnership will take the risk attributable to the secondment and the Partner will be treated as if the secondment had not taken place.

The Managing Partner or the Executive Partner has the authority to agree that the Partnership will take all or part of the relevant risk in other circumstances which the Managing Partner or the Executive Partner considers exceptional and where the Managing Partner or the Executive Partner considers it fair for the Partnership to do so.

**Date Policy adopted:       12 July 2012**

7.    **ALLOCATION OF GROSS INCOME TO EQUITY PARTNERS WHO ARE ALSO PARTNERS IN CLIFFORD CHANCE US LLP: ELG POLICY**

Pursuant to paragraph 8.1 of Schedule 6, Equity Partners who are also partners in the Associated Firm of Clifford Chance US LLP shall be entitled to allocations of gross income of the Partnership to the extent that their share of Equity Remuneration for a Financial Year (calculated without the application of this paragraph 7) exceeds their respective Partnership Profit Entitlements (as defined in the partnership agreement of Clifford Chance US LLP dated 8 February 2001 as amended from time to time) for such Financial Year. Such allocation shall be in substitution for any other allocation of Equity Remuneration to such Equity Partners by the Partnership for such Financial Year, provided that the provisions of this paragraph 7 shall not be taken into account in calculating such Partners' respective Group Profit Entitlements (as defined in the partnership agreement of Clifford Chance US LLP dated 8 February 2001 as amended from time to time).

**Date Policy adopted:         the Effective Date**

8.    **PARTNERS' PARTICIPATION IN ASSOCIATED FIRMS: ELG POLICY**

8.1    This Policy shall be applied, with the necessary modifications, in relation to Approved Persons as if references to "Partners" included references to Approved Persons.

This Policy shall be applied, with the necessary modifications, in relation to AP(E)s as if references to "Equity Partners" included references to AP(E)s.

8.2    Pursuant to paragraph 8.1.2 of Schedule 6, the Managing Partner has the authority to determine that a Partner will upon admission to the Partnership or at any time thereafter hold or cease to hold partnership interests, shares or similar proprietorship rights in one or more Associated Firms. If a Partner is to hold such rights in an Associated Firm, the Partners who already hold partnership interests, shares or similar proprietorship rights in the relevant Associated Firm will cause the relevant Partner to be admitted to it with effect from admission to the Partnership or any other date specified by the Managing Partner.

8.3    The power conferred by paragraph 8.1.2 of Schedule 6 will not be exercised in such a way as to cause an Associated Firm Equity Partner to cease being an Associated Firm Equity Partner.

**Date Policy adopted:        the Effective Date**

9.    **ACCOUNTING TO PARTNERSHIP FOR BENEFITS RECEIVED FROM DIRECTORSHIPS OR OTHER POSITIONS OR ACTIVITIES: ELG POLICY**

This Policy shall be applied, with the necessary modifications, in relation to Approved Persons as if references to "Partners" included references to Approved Persons.

Pursuant to paragraph 8.1.4 of Schedule 6, each Partner shall promptly account to the Partnership for any benefit or remuneration received from:

9.1.1    any directorship, trusteeship, arbitration, mediation or other office or position;

9.1.2    any transaction concerning the Partnership or an Associated Firm;

9.1.3    any use by the Partner of the property, name or business connection of the Partnership or an Associated Firm; or

9.1.4    teaching, speaking or writing about legal or business matters.

The Managing Partner will have the discretion (to be exercised only in exceptional circumstances) to permit a Partner to retain part or all of any such benefit or remuneration.

**Date Policy adopted:        the Effective Date**

10.    **ALLOWANCES FOR EQUITY PARTNERS: ELG POLICY**

This Policy is made pursuant to paragraph 9 of Schedule 6.

This Policy shall be applied, with the necessary modifications, in relation to AP(E)s as if references to "Equity Partners" included references to AP(E)s.

10.1    **Secondment allowances and benefits (secondment terms)**

Where an Equity Partner is seconded from the office in which that Equity Partner's Long-term Base (the **"home office"**) to work in another office of the Partnership or of an Associated Firm (the **"host office"**) which is either in another country or in another part of the same country but where conditions are significantly different (e.g. a

secondment from Hong Kong to Beijing), that secondee will be entitled to the benefit of the terms of the Partner Secondment Policy published on PartnerConnect.

The ELG will, from time to time, review the terms of the Partner Secondment Policy (whether in respect of any particular location or generally) and make any changes it considers appropriate.

(*Amended 14 November 2011*)

10.2    **Special Monetary Allowances (local terms)**

The ELG may decide that, taking account of all the circumstances, it is appropriate to pay a Special Monetary Allowance ("**SMA**") to an Equity Partner who has a Long-term Base outside and is working in an office outside that Equity Partner's home country as follows:

10.2.1    An SMA is only to be available in circumstances which the ELG considers exceptional and fair to the Equity Partner concerned, taking into account the overall interests of the Partnership.

10.2.2    In determining the amount of an SMA, the major criteria will be those of (i) overall fairness and (ii) the interests of the Partnership, rather than applying a rigid arithmetical formula.

10.2.3    An SMA will not be fixed for a period of more than two years at a time. The ELG will monitor both the circumstances and the amount so as to ensure that taken together they continue to justify the SMA in the particular case.

10.3    **Special hardship allowances (local terms)**

Where an Equity Partner works for a prolonged period or periods, or for numerous short periods over a prolonged period in any country which is neither that Equity Partner's home country nor Long-term Base and where, if the Partnership or an Associated Firm had maintained an office or if that Equity Partner had been seconded to an office of the Partnership in that country, a hardship allowance would have been payable to the Equity Partner, the ELG may, if it considers that it is appropriate and fair to do so, compensate the Equity Partner by means of a cash payment (a "**Special Hardship Allowance**").

10.3.1    In determining the amount of the Special Hardship Allowance the ELG:

(a)    will take into account the amount of the hardship allowance the Equity Partner would probably have received had the Equity Partner been on secondment terms, the Equity Partner's family circumstances and the length of time the Equity Partner is away from the relevant Long-term Base home and any family, and

(b)    will not take into account the difficulties or pressures arising from the nature of the work concerned, or the amount of work involved, or the number of working hours spent on it, or the fees (if any) resulting to the Partnership either directly or indirectly from the work.

10.3.2   Any Special Hardship Allowance will be paid net of tax in the Equity Partner's hands, the Partnership bearing the tax thereon.

10.4   **Commuting Abroad allowance**

There will be exceptional occasions when an Equity Partner is asked to work to a material extent in an office (the "**work office**") which is at a significant distance from the office where the Equity Partner's family resides (the "**residence office**") (and the latter will usually but not necessarily also be the Equity Partner's home office), but where neither the standard secondment terms nor a change of Long-term Base is appropriate. Examples when this might occur include:

10.4.1   where secondment terms have come to an end and the family has returned to the home office, or perhaps never left it, but the Partnership requests the Equity Partner to remain working at the work office;

10.4.2   where an Equity Partner is asked to "firefight" in another office;

10.4.3   where an Equity Partner holds a management position which requires work to a material extent but not full-time in one or more offices away from the Equity Partner's residence office.

In such situations, it might be impractical to expect the Equity Partner's spouse or family to move near to the relevant work office. Where in the opinion of the Managing Partner or the Executive Partner this is the case, suitable accommodation will be provided for the Equity Partner in the country of the work office, and reasonable travel costs to and from the Equity Partner's residence. In addition, a cost of living allowance will be paid.

All such allowances, payments and benefits will be net of tax in the Equity Partner's hands, the Partnership bearing the tax costs thereon.

Where the beneficiary of any allowance under this Policy is a member of the ELG the allowance must also be approved by the Senior Partner.

This Commuting Abroad allowance is additional to the Special Hardship Allowance (described in paragraph 10.3 above): in an appropriate case the ELG may decide that an Equity Partner should receive both.

**Date Policy adopted:**          **the Effective Date**

10.5   **Exceptional Monetary Allowances**

The ELG may decide that, taking account of the circumstances, it is appropriate to pay an Exceptional Monetary Allowance ("**EMA**") to an Equity Partner. The ELG shall only exercise its discretion as follows:

10.5.1   An EMA is only to be available in circumstances which the ELG considers exceptional and, taking into account the overall interests of the Partnership, that it would not be fair to the Equity Partner if an EMA were not to be paid, and the Partnership Council must agree with that determination as well as the amount and duration of the EMA. For example:

Policies under Schedule 6: Distribution of Remuneration

(a) such circumstances may arise when an Equity Partner has a Long-term Base in a country where the Partnership's structure puts the Equity Partner at a financial disadvantage (taking into account Tax) compared to the position that would apply if the Equity Partner were working for a domestic firm established in that country and entitled to remuneration typical for a partner in such a domestic firm who makes the contribution of the Equity Partner concerned; and

(b) An EMA will not be available on the grounds that the gross remuneration paid by a domestic firm established in the country of the Equity Partner's Long-term Base might be greater than that to which the Equity Partner is entitled under Schedule 5.

10.5.2 In determining the amount of an EMA, the major criteria will be those of (i) overall fairness and (ii) the overall interests of the Partnership, rather than applying a rigid arithmetical formula.

10.5.3 An EMA will not be fixed for a period of more than three years at a time. The ELG will monitor both the circumstances and the amount so as to ensure that taken together they will continue to justify the EMA in the particular case.

*(Added with effect from 23 April 2020)*

## 11. PAYMENT OF PARTNERSHIP PROFITS TO A FORMER EQUITY PARTNER: ELG POLICY

11.1 This Policy is made under paragraph 13 of Schedule 6.

This Policy shall be applied, with the necessary modifications, in relation to AP(E)s as if references to "Equity Partners" included references to AP(E)s.

The general principle which will apply to the payment of undrawn Partnership Profits due to an Equity Partner who has ceased to be an Equity Partner is that monthly drawings on account will end when an Equity Partner ceases to be an Equity Partner, but distributions of the balance of Partnership Profits for any Financial Year during which that Equity Partner has been an Equity Partner will be made in the same way and to the same extent as distributions of undrawn Partnership Profits for the relevant Financial Years are made to continuing Equity Partners. However they may be distributed earlier and all or part of the former Equity Partner's Tax Reserve may be released:

11.1.1 to the extent that the Managing Partner is satisfied that the earlier distribution of the former Equity Partner's undrawn Partnership Profits will confer a significant financial advantage on the Partnership or an Associated Firm, or

11.1.2 if:

(a) the Equity Partner will cease to be an Equity Partner to take up a partnership, position or appointment which forbids the Equity Partner from having any entitlement to a share of Partnership Profits for any Financial Year which would become payable after ceasing to be an Equity Partner or to a return of capital or any other amounts which the

Policies under Schedule 6: Distribution of Remuneration

Partnership would pay the Equity Partner after ceasing to be an Equity Partner;

(b)　　the Equity Partner requests the Senior Partner or Managing Partner to facilitate the Equity Partner's opportunity to take up such partnership, position or appointment by settling some or all of such entitlements with a payment on or after the date that the Equity Partner ceases to be an Equity Partner and before taking up a new partnership, position or appointment; and

(c)　　the Managing Partner believes it is in the best interests of the Partnership to comply with the Equity Partner's request.

11.2　　If paragraph 11.1.2 applies the Managing Partner may agree that an Equity Partner's entitlement to a share of Equity Remuneration or a Partner Annuity be settled before the signing of the Partnership Financial Report for relevant Financial Years. A Partner Annuity so settled will normally be paid as a share of the Equity Partner's Partnership Profit for the Financial Year in which that Equity Partner ceases to be an Equity Partner. The Equity Partner's entitlement to a share of Equity Remuneration or to a Partner Annuity that is calculated by reference to the value of a Unit will be determined by reference to the latest estimate of the Unit value for the relevant Financial Year which is available to the ELG at the time of the settlement (taking into account that the value of a Retirement Annuity Unit will not exceed £2,035) subject to such discount to reflect net present value as the Managing Partner believes is appropriate.

*(Amended with effect from 1 January 2008, with effect from 1 May 2017 and with effect from 1 May 2021)*

11.3　　If paragraph 11.1.2 applies and the Managing Partner agrees that the Partnership will pay the Equity Partner any other amounts then due or accrued from the Partnership or any Associated Firm to the Equity Partner at the time that Equity Partner ceases to be an Equity Partner, any sums accrued shall be calculated on a fair and reasonable basis.

11.4　　The Partnership's Policy on the Equity Partner's Tax Reserve will apply to:

11.4.1　　the payment of the balance of undrawn Partnership Profits to an Equity Partner who has ceased to be an Equity Partner; and

11.4.2　　a payment to an Equity Partner under paragraph 11.2 or 11.3, unless the Managing Partner agrees otherwise.

The Partnership may apply the positive balance on the Tax Reserve account of an Equity Partner who has ceased to be an Equity Partner in the payment of Tax attributable to that Equity Partner's Partnership Profit without any reference to that Equity Partner.

The Partnership will, at no cost to the retiring Equity Partner, assist the Equity Partner in the same way as previously in completing the Equity Partner's Tax returns in respect of income and gains for any Tax year during which that Equity Partner was an Equity Partner.

Policies under Schedule 6: Distribution of Remuneration

The Partnership will make available to the Equity Partner, the Equity Partner's professional advisers and the appropriate Tax authorities such information and documents as may reasonably be required in order to deal with the Equity Partner's Tax affairs.

*(Amended with effect from 1 January 2008)*

11.5    The Partnership or an Associated Firm is entitled to deduct from any undrawn Partnership Profits due to an Equity Partner who has ceased to be an Equity Partner any sums which it has paid or will pay on the Equity Partner's behalf or any sums which may be due to the Partnership or an Associated Firm from the former Equity Partner.

If paragraph 11.1.2 applies, deduction for sums accrued to the Partnership or an Associated Firm from the former Equity Partner will be made and calculated on a fair and reasonable basis.

11.6    In the circumstances set out below, interest will be payable by the Partnership to an Equity Partner who has ceased to be an Equity Partner or by a former Equity Partner to the Partnership. In such cases interest will be payable at the rate determined by the Managing Partner or the Executive Partner to be the interest rate for the period in question at which the Partnership borrows its principal long-term funding. Interest is payable:

11.6.1    by the Partnership if there is any delay in the payment of any amount due to a former Equity Partner in respect of the period from the latest date for payment under this Policy until the actual date of payment;

11.6.2    by the former Equity Partner to the Partnership in respect of any amounts overpaid to former Equity Partner: any such amounts will be due to the firm one month after the former Equity Partner has been notified of the amount of the overpayment, and interest will become payable for the period from the date such amounts become due until actual payment.

**Date Policy adopted:**          **the Effective Date**

**Policies under Schedule 7**

**Capital: ELG Policy**

1.  **INTRODUCTION**

    This Policy is made under Schedule 7.

    This Policy shall be applied, with the necessary modifications, in relation to AP(E)s as if references to "Equity Partners" included references to AP(E)s.

2.  **AMOUNT OF CONTRIBUTION**

    The ELG's general rule is that an Equity Partner shall contribute capital equal to £2,035 for every Unit held by that Equity Partner. However, the ELG shall disregard a deemed reduction in the number of Units that an Equity Partner is treated as holding by virtue of paragraph 1.3 of Schedule 5 (*becoming or ceasing to be an Equity Partner part way through a Financial Year*).

    *(Amended 29 January 2010, with effect from 1 May 2017, and with effect from 1 May 2021)*

3.  **CURRENCY OF CONTRIBUTION**

    The currency for contributions shall be the Accounts Currency.

4.  **TIMING OF CONTRIBUTIONS**

    An Equity Partner shall contribute capital within 6 months from (i) becoming an Equity Partner and (ii) the beginning of each Financial Year in which the number of Units held by that Equity Partner increases by virtue of Schedule 5, or in either case such later date as may be determined by the Managing Partner or Executive Partner.

    *(Amended 21 October 2008 and 29 January 2010 and with effect from 1 May 2015 and 1 May 2017 and 15 March 2024)*

5.  **EQUITY PARTNER FUNDING**

5.1 The currency for borrowings under the arrangements mentioned in paragraph 2.2.1 of Schedule 7 shall be the Accounts Currency.

5.2 An Equity Partner who has borrowed from a bank in order to pay a capital contribution shall give the Executive Partner (or such person as the Executive Partner may specify) a copy of the agreement and any documents relating to the relevant loan, any variation of the agreement or documents and any notice or demand made by the bank requiring repayment of the loan, and agrees that the relevant bank and the Partnership may exchange information with the bank about the Equity Partner's loan.

6.    **FAILURE TO CONTRIBUTE CAPITAL**

The rate of interest referred to in paragraph 2.3.1(a) of Schedule 7 shall be 2% per annum accruing daily and compounding on each date on which the Partnership must pay interest under its principal loan facility.

7.    **CAPITAL-RELATED PROFIT**

7.1    The timing of payments of capital-related profit depends on whether a Firm Equity Partner has borrowed money under arrangements with banks referred to in paragraph 2.2.1 of Schedule 7.

7.2    For a Firm Equity Partner who has borrowed money under such arrangements, each payment of capital-related profit shall be made:

7.2.1    (a) a date corresponding to the interest payment date applicable under the arrangements with banks referred to in paragraph 2.2.1 of Schedule 7; or (b) if there is more than one facility available under those arrangements and the interest payment dates applied under those facilities are not identical, such one of those dates as the Managing Partner or the Executive Partner shall decide from time to time; and

7.2.2    in respect of the period since the date of the immediately preceding payment of a capital-related profit.

7.3    For any other Firm Equity Partner, each payment of capital-related profit shall be made on the same dates as Special Distributions (as referred to in paragraph 3.4 of the Policies under Schedule 6) are paid and in respect of the next quarter to end after the date of the Special Distribution (and only to the extent that such capital-related profit has not already been paid). If no Special Distribution is paid during a quarter and the Partnership is not in arrears with capital-related profit payable under paragraph 7.2, the capital-related profit payable under this paragraph 7.3 for that quarter shall be paid at the end of the quarter. For this purpose, each quarter is a three-month period which ends on 31 July, 31 October, 31 January and 30 April. When the subsequent Special Distribution is paid the Firm Equity Partner's capital-related profit will be adjusted to correct any difference between an estimate of the Relevant Rate for the preceding quarter and the actual Relevant Rate for the preceding quarter.

7.4    The currency for payments of capital-related profit shall be the Accounts Currency.

*(Amended with effect from 1 December 2015)*

8.    **ASSOCIATED FIRM EQUITY PARTNERS AND EMPLOYED EQUITY PARTNERS**

The ELG delegates its authority under paragraph 3 of Schedule 7 to each of the Managing Partner and the Executive Partner.

*(Added with effect from 1 September 2014)*

**Date Policies adopted:**            **the Effective Date**

**Policies under Schedule 8**

**Partnership Decisions and Meetings: Partnership Council Policies**

1.    **VOTING PERIODS**

The voting period on a ballot will be at least seven days unless the Senior Partner or Managing Partner determines that a shorter period is appropriate in all the circumstances.

2.    **CONVENING OF PARTNERS' MEETINGS**

2.1    The Senior Partner (or the Managing Partner if the Managing Partner has convened the same) will decide at what time and place any meeting of Partners and any meeting of Equity Partners will be held.  Such a meeting may be conducted in several places by means of video or audio conference facilities.

2.2    At least 10 days' prior notice of any meeting of Partners will be given to each Partner. At least 10 days' prior notice of any meeting of Equity Partners will be given to each Equity Partner. The convenor of the meeting (i.e. the Senior Partner or Managing Partner as applicable) may convene any such meeting on shorter notice if determines that a shorter notice period is appropriate in all the circumstances. The notice will outline the matters to be considered at the meeting. If a formal decision of the Partners or Equity Partners is to be sought at the meeting, a ballot paper shall be sent with or following the notice for use when a secret ballot is held during (or immediately following) the meeting.

2.3    If at least a tenth of the Partners or at least a tenth of the Equity Partners makes a request in writing to the Senior Partner or, in the absence of the Senior Partner, the Managing Partner, that a meeting of Partners or Equity Partners be convened, such meeting shall be held within 21 days of the date of the request.

3.    **CONDUCT OF MEETINGS**

The Senior Partner or, in the absence of the Senior Partner, the Managing Partner, will chair meetings of Partners and meetings of Equity Partners and the meetings shall be conducted as the chair sees fit.  If the chair adjourns a meeting of Partners or Equity Partners to another occasion, at least seven days' prior notice of the adjourned meeting will be given to each Partner or Equity Partner, as the case may be, unless the chair determines that a shorter period is appropriate in all the circumstances.

4.    **ALL PARTNERS' MEETING**

Unless the Partnership Council decides otherwise, the Senior Partner is expected to convene a meeting of the Partnership no less than every 24 months at which:

4.1    the Managing Partner will deliver a "state of the firm" address; and

4.2    Partners will have an opportunity to ask questions of those holding leadership and management positions.

*(Amended with effect from 24 October 2024)*

- 37 -

Policies under Schedule 8: Partnership Decisions and Meetings

**Date Policies adopted:**          **the Effective Date**

**Policies under Schedule 9**

**Governance and Management**

(***Note:*** *References to Partnership shall include Associated Firms*).

1.    **RESPONSIBILITIES OF ELG: PARTNERSHIP COUNCIL POLICY**

1.1    This Policy is made pursuant to paragraph 2.1.1 of Schedule 9.

This Policy will be applied, with the necessary modifications, in relation to Approved Persons as if references to "Partners" included references to Approved Persons.

The Partnership Council may only amend or cancel this Policy with the agreement of the Executive Leadership Group.

1.2    The responsibilities of the ELG include:

1.2.1    setting, developing, sponsoring and implementing the strategy of the Partnership;

1.2.2    developing and protecting the Clifford Chance brand and reputation and developing the client-base of the Partnership in accordance with the strategy;

1.2.3    organising and overseeing the management of such Global Business Units, global practice areas, regions and sector and product groups as it considers to be appropriate for the successful implementation of the strategy and overseeing their management (including through establishing the roles of those in charge and the reporting lines of those reporting to them; setting the objectives of those in charge; and monitoring the performance of the relevant Global Business Units, global practice areas, regions and groups);

1.2.4    fostering the values and standards of the Partnership (including a collaborative and collegiate culture among Partners) and seeking to ensure that an appropriately diverse range of Partners with potential talent for leadership or management is suitably prepared and encouraged to take on future roles in leadership and management;

1.2.5    the financial performance of the Partnership, with the objective that the Partnership achieve strong financial performance in the context of the strategy;

1.2.6    the setting and monitoring of budgets for the Partnership and for the Global Business Units, global practice areas and, if deemed appropriate by the ELG, such other regions and groups as it determines from time to time;

1.2.7    the major commitments of the Partnership, including commitments relating to premises, fitting out premises, IT contracts and outsourcing contracts;

1.2.8    setting, implementing and monitoring procedures to manage the professional and other risks faced by the Partnership, including procedures to ensure compliance with law and regulation and to ensure business continuity;

1.2.9    the funding of the Partnership; and

1.2.10    the operations of the Partnership and seeking to ensure, with appropriate innovation, that operations meet clients' expectations that law firms become more efficient.

**Date Policy adopted: with effect from 1 September 2014**

2.    **GBUS, GLOBAL PRACTICE AREAS AND REGIONS: ELG POLICY**

This Policy is made pursuant to paragraph 2.3.4 of Schedule 9.

2.1    The Global Business Units and the global practice areas which they embrace are:

2.1.1    Global Financial Markets: the Finance practice and the Capital Markets practice;

2.1.2    Global M&A and Corporate Transactions/Advisory: the Corporate practice and the Real Estate practice; and

2.1.3    Global Risk Management and Dispute Resolution: the L&DR practice.

2.2    The global TPE practice is not part of a GBU.

2.3    The following regions have Regional Managing Partners: the Americas, Asia Pacific, Europe and the Middle East.

**Date Policy adopted: with effect from 1 September 2014 and amended with effect from 24 October 2024**

3.    **DECISION-MAKING PROCESSES OF ELG: ELG POLICY**

This Policy is made pursuant to paragraph 2.4 of Schedule 9.

3.1    The ELG will meet when convened by the Managing Partner. Except where the Managing Partner considers that there are circumstances which require a meeting to be held urgently, at least one week's notice will be given of each meeting.

The Managing Partner will invite the Partnership Council to meetings of the ELG twice a year and on dates agreed with the Senior Partner, unless the Managing Partner and Senior Partner together decide one meeting is sufficient. The Partnership Council will normally attend the ELG meeting at which the ELG conducts its major annual review of the strategy and business planning of the Partnership.

*(Amended with effect from 24 October 2024)*

3.2    Except to the extent that Special Circumstances (defined below) apply:

3.2.1    PartnerConnect will show all ELG meetings scheduled from time to time; and

3.2.2    not less than three days in advance of a meeting the agenda for the meeting will be posted on PartnerConnect and the relevant papers will be posted on PartnerConnect.

If, due to a meeting being convened at short notice, an agenda is not posted in advance on PartnerConnect, the Managing Partner will ensure that the relevant meeting is minuted.

3.3    When the agenda and papers for an ELG meeting are sent to the ELG they will also be sent to the Senior Partner and, subject to paragraph 3.9, to the rest of the Partnership Council.

3.4    If the Managing Partner considers that it is appropriate to allow those ELG members who have a vote ("**voting members**") to appoint proxies, the Managing Partner will so inform the ELG. In that case, a voting member may by writing to the Managing Partner appoint the Managing Partner or another member of the ELG as proxy to vote or abstain on behalf of the voting member on one or more specified proposals on the relevant agenda. A voting member whose powers and responsibilities are held by another Equity Partner following a decision by the Managing Partner under paragraph 2.6.6 of Schedule 9 may not appoint a proxy.

If the proxy is present at the relevant meeting and willing to act as proxy:

3.4.1    the voting member who has appointed the proxy will be deemed to be present for the purposes of establishing whether the ELG is quorate when it considers the proposal; and

3.4.2    when the ELG votes on the proposal, the proxy may exercise the vote of, or abstain on behalf of, the relevant voting member.

3.5    The ELG may meet by the use of video or audio conference facilities.

Meetings of the ELG will be chaired by the Managing Partner or, in the Managing Partner's absence, the Executive Partner.

The quorum for a meeting will be not less than half of the voting members. If the chair calls a vote on any matter each voting member of the ELG present in person or by proxy will have one vote. Decisions of the ELG will be taken by a simple majority of votes cast. The Managing Partner will have a casting vote in the case of an equality of votes.

If a Termination Notice or a Suspension Notice is in force against a member of the ELG then that member will be deemed not to be a member.

If the Managing Partner believes it appropriate non-members may be invited by the Managing Partner to attend meetings of the ELG or to attend such meetings for certain agenda items.

*(Amended with effect from 1 March 2010)*

3.6    A member of the ELG will not be involved in reaching a decision on any matter in which that member is concerned personally other than as one of a group of Equity Partners and when the Agreement provides that the approval or consent of the ELG is required in relation to such a matter the relevant member will be deemed not to be a voting member of the ELG when the ELG reaches its decision on the matter.

Policies under Schedule 9: Governance and Management

3.7     When the minutes of an ELG meeting are finalised they will be sent to the Senior Partner.

The minutes of each meeting of the ELG will be posted on PartnerConnect within two weeks after the meeting except in unforeseen and exceptional circumstances or to the extent that Special Circumstances apply.

3.8     A decision in writing agreed by each voting member of the ELG will be as valid and effectual as if it had been passed at a meeting of the ELG duly convened and held and may consist of several documents.

Except to the extent that Special Circumstances apply:

3.8.1     the proposed resolution and the relevant papers will be posted on PartnerConnect when they are submitted to the ELG; and

3.8.2     the ELG's decision will be communicated to Partners promptly after it is made.

With appropriate modifications paragraph 3.3 will apply to the proposed resolution and papers and paragraph 3.7 will apply to the record of the decision.

3.9     In this Policy **"Special Circumstances"** means that the Managing Partner and the Senior Partner have agreed that a matter ought not to be communicated to Partners generally because it is too sensitive or confidential.

In Special Circumstances, the relevant agenda, papers or minutes may be redacted to remove the parts which the Managing Partner and the Senior Partner consider too sensitive or confidential to be communicated to Partners generally or to be sent to the Partnership Council.

If, because of Special Circumstances, the agenda, papers or minutes are redacted, the unredacted agenda, papers and minutes will be made available to the Partnership Council. If the Managing Partner and the Senior Partner consider that the unredacted agenda, papers or minutes are too sensitive or confidential to be sent to the Partnership Council, they will agree on appropriate redactions to the relevant agenda, papers and minutes and the redacted versions will be made available to the Partnership Council instead.

*(Amended with effect from 1 March 2010)*

**Date Policy adopted: the Effective Date, amended with effect from 1 September 2014**

4.     **SOUNDINGS ON APPOINTMENTS OF GBU LEADERS AND REGIONAL MANAGING PARTNERS TO ELG: PARTNERSHIP COUNCIL POLICY**

This Policy is made pursuant to paragraph 2.6.1 of Schedule 9.

This Policy will be applied, with the necessary modifications, in relation to Approved Persons as if references to "Partners" included references to Approved Persons.

This Policy will be applied, with the necessary modifications, in relation to AP(E)s as if references to "Equity Partners" included references to AP(E)s.

4.1    The purpose of soundings on appointments of GBU Leaders, Global Practice Area Leaders and Regional Managing Partners is to gather views from relevant Partners on any Equity Partner who has expressed an interest in being considered to lead and manage the relevant GBU, global practice area or region in accordance with paragraph 2.1.2 of Schedule 9 (whether or not they are members of the ELG).

*(Amended with effect from 23 April 2020)*

4.2    The soundings will be carried out by such members of the Partnership Council and other Partners as the Partnership Council decides ("**Soundings Group**").

4.3    The Soundings Group will agree with the Managing Partner the appropriate process for soundings on each appointment.

The Soundings Group will keep each Partner's views anonymous unless otherwise agreed by a Partner.

4.4    The Soundings Group will report the outcome of its soundings to the Managing Partner and the Partnership Council.

**Date Policy adopted: with effect from 1 September 2014**

5.    **DECISION-MAKING PROCESSES OF PARTNERSHIP COUNCIL: PARTNERSHIP COUNCIL POLICY**

This Policy is made pursuant to paragraph 3.4 of Schedule 9.

5.1    The Partnership Council will meet when convened by the Senior Partner.  If any member of the Partnership Council so requires, the Senior Partner will convene a meeting of the Partnership Council.  Except where the Senior Partner considers that there are circumstances which require a meeting to be held urgently, at least two weeks' notice shall be given of each meeting.

*(Amended with effect from 1 March 2010)*

5.2    Except to the extent that Special Circumstances (defined below) apply:

5.2.1    PartnerConnect will show all Partnership Council meetings scheduled from time to time; and

5.2.2    not less than one week in advance of a meeting the agenda for the meeting will be posted on PartnerConnect and the relevant papers will be posted on PartnerConnect.

5.3    When the Partnership Council decides a matter by a vote each member will have one vote, subject to the rest of this Policy.

5.4    If the Senior Partner considers that it is appropriate to allow members to appoint proxies, the Senior Partner will so inform the Partnership Council.  In that case, a

member of the Partnership Council may by writing to the Senior Partner appoint the Senior Partner or another member of the Partnership Council as a proxy to vote or abstain on behalf of the relevant member on one or more specified proposals on the relevant agenda. A member of the Partnership Council whose powers and responsibilities are held by another Partner following a decision by the Partnership Council under paragraph 3.7.3 of Schedule 9 may not appoint a proxy.

If the proxy is present at the relevant meeting and willing to act as proxy:

5.4.1   the member who has appointed the proxy will be deemed to be present for the purposes of establishing whether the Partnership Council is quorate when it considers the proposal; and

5.4.2   when the Partnership Council votes on the proposal, the proxy may exercise the vote of, or abstain on behalf of, the relevant voting member.

5.5   The Partnership Council may meet by the use of video or audio conference facilities.

Meetings of the Partnership Council will be chaired by the Senior Partner or, in the Senior Partner's absence, a member of the Partnership Council elected by those present.

The quorum for a meeting will be not less than half of the members. If the chair calls a vote on any matter each member of the Partnership Council present in person or by proxy will have one vote. Decisions of the Partnership Council will be taken by a simple majority of votes cast. The Senior Partner will have a casting vote in the case of an equality of votes.

If a Termination Notice or a Suspension Notice is in force against a member of the Partnership Council then that member will be deemed not to be a member.

The Managing Partner will have a standing invitation to attend meetings of the Partnership Council but the Senior Partner may, if the Senior Partner is of the opinion that it would be appropriate to do so, require the Managing Partner does not attend a meeting while particular items are discussed.

If the Senior Partner believes it appropriate the Senior Partner may invite non-members to attend meetings of the Partnership Council or to attend such meetings for certain agenda items.

*(Amended with effect from 1 March 2010)*

5.6   A member of the Partnership Council will not be involved in reaching a decision on any matter in which that member is concerned personally other than as one of a group of Partners, and when the Agreement provides that the approval or consent of the Partnership Council is required in relation to such a matter the relevant member will be deemed not to be a member of the Partnership Council when the Partnership Council reaches its decision on the matter.

5.7   Minutes of each meeting of the Partnership Council will be posted on PartnerConnect within two weeks after the meeting except in unforeseen and exceptional circumstances or to the extent that Special Circumstances apply.

5.8    A decision in writing agreed by each member of the Partnership Council entitled to attend and vote at a meeting will be as valid and effectual as if it had been passed at a meeting of the Partnership Council duly convened and held and may consist of several documents.

Except to the extent that Special Circumstances apply:

5.8.1    the proposed resolution and the relevant papers will be posted on PartnerConnect; and

5.8.2    the Partnership Council's decision will be communicated to Partners promptly after it is made.

5.9    In this Policy "**Special Circumstances**" means that a matter, in the opinion of the Senior Partner, ought not to be communicated to Partners generally because it is too sensitive or confidential.

In Special Circumstances, the relevant agenda, papers and minutes may be redacted to remove the parts which the Senior Partner considers to be too sensitive or confidential to be communicated to Partners generally.

**Date Policy adopted:        the Effective Date, amended with effect from 1 September 2014**

6.    **DECISION-MAKING PROCESSES OF DESIGNATED MEMBERS: ELG POLICY**

This Policy is made pursuant to paragraph 5 of Schedule 9. Its provisions only apply when Designated Members are required to reach a collective decision.

6.1    Any Designated Member may convene a meeting of Designated Members on not less than two days' notice or a shorter notice period agreed by the Managing Partner or all of them.

6.2    Designated Members may meet by the use of video or audio conference facilities.

6.3    Meetings of Designated Members will be chaired by the Managing Partner or, in the Managing Partner's absence, a Designated Member selected by those present.

6.4    The quorum for a meeting will be not less than two Designated Members. If a vote is required on any matter each Designated Member will have one vote and decisions of Designated Members will be taken by a simple majority of votes cast. The Managing Partner will have a casting vote in the case of an equality of votes.

6.5    A resolution in writing agreed by each Designated Member will be as valid and effectual as if it had been passed at a meeting of them duly convened and held and may consist of several documents in like form.

**Date Policy adopted:        the Effective Date**

Policies under Schedule 9: Governance and Management

7.    **ELECTIONS: PARTNERSHIP COUNCIL POLICY**

These Policies concern the election of elected members of the Partnership Council, the Senior Partner and the Managing Partner.

This Policy will be applied, with the necessary modifications, in relation to Approved Persons as if references to "Partners" included references to Approved Persons.

This Policy will be applied, with the necessary modifications, in relation to AP(E)s as if references to "Equity Partners" included references to AP(E)s.

The Senior Partner will have the discretion to vary a minimum period or deadline set out in these Policies in such a way as the Senior Partner considers to be fair and reasonable in the circumstances.

*Proviso*

If the Senior Partner is a candidate for the relevant position, the Senior Partner's authority under these Policies will be vested in the Partnership Council.

*(Amended 12 July 2012 and amended with effect from 1 September 2014)*

7.1    **Partnership Council**

7.1.1    This Policy is made pursuant to paragraph 3.5.1 of Schedule 9 and sets out the procedures for the election of Partners to be elected to the Partnership Council. The procedures for the election of the Senior Partner are set out subsequently.

For the purposes of the voting procedure, the **"secretary"** is the person or persons nominated as such by the Senior Partner.

7.1.2    Before a Partnership Council election, the Senior Partner will invite Partners who would like to be elected to make their willingness known by a simple email to all Partners to that effect and to send to the secretary any manifesto they would wish to give Partners.

7.1.3    All Partners will be invited to vote for up to the **"relevant number"** of Partners. The relevant number is the number of Partnership Council positions for which there is or is to be a vacancy or such greater number as the Senior Partner may decide.

The secretary will make the manifestos available to all Partners on PartnerVote or otherwise. The ballot will be conducted in secret and will close at least a week later.

7.1.4    The Partners elected will be the number for which there is or is to be a vacancy gaining the highest number of votes. However, if a Partner's election would mean the Partnership Council would have more than two elected members based in one country (disregarding the Senior Partner), that Partner's election will be disqualified and the vacancy will be taken by a Partner not so disqualified with the next highest number of votes. In the case of an equality of votes, the Senior Partner will decide which Partner will take the vacancy.

*(Amended with effect from 1 March 2010 and amended with effect from 1 September 2014)*

### 7.2    Senior Partner

7.2.1    This Policy is made pursuant to paragraph 3.5.1 of Schedule 9 and sets out the procedures for the election of the Senior Partner.

For the purposes of the voting procedure the **"secretary"** is the person or persons nominated as such by the Senior Partner.

Note the proviso in the introduction to this paragraph 7.

*(Amended with effect from 1 September 2014)*

7.2.2    The Partnership Council will:

(i)    consult members of the ELG, Regional Managing Partners and such others as it considers appropriate on who could be a good Senior Partner;

(ii)    encourage Equity Partners whom it considers potentially suitable for the role to seek nominations; and

(iii)    invite all Partners to nominate up to five Equity Partners as candidates by written notification to the secretary.

*(Amended with effect from 1 September 2014)*

7.2.3    Each of the five Equity Partners with the most nominations will be told:

(a)    the identity of the five nominees; and

(b)    the number of nominations they have received,

and each person nominated will be asked within seven days:

(i)    to notify the secretary in writing of a wish to stand for election as Senior Partner (and a duly made notification in the affirmative makes such person a **"willing candidate"**); and

(ii)    to send any manifesto that person would wish to give Partners to the secretary.

7.2.4    If any of the five nominated Equity Partners notifies the secretary in writing within the seven day deadline of an intention not to stand for election, the others will be told of that decision.

If a nominated Equity Partner does not notify the secretary in writing of a wish to stand for election within the seven day deadline, that nominee will be deemed to have declined.

7.2.5    The five willing candidates with the highest number of nominations will be shortlisted as candidates for election provided that:

(a)    if there are less than five willing candidates all will be shortlisted for election; and

(b)    if there is only one willing candidate that candidate will be put forward for election and elected if endorsed by Ordinary Resolution of Partners.

7.2.6    All Partners will be told who the shortlisted candidates are once the seven day deadline is over. Save as stated above no Partner will be told who is nominated and how many nominations are received. Equity Partners who are given such information because they have been nominated will not disclose it to anyone else.

7.2.7    Each Partner will be invited to elect one of the shortlisted candidates as Senior Partner promptly after the shortlisted candidates have been announced. The secretary will make the shortlisted candidates' manifestos available to all partners on PartnerVote or otherwise. The ballot will be conducted in secret and will close at least one week later.

7.2.8    A shortlisted candidate approved by Ordinary Resolution of Partners will be elected as the Senior Partner.

If no shortlisted candidate is approved by Ordinary Resolution of Partners:

(a)    there will be eliminated from the election any shortlisted candidate coming fourth and fifth in the first ballot or, if there were only three shortlisted candidates, the shortlisted candidate coming third in the first ballot. In the case of an equality of votes, the Equity Partner with the lesser number of nominations will be eliminated;

(b)    the remaining shortlisted candidates will be told the number of votes received by all in the first ballot (and they will not disclose this information to anyone else);

(c)    each Partner will be invited to elect one of the remaining shortlisted candidates (excluding any who have withdrawn from the election) as Senior Partner promptly after the close of the first ballot. Each Partner will be told how many votes were received by those standing in the second ballot unless the Senior Partner decides otherwise. The second ballot will be conducted in secret and will close at least three business days later; and

(d)    a shortlisted candidate approved by Ordinary Resolution of Partners will be elected as the Senior Partner.

7.2.9    If no shortlisted candidate is approved by Ordinary Resolution of Partners in the second ballot:

(a)    the shortlisted candidate with the fewest votes in the second ballot will be eliminated from the election. In the case of an equality of votes the

candidate who gained the lesser number of votes in the first ballot will be eliminated;

(b)     the two remaining shortlisted candidates will be told the number of votes received by all in the second ballot (and they will not disclose this information to anyone else);

(c)     each Partner will be invited to elect one of the two remaining shortlisted candidates as Senior Partner promptly after the close of the second ballot (excluding any who have withdrawn from the election). Each Partner will be told how many votes were received by those standing in the third ballot unless the Senior Partner decides otherwise. The third ballot will be conducted in secret and will close at least three business days later; and

(d)     the shortlisted candidate approved by Ordinary Resolution of Partners will be elected as the Senior Partner provided that in the case of an equality of votes, the Equity Partner who received the highest number of votes in the second ballot will be elected.

*(Amended 12 July 2012)*

### 7.3     Managing Partner

7.3.1    This Policy is made pursuant to paragraph 2.5.2 of Schedule 9 and sets out the procedures for the election of the Managing Partner.

For the purposes of the voting procedure the **"secretary"** is the person or persons nominated as such by the Senior Partner.

*(Amended with effect from 1 September 2014)*

7.3.2    The Partnership Council will:

(i)     consult members of the ELG, Regional Managing Partners and such others as it considers appropriate on who could be a good Managing Partner;

(ii)    encourage Equity Partners whom it considers potentially suitable for the role to seek nominations; and

(iii)   invite all Partners to nominate up to five Equity Partners as candidates by written notification to the secretary.

*(Amended with effect from 1 September 2014)*

7.3.3    Each of the five Equity Partners with the most nominations will be told:

(a)     the identity of the five nominees; and

(b)     the number of nominations they have received,

and each will be asked within seven days:

>  (i)  to notify the secretary in writing of a wish to stand for election as Managing Partner (and a duly made notification in the affirmative makes such person a **"willing candidate"**); and
>
>  (ii)  to send any manifesto that person would wish to give Partners to the secretary.

7.3.4  If any of the five nominated Equity Partners notifies the secretary in writing within the seven day deadline of an intention not to stand for election, the others will be told of that decision.

If a nominated Equity Partner does not notify the secretary in writing of a wish to stand for election within the seven day deadline, that nominee will be deemed to have declined.

7.3.5  The five willing candidates with the highest number of nominations will be shortlisted for election provided that:

>  (a)  if there are less than five willing candidates all will be shortlisted for election; and
>
>  (b)  if there is only one willing candidate that candidate will be put forward for election and elected if approved by Ordinary Resolution of Partners.

*(Amended with effect from 15 September 2021)*

7.3.6  All Partners will be told who the shortlisted candidates are once the seven day deadline is over. Save as stated above no Partner will be told who is nominated and how many nominations are received. Equity Partners who are given such information because they have been nominated will not disclose it to anyone else.

7.3.7  Each Partner will be invited to elect one of the shortlisted candidates as Managing Partner promptly after the shortlisted candidates have been announced. The secretary will make the shortlisted candidates' manifestos available to all partners on PartnerVote or otherwise. The ballot will be conducted in secret and will close at least one week later.

7.3.8  A shortlisted candidate approved by Ordinary Resolution of Partners will be elected as the Managing Partner.

If no shortlisted candidate is approved by Ordinary Resolution of Partners:

>  (a)  there will be eliminated from the election any shortlisted candidate coming fourth or fifth in the first ballot or, if there were only three shortlisted candidates, the shortlisted candidate coming third in the first ballot. In the case of an equality of votes, the Equity Partner with the lesser number of nominations will be eliminated;

(b)    the remaining shortlisted candidates will be told the number of votes received by all in the first ballot (and they will not disclose this information to anyone else);

(c)    each Partner will be invited to elect one of the remaining shortlisted candidates as Managing Partner promptly after the close of the first ballot (excluding any who have withdrawn from the election). Each Partner will be told how many votes were received by those standing in the second ballot unless the Senior Partner decides otherwise. The second ballot will be conducted in secret and will close at least three business days later; and

(d)    the shortlisted candidate approved by Ordinary Resolution of Partners will be elected as the Managing Partner.

*(Amended with effect from 15 September 2021)*

7.3.9    If no shortlisted candidate is approved by Ordinary Resolution of Partners in the second ballot:

(a)    the shortlisted candidate with the fewest votes in the second ballot will be eliminated from the election. In the case of an equality of votes the candidate who gained the lesser number of votes in the first ballot will be eliminated;

(b)    the two remaining shortlisted candidates will be told the number of votes received by all in the second ballot (and they will not disclose this information to anyone else);

(c)    each Partner will be invited to elect one of the two remaining shortlisted candidates as Managing Partner promptly after the close of the second ballot (excluding any who have withdrawn from the election). Each Partner will be told how many votes were received by those standing in the third ballot unless the Senior Partner decides otherwise. The third ballot will be conducted in secret and will close at least three business days later; and

(d)    the shortlisted candidate approved by Ordinary Resolution of Partners will be elected as the Managing Partner provided that in the case of an equality of votes, the Equity Partner who received the highest number of votes in the second ballot will be elected.

*(Amended 12 July 2012 and amended with effect from 1 September 2014 and 15 September 2021)*

7.4    **Candidates**

7.4.1    This Policy is made pursuant to paragraphs 2.5.2 and 3.5.1 of Schedule 9.

If the Senior Partner is a candidate for the relevant position, the Senior Partner's authority under these Policies will be vested in the Partnership Council.

Policies under Schedule 9: Governance and Management

7.4.2   Partners who want to stand for any position to be elected by Partners will follow the following rules.

(a)   A Partner willing to stand for election may make such willingness to do so known by a simple email to that effect;

(b)   Each candidate may prepare a single manifesto of up to three pages or such greater length as the Senior Partner may agree for all the candidates, and the secretary will provide the manifesto to all Partners;

(c)   Unless allowed more latitude pursuant to paragraph 7.4.3, each candidate may canvass each Partner once, in person or by phone, as well as in the course of any formal hustings approved by the Senior Partner, and there must be no travel for the purpose of canvassing votes except for the purpose of formal hustings so approved; and

(d)   Candidates should not seek to circumvent these rules by having others campaign on their behalf.

7.4.3   The Senior Partner may agree such variations to the rules in paragraph 7.4.2 as the Senior Partner believes appropriate in order to facilitate open and fair elections.

Each candidate for election as Managing Partner may canvass votes and travel for the purpose of canvassing votes in accordance with rules agreed by the Senior Partner, who will take into account that an Equity Partner who has not held a global role in the management of the Partnership and Associated Firms may be disadvantaged unless that person is allowed more latitude to travel than a candidate who has held such a role.

Each candidate for election as Senior Partner may canvass votes and travel for the purpose of canvassing votes in accordance with rules agreed by the Senior Partner, which will take into account that an Equity Partner who has not held a global role in the management of the Partnership and Associated Firms may be disadvantaged unless allowed more latitude than a candidate who has held such a role.

*(Amended 12 July 2012 and amended with effect from 1 September 2014)*

7.5   **Partners**

No Partner, whether a candidate or not, may disclose to the press any information about an election of a Partner to a position within the Partnership or any Associated Firm.

**Date Policy adopted:**          **the Effective Date**

**Policies under Schedule 11**

**Registers**

1. **REGISTER OF PARTNERS: PARTNERSHIP COUNCIL POLICY**

1.1    A separate register will be maintained for each category of Partner (as referred to in paragraph 1 of Schedule 1). Each such register will record in respect of each Partner:

    1.1.1    full name;

    1.1.2    the effective date of admission as an Equity Partner or Non-Equity Partner;

    1.1.3    the number of Units allocated to that Partner (except for Non-Equity Partners); and

    1.1.4    the relevant Mandatory Retirement Date (except for Non-Equity Partners).

1.2    An updated version of such register will be published on PartnerConnect after each Annual Review and Biennial Review and when the Wider Leadership Group posts, pursuant to paragraph 7.2 of Schedule 5, a paper about such review.

*(Amended with effect from 23 April 2020)*

**Date Policy adopted:**        **the Effective Date**

2. **REGISTER OF OFFICE-HOLDERS: PARTNERSHIP COUNCIL POLICY**

A register of office-holders will record, for each person who is a member of the Partnership Council or ELG:

2.1    name;

2.2    office;

2.3    the date of commencement of office; and

2.4    the date on which the relevant term of office, if any, is due to end.

**Date Policy adopted:**        **the Effective Date**

3. **REGISTER OF ANNUITY ENTITLEMENTS: PARTNERSHIP COUNCIL POLICY**

3.1    A register will record, in respect of each Old Partnership Annuitant (or if deceased, that of the relevant surviving spouse) who is entitled to an Old Partnership Annuity:

    3.1.1    name;

    3.1.2    the amount of the Old Partnership Annuity payable to that Old Partnership Annuitant; and

3.1.3    such other information as briefly describes the nature and extent of the Old Partnership Annuity to which the relevant Old Partnership Annuitant is entitled.

3.2    A Register of Partner Annuitants will be kept in accordance with paragraph 6.4 of Schedule 14 (*Retirement of Equity Partners and Annuity Arrangements*)

*(Former paragraphs 3.2, 3.3, 3.4 and 3.5 deleted with effect from 23 April 2020)*

**Date Policy adopted:**            **the Effective Date**

4.    **SENIOR PARTNER'S VERIFICATION: PARTNERSHIP COUNCIL POLICY**

The Senior Partner's signature below an entry in a Register may be taken as confirmation by the Senior Partner that the entry is correct.

*(Amended with effect from 23 April 2020)*

**Date Policy adopted:**            **the Effective Date**

## Policies under Schedule 12

## Partner Behaviour and Obligations

*(Title of Policies under Schedule 12 amended with effect from 23 April 2020)*

1.  **CONFIDENTIALITY OF PARTNERSHIP AFFAIRS AND DEALING WITH THE PRESS: ELG POLICY**

    *[Note: References to Partnership include Associated Firms]*

    This Policy is made under paragraph 2 of Schedule 12. It applies to all Partners, including any Partner who is a member of a leadership group. Similar policies will be applied to senior executives and senior professional staff.

    This Policy shall be applied, with the necessary modifications, in relation to Approved Persons as if references to "Partners" included references to Approved Persons.

1.1  **Confidentiality and media relations**

    1.1.1    The affairs of the Partnership are strictly confidential. For the purposes of this Policy, information confidential to the Partnership includes information about the business objectives of the Partnership, its finances and its partners and staff except when - but only to the extent that - the Partnership has already issued a formal public statement on the issue in question.

    1.1.2    To the extent possible, confidential information circulated to Partners will be placed on PartnerConnect rather than circulated by email or in hard copy.

    1.1.3    Partners are expected to treat information confidential to the Partnership as they would treat information confidential to a client. Guidance on the appropriate professional standards is set out in Professional Standards and Practice, available on PartnerConnect.

    1.1.4    A Partner who has mislaid or through inadvertence or otherwise inappropriately communicated information that is confidential to the Partnership is required promptly to inform the Managing Partner or the Executive Partner of the circumstances and the nature of the relevant information.

    1.1.5    A Partner who has a spouse, partner, sibling or child who is a partner in a competitor law firm or who works in journalism with a professional interest in professional service firms (and in particular the legal sector) shall make an appropriate declaration to the Managing Partner.

    1.1.6    A Partner who has a close relationship or friendship with anyone who works in journalism with a professional interest in professional service firms (and in particular the legal sector) shall declare the fact to the Managing Partner.

    1.1.7    A Partner seeking election or re-election to a leadership or management position in the Partnership (and who therefore in particular would have access to information confidential to the Partnership) must declare to the Partnership any information falling within paragraphs 1.1.5 or 1.1.6.

Policies under Schedule 12: Partner Behaviour and Obligations

1.1.8    The only circumstance in which a Partner may speak to a journalist in response to enquiries about the confidential affairs of the Partnership is where prior agreement has been obtained from the Managing Partner, the Executive Partner or the Senior Partner and where, whenever possible, guidance has been obtained from the Partnership's External Communications team.

1.1.9    This Policy does not prevent Partners responding to questions about the Partnership which do not involve confidential information such as the Partnership's recruitment policy, pro bono initiatives and community affairs programmes.

## 1.2    Contact with the press at the request of a client

1.2.1    Where a Partner is instructed by a client to initiate contact with the press, the Partner is advised to make contact in advance with a member of the Partnership's External Communications team to plan the communication. Where communication with the press on behalf of a client happens on a regular but ad hoc basis, in circumstances where it will not be feasible to make contact in advance of each communication, the Partner is advised to make contact with a member of the Partnership's External Communications team in order to plan a general framework for all such communications.

## 1.3    Publicising work carried out by the Partnership

1.3.1    Where a Partner believes it would be appropriate to initiate contact with the press to seek press coverage of work done by the Partnership and this does not conflict with duties of confidentiality to a client, the Partner is advised to contact a member of the Partnership's External Communications team.

1.3.2    Where a Partner is contacted by the press and asked about work done by the themselves or their team, the Partner can provide the necessary information, providing this does not conflict with duties of confidentiality to a client or the Partnership. Any Partner who is at all uncertain how to answer any questions, should call back the journalist after taking advice from a member of the Partnership's External Communications team.

## 1.4    Discussions with journalists

1.4.1    A Partner who is in any conversation with a journalist must:

(a)    be polite;

(b)    inform the Partnership's External Communications team in advance of arranging a meeting or call with a journalist, and report back on the main points of the conversation afterwards; meetings should be arranged on a professional basis and partners should remember that, however informal the conversation, they are still representing the Partnership;

(c)    conduct the conversation by telephone or in a meeting; if conducting the meeting in a public place (such as a restaurant or bar) the usual precautions around confidentiality apply;

(d)     subject to appropriate clearance having been given (whether under paragraph 1.1.8 or by the relevant client), must maintain all relevant confidentialities;

(e)     subject to paragraph 1.1.8, must decline to answer any questions about the confidential affairs of the Partnership or, by implication, confirm or deny any story outlined by the journalist; and

(f)     subject to paragraph 1.1.8, immediately end the conversation if questions about the confidential affairs of the Partnership are nonetheless pursued (having referred the journalist to the Partnership's senior External Communications contact).

## 1.5     Protecting the interests of the Partnership

1.5.1     If, by reason of information available to the Managing Partner by virtue of this Policy or otherwise, the Managing Partner believes that confidential information in the hands of a particular Partner could pose a risk, or could be seen by other Partners to pose a risk, to the best interests of the Partnership or their clients, the Managing Partner can, with the agreement of the Senior Partner and on notice to the Partner concerned, take steps to place limitations on the extent of any such information made available to that Partner, or the manner in which it is made available, and on the Partner's attendance at meetings or discussions at which such confidential information is disclosed.

1.5.2     If the Managing Partner believes that there may have been a deliberate breach by a Partner of this Policy, the Managing Partner will normally seek suspension of the Partner concerned while a full investigation is carried out (with the assistance of any external agencies as the Managing Partner may deem appropriate in the circumstances), and pending a decision whether to seek the Partner's Termination.

**Date Policy adopted:          the Effective Date**

## 2.     ABSENCE FROM THE PARTNERSHIP: PARTNERSHIP COUNCIL POLICY

This Policy is made under paragraph 3 of Schedule 12.

This Policy shall be applied, with the necessary modifications, in relation to AP(E)s as if references to "Equity Partners" included references to AP(E)s.

## 2.1     Usual Holidays

Subject to paragraph 2.3.3(b) of Schedule 12, an Equity Partner is entitled to not more than thirty working days' holiday in each calendar year in addition to public holidays in the country in which the Equity Partner works and any other days when the office in which the Equity Partner works is not open officially.

## 2.2     Sabbatical Leave

2.2.1     Subject to the rest of this Policy a Partner is entitled to apply for two periods of sabbatical leave of up to three months each after nine years of becoming a

Policies under Schedule 12: Partner Behaviour and Obligations

Partner, or, in the case of a Partner who was an Equity Partner as at 1 May 2024, the earlier of nine years after becoming a Partner or six years after becoming an Equity Partner. The second period of sabbatical leave must be at least six years after the end of the first sabbatical leave period.

2.2.2    Sabbatical leave can be deferred to a later period from which point the next eligibility will be calculated (sabbatical leave is to be six years apart).

2.2.3    Sabbatical leave can be taken either as a single period of three consecutive months or as two periods of six weeks each. The minimum duration of sabbatical leave is six weeks. In the event of sabbatical leave being split, the second period has to be at least two years from the first period of leave.

2.2.4    A sabbatical may be taken at any time of the year.  Up to twenty working days out of a Partner's holiday entitlement may be added consecutively to a sabbatical or to any six-week period forming part of a sabbatical.

2.2.5    During sabbatical leave, Equity Partners are entitled to their full share of Equity Remuneration, Non-Equity Partners renumeration eligibility is unaffected and holiday entitlement is unaffected.

2.2.6    A Partner seeking to take sabbatical leave must submit a request through the relevant GBU Leader between January and March, and at least three months prior to the anticipated leave date. The Partner is required to present a business case that outlines plans to minimise business disruption including coverage by appropriately experienced Partners and client handover plans. The GBU Leader in consultation with the relevant Regional Managing Partner will confirm a final decision a reasonable period after all applications have been received.

2.2.7    Appropriate planning and handover of work including client relationships is essential to ensure minimal disruption, business continuity and the ability to detach from work. A Partner taking sabbatical leave is expected to remain contactable during the period of leave for exceptional matters only.

2.2.8    Sabbatical leave is usually not available in the following circumstances:

(a)    during a period of secondment to another office;

(b)    within two years of retirement;

(c)    if the Partner's performance is below expectations in the financial year preceding the requested leave period; and

(d)    immediately prior to or after a period of Parental Leave.

The relevant GBU Leader may waive these rules in any particular case in which the GBU Leader considers that there are special reasons making that appropriate.

2.2.9    A Partner will be entitled to take sabbatical leave in line with these provisions unless the GBU Leader determines otherwise. The GBU Leader reserves the right to postpone the requested sabbatical leave and will give reasons for any

such determination. The Partner concerned may appeal to the Senior Partner against that determination. The decision of the Senior Partner will be final and binding.

2.2.10 A Partner who has taken any period of sabbatical leave is required to remain at the Firm in the same capacity for a period of at least eighteen months from the end date of the sabbatical leave. The provisions of Paragraph 13 of Schedule 6 will apply to an Equity Partner who retires from the Partnership otherwise than at the Partnership's request within 18 months after returning from a sabbatical. The principles and procedures in Paragraph 13 of Schedule 6 will also be applied in respect of the renumeration of Non-Equity Partners who retire from the Partnership otherwise than at the Partnership's request within 18 months after returning from a sabbatical.

*(Amended with effect from 15 March 2024)*

## 2.3    Parental Leave

There are two elements to the Parental Leave provision – primary caregivers and secondary caregivers.

### 2.3.1    Primary caregiver

An Equity Partner who is expecting a child or whose partner is expecting a child and who is the primary caregiver for the child (whether as a parent or adoptive parent) is entitled to take primary caregiver parental leave for a period not exceeding six months commencing within the period from the beginning of the fourth week before the anticipated date of birth of the child (or, in the case of adoption, at any time after the beginning of the fourth week before the anticipated date upon which the child will reside with the Equity Partner) (the "arrival date") and concluding no later than 9 months after the arrival date.

For the purposes of this paragraph, an Equity Partner is not considered to be the primary caregiver if the Equity Partner's partner is taking leave as primary caregiver for a period of at least 6 months.

### 2.3.2    Secondary caregiver

An Equity Partner who is not the primary caregiver (whether as a parent or adoptive parent) is entitled to secondary caregiver parental leave for a period not exceeding three months commencing at any time after the date of birth (or arrival date in the event of adoption) of the child up to six months from the time after the date of birth (or arrival date) of the child.

### 2.3.3    General provisions

(a)    The maximum amount of parental leave is 6 months per birth or adoption event (irrespective of multiple births or in the event of a change in circumstances that results in an Equity Partner becoming a primary caregiver after a period of secondary caregiver leave).

Policies under Schedule 12: Partner Behaviour and Obligations

(b)     During primary or secondary caregiver leave the relevant Equity Partner is entitled to their full share of Equity Renumeration and the Equity Partner's holiday entitlement will be unaffected. An Equity Partner is entitled to take any unused holiday accrued during the period in which Parental Leave is taken in the following calendar year, in addition to that Equity Partner's usual holiday allowance in that calendar year.

*(Amended with effect from 24 October 2024)*

(c)     Additional unpaid parental leave can be requested and shall be subject to the firm's discretion, including under Paragraph 2.6.

(d)     In order to facilitate appropriate planning and client coverage, any Equity Partner must notify their Regional Practice Area Leader and local HR lead at least four months prior to the anticipated leave date when taking primary caregiver parental leave and two months when taking secondary caregiver leave.

(e)     Appropriate planning and handover of work including client relationships is essential to ensure minimal disruption and business continuity. An Equity Partner taking Parental Leave is expected to remain contactable for exceptional matters only.

*(Amended with effect from 15 March 2024)*

## 2.4     Compassionate Leave

2.4.1   Equity Partners are eligible for compassionate leave, recognising the need to take time away from work in order to manage difficult personal events or circumstances, including parental bereavement. The amount of time required will depend on the events or circumstances and should be requested via the relevant GBU Leader who will consult with the Regional Practice Area Leader and local HR lead. The approval of compassionate leave rests with the relevant GBU Leader in consultation with the Regional Managing Partner.

2.4.2   Parental bereavement forms part of compassionate leave provisions and apply if an Equity Partner is the parent of a baby/child who has passed away, the partner of the baby/child's parent, or if they have parental responsibility for the baby/child, including adoptive parents. Each case will be considered on its own merits, taking into account individual circumstances. The final decision in respect of such requests will rest with the relevant GBU Leader.

2.4.3   The firm provides a range of support to new parents or those who have experienced baby/child loss. An Equity Partner seeking to take advantage of such support should obtain details are available from their local HR lead.

*(Added with effect from 15 March 2024)*

## 2.5     Illness

2.5.1   If an Equity Partner is absent through illness lasting or likely to last longer than 10 consecutive working days or an aggregate of ten working days in any period

of six months, the Equity Partner will provide the Senior Partner or Managing Partner, if either so requests, with a certificate from a medical practitioner giving details of the illness and the period for which it is likely to last. If likewise requested the Equity Partner will provide a further certificate from a medical practitioner covering any extended or subsequent absence through illness within six months after the last such absence.

2.5.2   Illness includes absence on medical advice:

(a)   during pregnancy before the date of commencement of entitlement to parental leave as referred to in paragraph 2.3; or

(b)   after the Equity Partner has returned to work following parental leave; or

(c)   at the expiry of the permitted period of parental leave if the Equity Partner has not returned to work.

## 2.6   Part-time or flexible working arrangements

2.6.1   An Equity Partner may request to be allowed to adopt a flexible approach to work for specified family or other reasons. This flexibility is only appropriate in clearly defined circumstances and for limited periods if the interests of clients and colleagues are properly protected. Such circumstances may include: a long recovery period following illness, serious illness of a spouse or child, taking a leading position in a national bar or law society, taking on a management role within the Partnership or an Associated Firm that is a less than full time commitment, limited judicial or other similar opportunities immediately prior to retirement or the need to be with young children.

2.6.2   In appropriate cases the Partnership will try to accommodate these requests. However, the need to provide clients with the services they require and to avoid overburdening colleagues are overriding obligations and there will therefore be instances where flexible arrangements cannot be agreed for operational reasons. Furthermore partnership is primarily a long-term, full-time commitment and any lesser commitment should be for clearly defined reasons.

2.6.3   An Equity Partner may request a reduction of up to 40 per cent of working time. Subject to operational requirements, this reduction may be calculated in a number of ways, such as fewer working days per week or extended periods of leave.

2.6.4   The ELG will determine the appropriate impact on the Equity Remuneration of an Equity Partner entering into a part-time arrangement. As a guideline, the impact on the Equity Remuneration of an Equity Partner entering into a part-time arrangement would commensurately and fairly reflect the contribution proposed by the Equity Partner as compared to that under a full-time arrangement. In its determination, the ELG will review such matters as it considers appropriate, including but not limited to the number of working days which such Equity Partner proposes as the part-time arrangement (it being recognised that a full-time Equity Partner's normal commitment would

generally exceed five working days per week), and the proposed number of recorded hours (both billable and investment time) as compared to the targets for full-time Equity Partners.

2.6.5    An Equity Partner wishing to work part-time or flexibly should, in the first instance, make a request to the relevant GBU Leader, Global Practice Area Leader or Regional Managing Partner. The request should set out:

(a)    the reason for the application;

(b)    the proposed work cycle;

(c)    the anticipated duration;

(d)    an appraisal of the economic consequences; and

(e)    details of how potential operational or client relationship problems will be avoided.

The request will then be reviewed with the Equity Partner's working group to determine whether the application has their support. If such support is not forthcoming the application will not proceed.

If the Equity Partner's working group supports the application the GBU Leader, Global Practice Area Leader or Regional Managing Partner will put it to the ELG with a recommendation, discussed with the Equity Partner, on the appropriate share of Equity Remuneration for the Equity Partner. The ELG will decide whether to approve the application and on the appropriate Equity Remuneration. In considering the application, the ELG will take account of the interests of the Partnership, affected clients, affected colleagues and the Equity Partner.

2.6.6    If the ELG approves the application and the Equity Partner agrees with its terms it will take effect.

If the Equity Partner's GBU Leader, Global Practice Area Leader or Regional Managing Partner, having consulted the Equity Partner's working group and reviewed the circumstances, considers that the part-time or flexible arrangement is not working satisfactorily, the Equity Partner will be advised and given a period to return to full-time working.

The Equity Partner may apply to vary an agreed agreement by following the same procedures as applied on the initial application.

2.6.7    There will be no discrimination against Equity Partners making applications under this Policy.

**Date Policy adopted:        the Effective Date, amended 12 July 2012**

3. **CONDUCT OF PARTNERS PRIOR TO LEAVING: ELG POLICY**

This Policy is made under paragraph 5 of Schedule 12. It sets out the terms of a code concerning the values, conduct and standards to be observed by Partners in relation to the business of the Partnership and Associated Firms, namely the following code concerning the conduct of Partners prior to leaving.

This Policy shall be applied, with the necessary modifications, in relation to Approved Persons as if references to "Partners" included references to Approved Persons.

3.1 A Partner contemplating leaving the Partnership or an Associated Firm shall:

3.1.1 comply with all that Partner's obligations under or pursuant to the Agreement (including that Partner's duty of utmost good faith) and give any confirmation of such compliance as may be required by the Managing Partner or the Executive Partner;

3.1.2 adequately record professional time, manage the working capital for which that Partner is responsible (including invoicing clients) and ensure that all such matters for which that Partner is responsible are dealt with in a professional manner prior to leaving;

3.1.3 not, without the approval of the relevant GBU Leader, Global Practice Area Leader or Regional Managing Partner or the Managing Partner,

(a) encourage any other Partner or any professionally-qualified staff to leave the Partnership or an Associated Firm; or

(b) give to any other firm which that Partner is proposing to join the names of any professionally-qualified staff working for the Partnership or an Associated Firm with a view to that other firm encouraging such staff to leave the Partnership or an Associated Firm;

3.1.4 not discuss any plans to leave the Partnership or an Associated Firm with a client of the Partnership or an Associated Firm without the prior agreement of the relevant GBU Leader, Global Practice Area Leader or Regional Managing Partner or the Managing Partner;

3.1.5 act reasonably in agreeing with the relevant GBU Leader, Global Practice Area Leader or Regional Managing Partner or the Managing Partner a process for a timely and co-ordinated notification to clients and carry out such arrangements as that Partner has agreed;

3.1.6 comply with any reasonable requirements of the relevant GBU Leader, Global Practice Area Leader or Regional Managing Partner or the Managing Partner as regards attendance in the office, access to the Firm's systems, contact with employees/partners and other personnel and handling of client and other matters; and

3.1.7 if the Partner is in negotiations about leaving to join, accept an offer to join, work for or provide services to another firm or is preparing to compete with the firm as a sole practitioner, resign from any office or role within the Partnership

and Associated Firms which gives the Partner responsibility for management or special responsibility for clients (including as client relationship partner).

*(Amended with effect from 23 April 2020 and 15 March 2024)*

3.2    If a Partner contemplating leaving the Partnership or an Associated Firm fails to observe the terms of paragraph 3.1 that Partner's conduct may be referred to the Disciplinary Committee pursuant to paragraph 6.3 of Schedule 12.

*(Amended with effect from 23 April 2020)*

**Date Policy adopted:**          **the Effective Date**

4.    **VALUES, CONDUCT AND STANDARDS: ELG POLICY**

This Policy is made under paragraph 5 of Schedule 12.

This Policy shall be applied, with the necessary modifications, in relation to Approved Persons as if references to "Partners" included references to Approved Persons.

Each Partner will behave in accordance with:

4.1    The firm's Code of Conduct, as published on the Clifford Chance intranet;

*(Added with effect from 23 April 2020)*

4.2    Any policies relating to the roles and responsibilities of Clifford Chance Partners, as adopted from time to time by the ELG with approval of the Partnership Council and published on PartnerConnect;

*(Amended with effect from 23 April 2020)*

4.3    The Partner's individual responsibility for managing risk, as decided by the ELG and published on PartnerConnect; and

4.4    The global and local professional standards of the Partnership and Associated Firms, as published on the Clifford Chance intranet.

**Date Policy adopted: 12 July 2012**

5.    **CONSULTATION PRIOR TO DISCIPLINARY ACTION: ELG POLICY**

This Policy is made pursuant to paragraph 6.4 of Schedule 12.

This Policy shall be applied, with the necessary modifications, in relation to Approved Persons as if the references to "Partners" include references to Approved Persons.

5.1    For the purposes of paragraph 6.2 of Schedule 12, the Executive Partner will consult with not only the Managing Partner but also the Senior Partner, the Global Head of People and Talent and the Chief Risk and Compliance Officer or, if any of them is not available, others representing similar diversity of view.

5.2    For the purposes of paragraph 6.3 of Schedule 12, the Managing Partner will consult with the Executive Partner, the Senior Partner, the Global Head of People and Talent and the Chief Risk and Compliance Officer or, if any of them is not available, others representing similar diversity of view.

*(Added with effect from 23 April 2020)*

6.    **DISCIPLINARY ACTION: PARTNERSHIP COUNCIL POLICY**

This Policy is made pursuant to paragraph 7.3 of Schedule 12.

This Policy shall be applied, with the necessary modifications, in relation to Approved Persons as if references to "Partners" include references to Approved Persons.

6.1    Members of the Disciplinary Committee will be members for three years, although the Senior Partner, in consultation with the Managing Partner, may extend the term of a minority of members for up to two years to provide continuity.

6.2    The Senior Partner will in consultation with the Managing Partner, appoint a chair of the Disciplinary Committee.

6.3    For the purposes of assessing whether a referral should be made to the Disciplinary Committee, misconduct which may warrant the imposition of a sanction by the Firm may include, but shall not be limited to, the following matters:

(a)    any issue evidencing a lack of integrity or honesty;

(b)    any act of harassment, bullying or discrimination;

(c)    any deliberate or reckless act or omission which could damage the interests of the Partnership or an Associated Firm;

(d)    any personal conduct which is disrespectful of others and/or is likely to cause adverse publicity and/or damage the reputation of the Partnership or an Associated Firm;

(e)    material breaches of the firm's Code of Conduct or of Partnership policies;

(f)    a material breach of any professional rules or codes of conduct imposed by the SRA, local Bar or other relevant regulator;

(g)    a failure to be open and honest with the Firm or its regulator(s), a material failure to co-operate with any investigation conducted by the Firm or its regulator(s), or a failure to comply with the terms of any suspension notice served on the Partner;

(h)    any material failure to attend to the business of the Partnership and Associated Firms (ie. breach of paragraph 3 of Schedule 12);

(i)    any breach of the Policy governing the conduct of Partners prior to leaving (Policy under paragraph 5 of Schedule 12);

Policies under Schedule 12: Partner Behaviour and Obligations

(j)     any breach of the duty of good faith (ie. breach of paragraph 1 of Schedule 12) or failure to treat Partners with respect or any unreasonable failure to attempt to resolve differences in a constructive manner.

6.4     With the Senior Partner and the Managing Partner or the Executive Partner, the chair of the Disciplinary Committee will agree a statement of Disciplinary Procedure which will be published on PartnerConnect and on the intranet. Subject to paragraph 6.5, the Disciplinary Committee will comply with that Disciplinary Procedure.

6.5     Where any applicable law requires the Disciplinary Committee to carry out its functions in a manner inconsistent with the Disciplinary Procedure, the Disciplinary Committee will comply with such law while following the Disciplinary Procedure as closely as it reasonably can.

6.6     On any referral to the Disciplinary Committee, the chair will select a panel, normally of three members, to hear the referral.

6.7     Where a Partner's (or retired Partner's) conduct is referred to the Disciplinary Committee and that Partner (or retired Partner) attends a meeting with the Disciplinary Committee (or panel), that Partner may only be accompanied by a fellow Partner (unless otherwise determined by the Panel that it would be appropriate to allow the Partner to be accompanied by somebody who is not a Partner).

6.8     The Disciplinary Committee may obtain legal or other advice and a lawyer or other external adviser may attend any hearings to assist the Disciplinary Committee if the Disciplinary Committee so wishes.

*(Amended with effect from 24 October 2024)*

6.9     The Disciplinary Committee may impose any one or more of the following sanctions:

(a)     recommend that the Equity Partner be subject to Termination or that the relationship with the Non-Equity Partner be terminated;

(b)     impose a fine (which may be levied by withholding sums otherwise due to the Partner) in an amount up to the greater of 30% of that Partner's remuneration or, in the case of an Equity Partner £750,000 (if greater);

(c)     require that a portion of the Partner's Equity Remuneration or a Non-Equity Partner's remuneration to be deferred for a period;

(d)     recommend that a Non-Equity Partner who might be considered for admission as an Equity Partner should be deferred for a period;

(e)     require that the Partner take certain remedial steps within a time period specified by the Disciplinary Committee as a condition of remaining as a Partner in the Firm, including:

(i)     making a specified contribution to a charity approved by the panel;

(ii)    undertaking specified community service;

   (iii) undergoing specified training, treatment, therapy or counselling;

   (iv) making a personal apology;

  (f) require the Partner to cease to hold any post or role within the Partnership or an Associated Firm; or

  (g) such other sanctions as the Disciplinary Committee may decide is appropriate, including a verbal, written or final written warning.

6.9.2 Where a Partner or retired Partner has incurred reasonable legal costs in responding to proceedings before the Disciplinary Committee, the Disciplinary Committee (or relevant panel) may agree in its discretion (but taking into account whether any sanction was imposed or recommended) to reimburse such reasonable legal costs.

6.9.3 Where any fine or withholding of sums otherwise due to the Partner is imposed following:

  (a) a failure to notify a claim or threatened claim or circumstances which might give rise to a claim or threatened claim;

  (b) a failure to cooperate in relation to a claim or threatened claim or circumstances which might give rise to a claim or threatened claim as required by paragraph 3.1 of Schedule 16;

  (c) a liability for the Partnership or an Associated Firm arising from a claim for harassment, discrimination or bullying; or

  (d) pecuniary damage to the Partnership or an Associated Firm due to their loss of clients or work or Partners, lawyers or business professionals

then the fine or withholding shall be in a sum up to that which is necessary to compensate the Partnership or relevant Associated Firm for the loss or damage suffered.

6.9.4 A Partner who has suffered any fine or withholding of sums otherwise due to the Partner pursuant to a decision of the Disciplinary Committee (or any committee established to hear an appeal) shall cease to have any entitlement to any part of the withheld amount which has not been released (or agreed to be released) to that Partner within six months after the date of the withholding.

6.9.5 Where the Disciplinary Committee imposes a pecuniary sanction on a Partner or retired Partner, this does not limit the ability of the Partnership or an Associated Firm to claim additional loss or damage from the Partner or retired Partner.

6.9.6 In consultation with both the Senior Partner and the Managing Partner, having regard to the need to maintain confidentiality in respect of any individual disciplinary process, the chair of the Disciplinary Committee will periodically report to the Partnership and also to all lawyers and business professionals on the activities of the Disciplinary Committee.

Policies under Schedule 12: Partner Behaviour and Obligations

*(Added with effect from 23 April 2020 and amended with effect from 15 March 2024)*

## 7.    COMPULSORY INSURANCE: ELG POLICY

This Policy is made under paragraph 8 of Schedule 12.

This Policy shall be applied, with the necessary modifications, in relation to AP(E)s as if references to "Equity Partners" included references to AP(E)s.

### 7.1    Life Insurance

7.1.1    Each Equity Partner will contribute to a group insurance scheme selected by the ELG to provide a sum assured of up to £2,500,000 in the event of an Equity Partner's death. The sum assured may be a broadly equivalent sum in another currency agreed by the ELG pursuant to paragraph 5.1.3 or from time to time.

The group insurance scheme may be issued by the relevant insurers in the name of trustees who will, on death of the Equity Partner, hold any sum paid under the scheme on appropriate trusts.

7.1.2    This paragraph 5.1.2 applies to Equity Partners whose Long-term Base is not in the US.

Each Equity Partner whose Long-term Base is not in the US will contribute to a group insurance scheme selected by the ELG to provide a sum of £2,500,000. An Equity Partner who, on first becoming an Equity Partner, falls into the second or third categories below, may then select the correspondingly lower sum assured stated below:

**Category**

|  |  | Sum assured |
|---|---|---|
| 1. | For an Equity Partner who does not fall into the second or third categories below | £2,500,000 |
| 2. | For an Equity Partner who is married or in a civil partnership without any dependent children, or who is single with dependent children | £1,875,000 |
| 3. | For an Equity Partner who is single | £1,500,000 |

If the personal circumstances of an Equity Partner who has selected the second or third category change such that the relevant Equity Partner no longer falls within the second or third category, then that Equity Partner will move automatically to the next highest applicable category. The sum assured and the premiums will increase from the date of change in personal circumstances. Each Equity Partner will notify the Executive Partner of a change in personal circumstances which will change the applicable category, including pregnancy or pregnancy of a spouse or civil partner.

7.1.3    Each Equity Partner whose Long-term Base is in the US will contribute to group insurance schemes selected by the ELG to provide a sum assured of US$4,000,000 until reaching the age of 55. Thereafter, the sum assured will reduce to US$2,000,000, with a commensurate reduction in the Equity Partner's premium.

**Date Policy adopted: with effect from 1 May 2008, amended with effect from 1 May 2014**

7.2    **PHI Policy**

7.2.1    Each Equity Partner will maintain a permanent health insurance ("**PHI**") policy with an insurance company selected by the ELG (the "**Insurance Company**") providing cover of not less than £85,000 per annum (or an equivalent sum in another currency agreed by the ELG) or such higher level of cover as the ELG may from time to time decide.

An Equity Partner may select a higher level of PHI cover, if the Insurance Company will provide it, by notification to the Executive Partner.

7.2.2    The PHI cover will be payable on the Equity Partner's retirement from the Partnership in the circumstances covered by the policy and will continue to be payable until an Equity Partner's 65th birthday or death, whichever is the earlier. The annual sum will increase at the rate of 5 per cent per annum compound from the date of the first payment.

*(Amended 29 January 2010)*

7.2.3    Each Equity Partner will comply with the terms and conditions imposed by the Insurance Company, including submitting to any medical examination which may be required from time to time.

7.3    **Payment Provisions**

Payment of premiums for the life insurance and PHI policies will be made by the Partnership on behalf of each Equity Partner. The amount so paid will be deducted from the relevant Equity Partner's Equity Remuneration.

**Date Policy adopted: with effect from 1 May 2009**

**Policies under Schedule 14**

**Retirement of Equity Partners and Annuity Arrangements for Equity Partners**

1. **EQUITY PARTNERS WHO AGREE TO RETIRE ESSENTIALLY AT THE PARTNERSHIP'S REQUEST: PARTNERSHIP COUNCIL POLICY**

1.1 This Policy is made under paragraph 2.4 of Schedule 14 and covers notice to be given and payments to be made to an Equity Partner who agrees to retire essentially at the Partnership's request.

This Policy applies, with the necessary modifications, in relation to AP(E)s as if reference to "Equity Partners" included references to AP(E)s.

1.2 Period of notice

An Equity Partner who agrees to retire essentially at the Partnership's request will normally have been given a period of three months' notice and may be required to continue to work for the Partnership and Associated Firms during the notice period.

If it is agreed that the Equity Partner will retire or cease to work before the end of the notice period, the terms of retirement will normally provide that the relevant Equity Partner is paid a share of Equity Remuneration for the rest of the notice period calculated by reference to the Unit value applicable to the Financial Year of retirement.

*(Amended with effect from 1 March 2010, on 14 September 2010 and on 11 June 2012)*

1.3 Compensation

An Equity Partner who agrees to retire essentially at the Partnership's request will normally (and subject to paragraph 1.4) be paid six months' Equity Remuneration by way of compensation, calculated by reference to the Unit value applicable to the Financial Year of retirement.

*(Added 11 June 2012 and amended with effect from 23 April 2020)*

1.4 Provisos

No Equity Partner will be entitled to a share of Equity Remuneration pursuant to paragraph 1.2 or 1.3 unless, after consultation with the relevant GBU Leader, Global Practice Area Leader or Regional Managing Partner, the Managing Partner considers such a payment is appropriate and that the Equity Partner is retiring essentially at the Partnership's request.

If the Equity Partner had been given a Review Notice and the Equity Partner subsequently retires essentially at the Partnership's request, then notwithstanding paragraphs 1.2 and 1.3, that Equity Partner's Equity Remuneration for the period after the Review Notice will not exceed the value of the Units that Equity Partner held or would have held in the 12 months following the date of the Review Notice, provided that any such Equity Partner who had 300 Units or more on the Ladder will be treated as having 280 Units for the purposes of determining any additional share of Equity Remuneration payable under this paragraph.

Policies under Schedule 14: Retirement of Equity Partners and Annuity Arrangements for Equity Partners

The 12 month limit may be waived in whole or in part where the Review Notice was given more than 3 months before the Equity Partner was asked to retire and where both the Senior Partner and the Managing Partner so agree.

If the Equity Partner retires in the Financial Year after ceasing work, the agreement regarding that Equity Partner's retirement will normally provide that the Unit value which determines that Equity Partner's post-retirement share of Equity Remuneration pursuant to paragraph 1.2 and 1.3 will be, if lower, the value applicable to the Financial Year in which the Equity Partner ceased work.

An agreement pursuant to paragraph 1.3 will include a waiver of any claims and a right of recovery or set-off in respect of any sums payable to the Equity Partner under relevant local law.

If an Equity Partner is subject to Termination or retires after being given a Termination Notice but (i) before the date on which, according to the Termination Notice, that Equity Partner will cease to be an Equity Partner or (ii) before an appeal against the Termination Notice is decided, that Equity Partner is entitled to no share of Equity Remuneration pursuant to paragraph 1.3 but may be entitled to a share of Equity Remuneration under paragraph 1.9 of Schedule 15.

*(Amended with effect from 1 March 2010, 14 September 2010, 11 June 2012, on 5 November 2020 and 15 March 2024)*

1.5 **Legal/Outplacement fees**

If an Equity Partner agrees to retire from the Partnership essentially at the Partnership's request, the Partnership will normally agree to pay the Equity Partner up to £20,000 plus VAT in aggregate to cover (i) any legal fees incurred in connection with the execution of a waiver and release in a form satisfactory to the Partnership and (ii) any professional fees incurred in helping that Equity Partner find an alternative role. The Equity Partner's claims for payment must be supported by appropriate evidence.

*(Amended with effect from 3 April 2009 and on 1 May 2010)*

**Date Policy adopted:                    with effect from 1 January 2008**

2. **GATEWAY ARRANGEMENTS FOR EQUITY PARTNERS REACHING THE AGE OF 60: PARTNERSHIP COUNCIL POLICY**

2.1 This Policy is made under paragraph 3 of Schedule 14.

This Policy shall be applied, with the necessary modifications, in relation to AP(E)s as if references to "Equity Partners" included references to AP(E)s.

2.2 To the extent appropriate arrangements are not already agreed between the relevant Equity Partner and the Firm, any Equity Partner who will reach the age of 60 in the two-year period from 1 May in the calendar year in which the next Biennial Review will occur and who wishes to continue as an Equity Partner beyond the age of 60 must

Policies under Schedule 14: Retirement of Equity Partners and Annuity Arrangements for Equity Partners

notify the Managing Partner and the relevant GBU Leader to that effect no later than 31 October in the calendar year before that Biennial Review.

The Equity Partner will provide the Managing Partner and the relevant GBU Leader with relevant information about the terms on which the Equity Partner proposes to continue as an Equity Partner, including the following:

2.2.1    the Equity Partner's anticipated retirement date, being no later than the applicable Mandatory Retirement Date;

2.2.2    the Unit allocation or other remuneration arrangements proposed until the Equity Partner's anticipated retirement date;

2.2.3    the fee-earning and other roles to be performed by that Equity Partner in a capacity as an Equity Partner, with an estimate of the proportion of time devoted to those different roles;

2.2.4    the client relationships for which the Equity Partner will remain responsible and proposals for introducing other Equity Partners to take responsibility for those relationships before the Equity Partner's anticipated retirement date;

2.2.5    any external positions held by the Equity Partner, any benefits which the Equity Partner considers accrue to the Partnership from the holding of those positions, and the amount of time which the Equity Partner will be devoting to those positions; and

2.2.6    the level of support for the proposed arrangements from the Equity Partners with whom the Equity Partner works and also from the relevant GBU Leader, Global Practice Area Leader and Regional Managing Partner.

2.3    The Wider Leadership Group will consider whether the Firm should seek to agree an alternative arrangement with the relevant Equity Partner including to become a Non-Equity Partner, a consultant or another appropriate arrangement to facilitate succession planning and/or transition to the next stage of the Equity Partner's professional career. In addition to any other terms agreed, any arrangements pursuant to which an Equity Partner shall continue to be entitled to receive Equity Remuneration will be on terms whereby those arrangements will be reviewed no less frequently than at each subsequent Biennial Review, taking into account any relevant changes in any circumstances (including in respect of the abilities or contribution of the Equity Partner, the area of practice in which the Equity Partner works, the development of or changes in the Partnership's business, client requirements and also the level of support from the Equity Partners with whom the Equity Partner works and those Equity Partners who have management responsibilities for the practice area, group, or office in which the Equity Partner works).

*(Amended with effect from 1 March 2010, 15 March 2024 and 24 October 2024)*

**Date Policy adopted:**          **the Effective Date**

Policies under Schedule 14: Retirement of Equity Partners and Annuity Arrangements for Equity Partners

3. **ELECTION TO RECEIVE AN ANNUITY OVER EIGHT YEARS: PARTNERSHIP COUNCIL POLICY**

3.1    This Policy is made under paragraphs 4.6, 5.2 and 6.3 of Schedule 14.

This Policy applies, with the necessary modifications, in relation to AP(E)s as if references to "Equity Partners" included references to AP(E)s.

3.2    An Equity Partner may elect to receive an annuity for the period of eight years, rather than five years, from the date of the Equity Partner's retirement, by written notice to the Executive Partner given before the Equity Partner retires.

3.3    The effect of the election will be that:

3.3.1    the number of Retirement Annuity Units to which the Equity Partner is entitled in respect of a Financial Year is one eighth of the Total Retirement Annuity Units to which the Equity Partner is entitled (and proportionately when the entitlement begins or ends part way through a Financial Year); but

3.3.2    the value of the Equity Partner's Total Retirement Annuity Units will not be affected because:

(a)    in the first five years after retirement, each Retirement Annuity Unit will have the value of a Retirement Annuity Unit for the Financial Year in respect of which the entitlement to the Retirement Annuity Units arises;

(b)    in the sixth, seventh and eighth years after retirement, each Retirement Annuity Unit will have a value equal to the mean value per Retirement Annuity Unit of the Equity Partner's Retirement Annuity Units in the first five years;

(c)    where any of the first five years include one or more Financial Years prior to FY 2017/8, the Unit value for the relevant year or years will be divided by 2.6 for the purposes of calculating the mean value; and

(d)    where any of the first five years include one or more Financial Years after FY 2016/17, the Unit value for the relevant year or years will be divided by 2 for the purposes of calculating the mean value.

*(Amended with effect from 1 May 2021)*

3.4    The election will be irrevocable.

**Date Policy adopted:          29 January 2010**

4. **PAYMENT OF DECEASED EQUITY PARTNER'S ANNUITY: PARTNERSHIP COUNCIL POLICY**

4.1    This Policy is made under paragraphs 4.7, 5.3 and 6.7 of Schedule 14.

This Policy applies, with the necessary modifications, in relation to AP(E)s as if references to "Equity Partners" included references to AP(E)s.

Policies under Schedule 14: Retirement of Equity Partners and Annuity Arrangements for Equity Partners

4.2    If a former Equity Partner dies before the end of the period in which an annuity or other annual payment would be payable to that former Equity Partner under paragraph 4, 5 or 6 of Schedule 14, the Partnership Council has the authority to agree that the Partnership will pay all or part of the annuity or other annual payment to the former Equity Partner's estate or spouse or other dependents for all or part of the remainder of the relevant period.

If the Partnership Council agrees that the Partnership will make a payment under this Policy, any decision as to whether the payment is made to the estate or spouse or other dependents of the former Equity Partner may, without creating any obligation on the Partnership, have regard to the wishes of the former Equity Partner and any death duties or other Tax consequences of making such a payment.

The Partnership Council will normally only agree that the annuity or other annual amount will be the lesser of:

4.2.1    the aggregate value attributable to the former Equity Partner's Annuity Units in respect of the period from death to the end of the relevant period; and

4.2.2    £500,000.

**Date Policy adopted: with effect from 1 January 2008; paragraph 4.3 deleted with effect from 1 May 2017**

5.    **CAP ON TOTAL RETIREMENT ANNUITY UNITS OF CERTAIN WEIGHTED ELIGIBLE EQUITY PARTNERS WHO ACHIEVED ELIGIBLE STATUS AFTER THE PREVIOUS EFFECTIVE DATE AND BEFORE 1 JANUARY 2008: PARTNERSHIP COUNCIL POLICY**

5.1    This Policy is made under paragraph 4.13 of Schedule 14.

This Policy applies, with the necessary modifications, in relation to AP(E)s as if references to "Equity Partners" included references to AP(E)s.

5.2    This Policy applies to a weighted Eligible Equity Partner who achieved Eligible Status after the Previous Effective Date and before 1 January 2008 if the weighted Eligible Equity Partner's Partner Number is below.

The Total Retirement Annuity Units of such an Eligible Equity Partner will not exceed the number which corresponds to the relevant Partner Number as specified below.

| Eligible Equity Partner (per Partner Number) | Maximum Total Retirement Annuity Units |
|---|---|
| 600 | 276 |
| 651 | 120 |
| 688 | 240 |
| 696 | 272 |

**Date Policy adopted: with effect from 1 January 2008**

6.    **EFFECT OF LADDER 1 ON TOTAL RETIREMENT ANNUITY UNITS: PARTNERSHIP COUNCIL POLICY**

6.1    This Policy is made under paragraph 4.14.1 of Schedule 14.

This Policy applies, with the necessary modifications, in relation to AP(E)s as if references to "Equity Partners" included references to AP(E)s.

6.2    This Policy applies to the calculation of the Total Retirement Annuity Units to which an Eligible Equity Partner who has been on Ladder 1 during part of the period of that Eligible Equity Partner's Eligible Status.

If the Eligible Equity Partner has held Eligible Status for more than 20 years, the calculation will be made on the basis that (i) the period of Eligible Status that exceeds 20 years will be disregarded and (ii) the period so disregarded will (to the nearest quarter of a year) be treated as a *pro tanto* reduction to the period during which the Eligible Partner was on Ladder 1.

**Date Policy adopted: with effect from 1 January 2008; amended with effect from 1 May 2017**

7.    **EFFECT OF OFF-LOCKSTEP UNIT ALLOCATIONS ON TOTAL RETIREMENT ANNUITY UNITS: PARTNERSHIP COUNCIL POLICY**

7.1    This Policy is made under paragraph 4.14.2 of Schedule 14.

This Policy applies, with the necessary modifications, in relation to AP(E)s as if references to "Equity Partners" included references to AP(E)s.

7.2    If an Eligible Equity Partner has been subject to a Unit adjustment because of an event described in paragraph 4.14.2 (a), (b) or (c), the Retirement Annuity Units that Eligible Equity Partner is entitled to will be calculated by the following formula:

$$(a - 16b) + (16b \times c\%)$$

where:

$a$ = the number of Retirement Annuity Units to which the Eligible Equity Partner would be entitled but for any Unit adjustment

$b$ = the period in years (to the nearest quarter of a year) during which the Eligible Equity Partner has been subject to any Unit adjustment, applying the weighting of a weighted Eligible Equity Partner to any period before the Eligible Equity Partner reaches the Threshold

$c\%$ = the aggregate number of Units held by the Eligible Equity Partner as a result of any Unit adjustment during period $b$ expressed as a percentage of the aggregate number of Units that the Eligible Equity Partner would have held during period $b$ but for any Unit adjustment

but $16b$ is no greater than $a$.

Policies under Schedule 14: Retirement of Equity Partners and Annuity Arrangements for Equity Partners

The principles underlying this formula may be applied mutatis mutandis when calculating any commensurate reduction of entitlement on reaching the Threshold pursuant to the proviso in paragraph 4.11 of Schedule 14.

If the Eligible Equity Partner is subject to a Unit adjustment for more than one period or the Unit adjustment is varied, the calculation will be repeated accordingly.

If the Eligible Equity Partner has held Eligible Status for more than 20 years, the calculation will be made on the basis that (i) the period of Eligible Status that exceeds 20 years will be disregarded and (ii) the period so disregarded will (to the nearest quarter of a year) be treated as a *pro tanto* reduction to the period during which the Eligible Equity Partner was subject to a Unit adjustment. A period in which $c\%$ was lowest will be disregarded before a period in which $c\%$ was higher. If the Eligible Equity Partner has also been on Ladder 1 (under the terms of this Agreement in effect at any time prior to 1 May 2021), the calculation may be adjusted in such a way as the Partnership Council considers appropriate.

7.3    The calculation will not take account of:

7.3.1    a Unit adjustment relating to a period before 1 January 2008;

7.3.2    a reduction of Units to 118 or more (and any reduction of Units from above 118 to a number below 118 shall be treated as a reduction from 118) under the terms of this Agreement in effect as at 30 April 2021;

7.3.3    a reduction of Units to 280 or more (and any reduction of Units from above 280 to a number below 280 shall be treated as a reduction from 280); or

7.3.4    the fact that after Financial Years in which the Units were thereby adjusted, the Eligible Equity Partner might hold fewer Units than the Eligible Equity Partner would otherwise have held.

**Date Policy adopted: with effect from 1 January 2008; amended with effect from 1 March 2010, with effect from 1 May 2015, with effect from 1 May 2017 and with effect from 1 May 2021**

8.    **DEFERRAL OF ANNUITY OR OTHER ANNUAL PAYMENT: PARTNERSHIP COUNCIL POLICY**

8.1    This Policy is made under paragraph 4.15 and 6.8 of Schedule 14.

This Policy applies, with the necessary modifications, in relation to AP(E)s as if references to "Equity Partners" included references to AP(E)s and references to "Non-Equity Partners" include AP(NE)s.

8.2    An Equity Partner who is admitted as a Non-Equity Partner may defer, until retirement as a Non-Equity Partner, an annuity or other annual payment to which that Equity Partner is entitled under paragraph 4 or 6 of Schedule 14 pursuant to an agreement between the Partnership and the Partner approved by the Managing Partner under this Policy.

Policies under Schedule 14: Retirement of Equity Partners and Annuity Arrangements for Equity Partners

8.3 An agreement with a Partner who is entitled to an annuity under paragraph 4 of Schedule 14 may provide that the Partner's Total Retirement Annuity Units will be increased by up to 4 Retirement Annuity Units for every six months that Partner remains a Non-Equity Partner but:

8.3.1 the Managing Partner may decide that fewer incremental Retirement Annuity Units or incremental ERC Units are appropriate in all the circumstances, for example in the light of the Partner's remuneration as a Non-Equity Partner or the period the Partner is likely to remain a Non-Equity Partner; and

8.3.2 the Partner will still be subject to the maximum entitlement of Total Retirement Annuity Units that applied when that Partner retired as an Equity Partner.

8.4 Paragraphs 7 and 8 of Schedule 14 will apply to the deferred annuity or other annual payment, but for the purposes of paragraphs 7.2 and 7.4 the Partner will be deemed to have retired upon ceasing to be a Non-Equity Partner.

**Date Policy adopted: with effect from 1 January 2008**

9. **DISCRETIONARY ANNUITY FOR ELIGIBLE EQUITY PARTNER WITH 12 TO 15 YEARS' SERVICE: PARTNERSHIP COUNCIL POLICY**

9.1 This Policy is made under paragraph 5 of Schedule 14.

This Policy applies, with the necessary modifications, in relation to AP(E)s as if reference to "Equity Partners" included references to AP(E)s.

9.2 The Partnership Council will only exercise its discretion to agree that the Partnership will pay an annuity to an Eligible Equity Partner who retires before reaching the applicable Threshold if the Eligible Equity Partner is genuinely retiring from work that will generate material earnings, disregarding any consultancy work that the Eligible Equity Partner performs for the Partnership or an Associated Firm after retirement.

9.3 Subject to paragraph 9.4, when it exercises that discretion, the number of Total Retirement Annuity Units the Partnership Council grants to an Eligible Equity Partner will normally correspond to the actual or, if applicable, weighted years of the Eligible Equity Partner's Eligible Status, as specified below:

| Actual/weighted years of Eligible Status | Total Retirement Annuity Units |
|---|---|
| less than 12 | 0 (no discretion) |
| 12 < 13 | 129.4 |
| 13 < 14 | 155.2 |
| 14 < 15 | 181.2 |

*Provisos*

However:

9.3.1 the number of discretionary Total Retirement Annuity Units of a weighted Eligible Equity Partner who achieved Eligible Status after the Previous

Policies under Schedule 14: Retirement of Equity Partners and Annuity Arrangements for Equity Partners

Effective Date and before 1 January 2008 will be reduced if paragraph 4.13 of Schedule 14 means the maximum number of Total Retirement Annuity Units that Partner would be entitled to had that Partner retired on or after reaching the applicable Threshold (the "**cap**") is less than 300 Total Retirement Annuity Units.

If the cap is less than 300 the weighted Eligible Equity Partner's discretionary Total Retirement Annuity Units will be the lesser number that corresponds to the cap, as specified below:

| Cap | 260 – 300 | 194 – 259.5 | 130 – 193.5 | under 130 |
|---|---|---|---|---|
| Actual/weighted years of Eligible Status | Total Retirement Annuity Units | | | |
| 12 < 13 | 117 | 104 | 91 | 78 |
| 13 < 14 | 130 | 117 | 104 | 91 |
| 14 < 15 | 142 | 130 | 117 | 104 |

9.3.2   The number of discretionary Total Retirement Annuity Units of an Eligible Equity Partner who achieved Eligible Status after 1 January 2008 will be reduced if the proviso in paragraph 4.12 of Schedule 14 means the maximum number of Total Retirement Annuity Units that Partner would be entitled to if that Partner retired on or after reaching the applicable Threshold (the "**cap**") is less than 300 Total Retirement Annuity Units.

If the cap is less than 300 the weighted Eligible Equity Partner's discretionary Total Retirement Annuity Units will be the lesser number that corresponds to the cap, as specified below:

| Cap | 220 | 258 |
|---|---|---|
| Actual/weighted years of Eligible Status | Total Retirement Annuity Units | |
| 12 < 13 | 104 | 117 |
| 13 < 14 | 117 | 130 |
| 14 < 15 | 130 | 143 |

9.3.3   The principles of paragraph 4.14 of Schedule 14 will normally apply to the discretionary Total Retirement Annuity Units in such a way as the Partnership Council considers appropriate in all the circumstances.  The principles of paragraph 4.14 of Schedule 14, if applicable, will apply after paragraph 9.3.1 or 9.3.2 above, if applicable, has applied.

**Date Policy adopted: with effect from 1 January 2008; amended with effect from 1 May 2017 and 1 May 2021**

Policies under Schedule 14: Retirement of Equity Partners and Annuity Arrangements for Equity Partners

10.   **TAX EQUALISATION: PARTNERSHIP COUNCIL POLICY**

10.1   This Policy is made under paragraph 6.3 of Schedule 14.

This Policy shall be applied, with the necessary modifications, in relation to AP(E)s as if references to "Equity Partners" included references to AP(E)s.

10.2   This Policy may apply if:

10.2.1   A significant part of a retired Equity Partner's career was working for an Associated Firm or in a non-UK branch of the Partnership and after retirement the retired Equity Partner resides in that jurisdiction (the "Relevant Country");

10.2.2   The retired Equity Partner's annuity or other annual payment under paragraph 4, 5 or 6 of Schedule 14 has been or is expected to be paid by the Partnership or an Associated Firm in a different country;

10.2.3   The annuity or other annual payment has been or will be, pursuant to paragraph 7.9.1 of Schedule 14, subject to deductions in respect of Tax which exceed the Tax which the retired Equity Partner would have had to pay if the payment had been made by the Associated Firm in, or by an entity resident in, the Relevant Country;

10.2.4   In consequence the retired Equity Partner has suffered or will suffer a higher rate of Tax on the annuity or other annual payment than the rate of Tax that would otherwise have applied; and

10.2.5   The retired Equity Partner has made or will make all reasonable claims and elections to reduce the rate of Tax on the annuity.

10.3   In such circumstances, the Managing Partner may determine that the principles of paragraph 8.2.4 of Schedule 6 (Distribution of Remuneration; allocation of source of profit) apply to the shortfall (as defined in paragraph 7.3 of Schedule 14). The Managing Partner will only make such a determination for one Financial Year at a time to ensure the principles of paragraph 8.2.4 of Schedule 6 may only be applied to the extent that the annuity or other annual payment could have been made out of profits of the offices in the Relevant Country for the Financial Year to which the annuity or other annual payment relates.

**Date Policy adopted:       12 July 2012**

11.   **PAYMENT OF ANNUITY OTHERWISE THAN IN ACCOUNTS CURRENCY: ELG POLICY**

11.1   This Policy is made under paragraph 7.5 of Schedule 14.

This Policy applies, with the necessary modifications, in relation to AP(E)s as if references to "Equity Partners" included references to AP(E)s.

11.2   This paragraph 11.2 applies to an Equity Partner whose Long-term Base immediately before ceasing to be an Equity Partner was in an office whose currency was not the Accounts Currency.

Policies under Schedule 14: Retirement of Equity Partners and Annuity Arrangements for Equity Partners

Any annuity or other annual payment which is payable under paragraph 4, 5 or 6 of Schedule 14 to such an Equity Partner will be paid in the Office Currency of the Equity Partner's former office. The applicable exchange rate will be determined by reference to the average exchange rate for the translation of the Office Currency into the Accounts Currency which is used in the preparation of the Partnership Accounts for the relevant Financial Year (the "1YA Rate") or, if the Equity Partner was bound by an election under paragraph 4.2 of the Policies under Schedule 6, by reference to the average of the 1YA Rates for the three-year period ending with the last day of the Financial Year to which the annuity or other annual payment relates (the "3YA Rate").

11.3    This paragraph 11.3 applies to an Equity Partner whose Equity Remuneration immediately before retirement was subject to an agreement under paragraph 4.3 of the Policies under Schedule 6.

The Managing Partner or the Executive Partner may agree with the retired Equity Partner that all of the annuity or other annual payment under paragraph 4, 5 or 6 of Schedule 14 will be paid in the retired Equity Partner's home currency (as defined by the agreement under paragraph 4.3 of the Policies under Schedule 6). If so the applicable exchange rate will be determined by reference to the 1YA Rate or, if the Equity Partner was bound by an election under paragraph 4.2 of the Policies under Schedule 6, by reference to the 3YA Rate. If the retired Equity Partner's home currency is the Accounts Currency, the agreement would provide that the annuity or other annual payment is paid in the Accounts Currency.

An agreement under this paragraph 11.3 will normally be subject to the following conditions:

11.3.1    The Equity Partner's request for the annuity or other annual payment to be calculated in the applicable home currency must be submitted to the Director of Tax and Treasury no later than two weeks after the end of the Financial Year to which the payment relates.

11.3.2    The agreement will apply to all payments of the retired Equity Partner's annuity or other annual payment, unless the Managing Partner or the Executive Partner agrees that ending or changing the agreement is reasonable, having regard to the retired Equity Partner's personal circumstances.

11.3.3    The agreement will end if the retired Equity Partner's home currency ceases to be one of the Office Currencies of the Partnership and Associated Firms.

**Date Policy adopted: 20 March 2012; amended with effect from 1 May 2015 and with effect from 1 May 2016**

**Policies under Schedule 15**

**Equity Partners' Termination, Immediate Termination, Suspension and Retirement upon Physical or Mental Incapacity**

1.    **PERFORMANCE TERMINATION:  PARTNERSHIP COUNCIL POLICY**

1.1    This Policy is made under paragraphs 1.4 and 1.8 of Schedule 15.

This Policy shall be applied, with the necessary modifications, in relation to AP(E)s as if references to "Equity Partners" included references to AP(E)s.

If the Partnership Council appoints a committee to conduct or decide an appeal, references to the Partnership Council in this Policy will be construed accordingly.

1.2    The Managing Partner may only effect a Performance Termination under paragraph 1 of Schedule 15 with the agreement of the ELG.

1.3    When considering whether an Equity Partner should be subject to Performance Termination, the Managing Partner and the ELG must act reasonably to decide if in the circumstances of a particular case there are reasons that justify Performance Termination.

1.4    The ELG may authorise the Managing Partner to give an Equity Partner a Termination Notice specifying that the Equity Partner be subject to Performance Termination three months later if:

(a)    the ELG, following a review, considers that the Equity Partner's contribution is insufficiently valuable (in the context of the Partnership's strategy) or falls short of expectations (in the context of the Partnership's performance criteria);

(b)    the Equity Partner has had a written notification (a **"Review Notice"**), from the Managing Partner or relevant GBU Leader at least three months previously advising that the Equity Partner's contribution may be insufficiently valuable or fall short of expectations and will be subject to a review; and

(c)    following receipt of a Review Notice, the relevant Equity Partner has had the opportunity to make submissions to the ELG or committee appointed by the ELG for the purposes of carrying out the review.

The Managing Partner may agree with the Equity Partner that the Termination Notice is extended to longer than three months if the Equity Partner agrees a reduction in Unit allocation so that the Equity Partner's Equity Remuneration does not exceed the amount that would have been paid had the Equity Partner ceased to be an Equity Partner at the end of three months' notice and if the Equity Partner reaches reasonable agreement with the Partnership as to conduct during the notice period.

Policies under Schedule 15: Equity Partners' Termination, Immediate Termination, Suspension and
Retirement upon Physical or Mental Incapacity

1.5    When conducting an appeal against a Performance Termination, the Partnership
 * Council may seek verbal clarification or comments on any issue from any Partner or
any other person and it may call for any documents which it considers may be relevant
from any Partner or any other person.

If the Partnership Council obtains further information for the purposes of the appeal,
the information should be summarised in writing and, where appropriate, made
available to the ELG and the Equity Partner who is appealing so that they have the
opportunity to comment on that information in writing.

1.6    If the Partnership Council considers that the Equity Partner who is appealing appears
to be suffering from some physical or mental illness, it can require that the Equity
Partner is (on reasonable notice) medically examined by a medical practitioner
nominated for the purpose by the Senior Partner (the "**examining practitioner**"). If
the Senior Partner requires it, the Equity Partner must authorise and direct the Equity
Partner's own medical practitioner (or any specialist medical practitioner that may have
been consulted by the Equity Partner) to supply to the examining practitioner all
material information which the examining practitioner may need in order to carry out a
full and effective examination of the Equity Partner and to give a proper opinion as to
the state of the Equity Partner's physical and mental health. To the extent required to
give effect to these arrangements, the Equity Partner must waive and must authorise
and direct any other relevant person to waive (in relation to the Equity Partner and any
records, information or medical opinion relating to the Equity Partner or to the Equity
Partner's health known or available to the Equity Partner, the Equity Partner's own
medical practitioner or any specialist practitioner that may have been consulted by the
Equity Partner) all rights of confidentiality, privilege or similar rights in law so as to
permit full and unrestricted disclosure of all relevant records, information or medical
opinion to the examining practitioner.

The Equity Partner will be entitled to a copy of the report given by the examining
practitioner.

1.7    When the Managing Partner considers whether an Equity Partner who is subject to a
Performance Termination should be paid additional Equity Remuneration under
paragraph 1.9 of Schedule 15 the Partnership Council will normally:

    1.7.1    agree such additional Equity Remuneration only if the Equity Partner was
subject to Performance Termination pursuant to paragraph 1.4;

    1.7.2    limit such additional Equity Remuneration so that, when added to the Equity
Remuneration to which the Equity Partner was entitled from the date of the
Review Notice referred to in paragraph 1.4 until the Equity Partner's
Termination, it does not exceed the value of the Units which the Equity Partner
held and, but for Termination, would have held in the 12 months following the
date of the Review Notice (and if the period from the date of the Review Notice
until the Equity Partner's Termination exceeds 12 months, the Partnership
Council will not agree any additional Equity Remuneration); and

    1.7.3    require the Equity Partner to enter into documentation satisfactory to the
Partnership, including a waiver of any claims and a right of recovery or set-off
in respect of any sums payable to the Equity Partner under relevant local law.

1.8     The ELG will report annually to the Partnership Council on Termination Notices given to Equity Partners.

**Date Policy adopted: the Effective Date; amended 9 April 2007 and with effect from 1 March 2010; amended 11 June 2012; amended 23 April 2020; and amended 15 March 2024**

2.      **SUSPENSION: PARTNERSHIP COUNCIL POLICY**

2.1     This Policy is made under paragraphs 4 and 5 of Schedule 15.

This Policy shall be applied, with the necessary modifications, in relation to AP(E)s as if references to "Equity Partners" included references to AP(E)s.

In this Policy any reference to action to be taken by the Managing Partner includes the case where that action is for any reason taken by the Senior Partner or any two members of the Partnership Council appointed for the purpose by the Partnership Council to have the power and responsibilities of the Managing Partner or the Senior Partner, as provided in the Agreement.

If the Partnership Council appoints a committee to exercise its authority in relation to a Suspension Notice, references to the Partnership Council in this Policy will be construed accordingly.

2.2     A Suspension Notice must be in writing and must be signed by the Managing Partner.

2.3     A Suspension Notice must include the following matters or information:

2.3.1   the name of the Equity Partner who is to be suspended;

2.3.2   the date on which the suspension begins (which may be immediately the Suspension Notice is served);

2.3.3   the period of the suspension (which may be by reference to specific dates, the occurrence of specified events, or in such other manner as adequately describes the intended period of suspension); and

2.3.4   with reasonable particularity, the reason for the suspension.

2.4     A Suspension Notice may include any terms or requirements which will apply to the Equity Partner who is to be suspended, and the Managing Partner may at any time during the period of suspension specify additional terms or requirements or vary, suspend or revoke any terms or requirements previously imposed. The Managing Partner will have a complete discretion as to the terms or requirements which will apply to the Equity Partner during the period of suspension (but the Managing Partner will not be at liberty to impose any terms or requirements which are contrary to the terms of the Agreement). Unless in any particular case a Suspension Notice expressly states otherwise, every Suspension Notice:

2.4.1   will be deemed to incorporate the terms and requirements set out in paragraphs 4.7.1 to 4.7.5 of Schedule 15; and

2.4.2    will be deemed to incorporate a requirement that the Equity Partner will do or refrain from doing all such things as the Managing Partner or the Senior Partner will for any purpose require the Equity Partner to do (or to refrain from doing) in the usual course of Partnership business.

2.5    If the period of suspension specified in a Suspension Notice expires, and for any reason the matter which has given rise to the suspension has not been fully investigated or resolved to the satisfaction of the Managing Partner, the Managing Partner may extend the period of suspension for a further specified period (and thereafter for one or more subsequent further periods). The suspension will then continue on the same terms as applied during the preceding period of suspension (unless the Managing Partner at any time specifies other terms or requirements which are to apply to the Equity Partner for the subsequent period or periods of suspension).

2.6    If the Managing Partner considers that the Equity Partner who is suspended appears to be suffering from some physical or mental illness which may have given rise to the reasons or allegations which have resulted in the Equity Partner's suspension, the Managing Partner can require that the Equity Partner is (on reasonable notice) medically examined by a medical practitioner nominated for the purpose by the Managing Partner (the "**examining practitioner**"). If the Managing Partner requires it, the suspended Equity Partner must authorise and direct the suspended Equity Partner's own medical practitioner (or any specialist medical practitioner that may have been consulted by the Equity Partner) to supply to the examining practitioner all material information which the examining practitioner may need in order to carry out a full and effective examination of the suspended Equity Partner and to give a proper opinion as to the state of the suspended Equity Partner's physical and mental health. To the extent required to give effect to these arrangements, the suspended Equity Partner must waive and must authorise and direct any other relevant person to waive (in relation to the suspended Equity Partner and any records, information or medical opinion relating to the suspended Equity Partner or to the suspended Equity Partner's health known or available to the suspended Equity Partner, the suspended Equity Partner's own medical practitioner or any specialist practitioner that may have been consulted by the Equity Partner) all rights of confidentiality, privilege or similar rights in law so as to permit full and unrestricted disclosure of all relevant records, information or medical opinion to the examining practitioner.

The Equity Partner will be entitled to a copy of the report given by the examining practitioner. If, having been suspended for more than three months, the Equity Partner appeals to the Partnership Council against the suspension for any reasons which relate to the report of the examining practitioner, then in conducting that appeal the Partnership Council will have the right to require the Equity Partner to undergo further medical examinations by one or more other medical practitioners (the "**appeal practitioners**"), and for that purpose the Partnership Council may disclose to the appeal practitioners all the information supplied to the examining practitioner together with the report of the examining practitioner and such other material or information as the Equity Partner may request is provided to the appeal practitioners.

If, on the basis of the report obtained from the examining practitioner, or the appeal practitioners (as the case may be), it appears to the Managing Partner that the suspended Equity Partner's physical or mental health is such that the suspended Equity Partner will not be fit to resume duties as an Equity Partner within twelve months after the

suspension began, the Managing Partner may extend the period of suspension so that it runs for a period of twelve months. If the Equity Partner has been suspended for more than three months, the Equity Partner may appeal to the Partnership Council against the extension of the period of suspension under the procedures set out above. If the Equity Partner does not so appeal, or if the Equity Partner does appeal and the Partnership Council's decision is to uphold the extension of the period of suspension, then at the end of that twelve month period of suspension the Equity Partner will be treated for the purposes of the Partnership Agreement as having been unable to perform the applicable duties required as an Equity Partner by reason of physical or mental incapacity throughout that twelve month period, and therefore will be treated as having retired from the Partnership on the day on which that twelve month period ends.

**Date Policy adopted:**      **the Effective Date; amended with effect from 1 March 2010**

3.    **RETIREMENT OF AN EQUITY PARTNER WHO BECOMES PHYSICALLY OR MENTALLY INCAPACITATED:  PARTNERSHIP COUNCIL POLICY**

3.1    This Policy is made under paragraph 6 of Schedule 15.

This Policy shall be applied, with the necessary modifications, in relation to AP(E)s as if references to "Equity Partners" included references to AP(E)s.

3.2    If the Senior Partner considers that an Equity Partner has become physically or mentally incapacitated and is therefore unable to carry out the Equity Partner's responsibilities, the Senior Partner may at any time notify the Equity Partner in writing that the Equity Partner has become so physically or mentally incapacitated. The Senior Partner may also notify the Equity Partner of the date on which, for the purposes of paragraph 6 of Schedule 15, the physical or mental incapacity is to be treated as having begun. This notification by the Senior Partner is referred to as an "**Incapacity Notice**". As a matter of practice, the Senior Partner will normally serve an Incapacity Notice on an Equity Partner only at the time when and in circumstances where it is likely that the Equity Partner will be incapacitated for the twelve month period specified in the Agreement.

3.3    The Senior Partner, in giving an Incapacity Notice to an Equity Partner, and also on any subsequent occasion when a decision has to be made as to the physical or mental capacity of the Equity Partner, will take the advice of an appropriate medical practitioner. For these purposes the Senior Partner can require that the Equity Partner is (on reasonable notice) medically examined by a medical practitioner nominated for the purpose by the Senior Partner (the "**examining practitioner**"). If the Senior Partner requires it, the Equity Partner must authorise and direct the Equity Partner's own medical practitioner (or any specialist medical practitioner that may have been consulted by the Equity Partner) to supply to the examining practitioner all material information which the examining practitioner may need in order to carry out a full and effective examination of the Equity Partner and to give a proper opinion as to the state of the Equity Partner's physical and mental health. To the extent required to give effect to these arrangements, the Equity Partner must waive and must authorise and direct any other relevant person to waive (in relation to the Equity Partner and any records, information or medical opinion relating to the Equity Partner or to the Equity Partner's health known or available to the Equity Partner, the Equity Partner's own medical practitioner or any specialist practitioner that may have been consulted by the Equity

Policies under Schedule 15: Equity Partners' Termination, Immediate Termination, Suspension and
Retirement upon Physical or Mental Incapacity

Partner) all rights of confidentiality, privilege or similar rights in law so as to permit full and unrestricted disclosure of all relevant records, information or medical opinion to the examining practitioner.

3.4    The Equity Partner will be entitled to a copy of the report given by the examining practitioner. If the Equity Partner appeals to the Partnership Council under the procedures set out below, then in conducting that appeal the Partnership Council will have the right to require the Equity Partner to undergo further medical examinations by one or more other medical practitioners (the "**appeal practitioners**"), and for that purpose the Partnership Council may disclose to the appeal practitioners all the information supplied to the examining practitioner together with the report of the examining practitioner and such other material or information as the Equity Partner may request is provided to the appeal practitioners.

3.5    The Equity Partner who has received an Incapacity Notice may appeal against it to the Partnership Council. The appeal must be made in writing and submitted to the Senior Partner within 25 working days after the Incapacity Notice is given but the Senior Partner may extend this period if in the Senior Partner's opinion it is fair to the Equity Partner to do so. The Partnership Council will then decide whether the Incapacity Notice was justified and annul or confirm the Incapacity Notice accordingly.

The Partnership Council will decide the appeal on the basis of written material. The decision of the Partnership Council will be given in writing. On all matters relating to the Incapacity Notice, the decision of the Partnership Council will be final and binding.

The Partnership Council may, under paragraph 3.2 of Schedule 9 (*Governance and Management*), appoint a committee to conduct and decide an appeal. The Partnership Council will determine such procedural and other arrangements as it considers appropriate in the circumstances of each appeal.

3.6    When conducting an appeal against an Incapacity Notice, the Partnership Council may seek clarification of any issue from the Equity Partner concerned or from any member of the ELG.

If the Partnership Council obtains further information for the purposes of the appeal, the information should be recorded in writing and, where appropriate, made available to the ELG and the Equity Partner who is appealing so that they have the opportunity to comment on that information in writing.

3.7    If the decision of the Partnership Council is to annul the Incapacity Notice, the Equity Partner will not be treated, for the purposes of the Agreement, as physically or mentally incapacitated and therefore unable to perform the applicable duties as an Equity Partner by reason of the circumstances which led the Senior Partner to serve that Incapacity Notice on the Equity Partner.

3.8    If the decision of the Partnership Council is to confirm the Incapacity Notice, the Equity Partner will be treated, for the purposes of the Agreement, as physically or mentally incapacitated and in consequence of such incapacity unable to perform the applicable duties as an Equity Partner as from the date specified in the Incapacity Notice.

3.9    If at any time after an Incapacity Notice has been served on an Equity Partner, or at any time after, on appeal, the Partnership Council has confirmed an Incapacity Notice, and before the Equity Partner is treated under the Agreement as having retired from the Partnership, the physical or mental health of the Equity Partner improves to the extent that the Equity Partner is of the view that the applicable duties required can be performed by the Equity Partner, the Equity Partner may apply to the Partnership Council to annul the Incapacity Notice. In such a case the Equity Partner's application will be dealt with by the Partnership Council under the appeal arrangements set out above, resulting in a decision of the Partnership Council (which will be binding) to confirm or to annul the Incapacity Notice.

**Date Policy adopted:    the Effective Date; amended with effect from 1 March 2010**

**Policies under Schedule 18**

**Contracts and Documents: Partnership Council Policies**

1.   **CONTRACTS**

Each Partner will only make a contract on behalf of the Partnership or an Associated Firm within such limits on the relevant Partner's authority as are specified by the ELG from time to time.

2.   **DOCUMENTS**

2.1   The Partnership has a common seal.

2.2   A deed executed by the Partnership, whether or not by the affixing of its common seal, will only be duly executed if signed by:

  2.2.1   any two of the Senior Partner, the Managing Partner, the Executive Partner, the Designated Members or a person appointed by the ELG (or, if it has taken the relevant decision, a person appointed by the Partnership Council) who are Members (**"authorised signatories"**); or

  2.2.2   any one of the authorised signatories in the presence of a witness who attests the relevant signature.

  *(Amended 29 January 2010, with effect from 1 September 2014 and with effect from 15 March 2024)*

2.3   Any other document will be duly executed by the Partnership if signed by a Partner acting within such limits on the relevant Partner's authority as may be specified by the ELG from time to time.

*(Added with effect from 15 March 2024)*

2.4   A certificate signed by the Senior Partner, the Managing Partner or the Executive Partner who has not executed or signed such deed or document, stating that it has been executed or signed in accordance with these Policies, will be conclusive evidence for any third party that the Partnership is bound by the deed or document.

  **Date Policies adopted:          the Effective Date**